# EXHIBIT E

PATRICK E. STOCKALPER, SBN 156954
MOLSHREE GUPTA, SBN 275101
KJAR, MCKENNA & STOCKALPER, LLP
841 Apollo Street, Suite 100
El Segundo, California 90245
Telephone (424) 217-3026
Facsimile (424) 367-0400
pstockalper@kmslegal.com
mgupta@kmslegal.com

Attorneys for Defendants,
**COUNTY OF LOS ANGELES and SERGEANT TRAVIS KELLY (erroneously sued and served as "SHERIFF DEPUTY BADGE NUMBER 404532")**
*(Defendants is exempt from filing fees pursuant to Government Code § 6103)*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSHUA ASSIFF,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF LOS ANGELES;<br>SHERIFF DEPUTY BADGE<br>NUMBER 404532; And DOES 1<br>through 10,<br><br>Defendants. | **Case No.: 2:22-cv-05367 RGK(MAAx)**<br><br>**DEFENDANT COUNTY OF LOS ANGELES AND LOS ANGELES COUNTY SHERIFF'S DEPARTMENT RESPONSES TO PLAINTIFF'S REQUEST FOR PRODUCTION, SET ONE**<br><br>Action Filed: August 3, 2022<br>Pretrial Conference: July 10, 2023<br>Trial Date: July 25, 2023<br><br>Assigned to:<br>Hon. R. Gary Klausner, District Judge<br>Courtroom 850<br><br>All Discovery Matters Referred to:<br>Hon. Maria A. Audero, District Judge |

REQUESTING PARTY:        Plaintiff, JOSHUA ASSIFF

RESPONDING PARTY:       Defendant, COUNTY OF LOS ANGELES

SET NO.:                          ONE

1

DEFENDANT COUNTY OF LOS ANGELES AND LOS ANGELES COUNTY SHERIFF'S DEPARTMENT
RESPONSES TO PLAINTIFF'S REQUEST FOR PRODUCTION, SET ONE

**REQUEST FOR PRODUCTION NO. 1:**

Any and all DOCUMENTS CONCERNING the personnel records of Sergeant Travis Kelly. These records would include without limitation, performance evaluations, internal investigations, disciplinary records, training records, training officer and supervisor names, testing, promotional, transfer and job assignment records, arrest history, as well as any medical or psychological treatment records and all personnel complaints made by or against Sergeant Kelly by any member of the public or law enforcement agency.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

Objection, this request is vague, ambiguous, overbroad, and irrelevant; the request seeks the personnel files of "the personnel records of Sergeant Travis Kelly" without limitation in scope or time, such that the request seeks areas of information which bear no relationship to the claims presented in this case. The request is further objectionable in that it call for information protected from disclosure by the attorney client privilege and work product doctrine. The request is further objectionable in that it requests information protected by the right to privacy of third parties guaranteed by the California Constitution and the United States Constitution, First and Fourteenth Amendments. The request for production is further objectionable in that it is beyond the scope permissible under FRCP Rule 26.

Moreover, personnel files of government employees are considered official information. See, e.g., *Zaustinsky v. University of Cal.* (N.D. Cal. 1983) 96 F.R.D. 622, 625, aff'd, 782 F.2d 1055 (9th Cir.1985).  Federal common law recognizes a qualified privilege for official information.  *Kerr v. United States Dist. Ct. for N.D. Cal.* (9th Cir.1975) 511 F.2d 192, 198, aff'd, 426 U.S. 394, 96 S.Ct. 2119, 48 L.Ed.2d 725 (1976). In addition, the request seeks information protected by the self-critical privilege.  See *Dowling v. American Haw. Cruises* (9th Cir. 1992) 971 F.2d 423, 426.  Further, the information sought herein is protected from disclosure pursuant to California *Penal Code* §§ 832.7 and 832.8.

Responding Party further incorporates any and all objections to the information sought herein raised by and through its Stipulated Protective Order circulated to Propounding Party, by and through his counsel, on January 18, 2023.

Subject to and without waiving the foregoing objections, Responding Party responds as follows: Responding Party requests that Plaintiff meet and confer regarding the scope of the request, as the request currently seeks documents which are not discoverable and not reasonably calculated to lead to the discovery of admissible evidence. Furthermore, Responding Party requests that Plaintiff, by and through his counsel, execute the Stipulated Protective Order circulated to counsel on January 18, 2023, pursuant to which any responsive document may be produced. Discovery and investigation are continuing, and Responding Party reserves the right to supplement this response.

**REQUEST FOR PRODUCTION NO. 2:**

Any and all DOCUMENTS CONCERNING the policies and procedures of the Los Angeles County Sheriff's Department from January 2010 through the present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 2:**

Objection, this request is vague, ambiguous, overbroad, and irrelevant. The request for production is further objectionable in that it is beyond the scope permissible under FRCP Rule 26.

Subject to and without waiving the foregoing objections, Responding Party responds as follows: The "policies and procedures of the Los Angeles County Sheriff's Department" in effect on the date of the purported incident are publicly available at: https://pars.lasd.org/Viewer/Menu. Discovery and investigation are continuing, and Responding Party reserves the right to supplement this response.

**REQUEST FOR PRODUCTION NO. 3:**

Any and all DOCUMENTS CONCERNING the operating manual for the Los

1   Angeles County Sheriff's Department from January 2010 through the present.

2   **RESPONSE TO REQUEST FOR PRODUCTION NO. 3:**

3       Objection, this request is vague, ambiguous, overbroad, and irrelevant. The
4   request for production is further objectionable in that it is beyond the scope permissible
5   under FRCP Rule 26.

6       Subject to and without waiving the foregoing objections, Responding Party
7   responds as follows:  Responding Party does not understand what is meant by "operating
8   manual," and the terms are not defined in the request.  To the extent that Responding
9   Party understands "operating manual" to refer to the Department's manual of policies
10  and procedures, the same is publicly available at: https://pars.lasd.org/Viewer/Menu.
11  Discovery and investigation are continuing, and Responding Party reserves the right to
12  supplement this response.

13

14  **REQUEST FOR PRODUCTION NO. 4:**

15      Any and all DOCUMENTS CONCERNING the traffic stop policies and
16  procedures for the Los Angeles County Sheriff's Department from January 2010 through
17  the present.

18  **RESPONSE TO REQUEST FOR PRODUCTION NO. 4:**

19      Objection, this request is vague, ambiguous, overbroad, and irrelevant. The
20  request for production is further objectionable in that it is beyond the scope permissible
21  under FRCP Rule 26.

22      Subject to and without waiving the foregoing objections, Responding Party
23  responds as follows:  The "traffic stop policies and procedures of the Los Angeles
24  County Sheriff's Department" in effect on the date of the purported incident are publicly
25  available at: https://pars.lasd.org/Viewer/Menu.  To the extent that Responding Party
26  understands this request to demand the production of specific policies and procedures
27  pertaining and/or potentially applicable to to "traffic stops," Responding Party produces
28  them herewith as **Exhibit A**. Discovery and investigation are continuing, and

4

Responding Party reserves the right to supplement this response.

**REQUEST FOR PRODUCTION NO. 5:**

Any and all DOCUMENTS CONCERNING the use of force policies and procedures for the Los Angeles County Sheriff's Department from January 2010 through the present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 5:**

Objection, this request is vague, ambiguous, overbroad, and irrelevant. The request for production is further objectionable in that it is beyond the scope permissible under FRCP Rule 26.

Subject to and without waiving the foregoing objections, Responding Party responds as follows: The "use of force policies and procedures of the Los Angeles County Sheriff's Department" in effect on the date of the purported incident are publicly available at: https://pars.lasd.org/Viewer/Menu. To the extent that Responding Party understands this request to demand the production of specific policies and procedures pertaining and/or potentially applicable to "use of force," Responding Party produces them herewith as **Exhibit A**. Discovery and investigation are continuing, and Responding Party reserves the right to supplement this response.

**REQUEST FOR PRODUCTION NO. 6:**

Any and all DOCUMENTS CONCERNING Los Angeles County Sheriff's Department efforts to comply with the settlement agreement entered into with the United States Department of Justice filed on April 28, 2015 in USDC Case No. CV 15-03174.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

Objection, this request is vague, ambiguous, overbroad, and irrelevant. The request is further objectionable in that it call for information protected from disclosure by the attorney client privilege and work product doctrine. The request is further objectionable in that it requests information protected by the right to privacy of third

parties guaranteed by the California Constitution and the United States Constitution, First and Fourteenth Amendments. The request for production is further objectionable in that it is beyond the scope permissible under FRCP Rule 26.

Subject to and without waiving the foregoing objections, Responding Party responds as follows: Per Paragraph 21 of the First Amended Complaint, "the settlement agreement entered into with the United States Department of Justice filed on April 28, 2015 in USDC Case No. CV 15-03174" pertained to findings "that LASD's Antelope Valley stations have engaged in a pattern or practice of discriminatory and otherwise unlawful searches and seizures, including the use of unreasonable force, in violation of the Fourth Amendment, the Fourteenth Amendment…" Moreover, according to the "settlement agreement" referenced in this request, produced herewith as **Exhibit B**, it pertains to the "Los Angeles County Sheriff's Department Lancaster Station and Palmdale Station of the Antelope Valley…" (See Exhibit B, p. 3, ls. 2-4.)

Furthermore, the Defendants made initial disclosures in this matter on October 26, 2022 (prior Plaintiff filing his First Amended Complaint on December 14, 2022), which contained documents establishing that this incident arose out of the purported conduct of officer(s) assigned to the Santa Clarita Valley Station. As such, the "settlement agreement" referenced in this request, produced herewith as **Exhibit B**, does not pertain to this action. Discovery and investigation are continuing, and Responding Party reserves the right to supplement this response.

**REQUEST FOR PRODUCTION NO. 7:**

Any and all DOCUMENTS CONCERNING any COMMUNICATION to or from the United States Department of Justice CONCERNING any proposed modification and/or termination of the settlement agreement in USDC Case No. CV 15-03174 from April 28, 2015 to the present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**

Objection, this request is vague, ambiguous, overbroad, and irrelevant. The

request is further objectionable in that it call for information protected from disclosure by the attorney client privilege and work product doctrine. The request is further objectionable in that it requests information protected by the right to privacy of third parties guaranteed by the California Constitution and the United States Constitution, First and Fourteenth Amendments. The request for production is further objectionable in that it is beyond the scope permissible under FRCP Rule 26.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:  Per Paragraph 21 of the First Amended Complaint, "the settlement agreement entered into with the United States Department of Justice filed on April 28, 2015 in USDC Case No. CV 15-03174" pertained to findings "that LASD's Antelope Valley stations have engaged in a pattern or practice of discriminatory and otherwise unlawful searches and seizures, including the use of unreasonable force, in violation of the Fourth Amendment, the Fourteenth Amendment…"  Moreover, according to the "settlement agreement" referenced in this request, produced herewith as **Exhibit B**, it pertains to the "Los Angeles County Sheriff's Department Lancaster Station and Palmdale Station of the Antelope Valley…"  (See Exhibit B, p. 3, ls. 2-4.)

Furthermore, the Defendants made initial disclosures in this matter on October 26, 2022 (prior Plaintiff filing his First Amended Complaint on December 14, 2022), which contained documents establishing that this incident arose out of the purported conduct of officer(s) assigned to the Santa Clarita Valley Station.  As such, the "settlement agreement" referenced in this request, produced herewith as **Exhibit B**, does not pertain to this action.  Discovery and investigation are continuing, and Responding Party reserves the right to supplement this response.

## REQUEST FOR PRODUCTION NO. 8:

Any and all DOCUMENTS including without limitation any and all reports, statements, notes, documents, memoranda, photos, videos, audio recordings, emails, or texts — whether written, recorded or secured in digital format — CONCERNING any

arrest, investigation or surveillance of Plaintiff between September 23, 2021 and the present. This would include, without limitation, the body worn camera video of all LASD personnel participating or present during the arrest of Plaintiff, any surveillance video of Plaintiff captured during his arrest, detention or incarceration, any recorded interviews of Plaintiff during his arrest, detention or incarceration, and any recorded interviews of any witnesses and/or deputies involved in the arrest of Plaintiff.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**

Responding Party is unaware of any "arrest" or "surveillance" "of Plaintiff between September 23, 2021 and the present." As such, Responding Party does not believe that any such responsive documents ever existed.

However, to the extent that Responding Party understands the term "investigation" to include any and all interactions between "LASD personnel" and Plaintiff, Responding Party responds as follows: Responding Party believes that Plaintiff had interactions with "LASD personnel" after September 23, 2021 and will agree to produce available body worn camera video pursuant to Stipulated Protective Order. Responding Party requests that Plaintiff, by and through his counsel, execute the Stipulated Protective Order circulated to counsel on January 18, 2023, pursuant to which any responsive records can be produced. The stated interest is third party privacy. Discovery and investigation are continuing, and Responding Party reserves the right to supplement this response.

Dated: March 15, 2023                  KJAR, MCKENNA & STOCKALPER, LLP

By: _____
PATRICK E. STOCKALPER
MOLSHREE GUPTA
Attorneys for Defendants,
COUNTY OF LOS ANGELES and SERGEANT
TRAVIS KELLY

## VERIFICATION

STATE OF CALIFORNIA )
)
COUNTY OF LOS ANGELES )
)
)

I have read the foregoing DEFENDANT COUNTY OF LOS ANGELES AND LOS ANGELES COUNTY SHERIFF'S DEPARTMENT RESPONSES TO PLAINTIFF'S REQUEST FOR PRODUCTION, SET ONE and know of its contents.

I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

Executed on _____ 3/14 _____, 2023, at SANTA CLARITA California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

_____CAPTAIN DIEZ_____        _____
Type or Print Name                          Signature

# EXHIBIT A



Viewer ▸ Table of Contents ▸ View

<u>Field Operations Directives (FODs) (/Viewer/Manuals/13233?returnContentID=14376)</u>

# 01-016 Witness Detention or Transportation

‹ 02-001 Assisting LASD Detective Units or Other Law Enforcement Agencies in Tactical and Non-Tactical Operations (/Viewer/Manuals/13233/Content/14966)

01-014 Handling Suspicious Packages/Letters Re: Biological Hazard › (/Viewer/Manuals/13233/Content/14377)

## Los Angeles County Sheriff's Department
## FIELD OPERATIONS DIRECTIVE
Field Operations Support Services, (323) 890-5411



## WITNESS DETENTION OR TRANSPORTATION

### PURPOSE

The purpose of this directive is to reaffirm the Department's existing policy and practice and to establish a procedure for the proper detention or transportation of a witness from the scene of a crime to a patrol station or other location, pending further investigation (e.g. transporting potential homicide witnesses to the station for homicide investigations).

### OVERVIEW

In the past, law enforcement agencies have been sued for the <u>involuntary</u> transportation of a witness from a crime scene to a patrol station for investigative questioning. The Supreme Court has indicated its view that the line between detention and arrest is crossed when the police act without probable cause or a warrant, and forcibly remove a person from a location and transport him or her to a patrol station, where he or she is detained, although briefly, for investigative purposes. [*Michigan v. Summers*, 452 U.S. 692 (1981); *Orozco v. County of Yolo,* 814 F. Supp. 885 (1993)].

### POLICY

Upon arriving at a crime scene, deputies may conduct a _brief_ investigatory detention of persons who may have been in the immediate vicinity to determine their involvement in the crime, if any (i.e. persons may be suspects, aiders, or abettors).

Once a person is determined to be a witness only, deputies cannot detain the witness involuntarily. In the event that a witness possesses valuable information but will not consent to voluntarily remain at the scene or await interview by the handling detective or investigator, patrol deputies should attempt to do the following:

- Briefly determine the nature of the witness's information;
- Obtain valid identification;
- Determine when and where the witness can be contacted.

However, no individual _believed only to be a witness_ may be forced to remain at the scene or provide identifying information. In these cases, deputies should attempt to document identifying information [e.g. vehicle license numbers, photographs (see below)].

## **Photographing Witnesses**

No individual _believed only to be a witness_ may be forced to **pose** for a photograph without their consent. Area photographs, including individuals in plain view, may be taken without consent. Personnel equipped with "cop-cams" or vehicles equipped with "in-car video systems", may record information, including a witness' refusal to cooperate or provide information.

## **Written Consent to Transport Witness for Interview**

The Fourth Amendment is violated when the line between detention and arrest is crossed once a witness is _involuntarily_ transported to a patrol station and detained for investigative purposes.

Therefore, it shall be the policy of this Department that a consent waiver authorizing the voluntary transportation of the witness shall be signed by the witness, or by a person authorized to give consent, prior to transporting the witness to the patrol station for investigative or other purposes. The consent waiver may be typed or hand written and should contain language similar to that in the attached sample consent waiver form.

## **At the Station**

Witnesses should be separated and/or monitored to prevent information contamination or witness intimidation. Treat witnesses as guests and not as suspects. Witnesses should be allowed to use the telephone to notify a friend/family as to their whereabouts, and they should have access to restrooms, food, and drinks.

Upon request, the witnesses should be promptly transported back to their home or desired reasonable location.

## LOS ANGELES COUNTY SHERIFF'S DEPARTMENT

## <u>WITNESS TRANSPORTATION CONSENT FORM</u>

File No._____

## <u>CONSENT</u>

I,_____, understand that I am being asked by deputies from the Los Angeles County Sheriff's Department to go to the

_____

_____station for an interview.

Transportation to be by        __ my own personal means.

                                               __ police vehicle, for transportation only.

I hereby freely consent to this voluntary trip to the station, with the understanding that I have the right to refuse to consent. I acknowledge that I am <u>not</u> under arrest, that I am free to leave the station at any time I choose, and that return transportation will be provided for me, if requested.

Date:_____Signed:_____

## <u>PARENTAL CONSENT FOR MINORS</u>

I,_____, am the parent or guardian of the minor named above. I understand my rights as mentioned above and hereby consent to my child's voluntary transportation to the station.

Date:_____

Name:_____

(Print Name)

Signature:_____

Deputy Witness:_____     Emp. No:_____

Save Topic as PDF
(/Viewer/Manuals/GeneratePDF
reportIndex=0)

© 2022 - Los Angeles County Sheriff's Department - Version 2021.7.22.1

Back to Table of Contents
(/Viewer/Manuals/13233?
returnContentID=14376)

 Viewer ⟩ Table of Contents ⟩ View

Manual of Policy and Procedures (/Viewer/Manuals/10008?returnContentID=10235) / Volume 3 - Policy and Ethics (/Viewer/Manuals/10235?returnContentID=11239) / Chapter 10 - Force Policy (/Viewer/Manuals/11239?returnContentID=18743)

# 3-10/000.00 - Preamble to the Use of Force Policy

⟪ 3-09/340.00 - Department Information (/Viewer/Manuals/10008/Content/18848)

3-10/004.00 - Use of Force Terms Defined ⟩ (/Viewer/Manuals/10008/Content/18745)

The Los Angeles County Sheriff's Department is committed to upholding the rights secured or protected by the Constitution of the United States, while also maintaining the sanctity and preservation of life, human rights, and the dignity of every individual as described in Our Core Values, and doing so in a fair and unbiased manner. Sometimes it is necessary for Department members to use force in self-defense, defense of others, and during the execution of lawful duties. In all situations, Department members are required to conduct themselves in accordance with lawful and constitutional standards.

As leaders on the Department, all members shall view their duties in the context of safety for themselves and others, with an emphasis on respect, professionalism, and reverence for human life, even when force is necessary.

In cases where Department personnel must take action to conduct lawful duties where there is not necessarily an immediate physical threat, members shall take into account and communicate (where applicable) tactical considerations predicated on preventing the use of force whenever possible.

For planned tactical operations, such as service of warrants, parole compliance searches, tactical cell extractions, and prolonged passive resistance, members shall develop a tactical plan predicated on preventing the use of force whenever possible. Supervisors shall be present during planned tactical operations.

The Department is committed to upholding lawful, professional, and ethical standards through assertive leadership and supervision before, during, and after force incidents. This includes force prevention efforts, effective tactics, dispassionate and objective review, and analysis of every incident.

Save Topic as PDF (/Viewer/Manuals/GeneratePDF? reportIndex=0)

Back to Table of Contents

© 2022 - Los Angeles County Sheriff's Department - Version 2021.7.22.1

Case 2:22-cv-05367-RGK-MAA - Document 48-1   Filed 05/24/23   Page 17 of 187
Page ID #:608



Manual of Policy and Procedures (/Viewer/Manuals/10008?returnContentID=10235) / Volume 3 - Policy and Ethics (/Viewer/Manuals/10235?returnContentID=11239) / Chapter 10 - Force Policy (/Viewer/Manuals/11239?returnContentID=18747)

# 3-10/009.00 - Force Prevention and De-escalation Principles

‹ 3-10/004.00 - Use of Force Terms Defined (/Viewer/Manuals/10008/Content/18745)

3-10/020.00 - Use of Force Policy › (/Viewer/Manuals/10008/Content/18748)

Department members shall only use that level of force which is objectively reasonable, and force should be used as a last resort.  Whenever feasible, Department members should endeavor to de-escalate confrontations through tactical communication, crisis intervention, advisements, warnings, verbal persuasion, and other common sense methods (such as utilizing alternative tactics) which can prevent the need to use force, or reduce the amount of force, that is required.

When force must be used, deputies and staff shall endeavor to use restraint techniques when possible, and use only that level of force necessary for the situation, de-escalate force immediately as resistance decreases, and discontinue using force once a threat or resistance no longer exists.

Physical force shall not be used against individuals in restraints, except as objectively reasonable to prevent their escape, prevent the destruction of property, or prevent imminent bodily injury to the suspect, the Department member, or another person. In these situations, only a proportional amount of force necessary to control the situation shall be used.

De-escalation may not be appropriate in every situation and Department members are not required to place themselves in unnecessary danger or use de-escalation techniques in every instance.

Save Topic as PDF (/Viewer/Manuals/GeneratePDF?reportIndex=0)

Back to Table of Contents (/Viewer/Manuals/11239?returnContentID=18747)

© 2022 - Los Angeles County Sheriff's Department - Version 2021.7.22.1



Manual of Policy and Procedures (/Viewer/Manuals/10008?returnContentID=10235) / Volume 3 - Policy and Ethics (/Viewer/Manuals/10235?returnContentID=11239) / Chapter 10 - Force Policy (/Viewer/Manuals/11239?returnContentID=18755)

# 3-10/035.00 - Retaliatory Force

‹ 3-10/030.00 - Unreasonable Force and Duty to Intervene (/Viewer/Manuals/10008/Content/18749)

3-10/038.00 - Reportable Use of Force and Force Categories › (/Viewer/Manuals/10008/Content/18756)

Department members are prohibited from using force that is retaliatory in nature, particularly against subjects who only express criticism of, or disrespect for Department members.

Save Topic as PDF (/Viewer/Manuals/GeneratePDF?reportIndex=0)

Back to Table of Contents (/Viewer/Manuals/11239?returnContentID=18755)

(© 2022 - Los Angeles County Sheriff's Department - Version 2021.7.22.1



Manual of Policy and Procedures (/Viewer/Manuals/10008?returnContentID=10235) / Volume 3 - Policy and Ethics (/Viewer/Manuals/10235?returnContentID=11239) / Chapter 10 - Force Policy (/Viewer/Manuals/11239?returnContentID=15637)

# 3-10/150.00 - Tactical Incidents

‹ 3-10/140.00 - Executive Force Review Committee (/Viewer/Manuals/10008/Content/11256)

3-10/170.00 - Hobbling Definition and Procedure › (/Viewer/Manuals/10008/Content/19200)

The fundamental duty of all Department members is to protect life and property.

Department members shall be guided by sound tactical principles when involved in any tactical incident.  The tactics employed by Department members shall be governed by applicable Department policies, accepted training practices, the exigency of the circumstances, and the application of sound judgment and common sense.  Adherence to policies, training, and supervision is critical in preventing an unreasonable response to fear and resolving incidents in the safest manner possible.  When reasonable under the totality of circumstances, Department members should use de-escalation techniques such as advisements, verbal persuasion, and other force prevention tactics focused on increasing officer and/or public safety.  The Department's Core Values, a reverence for human life, and the safety of all parties shall be considered when deciding on a resolution to a tactical incident.

Following any tactical incident, regardless of significance, the conduct of Department members may be evaluated for compliance with established Department policies and state and federal statutes.  A primary consideration in determining sound tactics is whether the actions by Department members increase or decrease officer safety, and/or public safety.  All Department members shall be prepared to clearly articulate the circumstances which supported their decisions.

NOTE:    Tactical incidents include, but are not limited to: responses to crimes in progress, building searches and/or area containment, barricaded suspects, hostage situations, active shooters, foot or vehicle pursuits, pedestrian or traffic stops, missing persons, and <u>any</u> other law enforcement situation where sound principles and tactics should be employed.

The concepts commonly referred to as the six "C"s - COMMAND, CONTAIN, CONTROL, COMMUNICATE, COORDINATE, and CONTINGENCY - shall serve as a guide for all Department members involved.

Tactical incidents commonly share characteristics which must be constantly evaluated and, in most cases, analyzed to ensure a successful conclusion and enhance officer safety in future similar events. A seventh "C" - CRITIQUE - is equally important and shall be performed at the conclusion of any tactical incident.

The scope and sophistication of this critique (commonly referred to as a "debriefing") shall be dictated by the scope and sophistication of the incident. The critique should include a comprehensive analysis of those tactics and techniques which contributed to the success of the operation, while thoroughly evaluating those which proved unproductive. The critique shall be performed in a timely manner (preferably immediately following the event), attended by all involved members and, when appropriate, facilitated by a supervisor. Discretion shall be used by supervisors when critiquing actions which appear to be in violation of Department policy or established law. Supervisors and managers shall make every effort to maintain the technical and tactical proficiency of their subordinates through training, debriefings, tactical discussions, and engaged supervision.

Incident Command

Department members at the scene of, or directly involved in, a tactical incident shall demonstrate regard for incident command. In addition, all Department members have a positive duty to actively provide appropriate coordination and ensure communication is shared among participating Department members.

To ensure clarity, avoid confusion, and minimize risk to those involved, the following list of commonly used leadership/incident command terms and their definitions/significance is provided. All Department members shall expect that their conduct may be evaluated based on their adherence to the following principles.

| Command | The exercise of **complete authority** to direct the actions of others during a tactical incident. |
|---|---|
| Communication | Accomplished by radio, telephone, direct voice, hand and arm signals, or any other means in which the recipient(s) receives and understands the message and intent. |
| Contain | A coordinated response for the purpose of isolating and apprehending a person(s) attempting to avoid arrest, detention, or detection, or to locate critically missing person(s). |
| Contingency | A backup plan or the coordinated process of considering a future, unplanned event. |
| Control | When a supervisor or Department member is able to communicate with and coordinate or direct the actions of other Department members. |

| Coordination | When command Department members are able to organize and direct the actions of all Department members at the scene of a tactical operation to reduce friction, eliminate conflict(s), and integrate efforts to achieve a successful resolution to a specific mission. |
|---|---|
| Critique | A comprehensive debriefing conducted with all Department members involved in an incident to discuss tactics and other issues identified during a tactical operation.  The critique should include a comprehensive analysis of those tactics and techniques which contributed to the success of the operation, while thoroughly evaluating those which proved unproductive.  The critique shall be performed in a timely manner (preferably immediately following the event), attended by all involved members and, when appropriate, facilitated by a supervisor. |
| Tactical Dilemma | A choice between two or more disagreeable alternatives.  The goal of every adversarial operation is to place the suspect in a position where surrender is likely and resistance is futile. Dilemmas can be created with space or time. |

<u>High Risk or Armed Suspects</u>

The intent of this section is to increase the safety of Department members and minimize the potential for Department member created jeopardy where Department members place themselves unnecessarily in harm's way.

When dealing with a high risk or suspected armed suspect, Department members shall be cautiously persistent in performing their duties.  Consistent with this philosophy, while every situation is not absolute, in many cases, it may be safer to chase to contain rather than chase to apprehend.

This policy shall be considered when assessing the tactical performance of Department members involved in deadly force situations.  Moreover, the following specific tactical considerations should be utilized when a Department member is confronting high risk or armed suspects.

<u>Specific Tactical Considerations</u>

Similarly, the following list of definitions and their significance are general principles which shall be considered and/or employed by all Department members involved in a tactical operation (where appropriate).

| Concealment | Anything which conceals a person from view. |
|---|---|

| Cover | Anything which provides protection from bullets or other projectiles fired or thrown.  Cover is subjective and its effectiveness depends upon the threat's ballistic capability (handgun, rifle, etc...). |
|---|---|
| Cover Fire | Target specific controlled fire which is directed at an adversary who poses an imminent and ongoing lethal threat.  This tactic shall only be utilized when the use of deadly force is legally justified.  Target acquisition and communication are key elements in the successful use of this tactic.  Department members employing cover fire must establish their reason(s) for utilizing this tactic. |
| Tactics | The methods and concepts used to accomplish a particular objective or mission. |
| Cross Fire | A situation created when Department members find themselves in a position where their field of fire and/or shooting backdrop is occupied by another Department member who may engage the same intended target. |
| Danger Area | Any area which lacks or has limited cover and avenues of escape and offers a significant advantage to an adversary (doorway, hallway, staircase, alley, open area, etc.). |
| Designated Shooter | Department members assigned to deploy a firearm to protect other Department members performing a specific mission in an operation and otherwise unable to defend themselves.  Designated shooters are responsible for covering a specific threat while other Department members involved in the operation perform specific tasks that may require their weapon be holstered or secured.  These specific tasks include, but are not limited to: searches of suspects, arrest teams deployment of less lethal weapons, crowd control, and employees involved in K-9 searches. |
| Field of Fire | The lane of fire between a shooter and an intended target that will likely be subjected to the impact of fired rounds.  A field of fire is not restricted to a direct line between the shooter and intended target, but may be altered as a result of ricochets or skipped or fragmented rounds.  A field of fire is limited by the individual characteristics of the weapon deployed. |
| Fire Discipline | A controlled and measured rate of gunfire, usually two or three round bursts, which emphasizes maximum accuracy and efficiency and is achieved through constant reassessment and target re-acquisition (if necessary). |

| Independent Action | Any independent act taken outside a plan and/or without communicating or coordinating intentions with other involved Department members. |
|---|---|
| Kill Zone | An area in which concentrated fire is intended to neutralize an adversary by exploiting terrain and the impact of fire. |
| Partner Splitting | Partner splitting during a foot pursuit occurs when loss of visual contact, distance, or obstacles, separates partners to a degree that they cannot immediately assist each other should a confrontation take place. |
| Point of Aim | The specific location the muzzle of a weapon is directed and a fired round is intended to strike. |
| Shooting Backdrop | An area behind an intended target which may be subjected to the impact of rounds fired from a weapon.  A shooting backdrop will rarely be static as it will change as the target and/or shooter change their position and point of aim. |
| Sight Alignment | When the top of the front sight is even with the top of the rear sight and there is an equal amount of light visible on either side of the front sight combat shooting sight alignment is defined as the use of the front sight blade only and is generally used at close distances, usually under 15 feet. |
| Target Acquisition | The practice of identifying a specific threat and placing that threat within point of aim or sight alignment. |
| Tactical Position of Advantage | A position which maximizes the ability to control, monitor, or engage a threat in the safest manner possible. |

Save Topic as PDF
(/Viewer/Manuals/GeneratePDF?
reportIndex=0)

(© 2022 - Los Angeles County Sheriff's Department - Version 2021.7.22.1

Back to Table of Contents
(/Viewer/Manuals/11239?



Training Bureau Material (/Viewer/Manuals/14494?returnContentID=14534) / Field Operations
Training Unit (FOTU) Material (/Viewer/Manuals/14534?returnContentID=14959)

# Arrest and Control Techniques

‹ Arrest and Control/Driviers Training (/Viewer/Manuals/14494/Content/14958)

The Decision Making Process » (/Viewer/Manuals/14494/Content/14742)

**LOS ANGELES COUNTY SHERIFF DEPARTMENT**

**CONTINUED PROFESSIONAL TRAINING**

**POST PERISHABLE SKILLS PROGRAM**

**III - ARREST AND CONTROL TECHNIQUES**

(Sections I.- V. Are presented in the form of a lecture)

(Sections VI.- VIII. Are presented in the form of demonstration/practical application)

I. **REGISTRATION AND ORIENTATION**                **III (a,b)**

   A. Introduction, Registration and Orientation

   B. Safety Orientation

   C. Course Objectives/Overview, Exercises, Evaluation/Testing

II. **USE OF FORCE POLICIES AND LEGAL ISSUES**     **(Lecture)**        **III (g,j)**

   A. LASD Use of Force Policy

      1. Review Department Policy and advise of any changes

         a.   Participating agencies attending the course will be advised to

            review and be familiar with their department policies

2. Review Situational Use of Force Options Chart

B. Case Law Update, report documentation and policy

1. Graham v. Connor

2. Tennessee v. Garner

3. Terry v. Ohio

4. Young v. County of Los Angeles

5. Hayes v. County of San Diego

III. **BODY PHYSICS AND DYNAMICS/SUSPECT REACTION TO FORCE**     **III (h)**

A.     Constant Assessment during a use of force

1.     Yourself

2.     Suspect

3.     Surroundings

B.     Escalation / De-escalation

1.     Based on suspect's reaction to force applied

2.     Ability to escalate use of force

3.     Responsibility to de-escalate use of force

4.     Force option selected needs to correlate with the suspect's behavior

IV. **PHYSICAL CONDITIONING**     **III (a)**

A.     Three Biggest Disablers

1. Heart Attacks

2. Lower Back and Knee Injuries

3. Peptic Ulcers

B.     How to Reduce Individual Risk to Above Disablers

1.     Nutrition

2.  Rest

3.  Cardio/weight training (crossfit, MMA, etc…)

4.  Relaxing hobbies

V.  **PRACTICAL APPLICATION/TESTING  (Explanation)**                    **III (b)**

A.  Demonstration

1. During the practical application phase (VI, VII, VII) each exercise /technique will be demonstrated by the instructor(s).

2. Instructor(s) will use the "**IDEA** Principal" as the teaching method

3.  Demonstrate using the "**IDEA** Principal"

a.    **I**ntroduce (Tell the students what exercise/technique   they will be learning)

b.    **D**emonstrate (Live Speed)

c.    **E**xplain (Break down technique)

d.    **A**pply (Practical application)

4.  Each technique/exercise will taught using this method

5.  Students will work through each technique/exercise

a.    For each technique/exercise, students will pair up with one another

b.    Students will complete a number of repetitions (To be determined by the instructor)

c.    Students will then be evaluated by the instructor(s) (see VII TESTING)

B.  Practical Application

1.  Each student will be evaluated on their performance of each exercise/ technique during the practical application process.

2.    If the student successfully performs each exercise/technique to the satisfaction of the instructor(s), they successfully pass the course.

3.    Any student falling below standards on any exercise/technique, as established by the instructor(s), will be remediated and tested until standard is achieved

4.     Techniques that each student will be tested on during practical application

a. Handcuffing

   1.     Speed cuffing

   2.     Handcuffing during searching

b. Personal Weapons

   1.     Punches

   2.     Kicks

   3.     Knees

   4.     Elbows

c. Footwork

   1.     V-step

   2.     Forward/Rear shuffle

   3.     Right/Left shuffle

   4.     Pivoting

d.     Escort positions

   1.     Firm Grip/Close Grip/'C"-Grip

      a)     Arm Control

      b)     Wrist Control (Finger Flex)

      c)     Hammer Lock (Shoulder)

      d)     Americana (key lock)

e.     Takedowns

   1.     Cursory

   2.     From Escort Positions

## VI.      SAFETY ORIENTATION AND WARM-UP                                    III (a)

    A.    Review of Safety Policies and injury precautions

        1.    Orientate students with the following:

            a.    Restrooms/Facility Layout

            b.    Fire Escape Routes

            c.    First Aid Kit Locations

            d.    Designated Medical Facilities for Treatment

            B.    Students will participate in warm-up/stretching exercises

                1.    Warm-Up **(Practical Application)**

            a.    Identify if any students have any injuries or physical limitations

b.    Dynamic exercises to raise the body's core temperature

                        c.    Exercises to target specific muscle groups that will be used

                        during the training

                2.    Stretching

                    a.    Only stretching muscles when they are warmed up

              b.    Stretching the specific muscle groups that will be used during the training

                    c.    Stretching both before and after training session is optimal

## VII.     BODY BALANCE/STANCES/FOOTWORK AND PERSONAL         III (b,f,i)
        WEAPONS

    A.    Footwork Review

1.      Instructors will demonstrate the following techniques by using the "IDEA" Principal

a.      Forward/Rear shuffle

(1)      Students will start in their fighting stance and move forward or backwards by taking a step with the lead leg to move in the desired direction. The trailing leg will also step in the same direction, bringing them back into a fighting stance.  The number of shuffle steps for each direction will be determined by the instructor(s).

b.      Right/Left shuffle

(1)      Students will start in a "fighting stance" and move right or left by taking a step with the lead leg to move in the desired direction. The trailing leg will also step in the same direction, bringing them back into a "fighting stance."  The number of shuffle steps for each direction will be determined by the instructor(s)

c.      "V" step Right/Left

(1)      Students will start in a neutral stance and take forward step out with their left or right leg at a 45 degree angle.  They will then return to a neutral stance and then step out with the opposite leg at a 45 degree angle, finishing in a neutral stance.  The number of "V" steps for each direction will be determined by the instructor(s).

d.      Pivot Right/Left

(1)      Students will start in a "fighting stance" and practice pivoting on their lead or rear foot, while maintaining a "fighting stance."

e.      Shuffle/Pivot

(1)      Students will incorporate a Shuffle step in any direction and then pivot on either foot, all while maintaining a "fighting stance."

f.      Establishing a proper defensive ground position

(1)      Students will lie on their backs, with their head not touching the ground or mat, feet flat on the ground and close to their buttocks, hands out and away from their body to protect their face.

        g.        Access to equipment on duty belt while in a fighting stance and on the ground

        (1)        Points will be made regarding the availability to use or access various equipment or tools from a standing/kneeling/ground position.

        h.  Tactical Get-ups

        (1)        Students will practice getting up off the ground using both their left and right hands as a base, while maintaining balance and control.

B.      Personal Weapons

      1.      Instructors will demonstrate the following techniques by using the "IDEA" Principal

      2.      One student will hold a punching/kicking pad (In the desired position as demonstrated by the instructor), as the other student strikes the pad with the appropriate personal weapon(s)

      3.      Importance of using verbal commands: good for documentation, recorded audio/video (evidence), helps Officer/Deputy with breathing, suspect may comply….etc

a.      Straight Punches

      (1)      Student strikes the pad with both left and right fist, concentrating on making contact with the first two big knuckles of the hand.  The strike travels in a straight line from their face to the pad.

b.      Hammer Fists

      (1)      Students will use the edge of the fist (meaty portion of the hand between the pinky and the wrist) to strike the pad.  The strike normally travels from the face to the pad in a downward direction, leading with the pinky side of the fist (pinky side down facing the pad).

c.      Palm Heel Strikes

      (1)      Students will use an open hand to strike the pad.  Fingers will can be fully extended or curled down, leaving the palm exposed.  Emphasis will be made on flexing the hand back, exposing the meaty portion of the palm to make impact with.

d.      Front kicks

(1)    Students will use their left and right leg to kick the pad.

Emphasis will be made on first lifting the knee and then extending the leg to make contact with the pad.  Students will be using the instep of their foot to the bottom of the shin area, to contact the pad.

e.    Knees

(1)    While controlling their training partner in a modified clinch. Students will use their left and right knee to deliver Strikes to the pad. Emphasis will be made on using the tip of the knee to deliver the strikes.

f.    elbows

(1)    Students will practice our seven basic elbows by performing the strikes towards an imaginary target (no contact to a pad initially).  After several dry runs without a pad, students will pair up and strike the pad that their training partner is holding.

## VIII.  SEARCH TECHNIQUES/CONTROL HOLDS/TAKEDOWNS/    III (c,d,e,f,k)

## HANDCUFFING/DE-ESCALATION, VERBAL COMMANDS

A.    Overview on restraint devices and need to double lock and check for tightness

1.    Suspect cannot be handcuffed due to injuries

a.    First Aid - Suspect injured, wounds, fractures

b.    Special circumstances (medical, missing limbs)

c.    Complaint of pain should be reported and documented

d.    Failing to double lock handcuffs can result in injury to suspect and liability to an agency

B.    Overview of Suspect control, stationary or moving

1.    Firm Grip

a.    Students will use a "firm grip" control hold to escort their partner around.

               b.         Student playing the role of the "suspect" will not resist

               c.         Both students will play the role of the deputy/officer and suspect

2.      Close Grip

               a.         Students will use a "close grip" control hold to escort their partner around

3.      Control Holds

      a.     Control hold options based off of a suspect's actions

      (1)     Rear Finger flex

          (a)    Suspect pulls his hand towards his low back

        (2)     Hammer Lock/Shoulder Control

              (a)     Suspect tries to elbow Officer/Deputy in the face by pulling arm up/ leading with the elbow

        (3)     Arm bar control

               (a)      Suspect pulls his hand away from Officer/Deputy towards his own body

        (4)     Americana/"Keylock"

              (a)     Suspect pulls his hand up towards his own face/head

4.   Takedown options

a.   Different ways to transition to a takedown from each control Hold

C.     Unknown Risk handcuffing techniques

      1.     Cursory/Visual Search

               a.         One student will play the role of the suspect and one be the Officer/Deputy

               b.         They will review the cursory searching techniques by conducting a search of their training partner.  Once a thorough cursory search is completed, the students will switch roles.

      2.     Speed handcuffing

        a.     Both Students will practice speed handcuffing and un-handcuffing in a safe tactical manner (as demonstrated by the instructor(s).

3.     Standing Modified Search, to rear wrist lock and handcuffing

        a.     Both Students will practice searching each other from different positions, while standing.  They will then practice using the rear wrist lock and speed handcuffing.

4.     Takedown from cursory search

        a.     The type of takedown depends on the suspect's weight distribution

        (1)     Cursory Takedown

        (2)     Rear Leg Trip

        (3)     Single Leg Ankle Pick

b.     Disengaging, escalating, de-escalating with suspect and movement to more appropriate weapon (impact weapon, chemical agent, firearm, etc.) on duty belt.

D.     High Risk Search/Contacts

1.     High Risk Kneeling

        a.     Students will pair up, one playing the role of the Officer/Deputy, the other playing the role of the suspect

        (1)     Verbal Commands

        (2)     Control hands and transition to rear wrist lock

        (3)     Search (high risk area/waist & front R pocket)

        (4)     Handcuffing

        (5)     Move to safe area and thoroughly search

2.     High Risk Prone

        a.     Students will pair up, one playing the role of the Officer/Deputy, the other playing the role of the suspect

        (1)     Verbal Commands

        (2)     Prone Control (3 points of contact to rear arm lock)

      (3)     Search (back waist band area)

      (4)     Handcuffing

      (5)     Move to safe area and thoroughly search

**Students will practice their footwork and utilize verbal commands during the practical application portion of the course.**

    E.     Review

        1.     Legal Standing

        2.     Constant assessment during the use of force

           a.     Escalation

           b.     De-escalation

        3.     Goal of using force

           a.     Stop the threat

   b.    Gain safe control of the suspect/situation

4.    Elements of using Force

   a.    Knowing what we can do

   b.    Being able to physically and mentally win

   c.    Being able to clearly explain what we did and why

Save Topic as PDF
(/Viewer/Manuals/GeneratePDF?
reportIndex=0)

© 2022 - Los Angeles County Sheriff's Department - Version 2021.7.22.1

Back to Table of Contents
(/Viewer/Manuals/14534?
returnContentID=14959)



Training Bureau Material (/Viewer/Manuals/14494?returnContentID=14534) / Field Operations Training Unit (FOTU) Material (/Viewer/Manuals/14534?returnContentID=14958)

# Arrest and Control/Driviers Training

≪ Driver's Training Update (/Viewer/Manuals/14494/Content/14972)

Arrest and Control Techniques ≫ (/Viewer/Manuals/14494/Content/14959)

**LOS ANGELES COUNTY SHERIFF DEPARTMENT**

**CONTINUED PROFESSIONAL TRAINING**

**POST PERISHABLE SKILLS PROGRAM**

**ARREST & CONTROL/DRIVER TRAINING (PSP) - 1820-29515**


**III - ARREST AND CONTROL**



I. REGISTRATION AND ORIENTATION                    **III(a,b)**


    A. Introduction, Registration and Orientation

    B. Safety Orientation

    C. Course Objectives/Overview, Exercises, Evaluation/Testing


II. USE OF FORCE POLICIES AND LEGAL ISSUES                    **III(g,,j)**


    A. LASD Use of Force Policy

        1. Review Department Policy and advise of any changes

        2. Review Situational Use of Force Options Chart

12/1/22, 11:19 AM    Case 2:22-cv-05367-RGK-MAA    Document 48-11    Filed 05/24/23    Page 37 of 187
Arrest and Control / Advanced Training / eBook Viewer
Page ID #:628

B. Case Law Update, report documentation and policy

    1. Graham v Connor

    2. Tennessee v Garner

    3. Terry v Ohio

    4. Forrester v San Diego

    5. Long Beach v Long Beach POA

C. Local Policies

III. BODY PHYSICS AND DYNAMICS/SUSPECT REACTION TO FORCE        **III(h)**

    A. Suspect attacks officer

    B. Locking resistance (protesters, rioters)

    C. Going limp (should not use term passive resistive)

    D. Resisting with apparatus (chaining to objects, using large arm pipes)

    E. Use of pain compliance/pressure points/distraction techniques

    F. Mental conditioning for arrest control-Color-coding

        1. White = relaxed frame of mind (complacent and dangerous)

        2. Yellow = general awareness, minimum level of awareness in uniform

        3. Orange = specific awareness (clues, reactions, senses, possible red flags)

            1. Checklist of six used on initial approach with subject

                1. Hands

                2. Cover

                3. Weapons/bulges

                4. Associates, subjects and officers (resources available)

                5. Escape routes, subjects - tactical retreat, deputy

                6. Footing/balance, deputy's ability to stay on his/her feet

        4. Red = fight or flight

IV. PHYSICAL CONDITIONING                            **III(a)**

        A.     Three Biggest Disablers

    1. Heart Attacks

    2. Lower Back and Knee Injuries

    3. Peptic Ulcers

B.        How to Reduce Individual Risk to Above Disablers

1.                Nutrition
2.                Cardio/Weight lifting fitness program
3.                Life threatening physical altercations, 90 seconds of explosive endurance

V. SAFETY ORIENTATION AND WARM-UP                              III(a)

A.        Review of Safety Policies and injury precautions
B.        Students will participate in warm-up/stretching exercises

VI. BODY BALANCE/STANCE & MOVEMENT FROM POSITION OF INTERVIEW AND FIGHTING
STANCE                                                       III(i)

Footwork Review

    A. Forward/Rear shuffle
    B. Right/Left shuffle
    C. "V" step Right/Left
    D. Pivot Right/Left

E. Shuffle pivot

F. How to fall to the ground safely and assume a fighting position

G. Access to equipment on duty belt while in a fighting stance and on the ground


VII. FLASHLIGHT AS A DEFENSIVE WEAPON/STRAIGHT BATON TECHNIQUES, DE-
ESCALATION/FIRST AID/VERBAL COMMANDS           **III(e,f,i,j,k)**


A. Blocks

    1. High block

    2. Low block

    3. Strong side block

    4. Weak side block

    5. Center block


B. Strikes

    1. Review Impact Weapon Striking Chart

    2. Seven striking angles (same for flashlight and straight baton)

    3. Escalation/De-escalation

    4. Verbal Commands


C. First Aid/Medical Treatment

D. Reporting of Force to Supervisor


**Students will practice footwork and utilize verbal commands while practicing/demonstrating the techniques on training bags and live suspect.**

VII. SEARCH TECHNIQUES/CONTROL HOLD/TAKEDOWN/HANDCUFFING DE-ESCALATION, VERBAL
COMMANDS                                III(c,d,e,f,j,k)

A.      Overview on restraint devices and need to double lock and check for tightness
    1. Suspect cannot be handcuffed due to injuries
        1. First Aid - Suspect injured, wounds, fractures
        2. Special circumstances (medical, missing limbs)
        3. Complaint of pain should be reported and documented
        4. Failing to double lock handcuffs can result in injury to suspect and liability to an
           agency (LAPD $15 mil. to surgeon)

D. Unknown Risk Handcuffing techniques
    1. Cursory/Visual Search
        1. Speed handcuffing

    2. Standing Modified Search, to rear wrist lock and handcuffing
    3. Takedown from standing modified, disengaging, escalating, de-escalating with suspect and
       movement to more appropriate weapon (impact weapon, chemical agent, firearm, etc.) on
       duty belt.

E. High Risk kneeling or prone handcuffing
    1. High Risk Kneeling
        1. Verbal Commands
        2. Control hands and transition to rear wrist lock
        3. Search (high risk area)
        4. Handcuffing
        5. Thorough Search

    2. High Risk Prone
        1. Verbal Commands
        2. Prone Control (3 points of contact to rear arm lock)
        3. Search (back waist band area)
        4. Handcuffing
        5. Move to safe area and thoroughly search

VIII. GROUND CONTROL/CAROTID RESTRAINT/T.A.R.P./HOBBLE          III(d,e,i,j,k)

    C. Ground Control

        1. Body Positioning/Weight/Space

        2. Always be aware of your weapons

        3. Never roll on to your stomach

    D. Escaping the mounted position

        1. If possible, always roll over your gun side

        2. Trap and pin suspect's arm and foot

        3. Thrust your hips up and roll over on top of the suspect

    E. Escaping the guard position

        1. Place your hands onto the suspect's stomach

        2. Push both elbows into the suspect's inner thigh on nerve

    F. Carotid Restraint

        1. Level I

        2. Level II

        3. Chancery

        4. Department Policy

        5. First Aid

    G. T.A.R.P./Hobble

        1. Hobble

            a. Explain approved model

            b. Used to restrain legs and arms

            2.      T.A.R.P.

    a.                Explain difference

    b.                Demonstrate how to trap the legs

    c.                Wrap hobble around both feet and tighten

    d.                Drop between legs and pull hook end around the thigh

    e.                Hook to handcuffs and place suspect in the seated position

    f.                Explain Policy

g.                First Aid

IX. TESTING/REMEDIATION                                III(b)

**Testing: Any student scoring below standard on any exercise, as established by the instructor, will be remediated, tested until standard is achieved.**

## DRIVER TRAINING (PSP)

-

I.        REGISTRATION AND ORIENTATION

A.        Preparation of Necessary Class Documents

1.        Class roster

2.        Introductions - Classroom/ Instructor.

II.        DISCUSSION OF SCENARIOS (Prior to Policy Lecture)                II (A, B)

    A.        This discussion will gauge students understanding and possible misconceptions regarding Department Policy and Case Law.

    B.        The classroom will be divided into four groups. Each group will represent one of the following individuals:

        1.        Handling Deputy

        2.        Field Supervisor

            3.        Watch Commander

            4.        Citizen

      C.    Each group will read or listen to a scenario and discuss the issues specific to each situation.  A spokesperson for each group will then answer questions from the perspective of each of the above individuals using the attached "Role Playing Scenario Issues/Questions" as a guide.

D.    Scenario

      1.    Code-9/Blocking Intersections (Written Scenario)

  2.    Traffic Stop (Written Scenario)

    3.    417 Pursuit (Audio of pursuit)

      III.    POLICY /CASE LAW                    **II (F, D)**

A.    State Laws:

| | | | |
|---|---|---|---|
| 1. | 17001 CVC | 6. | 21056 CVC |
| 2. | 17004 CVC | 7. | 21057 CVC |
| 3. | 17004.7 CVC | 8. | 21806 CVC |
| 4. | 21052 CVC | 9. | 21807 CVC |
| 5. | 21055 CVC | 10. | 13519.8 CVC |

B.  Applicable Case Law and Key Issues:

      1.    <u>Kishida v. California</u> – 17004.7 CVC only requires that an agency "adopt" a policy and does not specify compliance with that policy.

      2.    <u>Colvin v. Gardena</u> – Gardena's pursuit policy language was too "vague" allowing too much officer discretion in initiating and terminating pursuits.

      3.    <u>Peterson v. Long Beach</u> – Because the City's policy was stricter than State Law, a violation of that policy caused the City to incur civil liability.

      4.    <u>Lewis v. Sacramento Co.</u> – Federal lawsuit alleging 14th Amendment violation. Set the "Shocks the Conscience" standard.

      5.    <u>Brower v. Inyo Co.</u> – "Dead man's Roadblock" used on non-violent offender resulted in court's determination that the officer's action "shocked the conscience."

6.  <u>Cruz v. Briseno</u> – Incident involving "closing the distance."  Fleeing suspect killed innocent 3rd party in collision.  Although deputy did NOT have emergency equipment activated, he was in fact "in pursuit." Immunity under 17004 CVC and 17004.7 CVC applied.

7.  <u>Nguyen v. City of Westminster</u> – Westminster pursuit of stolen van that ended in a schoolyard during school hours.  Suspect vehicle collided into a dumpster killing Mr. Nguyen.  The Court held that Westminster was civilly immune under 17004.7 CVC, however, the cited that the law is flawed and should be reviewed.

C.    Department Policy Issues

-Code 9

-Surveillance Mode

-Clearing Intersections

-Blocking Intersections

## D. Review Stress and Coping Skills

IV.    VEHICLE DYNAMICS/DEFENSIVE DRIVING OVERVIEW            **II (C, E, G)**

A. Weight Transfer

B. Steering Control/Safe Backing

C. Throttle/Braking/Road Position

D. Defensive Driving

V.    SECOND CLASS DISCUSSION AND STUDENT EVALUATION            **II (B)**

A.    Briefly discuss earlier scenarios using information from Section III (Policy Lecture).

12/1/22, 11:19 AM    Case 2:22-cv-05367-RGK-MAA    Arrest and Control Advisors Training eABS Viewer    Filed 05/24/23    Page 45 of 187

Page ID #:636

B.     Course Critique

Save Topic as PDF
(/Viewer/Manuals/GeneratePDF?
reportIndex=0)

© 2022 - Los Angeles County Sheriff's Department - Version 2021.7.22.1

Back to Table of Contents
(/Viewer/Manuals/14534?
returnContentID=14958)

 **Viewer** **Table of Contents** **View**

Training Bureau Material (/Viewer/Manuals/14494?returnContentID=15100) / Training Videos (/Viewer/Manuals/15100?returnContentID=15354)

# COMMUNICATION DURING ACTIVE EVENTS

‹ GROOMING & DRESS STANDARDS (/Viewer/Manuals/14494/Content/15353)

RESPONDING TO 459 "WHODUNIT" CALLS › (/Viewer/Manuals/14494/Content/15355)

COMMUNICATION DURING ACTIVE EVENTS
(http://www.lasdvideos.org/video/TBCommsDuringActiveEvents.mp4)

Save Topic as PDF
(/Viewer/Manuals/GeneratePDF? © 2022 - Los Angeles County Sheriff's Department - Version 2021.7.22.1
reportIndex=0)

Back to Table of Contents
(/Viewer/Manuals/15100?
returnContentID=15354)



Training Bureau Material (/Viewer/Manuals/14494?returnContentID=14532) / Advanced Officer Training Unit (AOT)
Material (/Viewer/Manuals/14532?returnContentID=15071)

# Detective Concepts

‹ Coplink (/Viewer/Manuals/14494/Content/15069)

Driver Awareness ECO ›› (/Viewer/Manuals/14494/Content/14692)

**LOS ANGELES COUNTY SHERIFF'S DEPARTMENT**

**INTERMEDIATE DETECTIVE CONCEPTS**

**PROFESSIONAL IMAGE**

I. WHAT DO WE MEAN "PROFESSIONAL IMAGE"?

    A. What is your particular Professional Image based on? ( class discussion)

    B. Public Expectation's of a Professional Detective?

    C. Where does it come from? (TV, Movies, News Interviews)

    D. "Jack Webb / Joe Friday / CSI" perception

    E. How does the location of the interview effect the style of dress?

II. DRESS

    A. The difference between interviewing Victims vs. Suspects

        1. How would dressing differently effect the interview?

        2. Would the location of the Interview affect the way you dress?

    B. Public Perception

        1. Going to court: Raid Jacket vs. Suit & Tie, Undercover Operations

        2. Coming to Court dressed as bad guy, Pic's of Detectives Operation day

        3. Deputies will tend to dress to levels of expectation not what is necessary for the occasion

III. PROFESSIONALISM

    A. Setting Personal Grooming Standards High vs. Acceptable

        1. What rank do we hold at a Station Level / Who Looks Up to Us?

    2.    How many chances do we get to make a first impression?

    B.    California Law Enforcement (LASD/ LAPD) vs. Rest of the Country

    1.    Do we have the responsibility to set the standard?

    2.    How does the standard get set? Personal or Departmental?

    C.    Professionalism

    1.    Professional Personality vs Off Duty Personality. Are they similar?

2. Are we approachable enough to the public? Other Deputies? Civilian Staff?

    D.    The Well Dressed Analytical Interviewing

    1.    Comfort Zones, Body Language, how can the attire affect it?

    E.    Bare Minimum Dress Standards

    1.    How do our supervisors / peers look at us ?

    2.    Good Interviews / Bad Interviews

    3.    Making the Vict, Witness, Suspect feel comfortable

F.    What is our overall goal when conducting our interviews?

    1.    Solve Cases, Get the Confessions, Extract all Necessary Info

    G.    What kind of gear do detectives wear when going out to conduct the interview?

    1.    Are we prepared for a violent confrontation in the field

    2.    Daily Prep / Prep your gear the night before

    3.    Take a hard look in the mirror everyday

**LOS ANGELES COUNTY SHERIFF'S DEPARTMENT**

**INTERMEDIATE DETECTIVE CONCEPTS**

**<u>CASE MANAGEMENT</u>**

I. Transition to Detective Assignment

    A. Handling a Caseload vs. Shift Work

    1. Difference between day-to-day work and extended case investigations

    B. Prioritizing Workload

    1. Perishable Evidence

    2. In-Custody Cases

    3. Danger To Society

    4. Bond Releases

    5. "Specials" (As Designated by Supervisors)

    6. Workable Felonies

    7. Workable Misdemeanors

    8. Pending Felonies

    9. Pending Misdemeanors


II. Organizing Investigations

    A. Case Tracking

        1. Organization's Tracking Systems

        2. Personal Tracking Systems

    B. Creating Investigative Systems

        1. Visit Crime Scene

        2. Obtain All Recorded Evidence

        3. Obtain All Document Evidence

    C. Organizing Files

        1. File Contents

        2. File Storage

    D. Determining When to End an Investigation

        1. Cost/Benefit Analysis


III. Documenting Investigations

    A. Notes

        1. Single Case = Single Notebook

        2. Pen vs. Pencil

        3. What to Write

        4. Note Retention

    B. Photographic/Video Evidence

        1. Film vs. Digital

        2. Retention Location

    C. Audio Recordings

        1. Tape vs. Digital

        2. Retention Location

    B. Reports

        1. Timeliness

        2. Sufficiently Thorough

      3. Punctuation, Spelling, Grammar et al

      4. Active Writing Style vs. Passive Writing Style

IV. Handling Extraordinary Cases

    A. Recognize Your Role As Orchestra Conductor

    B. Get Sufficient Assistance

    C. Buffering Yourself From Meddlers

    D. Handling Press Inquiries


# LOS ANGELES COUNTY SHERIFF'S DEPARTMENT

## INTERMEDIATE DETECTIVE CONCEPTS


### COMMUNITY COLLABORATIONS


I.      Importance


II.     Governmental Collaborations

      A.    Inter-Agency Gang Task Force (IGTF)

      B.    Los Angeles Regional Gang Information Network (LARGIN)

      C.    LA IMPACT - Gang Wire-tap Taskforce

      D.    DISARM - Probation

      E.    Department of Children and Family Services

                F.    Nuisance Abatement Teams (LA County NAT)

        1.    Administrative warrants

      G.    Liaison mandates


III.    Civilian Collaborations

      A.    Community-Based-Organizations

        1.    Federally funded

        2.    State-funded

     3.     Local-funded

     4.     Department-funded

     5.     Volunteer

IV.    Referrals and Networking

**LOS ANGELES COUNTY SHERIFF'S DEPARTMENT**

**INTERMEDIATE DETECTIVE CONCEPTS**

**<u>MIRANDA ISSUES AND CASE FILING</u>**

I.    CASE FILING

    A.    Introduction

    B.    Branches and area offices of the District Attorney are provided for the purpose of filing all felony and misdemeanor complaints initiated by the Sheriff.  The District Attorney has the responsibility for determining the type of complaint to be issued.

    1. Filing Package.

    2. Copies of the original reports and all supplemental reports for each defendant.

    3. Results of all record checks

    4. Additional evidence, (e.g., recordings or statements, videos, photos, prints, etc.)

C. Department Policy

1. Section 5-07/020.00 Obtaining of Felony and Misdemeanor Complaints

II. LEGAL UPDATE/MIRANDA

A. Introduction

1. In 1966 Miranda vs. Arizona made its way to the United States Supreme Court where the high court overturned a conviction on the grounds that Miranda's Fifth Amendments rights against self-incrimination had been violated.

2. Miranda warnings are required before any "custodial interrogation."

3. Direct or "express" questioning about the crime being investigated.

4. On-the-scene questioning (preliminary) not interrogation.

B. Spontaneous or Volunteered Statements

1. 1. Volunteered statements are not made in response to interrogation, they are admissible even though the suspect is in custody, and has not yet been read his Miranda Rights. ( Innis (1980) 446 U.S. 291, 300; Huggins (2006) 38 Cal.4th175, 197-198, 243-244; McDaniel (1976) 16 Cal.3d 156, 171-172

2. Waiver of Miranda must be made without force or coercion

3. Knowing, intelligent, and a voluntary waiver of rights

C. Case Law

1. " Not every question directed by an officer to a person in custody amounts to an 'interrogation' requiring Miranda warnings." ( Wader (1993) 5 Cal.4th 610, 637.) "The police may speak to a suspect in custody as long as the speech would not reasonably be construed as calling for an incriminating response." ( Cunningham (2001) 25 Cal.4th 926, 993, quoting from Clark (1993) 5 Cal.4th 950, 985.) Courts apply an objective standard and consider all the case-specific circumstances. ( Wader (1993) 5 Cal.4th 610, 637.)

**LOS ANGELES COUNTY SHERIFF'S DEPARTMENT**

**INTERMEDIATE DETECTIVE CONCEPTS**

**BASIC SURVEILLANCE CONCEPTS**

I. SURVEILLANCE

A. Definition

B.    Types of Surveillance
        1.    Static
        2.    Mobile
        3.    Pedestrian
        4.    Transition to arrest and command post
C.    Objective of a Surveillance
        1.    Determine if crime occurred
        2.    Crime prevention
        3.    Suspect apprehension
        4.    Develop probable cause for search/arrest warrants
        5.    Develop probable cause for court orders
        6.    Locate a wanted person
        7.    Locate hidden property or evidence
        8.    Provide protection for undercover officer and/or CRI
        9.    Monitor movement/activity of informants
        10.    Monitor movement/activity of terrorists (criminal intelligence)
        11.    Determine subject's habits, hangouts, and associates (pattern)
D.    Planning for Surveillance
        1.    Personal info regarding subject
        2.    Routine activities of subject
        3.    Criminal history of subject
        4.    Previous weapons possession
        5.    Previous narcotics use
        6.    Previous subject of surveillance
        7.    Length of time at current address
        8.    Gang and/or criminal entity affiliation
E.    Staffing Concerns and Team Assignments
        1.    Minimum requirements
        2.    Optimal staffing level
F.    Basic Team Equipment
        1.    Team equipment
        2.    Individual equipment
        3.    Emphasis on team member comfort
G.    Conducting the Surveillance
        1.    Scouting the location

2. Setting up
3. Approaching the location
4. Termination of the surveillance and debriefing

H. Cops as Victims

I. Additional Resources

1. Air support
2. Technical support equipment

J. Multi-Agency and/or Joint Surveillance Operation

1. Operational planning
2. Communications
3. Contingencies
4. Tactical considerations

-
-
-
-
-

**LOS ANGELES COUNTY SHERIFF'S DEPARTMENT**

**INTERMEDIATE DETECTIVE CONCEPTS**

-

**MEDIA RELATIONS**

-

I. LAW ENFORCEMENT AND THE MEDIA

A. 409.5 PC Provides for an exception to the media to cross a police or fire line into an area that has been closed due to menace to public safety or calamity, i.e.

1. train wreck
2. earthquake
3. disaster area
4. brush fire
5. flood
6. explosion

B. Media Role in a Democracy

1. Gather information of interest to the public

             2.     Relay that information in reports

     C.     Elements of a Transparent Police Agency;

             1.     Develops good relationships with media outlets.

             2.     Is a good source of information to the media

             3.     Provides accurate, timely information, as ethically as possible

             4.     Keeps media informed about crimes, trends, police strengths and weaknesses, and special problems that are unique to neighborhoods

**LOS ANGELES COUNTY SHERIFF'S DEPARTMENT**

**INTERMEDIATE DETECTIVE CONCEPTS**

**TACTICS TRAINING AND TESTIMONY**

**"MIND GAMES"**

I.     COURSE ADMINISTRATION

     A.     Course Administration is designed to provide the presenter with the opportunity to address necessary administrative issues such as,

             1.     Registration

     2.     Expectations

             3.     Attendance Requirements, and

             4.     Course Completion Requirements

II.     INTRODUCTORY ISSUES

     A.     Introductory issues will provide an overview of the course, review of key concepts, and instructional blocks.

III.     THE PROBLEM WITH BEING HUMAN:  IMPLICATIONS FOR TRAINING TACTICS AND TESTIMONY

     A.     Learning Objectives

             1.     Memory

             2.     Multiprocessing

             3.     Mind-body connection

             4.     Perceptual limitations/Distortions

             5.     Amnesia

             6.     Interviewing techniques for enhancing memory retrieval

**LOS ANGELES COUNTY SHERIFF'S DEPARTMENT**

**INTERMEDIATE DETECTIVE CONCEPTS**

**VEHICLE/PEDESTRIAN STOPS IN UNMARKED VEHICLE**

I.        STATIONARY AND MOBILE UNDERCOVER VEHICLE ARREST TACTICS

                        A.        Undercover Vehicle Arrest Tactics

                                1.        Preplanning and target evaluation

                                2.        High risk call back

                        B.        Stationary Containment

                                1.        T-Bone front

                                2.        T-Bone rear

                                3.        In-line variation

                                4.        I-beam

                        C.        Transition from Surveillance to Tactical Entry

                                1.        Establish a static surveillance

                                2.        Establish a staging area and command post

                                3.        Organize team members for tactical entry

                                4.        Maintain "eye" and identify "eye" security

                                5.        Identify need for notifications

                                6.        Establish and/or identify mutual aid frequency

                                7.        Contingency plan for unexpected mobility of subject and/or "barricaded suspect"

**LOS ANGELES COUNTY SHERIFF'S DEPARTMENT**

**INTERMEDIATE DETECTIVE CONCEPTS**

**VEHICLE THEFT INVESTIGATIONS**

I.        Basic Facts

                        A.        Vehicle stolen:

1.     every 2 minutes in California and

2.     every 20 seconds nationally

II.     High Theft Vehicles

    A.     Why

    1.     Interchangeable parts

    2.     Easy to steal

    3.     Easy to sell

III.     Basic Reason for Theft of Vehicle

    A.     Transportation

    1.     Personal use

    B.     Commit other crimes

    1.     Robberies

    2.     Burglaries

    3.     Drive-by shootings

    4.     Drug smuggling

    C.     Theft for Profit

    1.     Ship vehicles overseas

    2.     Strip vehicles of parts and sell them

    3.     VIN switch the vehicle and sell it outright

IV.     Current Trends in Vehicle Theft

    A.     Fraud applications

    B.     VIN switching

    C.     Sub plate

    D.     Cold plate

    E.     Wash title

    1.     Stolen info

    2.     Salvage records

    F.     Ship overseas

    G.     Rebuild salvages/put togethers

V.     How Vehicles are Stolen

        A.      Suspect(s) work alone or as team, each with specific duty:

            1.     Look-out

            2.     Break into car

            3.     Steal the car/drive away

            4.     Follow in chase car

-

VEHICLE THEFT
INVESTIGATION
PAGE 2

-

        B.     Devices used to enter car

            1.     Owner's keys

            2.     Master keys

            3.     Break window/pull back window

        C.     Devices used to steal car

            1.     Owner's keys

            2.     Master key

            3.     Slide hammer

            4.     Screwdriver

            5.     Gizmo

            6.     Hot wire

        D.     Other ways vehicles stolen

            1.     Fraud

            2.     Car jacking

            3.     Embezzle

-

VI.       Where Vehicles Commonly Stolen

        A.     Grocery stores

        B.     Residence

        C.     Mall

        D.     Valet parking

        E.     Sporting events, other large events

        F.     Dealerships

-

VII.      Fundamental Laws

        A.     487(d) PC/GTA

B.    10851(a) VC/Unlawful taking of a motor vehicle

C.    496d(a) PC/RSP

D.    10801 VC/Operation of a Chop Shop

E.    532a(1) PC/Fraud app

F.    530 PC/Identity Theft

G.    215 PC/Car jacking

**St LOS ANGELES COUNTY SHERIFF'S DEPARTMENT**

**INTERMEDIATE DETECTIVE CONCEPTS**

**HARDCORE D.A. FILINGS**

I.    STEP ACT PROSECUTIONS

    A.    What it is

        1.    186.22(a)    Substantive charge – wobbler

        2.    186.22(b)    Allegation (enhancement), attached to felony

        3.    186.22(d)    Elevates gang misdemeanors to felonies

        4.    186.22a    Nuisance abatement

    B.    Why we need it

        1.    186.20 PC    Legislative intent

        2.    Gangs present clear and present danger to society

    C.    How to use it - present evidence

        1.    Gang membership

        2.    Gang monikers

        3.    Gang tattoos

        4.    History of gang

II.    Filing The Gang Case

    A.    Overcoming Prosecutorial Resistance

    1.    Talk to your gang expert before filing

        2.    Be prepared to explain expert opinion to filing deputy

        3.    Get all necessary documents for filing: FIs, I Cards, Predicate priors

        4.    Be persuasive, not abrasive

        5.    Know procedures for appealing a filing decision

        B.    Pushing the envelope on the gang allegation

             1.    Case law indicates that the scope of the gang allegation is getting broader

  C.    Target crimes

        1. Narcotics cases: Sales, Possession for sale, transportation

           2.    Firearms possession cases, felon with firearm

           3.    Vandalism

**III.   A Gang Allegation Requires a Gang Expert**

    A.    What The Gang Expert Brings To The Case

           1.    Prove up the 186.22(b)(1) gang allegation

           2.    Educate the jury on how gangs operate

           3.    Interpret/explain witness behavior

    B.    Gang Expert Testimony

**        1.    Evidence Code Section 801: "Expert opinion is permissible if the subject is sufficiently beyond common experience and the opinion would assist the trier of fact."**

           2.    "The expert testimony need not be necessary, only helpful." People v. Cramblitt, 84 Cal. App. 3d 347 (1978)

    C.    Qualifying as an expert witness

**        1.    Keep good records**

           2.    Memorize your qualifications

           3.    Come to court prepared

           4.    Tell a good story in layman's terms

           5.    Only give an opinion you are comfortable giving (It's your credibility at stake)

           6.    Don't overstate your case

           7.    Jurors don't like arrogance

    D.    Important Reminder

        1.    Never, Never compromise your integrity for a case

           2.    Integrity and credibility matter most

-

-

**St LOS ANGELES COUNTY SHERIFF'S DEPARTMENT**

**INTERMEDIATE DETECTIVE CONCEPTS**

-

**LADA BUREAU OF INVESTIGATION**

-

I.      HISTORY OF BUREAU OF INVESTIGATION

        A.      Authority

                1.      Peace officer status (830.1 PC)

        B.      Number of Sworn Personnel


II.     Duties of a District Attorney Investigator

        A.      Prosecution Support

        1.      Felony pre-trial investigations

                2.      Locating witnesses

                3.      Crime scene investigation

        B.      Original Jurisdiction Cases

                1.      Complex fraud cases

                2.      Insurance & Worker's Compensation fraud

                3.      Welfare & consumer frauds

                4.      Political corruption

                5.      Child abductions by non-custodial parents

                6.      Stalking cases

                7.      High tech computer crimes

                8.      Organized crime

                9.      Major crimes

        C.      Assist Other Law Enforcement Agencies

                1.      24-hr command center

                2.      Vehicle surveillance

                3.      Electronic surveillance (wire tap)

                4.      Photographic services

                5.      Questioned documents examination


III.    Bureau of Investigation by Division

        A.      Administrative Division

                1.      Internal Affairs

                2.      Training Section

        B.      Criminal Division

                1.      Witness Assistance

                2.      Central Investigations

                3.      Branch Offices

4.      Technical Services

C.      Fraud Division

1.      Recipient Welfare Fraud

2.      Specialized Fraud Investigations

3.      Auto Insurance Fraud Task Force

4.      Code Enforcement Unit

5.      Major Fraud

D.      Special Operations Division

1.      Integrity Section

2.      Special Litigation Unit

3.      Major Crimes Investigations

4.      Operations

‐

## LOS ANGELES COUNTY SHERIFF'S DEPARTMENT

## INTERMEDIATE DETECTIVE CONCEPTS

## DETECTIVE INFORMATION RESOURCE CENTER

‐

I.  UNIT MISSION

A.   Assist Detectives

1.      Find persons/locations

2.      Provide property ownership records

3.      Telephone number identification

4.      Photograph identification & 6‐pack production

5.      Vehicle photo production

‐

II.  RESOURCES

A.   Law Enforcement Databases

1.      ChoicePoint

2.      Parole Law Enforcement and Detection System

3.      Dallas Computer Systems

4.      Entersect

5.      Family and Children's Index

      6.    National Insurance Crime Bureau

      7.    Financial Crimes Enforcement Network

      8.    Birth, Death and Marriage Records

      9.    Expanded Traffic Records System

      10.    Dataquick

      11.    Prosecutors Information Management System

  B.    Free Internet Sites

      1.    Zaba Search

      2.    Mugshots

      3.    AJIS

      4.    ZipCodeFinder

      5.    BOP

      6.    DMV

      7.    Inmate Locator

      8.    AncesterHunt

      9.    Reverse Phone Directory

      10.    Earth Google

      11.    Local Live

      12.    Pipl.com

-

## LOS ANGELES COUNTY SHERIFF'S DEPARTMENT

## INTERMEDIATE DETECTIVE CONCEPTS

-

## INTRODUCTION TO DNA

-

I.   ROLES OF A CRIMINALIST/CRIME LAB FUNCTIONS

   A.    What is a Criminalist?

      1.    A Criminalist searches for, collects, preserves, and examines physical evidence in the investigation of crime

## B.      Crime Lab Services

      1.    Drug Analysis

      2.    Toxicology / Blood Alcohol

      3.    Questioned Documents

    4.       Polygraph

    5.       Photo Studio / Digital Imaging Services

## 6. Fingerprints/chemical Processing

## 7. Firearms

## 8. Forensic Biology (DNA)

## 9. Physical/Trace

## II. IDENTIFYING & COLLECTING EVIDENCE

### A.      Types of Evidence

           1.    Impression        2.    Trace

    3.    Hairs/Fibers

    4.    GSR

    5.    Paint

    6.    Glass

### B.    IDENTIFICATION TECHNIQUES

    1.    Alternate Lighting

    2.    Fluorescence

    3.    Presumptive Tests

    4.    Blood (Kastle-Meyer)

### 5.    Semen (Acid Phosphatase)

### C.    Enhancement Techniques

    1.    Luminol

    2.    Leuco Crystal Violet (LCV)

    3.    Oblique Lighting

### D. Collection of Evidence

    1.    Documentation

### 2.    Tape Lifts

    3.    Hairs, Fibers, and other trace evidence

### 4.    Casting

    5.    Swabs and/or Cuttings

    6.    Biological stains

       7.    Impressions

## E.    Basic Rules of Evidence Collection

    1.    NO plastic (except for volatile substances)

    2.    Collect the entire item when possible

    3.    Avoid marking the evidence itself

    4.    Avoid contamination – use gloves when handling evidence and change often

## F.    Packaging of Evidence

    1.    Almost all collection is in paper packaging

    2.    Coin envelopes for small items, paper bags for large ones

    3.    Double package whenever possible

    4.    Tape Seal the package with initials across the seal

## G.    Packaging Documentation

    1.    Case #

    2.    Date

    3.    Initials of collector

    4.    Contents

    5.    Warnings, if necessary

-

## III.    INTRODUCTION TO DNA

## A.    What is DNA?

    1.    Building block for an individual's entire genetic makeup

    2.    A component of virtually every cell

    3.    A person's DNA is the same in every cell

    4.    Each person's DNA is different from every other individual except identical twins

    5.    DNA collected from a crime scene can either link a suspect to the evidence or eliminate the suspect

    B.    Where DNA Can Be Found

    1.    Blood and semen

    2.    Skin cells, hair, tissues

    3.    Saliva, mucous, sweat

    4.    Urine and feces

    5.    Bone and teeth

## C. Other Sources of DNA

    1. Clothing

    2. Gloves

    3. Saliva- Cigarette butts

    4. Condoms

    5. Hair brush/Comb

    6. Toothbrush

    7. Eyeglasses

## D. Limitations of DNA

    1. Doesn't tell you when it was deposited

    2. Doesn't tell you how it was deposited

    3. If multiple contributions of DNA to one stain, may be difficult to attribute source

## E. What Can DNA Do for You?

    1. "Doe" Identifications

## 2. Individualization

    3. Identify who is the source of the body fluid

## F. DNA Typing

    **1. After Individualization**
    **2. CODIS DNA DATABASE**

Save Topic as PDF
(/Viewer/Manuals/GeneratePDF?
reportIndex=0)

© 2022 Los Angeles County Sheriff's Department – Version 2021.7.22.1

Back to Table of Contents
(/Viewer/Manuals/14532?
returnContentID=15071)



Training Bureau Material (/Viewer/Manuals/14494?returnContentID=14532) / Advanced
Officer Training Unit (AOT) Material (/Viewer/Manuals/14532?returnContentID=14976)

# Field Ops School-Sergeant

‹ First Aid Instructor Transition (/Viewer/Manuals/14494/Content/14975)

Field Training Officer › (/Viewer/Manuals/14494/Content/14977)

LOS ANGELES COUNTY SHERIFF'S DEPARTMENT

FIELD OPERATIONS, SERGEANT

1820-31770


SEARCH AND SEIZURE LEGAL UPDATE


   A.  SEARCH AND SEIZURE:

       1.  Standing


   B.  LAWS OF ARREST:

       1.  Detentions:

          2.  Private person's arrest:


   C.  DETENTION CATEGORIES:

      1.  Investigation based on reasonable Suspicion:

         2.  Officer safety:

         3.  Stop and detain based on anonymous source.

          4.  Unusual circumstances.

    5.  Factual nexus between the seizure and the unlawful conduct.

    6.  A ruse may render a detention unlawful - invalid consent search.

    7.  Running, by itself, does not justify a detention.

    8.  Detaining an occupant for a parking violation.

    9.  Arrest.

D.   CONSENSUAL ENCOUNTERS:

    1.  Free to leave.

    2.  Consent tested on an objective belief standard.

E.  PAT SEARCHES:

    1.  Reasonable suspicion:

        2.  A detention, by its self, does not justify a pat search.

    3.  Companion search – Close physical association.

    4.  Presence of drugs immediately apparent during pat search.

    5.  Hostility directed toward an officer.

F.  VEHICLE STOP:

    1.  Officer's subjective belief.

    2.  Pretext stops

    3.  Ordering the driver out

    4.  Ordering passengers in or out of a vehicle

    5.  Detaining passengers

    6.  Demanding identification

    7.  Failing to present satisfactory evidence of identity

    8.  Stopping cars for seat belt violations

G. VEHICLE SEARCHES:

>   1. Six ways in which a vehicle may be searched:

>>   2. Inventory searches

>>   3. Searches incident to an arrest

>>   4. Probable cause search:

>>   5. Consent search:

>>   6. Protective vehicle search:

>>   7. Instrumentality search:

H. PAROLE AND PROBATION SEARCHES:

>   1. Parolee searches:

>   2. Challenging a probation search.

>>   3. Associating with probationers – expectation of privacy restricted.

>>   4. Invalidating a probation search.

I. RAMEY RULES AND PROCEDURES:

>   1. Entering a residence to arrest.

>>   2. Use of subterfuge to induce suspect to exit the location.

>>   3. Entering the residence of someone other than the arrestee.

>   4. Compliance with knock and notice requirements.

>>   5. Knock and notice - entry refused.

J. PLAIN VIEW SEIZURES:

>   1. Lawfully at the observation point.

>>   2. Searching entire room based on plain sight.

>>   3. Lawful access to the evidence.

>   4. Warrant less searches of residence - plain view.

K. CONSENT SEARCH:

      1. Consent - free and voluntary given.

        2. Consent regarding locked containers.

L. EXIGENT CIRCUMSTANCES:

      1. Warrant less entry based on an exigency.

        2. Exigencies created by the police.

M. MIRANDA REQUIREMENTS:

      1. Custodial interrogation - Miranda warnings required.

                                2. Deliberately ignoring the suspect's Miranda invocation.

        3. The cost of going outside Miranda.

N. SEARCH AND SEIZURE UPDATE:

      1. Update current case law.

II. RISK MANAGMENT

A. OBJECTIVE:

   1. Personnel Investigations

B. STRUCTURE OVERVIEW OF THE CHANGING ENVIORNMENT:

   1. Civil Litigations

   2. Complaints

3. Structure

### C. ADMINISTRATIVE INVESTIGATIONS:

1. 832.5 PC

2. Sources

3. Handling

4. Criminal/Civil

5. Routing

6. PC Sections

### D. SUPERVISORY INQUIRY:

1. Sources

2. Course of Action

3. Government Codes

4. Punitive Action

5. Investigation

### E. WATCH COMMANDERS RESPONSIBILITIES:

1. Investigations

2. Resolutions

3. Attorneys and Litigations

4. Problems

5. Civilian Participation

### F. CONDUCTING THE ADMINISTRATIVE INVESTIGATION:

1. Complaint Review

2. Familiarization

3. Questioning

4. History

G. THE INTERVIEW:

1. Advantages and Disadvantages

2. Order of Interview

3. Summarization


H. SUBJECT INTERVIEWS:

1. Sworn Subjects Rights

2. Representatives

3. Overall Procedures


I. INTERVIEWING SKILLS:

1. Objectives

2. Specifications

3. Intimidation

4. Team Up

5. Style


J. DISPOSITION WORKSHEETS:

1. Bail Schedule


K. RESIGNATIONS:

1. Rules

2. Regulations

3. Paperwork


L. GUIDELINES FOR DISCIPLINE/CASE REVIEW:

1. Guidelines for Discipline

2. Civil Service Jurisdiction

3. Dispositions

4. Miscellaneous

    M. PROFESSIONAL STANDARDS AND TRAINING:

1. Incident Generated Response

2. PSTD Response

3. IAB Response

4. Roll Out Teams

    N. COMMANDERS REVIEW:

1. Review Committee Options

2. Training Issues

# III. PATROL TACTICS

    A. INTRODUCTION TO PATROL TACTICS:

1. Pedestrian Stops

2. Bike Stops

3. Vehicle Stops/Felony Traffic Stop

    B. SHOW VIDEO (GUN TO HEAD/902A):

1. Group Breakout (Flip Charts)

2. Group Teach Back

3. Class Discussion

    C. SHOW VIDEO (OFFICER DOWN):

1. Group Breakout (Flip Charts)

2. Group Teach Back

3. Class Discussion

D.  SHOW VIDEO (PALMDALE/LANCASTER 11550 CONTACT/LESS

LETHAL).

    1.  Group Breakout (Flip Charts)

    2.  Group Teach Back

    3.  Class Discussion

## E.  OFFICER DOWN CONSIDERATIONS:

  1.  Scoop or Don't Scoop

  2.  Mike Arruda/Jerry Ortiz

### F.  CLASS DISCUSSION:

1. Communication

2. Deployment

3. Contingency Planning

4. Response Team

5. Command Post

## IV.  CRIME LAB

A.  INTRODUCTION OF THE CRIME LAB:

1.  All Sections (Trace and Biology will be in more detail)

B.  TRACE EVIDENCE:

1.  Introduction

2. Examination results

3. Impressions

4. Physical Patterns

5. Physical and Chemical Properties

6. Gun Shot Residue (GSR)

7. Arson/Explosives

8. Hairs/Fibers

9. Paint


C. BIOLOGICAL EVIDENCE AND ANALYSIS:

1. What is DNA?

2. Biological evidence as physical evidence                                    3. Short Tandem Repeats (STR's)

4. Steps of DNA analysis

5. Polymerase Chain Reaction (PCR)

6. Current STR kit

7. DNA analysis

8. Statistics


D. CODIS:

1. Combined DNA Index System

2. CODIS Databases (Two sides)

3. Two types of CODIS hits

4. Important CODIS information for investigators

5. Persons who qualify for DNA sample collection

6. Is a person of interest in the CO database?

7. Local suspect DNA database

8. Familial Searching

**E. CRIME SCENE INVESTIGATION:**

1. Management

2. Team Players

3. Documentation

4. Physical Evidence

5. Presumptive Testing

6. Search Techniques

7. Evidence Handling

## V.  CODE 3 OPERATIONS & PURSUIT MANAGEMENT

A. INTRODUCTION :

1. LASD Historical

B. LAWS GOVERNING VEHICLE PURSUITS:

1. 17001 CVC – "A public entity is liable for death or injury to person or property

   proximately caused by a negligent or wrongful act or omission in the operation of

   any motor vehicle…."

   2. 17004 CVC – "a public employee is not liable for civil damages on account of

      personal injury or death of any person or damage to property resulting from the operation,

      in the line of duty, of an authorized emergency vehicle while responding to an emergency

      call, or while in immediate pursuit…"

3. 17004.7 CVC – Provides immunity to public agencies from liability for the actions of a

                  suspect during the course of a pursuit provided that the policy meets the requirements
   of

      the code and that the agency has met specified training requirements.

4. 21055 CVC – Provides exemption from specified provisions of the Vehicle Code

primarily Rules of the Road) for vehicles operating Code-3.

5. 21056 CVC – Imposes "the duty to drive with due regard for the safety of all persons….."

When operating under CVC 21055.

C. SIGNIFICANT COURT DECISIONS CONCERNING PURSUITS:

1. Colvin v. City of Gardena (11 Cal. App. 4th 1270) (1992)

2. County of Sacramento v. Lewis (523 U.S. 833) (1998)

3. Cruz v. Briseno (22 Cal. 4th 568) (2000)

4. Nguyen v. City of Westminster (103 Call. App. 4th 1161) (2002)

5. Scott V. Harris (127 S. Ct. 1769) (2007)

D. CODE THREE OPERATIONS

1. Definitions

E. PURSUIT POLICY

1. Changes made effective July 1, 2007

2. Purpose and Philosophy

3. What is a "Pursuit"?

4. Initiation of a pursuit

5. Pursuit-rated vehicles

6. Termination of a pursuit

7. Conduct of a pursuit

8. Interagency Pursuits

F. PURSUITS – THE HANDLING AND ASSISTING UNITS

1. "Adrenaline" and its effects

2. "Tunnel Vision"

G. PURSUITS – THE FIELD SERGEANT

1. Management of resources

2. Documentation

H. PURSUITS – THE WATCH COMMANDER

1. Cold Line communications with SCC

2. "10-22" or "Let it go" decisions

I. PRACTICAL APPLICATION

1. INTERACTIVE ROLE PLAYING

I. CRITICAL INCIDENTS SITUATIONAL PLANNING

A. UNDERSTAND THE INITIAL POLICE RESPONSE

1. Command responsibility

2. First responders have a responsibility to establish on-scene command and set

Up a field command post, request necessary personnel and equipment.

3. To accomplish this, the supervisor should:

4. Types of situations and barricades:

5. Location types

6. FTO and trainee response

B. RECOGNIZE THE FACTORS UPON ARRIVAL AT SCENE

1. Determine best approach

2. Drive safely into area

3. Scan area for danger signs

4. Vehicle position, wait for back up

5.  Detain persons, relay information

      6.  Field training member's responsibilities

C.  IMPORTANCE OF SITUATION RISK ASSESSMENT

    1.  This information may be developed by the first deputy at the scene and should

    Include:

        **a.  Type of barricade**

            **1.  Suspect, location information**

        **b.  Information obtained from informant, victim, witness, etc.**

        **c.  Type of structures and area size**

        **d.  Contact suspect**

        **e.  Number of additional deputies required**

        **f.  Field command Post location**

        **g.  Assistance required i.e. ambulance, fire, etc.**

        **h.  Number and type of casualties/injuries**

        **i.  Notifications**

D.  RECOGNIZE OTHER FACTORS TO CONSIDER

1.  Hostages, mobility

2.  Weapons, intoxication

3.  Shots fired, injuries

4.  Liability, risk

      5.  Potential training opportunities

E.  IDENTIFY CONTAINMENT AND ISOLATION ISSUES

1.  Inner and outer perimeter

2.  FTO and trainee containment assignments

3.  Escape routes and air coverage

      4.  Cover and concealment

F.  IMPORTANCE OF FIELD COMMAND POST SITE SELECTION FACTORS

1. Strategically located to incident (safe location)

2. Accessible to responding personnel

3. Sufficient space for responding personnel and equipment

4. Communications capabilities (telephones, radios, etc.)

5.  Potential command post sites might include

a. **Parking lot, briefing location**

b. **Restrooms, storage**

c. **Electricity, shelter**

d. **Water, food**

6.  Establish command post


G.  UNDERSTAND INTELLIGENCE GATHERING

1. Sketch of location and plan

2. Description of persons involved

3.  Criminal background


H.  EXPLAIN COMMAND POST FACTORS

1. Notifications and request personnel

2. FTO and trainee roles

3. Assign and delegate duties to staff

4. Radio communications

5. Isolation of area

6.  Other field training factors


I.  METHODS IN TAKING ACTION TO END BARRICADE

1. Tactics options to enter, contain, prevent escape

2. Use of less lethal and distractions, resources, equipment

3. Arrest team, take down team, etc.

4. SEB handles the operation

     5. Other tactics and strategies

J. POST OPERATION CONTROL

1. Evidence, arrests, reports, briefing, etc.

     2. Other post operations issues.

# II. <u>NOTIFICATION RESPONSIBILITIES</u>

    A. OBJECTIVES AND OUTLINE

1. To familiarize participants with Department Policy as it pertains to

    mandatory Notifications and Activation of Shooting/Force Roll-Out teams.

    2. To instruct participants in their responsibilities as supervisors and

Manager's as those responsibilities pertain to Mandatory Notifications

and Shooting/Force Roll-Out incidents.

3. To familiarize participants with IABs level of involvement and processes

in force incidents, including Mandatory Notifications and Shooting/Force

Roll-Out's.

    4. To familiarize participants with their supervisory and managerial duties in

the field and stations in both shooting and force roll-outs situations.

    5. To familiarize participants with the Executive Force Review process and

its relation to IAB roll-outs.

B. METHODS AND SEQUENCE

    1. Introduction

    2. Mandatory Notifications

    3. Force Roll-Outs

    4. Shooting Roll-Outs

    5. Immediate Investigations

    6. EFRC Review Process

C. EQUIPMENT AND SUPPLIES NEEDED

    1. Laptop computer with Microsoft Power Point compatibility and A/V projector

    2. Dry-Erase board and markers

D. STUDENT MATERIALS

    1. Note-taking material

E. INSTRUCTOR MATERIALS

    1. PowerPoint presentation

    2. Video(s) of select incident(s)

I. <u>SEB/ K-9 / ACTIVE SHOOTER LECTURE</u>

-

    A. TYPES OF CRITICAL INCIDENTS

1. Armed barricaded suspects

2. Hostage situations

3. Active shooters

4. Pre-planning for tactical events

    5. Applies to all critical incidents, not just tactical (fires, floods, earthquake)

    B. CONTAINMENT

1. Appropriate for problem

2. Cover vs. Concealment

3. Plot and diagram

4. Use aero to tighten or review containment

5. Immediate deployment

       C.  ARREST TEAM

1. Multiple functions

2. Prevents containment from breaking down

3. Should have supervisor (sergeant or training officer)

4. Designate responsibilities

       D.  CRISIS ENTRY TEAM

1. A must for hostage situation, pending the arrival of SEB

2.  Personnel and equipment

       E.  COMMAND AND CONTROL

1. Command post

       2.  Designate scribe and radioman

3. Make effort to get suspect to come out

4. Consider option of CNT

5. Use SEB Lieutenant as resource to help solve problem

6. Get warrant started asap

       7. Review new barricaded suspect checklist WHEN THINGS CALM DOWN

       F.  COMMUNICATE AND COORDINATE

1. Safe route to c/p, direct route and when to shut down Code 3

2. Constant updates

       G.  INTELLIGENCE GATHERING

1. Handling deputy

2. Family of suspect

3. Neighbors can also provide intel

### H. EVACUATIONS

1. How big??

2. Do them if you safely can

3. Get the address if you do them

4. Have a place for evacs to go

5. Shelter in place and refusals

### I. INCIDENT CONCLUSION AND CRITIQUE

1. Tempo (be prepared to get busy)

2. Maintain containment

3. Protect crime scene

4. Debrief or critique

### J. WEAPONS

1. AR15

2. Shotgun

3. Arwen or SL6

4. Breaching Tools

5. Shields

### K. CRITICAL INCIDENT DEBRIEF

1. Jake Kuredjian

IX. <u>FORCE ISSUES LECTURE</u>

-

*A. LANDMARK CASES*

1. Graham vs. Conner

2. Tenn. vs. Garner

B. SITUATIONAL USE OF FORCE OPTIONS CHART

1. Cooperative

2. Resistive

3. Assaultive / High Risk

4. Life threatening, serious bodily injury

C. STRIKING CHART

1. Green areas

2. Yellow areas

3. Red areas

4. Impact weapons

5. Personal weapons

6. Striking chart applies to

D. GAINING SAFE CONTROL

1. Escalation

2. De-escalation

3. An unarmed suspect

4. Three types of control

E. CITIZEN CONTACTS

1. Consensual

2. Detention (reasonable suspicion Terry vs. Ohio 1968)

3. Arrest (probable cause)

F. LEGAL STANDING

1. Department Policy

2. State Law

3. Federal Law

4. Case Law

G. DEPLOYING LESS LETHAL WEAPONS

1. Force options chart

2. Weapons types

3. M-26 Taser

4. Potential liability saving with less lethal.

H. REPORTABLE FORCE

1. Significant

2. Less significant

I. SERGEANT RESPONSIBILITIES

1. Significant force

2. Less significant

J. MEDICAL TREATMENT

1. Suspect shall be transported to a medical facility when:

K. FORCE REVIEW PACKAGE

1. What shall be included:

2. Mandatory PTD notification

MD/INCIDENT PLANNIG

      A. TERRORISM

  1. Foreign

      2. Domestic

     B. TARGETS

  1. Critical infrastructure

      2. Critical Assets

      3. Symbolic

     C. RESPONSE ACTIONS

  1. Chemical, Biological, Radiological, Nuclear and Explosive Hazards

    (CBRNE)

      2. Personal Protective Equipment

     D. TERRORIST REPORTING PROCEDURES

      1. Regional Terrorist Threat Assessment Centers (RTTAC)

      2. Joint Regional Intelligence Center (JRIC)

XI. LESS LETHAL WEAPONS

-

 A. ARWEN 37 MM WEAPON SYSTEM

  1. Description

  2. Classification

  3. Weapon Specifications

4. Department Policy and Procedures

5. Tactical Deployment and Considerations

6. Warnings and Less-Lethal Force

B. SAGE SL-6 37 MM WEAPON SYSTEM

1. Description

2. Classification

3. Weapon Specifications

4. Department Policy and Procedures

5. Tactical Deployment and Considerations

C. SAGE SL-1 37 MM WEAPON SYSTEM

1. Description

2. Classification

3. Weapon Specifications

4. Department Policy and Procedures

5. Tactical Deployment and Considerations

D. 12 GAUGE "STUNBAG" SHOTGUN

1. Description

2. Classification

3. Cartridge Specifications

4. Department Policy and Procedures

5. Tactical Deployment and considerations

E. 552-1 STING BALL GRENADE

1. Description

2. Classifications

3. Weapon Specifications

    4. Department policy and Procedures

    5. Tactical Deployment and Considerations

F. M-26 ADVANCED TASER

    1. Description

    2. Classification

    3. Weapon Specifications

    4. Department Policy and Procedures

      5. Tactical Deployment and Considerations

    G. LESS LETHAL DEPLOYMENT APPLICATION

      1. Arwen 37mm

      2. Sage SL-6/SL-1 37mm

      3. 12 Gauge Stunbag

. <u>CRITICAL INCIDENT SCENARIOS</u>

-

A. Brief class Re: practical exercise and send them to the

predetermined staging area.

    1. Vehicles

    2. Radios

    B. Run practical exercise #1 (Foot Pursuit).

      1. Foot pursuit traffic

      2. 998

      3. Sgt/Deputy response

      4. Handle to conclusion

      5. Debrief

      C. Run Practical Exercise #2  (902A/Gun To The Head)

1. 415BG radio traffic
2. Sgt/Deputy response
3. Handle to conclusion
4. Debrief

B. Run Practical Exercise #3 (Active Shooter/ Barricaded Suspect)
1. Radio traffic
2. Sgt/Deputy response
3. Handle to conclusion
4. Debrief

C. Run Practical Exercise #4 (Deputy Down/Rescue)
1. Radio traffic
2. Sgt/Deputy response
3. Handle to conclusion
4. Debrief

F. Review the following topics
1. Do not transport a deputy that requires stabilization.
2. Manage the scene and do not become personally involved.
3. Assess the scene and make sure the following is being taken care of:

G. Facilitate class discussion
1. Practical exercise
2. Personal experience

XIII. <u>AERO BUREAU</u>

-

A. AERO BUREAU OVERVIEW

1. Patrol

2. Rescue

3. Surveillance

4. Transportation

5. Photo missions

6. Pilot training / Recurrence

A. AERO BUREAU HISTORY OVERVIEW
   1. Past
   2. Present
   3. Future

   C. PATROL HELICOPTER OVERVIEW
   1. FLIR infra-red camera capabilities
   2. Night sun searchlight capabilities
   3. Moving Map (position identification/plot data)
   4. Electro stabilized binoculars
   5. Downlink video capabilities

D. BREAKDOWN OF AERO BUREAU PILOT DUTIES
   1. Aircraft
   2. In service

E. PATROL AIRCRAFT AVAILABILITY
   1. Shifts and times
   2. Outside agencies

F. FACTORS EFFECTING AVAILABILITY
   1. Already handling call in other area
   2. No relief ship scheduled
   3. Weather
   4. Maintenance
   5. Air Traffic Control

G. COMPARISON WITH LAPD AIR SUPPORT
   1. Comparison of personnel / equipment
   2. Geographical area difference
   3. Patrol deployment differences

H. AIR SUPPORT CONTRACTS
   1. County
   2. State

I. INTER-AGENCY MUTUAL AID REQUESTS
  1. Overview of 89-8
  2. Overview of mutual aid air support request

J. TACTICAL CONSIDERATIONS
  1. Air crews will always prioritize response
  2. Barricaded Suspects
  3. Request Air Support when there is workable information
  4. Tactical use of multiple radios (car radio, handheld)
  5. Use of tactical frequency for emergent calls
  6. Desk responsibility
  7. Importance of good vehicle description
  8. Importance of preliminary broadcasts
  9. What to expect from air crew during emergent calls
 10. Use air crew to recon for officer safety
 11. Active / Mobile Shooter
 12. Use of patrol helicopter for medevac

K. CONTAINMENTS
  1. Primary considerations for a containment
  2. Goal of containment
  3. "Container Analogy"
  4. Fleeing Suspect Actions
  5. Correct phraseology when talking to air crew
  6. Be brief in describing area that needs to be contained
  7. Importance of good suspect description
  8. Considerations for containment
  9. Command Post considerations
 10. Deputy involved shooting considerations
 11. Factors effecting quality of containment

L. PURSUITS
  1. Overview of Aero Bureau policy regarding pursuits
  2. Pre-coordinate stop when able
  3. Overview of use of spike strips in pursuit
  4. Pre planning is essential

M. SURVEILLANCE MODE OPERATIONS
  1. Surveillance mode requires a helicopter
  2. Unit actions in surveillance mode
  3. Be aware of the presence of media helicopters
  4. Surveillance mode considerations
  5. When surveillance mode should not be used

6. Past examples of problems with surveillance mode

N. OVERVIEW OF AIRCRAFT ACCIDENTS
1. What to do if crash occurs
2. Craft Identification

O. OVERVIEW OF AIRCRAFT REGULATIONS
1. Public Utility Codes
2. Federal Aviation Regulation
3. Penal Codes


XIV. OFFICER INVOLVED SHOOTINGS
-
A. FIELD SERGEANT RESPONSIBILITIES
1. Safety of department personnel
2. Inner / outer containment
3. Preservation of evidence
4. Transporting of deputies / witnesses
5. Canvassing for witnesses
6. Witness statements
7. Homicide / IAB interviews
8. D.A. Roll out

B. ADMINISTRATIVE INVESTIGATIONS
1. Watch Commander Service Comment Reports
2. Policy / Reporting
3. Interviews
4. Follow-up

C. TRAFFIC COLLISIONS
1. Forms
2. Interviews
3. Evidence collection
4. Documentation

D. USE OF FORCE
1. Forms
2. Interviews
3. Evidence
4. Documentation

XV.  <u>FOOT PURSUITS & REVIEW PRESENTATIONS</u>

-

A. SET UP CONTAINMENT ON MAP.
  1. Personnel
  2. Tactics


  B. PLAY AUDIO TAPE OF DEPUTY YOKUM'S EMERGENCY RADIO
  TRAFFIC

1. Good
2. Bad


  C.  TELL THE CLASS MIKE YOKUM'S FOOT PURSUIT AND SHOOTING
  INCIDENT.
  1. Setup and Intent
  2. Outcome


  D.  PERFORMANCE OBJECTIVES
  1.  At the conclusion of this block of instruction the student will identify
  three hazards of a one man foot pursuit.  The student will
  demonstrate the ability to set up  a tactical containment in lieu of a
  one or two man foot pursuit.


  E.  PRESENTATION
  1.  One man foot pursuits are dangerous and should be discouraged.
  2.  Listen to and debrief Deputy Yokum's one man foot pursuit.
  3.  Physical conditioning is a factor
  4.  Deputies are carrying a lot of heavy equipment while in foot pursuit. This is
      a disadvantage.


  F.  ONE MAN FOOT PURSUIT POLICY
  1.  Chase to contain
  2.  Closing the distance
  3.   Radio traffic



  G.  MOST FOOT PURSUITS END IN A USE OF FORCE
  1.  The Deputies size, strength, and defensive tactics skill level is a major
      factor.

2. The public's fighting skill level is better than it's ever been.  UFC
   is very popular today.
3. Nearest back up may be an extended time.

H.  TWO MAN FOOT PURSUITS
1. Discuss Policy
2. Explain importance of not chasing into buildings or jumping fences

I.  TACTICAL CONTAINMENT

1. One man unit

2. Coordination considerations

J.  APPLICATION

1. The class will be divided into three separate groups.

2. Each group will have a map written on a flip chart.  The map
   will have a box indicating where a deputy was in foot pursuit
   and lost the suspect.  The box will have an arrow pointing in the
   direction the suspect was last seen running.

3. Each group will work together to show where they would put
   the initial deputy as well as responding deputies in a tactical
   containment.

A. Presentations
   1. Student presentations to class
   2. Question and answer period
   3. Handout and topic review

XVI.  <u>FAMILY CRIMES</u>

A. Child Abuse Laws
   1. Physical cases and Sexual cases
   2. Felony explanation and examples
   3. Misdemeanor explanation examples

B.  Protective Custody (300 WIC sections), Mandated Reporting,  DCSF
   1.  Law Enforcement's Responsibility

        2. Cross reporting to DCFS

        3. Subject/Victim booking

        4. DCFS's Role

C. SCAR (Suspected Child Abuse Report)

        1. Handling deputy's responsibility

        2. Investigation

        3. Report

D. Approval of Child Abuse Reports and Case Assignment

        1. Deputy's Responsibilities

        2. Information that needs to be documented in the report

        3. Supervisors Responsibilities

E. Special Victims Bureau Immediate Notifications

        1. Roll-Out criteria

        2. Preservation of crime scene and evidence collection

F. Liability / Risk Management

        1. Department

        2. Personal

Save Topic as PDF
(/Viewer/Manuals/GenerateRDF?
reportIndex=0)

© 2022 - Los Angeles County Sheriff's Department - Version 2021.7.22.1

Back to Table of Contents
(/Viewer/Manuals/14532?
returnContentID=14976)



Training Bureau Material (/Viewer/Manuals/14494?returnContentID=15100) / Training Videos
(/Viewer/Manuals/15100?returnContentID=15257)

# PAT-DOWN SEARCHES

❮ SIGHTING THE RIFLE (/Viewer/Manuals/14494/Content/15256)

THE PUBLIC'S RIGHT TO FILM ❯ (/Viewer/Manuals/14494/Content/15258)

PAT-DOWN SEARCHES (http://www.lasdvideos.org/video/TBPatDown.mp4)

Save Topic as PDF
(/Viewer/Manuals/GeneratePDF
reportIndex=0)

© 2022 - Los Angeles County Sheriff's Department - Version 2021.7.22.1

Back to Table of Contents
(/Viewer/Manuals/15100?
returnContentID=15257)



Training Bureau Material (/Viewer/Manuals/14494?returnContentID=14532) / Advanced
Officer Training Unit (AOT) Material (/Viewer/Manuals/14532?returnContentID=14808)

# Search Warrants

‹ Radar Laser Course (/Viewer/Manuals/14494/Content/14803)

Supervisor School › (/Viewer/Manuals/14494/Content/14809)

LOS ANGELES COUNTY SHERIFF'S DEPARTMENT

SEARCH WARRANT & INFORMANT MANAGEMENT


<u>SEARCH WARRANT</u>

-

I.       SEARCH WARRANT AND AFFIDAVIT- DEFINITIONS AND COMMENTS

A.      Introduction- Assist police officers in the preparation of valid search  warrants.
Dealing with the service of warrants, informant motions,    court proceedings and other
related topics.

B.      Search Warrant Defined

1.  Form of Warrant

2.  Statutory grounds for issuance

3.  Magistrate defined

_____C.      Affidavit Defined

1.  Form and Contents of Affidavit

D.      Jurisdiction – Including Out of County Search Warrants

E.      Search Warrant in California for Crimes Committed Outside the
State

F.      Use of A Search Warrant to Serve an Arrest Warrant

G.      Preference Given to Search Warrant

H.      United States Supreme Court Decisions Governing Search Warrants

1.  Illinois v. Gates – Totality of the Circumstances Test

2.  United Stated v. Leon – Good Faith Exception

3.  Franks v. Delaware – Traversal of Warrant

4.  People v. Wilson – Presumption of Validity

I.      Other Advantages of Search Warrant

1.  Ramey Problems

2.  Withdrawal of Consent

3.  Keeping Informant

4.  Officer Protection

J.      Alternatives to a Search Warrant

1.  Probation

2.  Parole Search

3.  Consent

4.  Exigent Circumstances

5.  Inspections of Auto Repair Facility

6.  Search of a Car

7.  Search Following Arrest

8.  Plain View

K.      Use of Search Warrant for AIDS Blood Test

II.     DESCRIBING THE PLACES, VEHICLES, AND PERSON(S) TO BE SEARCHED

A.      Introduction

1.  Description in General

2.  Search of Premises

B.      Describing Places – Address Known – Examples

1.  House

2.  Apartment

3.  Store or Business

C.      Describing Places – Address Unknown – Examples

D.      "Special" Handling Places at or Within a Location

E.      Describing Vehicles

1.  General Description

2.  Search Warrant for "Any Vehicle"

3.  Seizure of the Vehicle

F.      Describing Persons – Examples

G.      Use of Photographs and Diagrams

H.      Including Unique Features

I.      Accuracy – Mistakes Do Not Necessarily Invalidate Search Warrant

J.      Number of Places, Vehicles or Persons per Warrant

K.      Searches of Other Than Places, Vehicles and Persons

L.      "Newsroom" Searches

M.      Officer of Attorney - Doctor - Psychotherapist - Clergyman

N.      Telephone Records and Computer Records in Possession of Foreign Corporations

O.      Crime Scene Searches

P.      Severability

Q.      "Good Faith' Exception – Description


III.    DESCRIBING THE PROPERTY AND PERSON(S) TO BE SEIZED

A.      Introduction

B.      Controlled Substances

1.  Cocain Dealer

2. Heroin Dealer

3. Marijuana

4. Methamphetamine Dealer

5. Methamphetamine Laboratory

    C.     Bookmaking

    D.     Telephone Calls

1. In Affidavit or in Statement of Probable Cause

2. In Warrant and in Combined Warrant/ Affidavit Form

    E.     Stolen Property

    F.     Property Used to Commit Felony; Property Tending to Identify Perpetrator

    G.     Bank Records

1. Customer Authorization

2. Administrative Subpoena or Summons

3. Search Warrant

4. Judicial Subpoena or Subpoena Duces Tecum

5. Police Request

6. Victimized Financial Institution Turns over Records

    H.     Phone Records

1. Unlisted Service

2. Telephone Records

3. Certification for Non-Disclosure

4. Out-of-State Telephone Companies

    I.     Dominion and Control Evidence

    J.     Credit Balance in Bank Accounts

    K.     "Peer Review" Medical Records

    L.     Pen Registration and Trap-and-Trace Devices

    M.     Credit Card Information

    N.     Records

O.    Computer Services Records Involving Foreign Corporation

P.    Computer Searches

1.  Overview

2.  Federal Cases

3.  Describing the Hardware to be Searched

4.  Describing the Data to be Seized

5.  Searching the Computer

Q.    Fraud Cases – Business "Permeated with Fraud"

R.    Evidence of Sexual Exploitation of Children and/or Minors

S.    Child Molestation Cases

T.    Search Warrant to Seize a Person for Whom a Warrant of Arrest Has Been Issued

U.    "Good Faith" Exception – Descriptions

V    Checklist

1.  Be Specific

2.  Be Thorough

3.  Proofread

4.  Include List of Items to be Seized


IV.    STATEMENT OF PROBABLE CAUSE

A.    Introduction

1.  Use of Informants – Two Prong Test

2.  Use of Informants – Totality of Circumstances Test

B.    Affiant – Establishing Identity, Training and Experience

1.  Narcotics

2.  Burglary

3.  Explosives

C.     Establishing Credibility of Informants

1.  Police Officers

2.  Citizen Informants

3.  Tested Reliable Informants

4.  Untested Informants

5.  Statements Against Penal Interest of Suspects and     Accomplices

6.  Informant Sworn Before Magistrate

7.  Information about Informants Background and Motivation   to Assist Police

8.  Other Sources of Information – Official Channels

D.     Establishing Factual Basis of Information – Personal Knowledge

1.  Confidential Reliable Informant

2.  Citizen Informant

3.  Declaration Against Interest

4.  Observations of the Affiant

E.     Double Hearsay

F.     Corroboration – Detailed Information; innocent Behavior as Corroboration

1.  Use of Corroboration

2.  Detailed Information

G.     Staleness

1.  General

2.  Narcotics Cases

3.  Special Fact Situations

4.  Information as to Suspect's Residence

5.  Specific Time Reference

H.     Use of Police Reports as Exhibits in Affidavit

I.     Sufficiency of Information

1.  Narcotics Offenses

2.  Controlled Delivery/Anticipatory Search Warrant

3. Narcotics Traffic

4. Growing Marijuana

5. Burglary, Robbery and Other Offenses – Search pf Suspect's Residence

6. Airport Searches Involving Trained Dogs

7. Sex Offenses

J. Crime Scene Searches

1. Generally

2. Arson Scene Searches

K. Covert Searches Under Warrant – "Sneak-and-Peak" Search Warrant

L. Justification for Answering the Telephone

1. Bookmaking

2. Narcotics Sales

V. NIGHTTIME SEARCHES

A. Introduction

B. "Good faith" Exception – Effect of Proposition 8

C. Requirement of Magistrate's Direction on Warrant

D. Requitement of "Good cause" in Affidvit

1. Heroin Sales at Night

2. Suspect Arrested – Confederates Outstanding

3. Arrest of an Occupant – Avoiding All Night Vigil

4. Premises Unoccupied

5. Items "Perishable"

6. Item "Consumable"

7. Prevention of Additional Crimes

8. Suspect Has Discovered Investigation

9. Probable Disposal of Stolen Items

10. Officer's Safety – Public Safety

E. Noting Nighttime Service Request on Search Warrant Forms

F.    Serving a Nighttime Warrant

G.    Search Commences Before 10:00 PM But Continues After

10:00 PM

H    Exceptions


VI.    INFORMANTS – PROTECTING IDENTITY

A.    Introduction

B.    Informant Disclosure – General Principles

1.  No Disclosure to Attack Probable Cause

2.  Luttenberger motions

a.  Raise a Reasonable Doubt

b.  Specify Information Sought

c.  Demonstrate Materiality of Information Sought

3.  Disclose Informant Only if "Material"

4.  Burden of Proof on Defendant – Exonerating Evidence        Only

C.    Defendant in Possession; Overwhelming Evidence of Guilt 00 No
Disclosure

D.    Lapse of Time Since Informant's Observation

E.    Informant Not Material on All Counts; Not Material for Possession
Only

F.    Court Proceedings – Open Court Hearing, In Camera Hearing

G.    Reducing Likelihood of Disclosure

H.    Compliance With Disclosure

I.    Sealing the Affidavit to Protect Informant's Identity "Hobbs
Warrant"

1. "Hobbs Warrant"

2. Court Order

J.    "Crimestopper" Informants

K.    Narcotics Surveillance Point Disclosure

VII.    MECHANICS OF PREPARATION

A.     Introduction

B.     Preparing the Search Warrant and Affidavit

C.     Presenting the Search Warrant and Affidavit to Magistrate

D.     Making Copies Affidavit and Warrant Are Signed

1.  Making Copies AFTER Affidavit and Warrant Are Signed

2.  Making Copies BEFORE the Affidavit and Warrant Are     Signed

E.     Sealing the Affidavit

1.  Sealing to Protect the Identity of an Informant

2.  Sealing to Protect an Ongoing Investigation

F.     Return of the Warrant


VIII.   SEARCH WARRANT CHECKLIST – SEARCH WARRANT FORMAT

A.     Introduction

B.     Checklist

C.     Search Warrant Format


IX.   ORAL AFFIDAVITS

A.     Introduction

1.  Oral Affidavits

2.  Telephonically Authorized Search Warrants

3.  Facsimile Search Warrants

4. Electronic Mail Search Warrants

B.     Oral Affidavits

1.  Oral Affidavit Procedures

C.     Telephonic Authorized Search Warrants

1.  Telephonic Procedures

2.  Failure of Recording Equipment

3.  Helpful Hints

D.     Facsimile Search Warrant – Penal Code Section 1526(b)(2)

E.     Electronic Mail Search Warrant – Penal Code Section 1526(b)(2)

X.     SERVICE OF THE SEARCH WARRANT

A.     Time Limit for Execution of Search Warrant

B.     Occupying Premises before Search

1.  Prior Illegal Entry – Effect Thereof

C.     Approaching the Premises; No News Media Entry

D.     Knock and Notice Requirements – Penal Code Section 1531

1.  General Rules

2.  Evidence is not Excluded Because of Knock-Notice     Violation

3.  Compliance with Penal Code Section 1531

4.  Justification for Noncompliance with Penal Code Section     1531

a.  Knock-Notice Cannot be Excused in Advance

b.  Standard for "No-Knock" Entry

c.  Safety of Search Team or Others

d.  Items Sought Will Be Destroyed or Disposed

5.  Substantial Compliance

a.  Officer's Purpose Clear

b.  Running Footsteps – Destruction of Evidence

c.  Occupants Arming Themselves

d.  "Walled" Residence

6.  Ruse to Get Door Open

7.  Vacant Premises

8.  Stores

9.  Inner Doors

10.  Occupant Cannot Resist Entry

E.     Use of Motorized Battering Ram – "The Tank"

F.     Conduct the Search

1.  Only Peace Officer May Serve Search Warrants

2. After Entry is Made

3. Questioning Occupants

4. Conduct a Thorough Search

5. Searching Container Within the Premises

6. Using "Evidence Collectors"

7. Leave an Inventory of Item Seized

8. Restraining Orders

9. Warrant Authorizes Single Search

10. Continuous Search

    G.    Search of a Person

    H.    Reading/Seizing Documents

    I.    Seizure of Items Not Described in the Warrant

        1. Contraband

2. Mere Evidence

3. Preparing a Second Warrant

4. Amending the Warrant

    J.    "Flagrant Disregard" of Authorized Scope of Search

    K.    Safes and Locked Containers

    L.    Answering Phones

    M.    Special Master

    N.    Return to the Search Warrant

    O.    Effect of Late and Deficient Returns

    P.    Releasing Property Seized Pursuant to a Search Warrant

    Q.    Warrantless Arrests While Serving Warrant

XI.    COURT PROCEEDINGS IN SEARCH WARRANT CASES

    A.    Proposition 8 – "Truth-In-Evidence"

    B.    Standard of Review – "Totality of Circumstances Test"

    C.    Penal Code Section 1538.5 Motions

1. Sole Suppression Remedy

2. Five Days Notice and Written Motion Required at        Preliminary Hearing

3. Precise Grounds for Suppression Must be Specified

4. One Evidentiary Hearing Only

5. Application of 1538.5, Subd. (I)

6. Dismissal on Search and Seizure Grounds – Penal Code        Section 995

       D.      Standing to Challenge Search

       E.      Prosecution Should not Concede Standing

       F.      Defendant's Disclaimer/Abandonment on Issue of Standing

1. Disclaimer

2. Abandonment

       G.      Motion to Quash Search Warrant

       H.      Motion to Traverse Search Warrant

1. General Rules

2. Procedures – Franks v. Delaware

3. Luttenberger Motions

4. Responding to Defense Affidavits

5. Details Surrounding Informant's Criminal        Background/Defense Discovery

6. Summary of Traversal Procedure

       I.      Illegally Obtain Information in Affidavit

       J.      Good Faith Exception

       K.      Sealed Affidavits Pursuant to People v. Hobbs

       L.      Severability of Search Warrant

       M.      Penal Code Section 871.5 Review of Warrants Declared Invalid

       N.      "Technical" Mistakes – Clerical Errors

       O.      Prior Illegal Entry

       P.      Court Proceedings Involving Claims of Privilege

       Q.      A Summary of Procedure – Practice Tips

1. Penal Code Section 1538.5 Motions

2.  Establish Standing

3.  Quash and Traverse Motions

4.  Standard Review

5.  Good Faith Exception

    R.      Proceeding for Return of Property of Non-Defendant

XII.    SEARCH WARRANT AND AFFIDAVIT EXAMPLES

    A.      Fruits of the crime

    B.      Evidence

    C.      Instrumentalities of a crime

Save Topic as PDF
(/Viewer/Manuals/GeneratePDF?
reportIndex=0)

© 2022 - Los Angeles County Sheriff's Department - Version 2021.7.22.1

Back to Table of Contents
(/Viewer/Manuals/14532?
returnContentID=14808)

 Viewer ▷ Table of Contents ▷ View

Training Bureau Material (/Viewer/Manuals/14494?returnContentID=14538) / Tactics and Survival Unit (TAS) Material (/Viewer/Manuals/14538?returnContentID=14812)

# Tactical Communications

❮ Search and Rescue Techniques (/Viewer/Manuals/14494/Content/14807)

Red Dot Pistol Transition ❯❯ (/Viewer/Manuals/14494/Content/14745)

**LOS ANGELES COUNTY SHERIFF'S DEPARTMENT**

**TRAINING DIVISION**

**TACTICS & SURVIVAL UNIT**

**TACCOM (PSP)**

**1820-29504**

**Expanded Course Outline**

-

-

Time:                        2  hours

Instructors(s):          Sworn member(s) of Los Angeles Sheriff's Department

Resources:          **LASD** -Field Operations Training Unit (CPT- Tactical Communication); **Advanced Officer Training-** ;**Ca. P.O.S.T. Training**; **LASD** - Tactics & Survival Training Unit (Laser I curriculum).

Goal:                    The course will provide the student with the minimum topics of Tactical Communications required in the POST Perishable Skills Training Program. The intent of the course is to improve the students ability to generate voluntary compliance through the art of persuasion and utilizing the tools of interpersonal communication. The

student will receive an overview of Tactical Communication concepts such as: tactical communication within the *Use-of-Force Options Chart*, communication elements, inappropriate language, questioning techniques and other communication principles.

Performance Objectives:

At the conclusion of this block of instruction, the student(s) will to the satisfaction of the instructor be able to:

1.    Clarify the Communication Process

2.    Describe Active Listening techniques

3.    Describe Communication techniques for Voluntary Compliance

Methods & Media:    Lecture, question and answer- facilitation of group discussion and exercise, video clips, white board and markers, flip charts, handouts, props, powerpoint presentation, practical application scenarios.

Minimum Topics/Exercises:

A.    Class exercises/ student evaluation/ testing

B.     Tactical- officer to: officer/suspect/citizen

C.    Tactical Communication role within the Use-of-Force Options Chart

D.    Communication Elements (e.g. approach, body language, posturing, observing, listening, asking, paraphrasing, redirecting, defusing, responding, interest, empathy, influence, resolution).

E.     Officer safety (e.g. positioning, environment, reading suspect(s), control/voluntary

compliance).

    F.    Professional/non-professional/inappropriate language

    G.    Intentional/unintentional contact escalation versus de-escalation

    H.    Questioning techniques (e.g. fact finding, leading, opinion/feedback, general).

-

**Expanded Course Outline**

I. Introduction

   A. Registration
   B. Course Overview
   C. Course Goals
      1. Safety- yours and theirs
      2. Enhanced professionalism
      3. Decrease in complaints
      4. Decrease in liability
      5. Lessen personal stress

   D. Course Objectives

I. Instructional Resources

   A. Verbal Judo history and background (tactical communication)

I. Tactical Communication role within the Use-of-Force Options Chart      **IV-Tactical(c)**

A. Command presence, verbal communication (Compliance)

B. Control holds, firm grip, OC Spray, defensive tactics (Resistive)

C. Less lethal weapons, personal weapons, impact weapons (High Risk/Assaultive)

D. Lethal Force, Impact strikes to vital areas (Deadly Force/Assault with force likely to produce serious bodily injury)

I. Communication Elements                                **IV-Tactical (d)**

A. Content- 7-10% has little power to persuade or convince

B. Voice-   33-40%

    1. Tone- attitude 90% of complaints are tone related

    2. Pace-   slow/fast vs. pitch

        a. I never said he stole the money

C. Other Non-Verbals- 50-60% presence

I. Professional/Non-professional/ Inappropriate language    **IV-Tactical (f)**

A. Separate attitude from behavior. Focus only on behavior.

B. You are a Peace Officer-   where you go there should be Peace.

C. Re-spect vs. respect

I. Five Types of Questioning Techniques              **IV-Tactical (h)**

A. Fact finding- who, what, where, when, why and how

B. General- open ended. "What's the matter....?"

C. Direct- Yes or No

D. Leading- Putting words in other's mouths

E. Opinion seeking- "Is there some way we can handle this?"

I. Tactical Officer To: Officer/Suspect/Citizen              **IV-Tactical (b)**

A. Greeting

B. ID self/dept.

C. Reason for stop

D. Any justified reason

E. Driver's license

F. Registration and Insurance

G. Decision

H. Close

I. Intentional/Unintentional Contact                                **IV-Tactical (g)**

Escalation vs. De-escalation

    A.      The Five Step "Hard Style"

          1.      Ask

          2.      Set Context

          3.      Present Options

          4.      Confirmation

          5.      Act

    B.      Soler

          1.      Square off

          2.      Open posture

          3.      Looking interested

          4.      Eye contact

          5.      Relaxed

I. Officer Safety- S.A.F.E.R. Concept                              **IV-Tactical (e)**

A. Security

B. Attack

C. Flight

D. Excessive repetition

E. Revised priorities

I. Class Exercise/Student Evaluations/Testing                                    **IV-Tactical (a)**

   A. Evaluate students role playing the tactical 8-step

   B. Evaluate students role playing the 5-step "Hard Style"

**Testing: Any student scoring below standard on any exercise, as IV-Tactical (a)**

**established by the presenter, will be remediated, testing until standard**

**is achieved.**

Save Topic as PDF
(/Viewer/Manuals/GeneratePDF?
reportIndex=0)

© 2022 - Los Angeles County Sheriff's Department - Version 2021.7.22.1

Back to Table of Contents
(/Viewer/Manuals/14538?
returnContentID=14812)

Case 2:22-cv-05367-RGK-MAA    Document 48-11    Filed 05/24/23    Page 117 of 187
Page ID #:708



Training Bureau Material (/Viewer/Manuals/14494?returnContentID=15100) / Training Videos
(/Viewer/Manuals/15100?returnContentID=15258)

# THE PUBLIC'S RIGHT TO FILM

‹ PAT-DOWN SEARCHES (/Viewer/Manuals/14494/Content/15257)

KEEPING YOUR FINGER OFF-TRIGGER › (/Viewer/Manuals/14494/Content/15259)

THE PUBLIC'S RIGHT TO FILM (http://www.lasdvideos.org/video/TBPublicRightToFilm.mp4)

Save Topic as PDF
(/Viewer/Manuals/GeneratePDF?
reportIndex=0)

© 2022 - Los Angeles County Sheriff's Department - Version 2021.7.22.1

Back to Table of Contents
(/Viewer/Manuals/15100?
returnContentID=15258)



Training Bureau Material (/Viewer/Manuals/14494?returnContentID=14532) / Advanced
Officer Training Unit (AOT) Material (/Viewer/Manuals/14532?returnContentID=14750)

# Vehicle Theft Investigation

❮ Traffic Collision Investigation Advanced (/Viewer/Manuals/14494/Content/14749)

Four-wheel Drive Vehicles and Equipment Course ❯ (/Viewer/Manuals/14494/Content/14795)

I. **REGISTRATION**

    A. Describe class goals

    B. Advise participants of safety during class and injury reporting

    C. Introduce Instructors

II. **GENERAL & ALTERED VEHICLE IDENTIFICATION**

    A. Vehicle Identification Number

        1. Vehicle Identification Number History - Past & Present

        2. Vehicle Identification Number Labels

        3. Vehicle Identification Number Decoding Resources

    B. Methods Of Identification

        1. Public VIN

        2. Vin Labels

        3. Confidential Identifiers

        4. Component Part Serial Numbers

    C. Locating Stolen Vehicles

        1. Initial Indicators

        2. Tampered Identification Numbers

        3. Replaced Identification Numbers

         4. Removed Identification Numbers

   D. Report writing

         1. Omit "Confidential Locations & Information"

   E. Resources Available

         1. State Task Force

         2. Manufacture Contacts

         3. Insurance Company

         4. Training Seminars

## III. VEHICLE THEFT LAWS

   A. Applicable State Penal Code

         1. 487 d (1) P.C.

         2. 499 b P.C.

         3. 496 d (a) P.C.

         4. 548 (a) P.C.

   B. Applicable State Vehicle Code

         1. 2805 C.V.C.

         2. 10751 C.V.C.

         3. 10801 C.V.C.

         4. 10802 C.V.C.

         5. 10803 C.V.C.

         6. 10851 (a) C.V.C.

   C. Applicable State Evidence Code

         1. 1040

   D. Search & Seizure

         1. Warrant

         2. Consent

         3. Auto Searches

   E. Defendant Statements

         1. Showing Intent

IV. **VEHICLE THEFT M. O. 's**

    A. Statistics

        1. Stolen

        2. Recovered

        3. Outstanding

        4. High Theft vehicles

    B. Reasons For Vehicle Theft

        1. Easy to steal

        2. Easy to sell

        3. Interchangeable

    C. Trends In Vehicle Thefts

        1. V.I.N. Switching

        2. Cold Plated Vehicles

        3. Chop Shop

    D. Methods Of Vehicle Theft

        1. Tools used to gain entry

        2. Tools used to steal vehicles

        3. Use of tow trucks and car carriers

        4. Locations where thefts occur

    E. In The Field Investigations

        1. Interview Techniques

    F. Scenario and Closing Discussion

V. **SUBPLATING AND V.I.N. SWITCHING**

    A. Explain Subplating

        1. Passenger Vehicle License Plate Sequential Issuance

        2. Commercial Vehicle License Plate Sequential Issuance

    B. DMV Codes

        1. On Registration Forms

        2. On Mobile Digital Terminals

    C. Subplating Scenario

        1. Break into groups and discuss scenario

    D. V.I.N. Plate Examination

1. Examine Manufacturer VIN Plates

2. Examine Counterfeit VIN Plates

3. Discuss Security Features

E. Video Depicting a Suspect VIN Switching a Vehicle

1. Removing VIN's

2. Replacing VIN's

3. Changing Confidential VIN's


VI. **WATERCRAFT IDENTIFICATION**

A. Hull Identification Numbers HIN

1. History

2. Format Variations

3. Current Format

4. HIN Breakdown

5. Altered HIN's

B. Locations For HIN's & Secondary HIN's

1. Boats

2. Personal Watercraft

C. Vessel Component Identification

1. Mercury Outdrive

2. Volvo OMC Outdrive

3. Gimble Numbers

4. Inboard Engine Numbers

5. Outboard Engine Numbers

D. CF an Registration Numbers

1. CF Number Breakdown

2. Non-California Registration

E. Special Construction Watercraft

1. CFZ Numbers

F. Applicable Laws Pertaining to Watercraft

1. 9845 C.V.C.

2. Other Vehicle Code Sections

G. Trailer Identification

1. Manufacturer Markings and Labels

2. Special Construction Labels

3. Secondary Locations

## VII. **IDENTITY THEFT & FRAUD**

A. How Does Identity Theft Begin

1. Through Theft

2. How Identity Thieves Use Your Personal Information

3. Through Purchases

B. Resources

1. Credit Bureaus

2. Social Security

3. U. S. Postal Service

4. Mail Box Drops

5. Department Of Motor Vehicles

6. Direct Marketers

7. Banks & Lenders

C. Applicable State & Federal Laws

## VIII. **BAIT CAR OPERATIONS**

A. Nomenclature of TRAP's (Taskforce for Regional Autotheft Prevention) Vehicles

1. Audio & Video Capabilities

2. Ignition shut-off

3. Controlled Environment

B. Requirements Necessary for an Operation

1. Operation Plan

2. Local Statistics

3. Reporting Procedures

C. Video of Past Operations

## IX. **CARGO THEFT & COMMERCIAL VEHICLE IDENTIFICATION**

A. Applicable State Laws

      1. 487 h (a) P.C.

      2. 487 h (b) P.C.

B. Cargo Crime Classification

      1. Larceny

      2. Grand Theft

      3. Burglary

      4. Robbery

C. Cargo crime Impact

      1. Monetary Loss

      2. Delay in Supply Chain

      3. Passed-On Cost To Customers

      4. Devastating To Smaller Businesses & Independents

D. Methods Of Thefts

      1. Hi-Jacking

      2. Driver Give-Ups

      3. Burglaries

      4. False Documentation

E. Reporting & Tracking

      1. Enter Vehicles in S.V.S

      2. Enter Property in A.P.S.

      3. Make Immediate Notifications

F. Cargo Theft Investigations

      1. Informants

      2. Surveillance

      3. Buy/Bust Operations

      4. Undercover Operations

      5. Search Warrants

      6. Filing/Prosecutions

G. Vehicle Identification Numbers Pertaining To Cargo

      1. Equipment I.D.

      2. Tractors

      3. Trailers

      4. Containers

      5. Chassis

      6. Cargo Vans

H. Indicators of Theft

    1. Broken Seal

    2. Broken Door

    3. Illegally Parked

    4. Un-Attended

X. **CONSTRUCTION EQUIPMENT IDENTIFICATION**

A. Problem Awareness

    1. Statistics

B. Different Types of Equipment

    1. Track-Type Tractors

    2. Wheel-Type Tractors

    3. Skidders

    4. Graders

    5. Compactors

    6. Lift Trucks

    7. Rippers

    8. Backhoes

C. Different Manufacturers

D. Product Identification Number P.I.N.

    1. P.I.N. History

    2. P.I.N. Labels

    3. P.I.N. Plates

E. Methods Of Identification

    1. National Insurance Crime Bureau (NICB)

    1. Crime Prevention Program (CPP)

    2. National Equipment Registry (NER)

    3. Stolen Vehicle System (SVS)

B. DMV Registration Requirements

C. Locating Stolen Equipment

    1. Types of Transporters

    2. Late hour Transporting

       3. Initial Indicators

       4. Tampered Product Identification Numbers

       5. Replaced Product Identification Numbers

       6. Removed Product Identification Numbers

D. Report writing

       1. Omit "Confidential Locations & Information"

E. Resources Available

       1. State Task Force

       2. Manufacture Contacts

       3. Insurance Company

       4. Training Seminars

## I. MOTORCYCLE IDENTIFICATION

A. Vehicle Identification Number

       1. Vehicle Identification Number History - Past & Present

       2. Vehicle Identification Number Labels

       3. Vehicle Identification Number Decoding Resources

B. Methods Of Identification

       1. Frame VIN

       2. Vin Labels

       3. Engine Numbers

       4. Confidential Identifiers

       5. Component Part Serial Numbers

C. Locating Stolen Vehicles

       1. Tampered Identification & Engine Numbers

       2. Replaced Identification & Engine Numbers

       3. Removed Identification & Engine Numbers

D. Report writing

       1. Omit "Confidential Locations & Information"

E. Resources Available

       1. State Task Force

       2. Manufacture Contacts

       3. Insurance Company

I. **PRACTICAL APPLICATION**
   A. Individual Scenario Stations
      1. The student will demonstrate his ability to apply his new acquired knowledge at each of the six stations
      2. The instructor will pass or fail each of the assigned learning activities

I. **WRITTEN TEST & COURSE EVALUATION**

Save Topic as PDF
(/Viewer/Manuals/GeneratePDF?
reportIndex=0)

© 2022 - Los Angeles County Sheriff's Department - Version 2021.7.22.1

Back to Table of Contents
(/Viewer/Manuals/14532?
returnContentID=14750)

# EXHIBIT B

1 | VANITA GUPTA
2 | Principal Deputy Assistant Attorney General
   | JUDITH C. PRESTON (MD Bar)
3 | STEVEN H. ROSENBAUM (NY Bar Reg. #1901958)
4 | CHRISTY E. LOPEZ (DC Bar #473612)
   | R. TAMAR HAGLER (CA Bar #189441)
5 | CHARLES HART (NY Bar Reg. # 4282281)
6 | NORRINDA BROWN HAYAT (DC Bar #479640)
   | CARRIE PAGNUCCO (DC Bar #1000551)
7 | KATHRYN LADEWSKI (MI Bar #P74431)
8 | Civil Rights Division
9 | U.S. Department of Justice
   | 950 Pennsylvania Avenue, N.W.
10 | Washington, DC 20530
11 | Tel: (202) 305-3192
   | Fax: (202) 514-0212
12 | Email: charles.hart@usdoj.gov
13 | norrinda.hayat@usdoj.gov
14 | Attorneys for Plaintiff United States of America

15

UNITED STATES DISTRICT COURT

16

FOR THE CENTRAL DISTRICT OF CALIFORNIA

17

18 | UNITED STATES OF AMERICA,    )        No. CV 15-03174

19 |                        )
   |     Plaintiff,             )
20 |                        )
21 |     v.                  )
   |                        )        SETTLEMENT AGREEMENT
22 | THE COUNTY OF LOS ANGELES  )
23 | and THE LOS ANGELES COUNTY )
   | SHERIFF'S DEPARTMENT       )
24 |                        )
25 |     Defendants.           )
26 |                        )
27 |                        )
28

1

## I.    **INTRODUCTION**

2        The United States, the County of Los Angeles, and the Los Angeles Sheriff's
3   Department ("LASD") (collectively "the Parties") enter into a Settlement Agreement
4   ("Agreement") with the goal of ensuring that police services are delivered to the
5   people of Lancaster and Palmdale, and the surrounding unincorporated areas, in a
6   manner that fully complies with the Constitution and laws of the United States,
7   effectively ensures public and deputy safety, and promotes public confidence in LASD
8   and its deputies.  The Parties also recognize that the County of Los Angeles' law
9   enforcement officers often work under difficult circumstances, risking their physical
10  safety and well-being for the public good.

11       For these reasons, and noting the general principle that settlements are to be
12  encouraged, particularly settlements between government entities, the Parties agree to
13  implement this Agreement under the following terms and conditions.

14       The United States has filed a complaint in the Federal District Court for the
15  Central District of California pursuant to the authority granted to the United States
16  Department of Justice ("DOJ") under 42 U.S.C. § 14141 to seek declaratory or
17  equitable relief to remedy a pattern or practice of conduct by law enforcement officers
18  that deprives individuals of rights, privileges, or immunities secured by the
19  Constitution or federal law.  The complaint is also filed pursuant to the Fair Housing
20  Act, 42 U.S.C. § 3614(a), which grants DOJ the authority to seek declaratory,
21  equitable, and monetary relief to remedy a pattern of practice of housing
22  discrimination.  LASD does not admit or agree with DOJ's findings and conclusions.
23  Nothing in this Agreement will be construed as an acknowledgment, agreement,
24  admission, statement, or evidence of liability of the County, LASD, or any of its
25  deputies or officials under 42 U.S.C § 14141, the Safe Streets Act, Title VI, or the Fair
26  Housing Act.  LASD enters into the Agreement because it wishes to ensure that its
27  department is functioning at an exceptional level and that it has positive relationships
28  with all its communities.

-2-

1

## II.  DEFINITIONS

2      1.    "LASD-AV" or "Antelope Valley stations" means the Los Angeles
3 County Sheriff's Department Lancaster Station and Palmdale Station of the Antelope
4 Valley, and these stations' agents, deputies, supervisors, and employees (both sworn
5 and unsworn).

6      2.    "County" means the County of Los Angeles, including its agents,
7 deputies, and employees.

8      3.    "DOJ" means the United States Department of Justice's Civil Rights
9 Division and its agents and employees.

10      4.    "Court" means the United States District Judge for the Central District of
11 California presiding over this case.

12      5.    "Active resistance" means a subject's physical actions to defeat a deputy's
13 attempt at control and to avoid being taken into custody, such as attacking or striking a
14 deputy.  Verbal statements, bracing, tensing, pulling away, or fleeing the scene, do not
15 alone constitute active resistance.

16      6.    "Administrative investigations" mean investigations conducted by the
17 Internal Affairs Bureau or Palmdale or Lancaster unit-level investigations.
18 Administrative investigations can result in formal discipline.

19      7.    "Backseat detention" means restraining a person's freedom by placing
20 him or her in the backseat of a patrol car for any period of time.

21      8.    "Community Advisory Committee" means the group of community
22 members currently working with the LASD's Antelope Valley Stations to advise and
23 consult on community related policing issues and assist with the implementation of
24 this agreement as enumerated in Section VII.

25      9.    "Defensive resistance" means a subject's attempts to evade deputy
26 attempts to control, including pulling away from an officer's grasp or fleeing the scene.

27      10.    "Discriminatory policing" means selective enforcement or non-
28 enforcement of the law, including the selecting or rejecting of particular policing

-3-

1  tactics or strategies based on membership in a demographic category specified in this
2  Agreement.  Discriminatory policing does not include using race, ethnicity, or any
3  other status in any reliable and recent suspect-specific description.

4      11.    "Effective Date" means the day this Agreement is entered by the Court.

5      12.    "Executive Force Review Committee" refers to the LASD committee that
6  reviews all uses of force requiring a rollout by the Internal Affairs Bureau
7  force/shooting response team.

8      13.    "Force" means any physical effort used to control or restrain another, or
9  to overcome the resistance of another.

10     14.    "Fraud Compliance Check" means search of a voucher holder's home by
11 an agent of the Housing Authority, with or without third parties, including LASD
12 deputies, to determine whether the voucher holder is in compliance with the rules of
13 the Section 8 program.

14     15.    "Full and effective compliance" means achieving both sustained
15 compliance with all material requirements of this Agreement and sustained and
16 continuing improvement in constitutional policing and public trust, as demonstrated
17 pursuant to the Agreement's outcome measures.

18     16.    "Housing Authority" means Housing Authority of the County of Los
19 Angeles (HACoLA).

20     17.    "IAB" means the Internal Affairs Bureau.

21     18.    "ICIB" means the Internal Criminal Investigations Bureau, which is the
22 LASD unit that investigates any conduct where a deputy may be criminally liable.

23     19.    "Including" and "include(s)" mean including but not limited to.

24     20.    "Implement" or "implementation" means the development or putting into
25 place of a policy or procedure, including the appropriate training of all relevant
26 personnel, and the consistent and verified performance of that policy or procedure in
27 actual practice.

28

-4-

21. "Investigatory stop" or "investigatory detention" means a temporary restraint where the reasonable person subjected to the stop or detention would reasonably believe that s/he is not free to leave. An investigatory stop or detention may be a pedestrian, vehicle, or bicycle stop.

22. "LEP" means Limited English Proficient, and refers to a person who does not speak English as his/her primary language and has a limited ability to read, write, speak, or understand English. LEP individuals may be competent in certain types of communication (e.g., speaking or understanding), but still be LEP for other purposes (e.g., reading or writing).

23. "MDC" means the Mobile Digital Computer or Mobile Digital Systems (MDS), which is the electronic system where deputies record daily patrol activity.

24. "Monitor" means a person or team of people who shall be selected to monitor and report on implementation of this Agreement.

25. "North Patrol Division" means the LASD geographic area covering the cities of Lancaster and Palmdale and the surrounding unincorporated areas of the Antelope Valley. North Patrol Division was previously called Region 1.

26. "Personnel complaints" are external allegations of misconduct against an LASD deputy or employee that could be a violation of law or LASD policy. In contrast, a "service complaint" is an external complaint about an LASD service, procedure, or practice that does not involve misconduct by an LASD deputy or employee.

27. "PLE" means Performance Log Entry and refers to the hard copy documentation of supervisory notations about a deputy's performance, including commendations, weaknesses, career guidance, and training recommendations.

28. "Performance Mentoring Program" refers both to LASD's department-wide mentoring program as well as the North Patrol Division's mentoring program. These performance mentoring programs identify and assist deputies in need of specialized or additional training, supervision, or mentoring.

1   29.   "Policy" means regulations, directives, unit orders or manuals, regardless
2   of the name, describing the duties, functions, and obligations of LASD deputies and/or
3   employees, and providing specific direction in how to fulfill those duties, functions, or
4   obligations.

5   30.   "PPI" means the Personnel Performance Index, which is LASD's early
6   intervention database.  The PPI provides a systematic recording of data relevant to
7   incidents such as uses of force, shootings, commendations, and complaints regarding
8   LASD personnel.  In addition, PPI tracks the progress of administrative investigations,
9   civil claims and lawsuits, and Pitchess motions that are handled by the Department.

10   31.   "Reasonable suspicion" means articulable facts that, within the totality of
11   the circumstances, lead a deputy to reasonably suspect that a crime has been, is being,
12   or is about to be committed.

13   32.   "Reportable use of force" means any use of force that is greater than that
14   required for unresisted searching or handcuffing.  Additionally, any use of force which
15   results in injury or a complaint of pain must be reported.

16   33.   "SCR" means a service comment review, which is the review of an
17   external civilian complaint about an LASD deputy or employee's behavior.

18   34.   "Section 8" or the "Voucher Program" means the federal Section 8
19   Housing Choice Voucher Program, which is authorized under 42 U.S.C. § 1437f and
20   funded by the United States Department of Housing and Urban Development (HUD),
21   under which qualifying persons may receive a voucher for a portion of their rental
22   housing costs, which they can use on the open market to obtain housing.

23   35.   "Seizure" or "detention" occurs when a deputy's words or actions convey
24   to a reasonable person that he or she is not free to leave.

25   36.   "Settlement Agreement" or "Agreement" means this document, filed as a
26   part of the action, United States v. Los Angeles County et al., Civil Action No.

27   _____.

28

-6-

1   37.   "Shall" or "will" or "agrees to" means that the provision imposes a
2   mandatory duty.

3   38.   "Supervisor" means a sworn LASD-AV employee at the rank of sergeant
4   or above (or anyone acting in those capacities) and non-sworn LASD-AV personnel
5   with oversight responsibility for other deputies.

6   39.   "Use of force" means any physical coercion used to effect, influence, or
7   persuade an individual to comply with an order by a deputy.

8   40.   "Voucher Participant" means a person who is a participant in Section 8.

9   ## III.   STOPS, SEIZURES, AND SEARCHES

10   LASD agrees to ensure that all investigatory stops, seizures, and searches are
11   conducted in accordance with the rights, privileges, or immunities secured or protected
12   by the Constitution or laws of the United States.  LASD shall ensure that investigatory
13   stops and searches are part of an effective overall crime prevention strategy, do not
14   contribute to counter-productive divisions between LASD and the community, and are
15   adequately documented for tracking and supervision purposes.  To achieve these
16   outcomes, LASD shall implement the requirements below.

17   **A. Investigatory Stops and Detentions**

18   41.   LASD-AV deputies shall only conduct investigatory stops or detentions
19   where the deputy   has reasonable suspicion that a person has been, is being, or is
20   about to be engaged in the commission of a crime.

21   42.   LASD agrees to incorporate the following elements in its training of
22   Antelope Valley deputies:  (1) introducing themselves at the initiation of contact with a
23   civilian when reasonable and practical; (2) stating the reason for an investigatory stop
24   or detention as soon as practicable; (3) ensuring that an investigatory stop or detention
25   is no longer than necessary to take appropriate action; and (4) acting with
26   professionalism and courtesy throughout the interaction.

27   43.   LASD-AV deputies shall not use race, color, ethnicity, national origin,
28   religion, gender, gender identity, disability, or sexual orientation as a factor, to any

-7-

1    extent or degree, in establishing reasonable suspicion or probable cause, except as part

2    of actual and credible description(s) of a specific suspect or suspects in any criminal

3    investigation.

4        44.    LASD-AV deputies shall document the following information about

5    patrol activity in their MDC patrol logs:

6        a. the deputy's name;

7        b. the date and time of the stop;

8        c. the location of the stop;

9        d. the race/ethnicity of each individual stopped, detained, or searched;

10       e. the disposition of the stop, including whether a citation was issued or an

11           arrest made;

12       f. a concise narrative articulating specific facts and circumstances that

13           support reasonable suspicion or probable cause for investigative stops and

14           detentions consistent with the radio clearance code (Noting a radio

15           clearance code, or the code for the resulting citation or other result, will

16           not be deemed sufficient articulation of legal support for the stop or

17           search.);

18       g. whether they asked an individual about his/her probation or parole status,

19           and what the answer was;

20       h. where a backseat detention was conducted, a narrative articulating a

21           reason, consistent with LASD policy and the law, as to why each backseat

22           detention was necessary, as well as the reasonable suspicion for the

23           investigation;

24       i. the length of any backseat detention;

25       j. whether a consent search of an individual was conducted, and if so, the

26           reason for seeking consent; and

27       k. whether a vehicle was impounded and the justification for the

28           impoundment.

-8-

1      45.   LASD-AV deputies shall use accurate and specific descriptive language
2  and not rely solely on "boilerplate" or form language in any reports describing factual
3  circumstances of investigatory stops, detentions, and searches.

4      46.   LASD-AV shall collect and analyze data related to searches based on
5  probation or parole status. LASD shall assess the efficacy of this tactic and its impact
6  on the community and make policy changes accordingly.

7      47.   LASD will revise its policy and training about backseat detentions to
8  ensure that they only occur when a LASD-AV deputy has individualized reasonable
9  suspicion that justifies the detention and when a deputy can articulate reasonable
10  deputy safety concerns, and ensure that supervisors understand how to assess the
11  reasonableness of a backseat detention.

12      48.   LASD-AV deputies may not conduct backseat detentions as a matter of
13  course during routine traffic stops or domestic violence situations. When LASD-AV
14  deputies do conduct backseat detentions, LASD shall continue to require deputies to
15  explain to civilians in a professional and courteous manner why they are being
16  detained in the backseat of patrol cars. LASD will not permit backseat detentions
17  based on unreasonable or factually unsupported assertions of deputy safety. Backseat
18  detentions shall not be used except where the deputy has an objectively reasonable
19  belief that the detained person may pose a threat or be an escape risk. In instances
20  where the backseat detention is premised on weather conditions or the detainee's
21  articulated desire for privacy or personal safety, the deputy will inform the individual
22  that the detention is optional.

23      49.   LASD policy will specify that if an individual complains about being
24  detained in the backseat of a patrol car, the LASD-AV deputy shall call for a field
25  sergeant to respond to the scene and take the individual's complaint. If the individual
26  does not want to wait for the field sergeant to respond to the scene, the deputy shall
27  provide the individual with a complaint information brochure, currently called
28  "Procedures for Public Comment" and the deputy's business card.

-9-

**B. Searches**

50.     LASD-AV deputies shall not use race, color, ethnicity, national origin, religion, gender, gender identity, disability, sexual orientation, or gender identity in exercising discretion to conduct a search, except as part of an actual and credible description of a specific suspect or suspects in any criminal investigation.

51.     LASD-AV deputies shall not conduct arbitrary searches. The request to conduct a consent search must be reasonable and a deputy must be able to articulate a valid reason under law and LASD policy for initially having stopped the individual.

52.     All LASD-AV deputies equipped with body worn audio or video recorders shall record all requests for consent to search and the individual's response. Where a subject is Limited English Proficient, the deputy shall affirmatively inform the subject in the appropriate non-English language. LASD agrees to work with Community Advisory Committees (CACs) to conduct outreach to explain to AV residents their right to refuse or revoke consent before or during a search. This outreach will include a one-page written explanation of an individual's right to refuse or revoke consent. This written explanation will be posted on the LASD-AV website and provided at community meetings. An LASD-AV deputy shall immediately notify a supervisor when considering a home search based on consent, and the supervisor shall approve the search before it is conducted.

53.     In conducting searches, particularly searches related to Section 8 compliance checks, LASD-AV will use only the number of deputies reasonably necessary for efficacy and officer safety based on the circumstances of the search. A supervisor must approve the use of more than two deputies for any consent search. If a supervisor is not available within a reasonable amount of time, a supervisor will review the documentation or recording of consent as soon after the search as possible.

54.     LASD-AV deputies shall only be involved with a Section 8 compliance check where the housing authority agent has sufficiently articulated legitimate safety concerns.

-10-

1       55.     When LASD-AV deputies conduct searches or Section 8 compliance

2 checks and individuals other than the subject of the search are present, the individuals

3 shall not be detained longer than reasonably necessary to conduct the search and secure

4 the area, and the individuals shall not be subject to frisk or search without the legally

5 requisite level of individualized suspicion or probable cause.

6       56.     LASD-AV deputies shall only conduct searches of individuals on

7 probation or parole in accordance with the provisions of this section and when

8 knowledge of a probation or parole search condition has been established.

9 **C. Stop, Search, and Seizure Training**

10       57.     LASD shall provide all Antelope Valley deputies with training on stops,

11 searches, and detentions, including the requirements of this Agreement. Such training

12 shall be taught by a qualified legal instructor with significant experience in Fourth

13 Amendment issues, and shall:

14          a. ensure officers understand Fourth Amendment and related legal

15             restrictions on searches and seizures, including consent searches, backseat

16             detentions, probation and parole searches, and Section 8 related activity,

17             as well as additional limitations under LASD policy;

18          b. address the differences between various police contacts by:

19                 1. the scope and level of police intrusion,

20                 2. differences between probable cause, reasonable suspicion,

21                      and mere speculation, and

22                 3. true voluntary consent;

23          c. provide guidance on the facts and circumstances in addition to legal and

24             policy limitations, that should be considered in initiating, conducting,

25             terminating, and expanding a stop or search, including consent searches,

26             probation and parole searches, backseat detentions, and Section 8-related

27             activities;

28

1    d. incorporate role playing scenarios and other adult-learning mechanisms to

2     facilitate deputy ability to exercise good judgment about whether and how

3     to stop and search individuals; and

4    e. provide guidance on stopping and/or searching individuals for

5     discretionary and non-violent offenses, including providing guidance

6     about procedural justice, alternatives to conducting investigatory stops

7     and searches, and the impact on civilians of conducting apparently

8     arbitrary stops and searches.

9 **D. Supervisory Review**

10   58. LASD agrees to implement additional accountability and supervision

11 practices outlined below in the Antelope Valley, and ensure that existing policies are

12 followed, to ensure that unlawful stops, searches, and seizures are detected and

13 effectively addressed.

14   59. Sergeants assigned as raters shall regularly audit their assigned deputies'

15 stop, search, and seizure documentation in addition to arrest reports and citations for

16 completeness, accuracy, and legal sufficiency. Sergeants shall audit at least one CAD

17 log for each deputy under their supervision each week. Sergeants shall conduct further

18 review as indicated by weekly audits, PPI information and other indicia.

19   60. If a deputy's stop, search, or seizure documentation does not provide

20 sufficient detail or articulate sufficient legal and policy justification for the action, the

21 supervisor shall review the action with the deputy to determine whether there was

22 sufficient legal and LASD policy justification.

23   61. Antelope Valley supervisors and commanders shall take appropriate

24 action to address all violations or deficiencies in stops, searches, and seizures including

25 non-disciplinary corrective action for the involved deputy, and/or referring the incident

26 for disciplinary action.

27

28

1    62.    Antelope Valley supervisors and commanders shall track repeated
2    violations of the provisions of this agreement or deficiencies and the corrective action
3    taken, if any, in PPI.

4    63.    LASD agrees to hold accountable supervisors and Antelope Valley station
5    commanders for appropriately and thoroughly reviewing reports and documentation
6    related to stops, searches, and seizures, and requiring deputies to articulate sufficient
7    rationale under law and LASD policy.

8    ## IV.    BIAS-FREE POLICING

9    LASD agrees to deliver police services that are equitable, respectful, and bias-
10   free, in a manner that promotes broad community engagement and confidence in the
11   department.

12   **A. Bias-Free Policing**

13   64.    In conducting its activities, LASD agrees to ensure that members of the
14   public receive equal protection of the law, without bias based on race, color, ethnicity,
15   national origin, religion, gender, gender identity, disability, or sexual orientation, and
16   in accordance with the rights secured or protected by the Constitution or laws of the
17   United States.  Deputies shall not initiate stops or other field contacts because of an
18   individual's actual or perceived immigration status.

19   65.    LASD agrees to continue to consult with the Museum of Tolerance
20   personnel and others to ensure clear guidance for LASD-AV deputies, through policy,
21   training, and supervision, on prohibited conduct, including selective enforcement or
22   non-enforcement of the law and the selection or rejection of particular tactics or
23   strategies, based upon stereotypes or bias.  LASD agrees to consult with experts to
24   ensure that the manner in which guidance is provided to personnel takes into account
25   the influences of implicit bias and stereotype threat.

26   66.    LASD agrees to effectively communicate with and provide timely and
27   meaningful access to police services to all members of the Antelope Valley

28

-13-

1  community, regardless of their limited ability to speak, read, write, or understand
2  English.  To achieve this outcome, LASD agrees to:
3        a. develop and implement a language assistance plan and policy that
4          complies with Title VI of the Civil Rights Act of 1964, as amended, (42
5          U.S.C. § 2000d et seq.) and other applicable law, and comports with best
6          practices and current professional standards; and
7        b. ensure that all LASD personnel shall take reasonable steps to provide
8          timely, meaningful language assistance services to LEP individuals they
9          encounter.

10      67.  LASD-AV agrees to incorporate requirements regarding bias-free
11  policing and equal protection into its performance assessment processes, including
12  giving significant weight to an individual's history of sustained bias-related violations,
13  as well as using all available methods to assess the individual's ability to effectively
14  practice bias-free policing.

15      68.  Within one year of the Effective Date, and annually thereafter, LASD will
16  assess all programs, initiatives, and activities involving the Antelope Valley Stations to
17  determine the extent of any disparate impact and to ensure that no program, initiative,
18  or activity is applied or administered in a manner that unlawfully discriminates against
19  individuals on the basis of race, color, ethnicity, national origin, religion, gender,
20  gender identity, disability, or sexual orientation.

21      69.  LASD agrees to utilize experts and the community survey outlined below
22  to study organizational climate and culture in the Antelope Valley stations to aid in
23  developing the requirements of this section.  Personnel will be allowed to
24  confidentially provide information for the study.  LASD will conduct longitudinal
25  climate and culture studies during the course of this Agreement.

26  **B. Training to Promote Bias-Free Policing**

27      70.  LASD will continue to conduct regular training for deputies, training
28  deputies, supervisors, and command staff regarding discriminatory policing.  In

-14-

1   addition to LASD's current state-mandated training for Antelope Valley deputies,

2   LASD will provide training that emphasizes how bias may occur in law enforcement

3   activity, and the impact of biased policing on effective crime prevention and police

4   legitimacy. This training further shall include:

5           a. methods and strategies for more effective policing that relies upon non-

6             discriminatory factors;

7           b. police and community perspectives related to discriminatory policing;

8           c. constitutional and other legal requirements related to equal protection and

9             unlawful discrimination, including the requirements of this Agreement;

10          d. the protection of civil rights as a central part of the police mission and as

11            essential to effective policing;

12          e. the requirements of the FHA, with specific emphasis on discrimination on

13            the basis of race;

14           f. the existence and impact of arbitrary classifications, stereotyping, and

15            implicit or subconscious bias;

16          g. instruction in the data collection protocols required by this Agreement,

17            including reasons for data collection/analysis;

18          h. identification of key decision points where prohibited discrimination can

19            take effect at both the incident and strategic-planning levels; and

20          i. methods, strategies, and techniques to reduce misunderstanding, conflict,

21            and complaints due to perceived bias or discrimination, including

22            problem-oriented policing strategies.

23      71.    LASD-AV will conduct roll call trainings at least quarterly to emphasize

24   the importance of preventing discriminatory policing. These roll call sessions will

25   include scenario-based discussions of real and hypothetical situations.

26      72.    LASD agrees to utilize experts and the survey below to study

27   organizational climate and culture in the Antelope Valley stations to aid in developing

28   these training requirements.

## V. ENFORCEMENT OF SECTION 8 COMPLIANCE

LASD agrees not to violate the FHA by: (a) making unavailable or denying a dwelling unit to any person because of race; (b) discriminating against any person in the terms, conditions or privileges of renting a dwelling unit, or in the provision of services or facilities in connection therewith, because of race; (c) making, printing, publishing, or causing to be made, printed, or published any notice, statement, or advertisement with respect to the rental of a dwelling unit that states any preference, limitation or discrimination based on race; or (d) coercing, intimidating, threatening or interfering with any person in the exercise or enjoyment of, or on account of having exercised or enjoyed, or on account of their having aided and encouraged any other person in the exercise or enjoyment of, any right granted by the Fair Housing Act.

### A. Housing Non-Discrimination Policy

73. LASD shall implement a Housing Non-discrimination Policy which reflects LASD's commitment to the requirements of the FHA and explains how to file a complaint of discrimination in housing.

74. LASD shall provide a copy the Housing Non-discrimination Policy to all sworn LASD-AV deputies. LASD shall secure signed statements from each individual subject to this paragraph acknowledging that he or she has received and read the Housing Non-discrimination Policy, has had the opportunity to have questions answered, and agrees to abide by the relevant provisions of this Order and the Housing Non-discrimination Policy.

75. During the term of this Settlement Agreement, within 15 days after each new deputy is assigned to LASD-AV, LASD shall provide the individual with a copy of the Housing Non-discrimination Policy and shall secure the same signed acknowledgment.

### B. Policy Regarding Accompaniment of Section 8 Compliance Checks

76. LASD shall revise its policies regarding the review of requests from a housing authority for deputy accompaniment on compliance checks in Field Directive

-16-

1 | 12-02. The revised policies shall, among other things, specifically outline factors to be
2 | considered when assessing the need for deputy accompaniment and the number of
3 | deputies necessary for accompaniment.

4 | **C. Policy Regarding Independent Investigations of Compliance with Section 8**

5 | 77.  LASD shall institute policies regarding LASD's own independent
6 | investigations upon referral of a housing authority of allegations of fraud on the
7 | voucher program to ensure that those investigations are not being used to harass
8 | residents in their homes or motivate residents to relocate from their homes.  LASD's
9 | policies shall be revised to include guidance on proper procedures for sharing
10 | information with a housing authority and guidelines for referral of cases for criminal
11 | prosecution for fraud based solely on compliance with the Section 8 contract.

12 | **D. Fair Housing Reporting and Analysis**

13 | 78.  LASD shall require all deputies to document all voucher holder
14 | compliance checks using stat code 787 pursuant to Field Operations Directive 12-02.

15 | 79.  LASD shall require all deputies to document each independent
16 | investigation for criminal fraud based on voucher holder compliance with the voucher
17 | contract using stat code 787.

18 | 80.  LASD shall require all deputies to document calls, observations, or
19 | incidents involving voucher holders using stat code 787.  Nothing in this paragraph
20 | shall authorize deputies to inquire into an individual's Section 8 status during routine
21 | law enforcement activity.

22 | **VI.  DATA COLLECTION AND ANALYSIS**

23 | To identify shortcomings, assess improvement, and increase community
24 | confidence in LASD's law enforcement activity in the Antelope Valley, LASD agrees
25 | to enhance its data collection, analysis, and reporting as set out below.  LASD will
26 | develop and implement a protocol for the collection and regular analysis of data to
27 | assess whether there are trends and patterns that indicate bias or practices that
28 | otherwise run counter to constitutional and effective policing.

-17-

1    81.    LASD will continue to collect data currently required by the Statistical

2 Code Guide, Radio Code Book, and related policies and shall create new statistical

3 codes and/or data fields requiring documentation of the following in the MDC patrol

4 log system and Regional Allocation of Police Service (RAPS) database:

5         a. bicycle stops;

6         b. backseat detentions;

7         c. probation or parole stops and searches;

8         d. consent searches; and

9         e. vehicle impoundments.

10    82.    LASD will conduct at least semi-annual analysis of, at a minimum, the

11 following AV data:

12         a. stop, search, contraband seizure, and arrest data, including backseat

13            detentions, probation and parole searches, and consent searches;

14         b. stops, searches, and/or arrests for discretionary offenses such as

15            jaywalking, crossing against a traffic light, failing to yield right of way or

16            walking on the wrong side of the street;

17         c. uses of force, including force associated with obstruction arrests and

18            similar violations;

19         d. arrests for California Penal Codes § 69 (felony obstruction or resisting

20            arrest),    § 148(a)(1) (misdemeanor obstruction or resisting arrest), and §

21            243(b) (battery on a peace officer or other public officer without infliction

22            of injury);

23         e. vehicle impoundments;

24         f. civilian complaints, by category; and

25         g. Voucher Holder compliance checks involving LASD personnel.

26    83.    LASD agrees to base its analysis on accurate, complete, and reliable data.

27 Analysis of this data will include a regression analysis to determine whether law

28 enforcement activity has a disparate impact on any racial or ethnic group. This

-18-

1 regression analysis will control for factors other than race, including but not limited to
2 demographics and crime rates, in describing any potential disparate impact. The
3 regression analysis will include determining whether, after controlling for alternate
4 explanations:

5        a. LASD deputies working in the Antelope Valley are more likely to stop,
6          cite, search, or arrest based race or ethnicity;

7        b. LASD deputies working in the Antelope Valley are more likely to ask
8          persons of certain races or ethnicities for consent searches, and about their
9          probation or parole status;

10        c. LASD deputies working in the Antelope Valley are more likely to stop or
11          search persons of certain races or ethnicities for discretionary and non-
12          violent offenses; and

13        d. LASD deputies working in the Antelope Valley are more likely to
14          impound or store the vehicles of persons of certain races or ethnicities.

15     84.    Through this data analysis, LASD will identify any trends or issues that
16 compromise constitutional policing and respond accordingly. Appropriate responses
17 may include reviewing and revising any policies or training that may be leading to
18 problematic trends; and assessing whether any practices should be changed to ensure
19 adherence to constitutional requirements and/or more effective policing.

20     85.    This analysis will also determine whether there are reporting districts and
21 deputies with potentially problematic trends and respond accordingly. LASD will
22 make efforts to incorporate regular analysis of this data into its routine operational
23 decisions.

24     86.    On a semi-annual basis for the first year of the agreement and annually
25 thereafter, LASD agrees to issue a report summarizing the results of the AV data
26 collected, and the steps taken to correct problems and build on successes. The report
27 will be publicly available in English and Spanish and posted on LASD's website.

28

# VII. **COMMUNITY ENGAGEMENT**

LASD agrees to promote and strengthen partnerships within the community, to engage constructively with the community to ensure collaborative problem-solving and bias-free policing, and to increase community confidence in the Department. To achieve this outcome, LASD agrees to implement the requirements below.

## A. Community and Problem-Oriented Policing

87. LASD agrees to actively participate in community engagement efforts in the Antelope Valley, including participating in local community meetings, making itself available for community feedback, developing the Community Advisory Committees (CAC), and working with the community on the development of diversion programs.

88. All sworn personnel at the Antelope Valley stations shall actively attend community meetings and events. LASD agrees to develop a plan for such attendance based on the results of annual community satisfaction surveys and feedback from the civilian panel, discussed below. The plan shall indicate the number and types of events to be attended on a regular basis and take into account the need to enhance relationships with particular groups within the community, including, but not limited to, youth, and communities of color.

89. LASD agrees to provide structured annual in-service training on community policing and problem-oriented policing methods and skills for all AV deputies, including station supervisors and unit commanders. This training shall include:

a. methods and strategies to improve public safety and crime prevention through community engagement;

b. scenario-based training that promotes the development of new partnerships between the police and community targeting problem solving and prevention;

c. leadership, ethics, and interpersonal skills;

1            d.  community engagement techniques, including how to establish formal

2                partnerships and actively engage community organizations, including

3                youth, immigrant, and LGBT communities;

4            e.  problem-oriented policing tactics;

5            f.  conflict resolution and verbal de-escalation of conflict; and

6            g.  cultural awareness and sensitivity training.

7          90.    LASD agrees to ensure that monthly Crime Management Forum meetings

8    with the Assistant Sheriff or his designee and semiannual Risk Management Forum

9    meetings include discussion and analysis of trends in misconduct complaints and

10    community priorities to identify areas of concern, and to better develop interventions

11    to address them.  LASD agrees to use techniques such as spatial mapping and scientific

12    deployment analysis to enable the Risk Management Forum to better support and

13    measure community and problem-solving policing efforts.

14          91.    To continually improve police-community partnerships, LASD will assess

15    and report on the impact of community engagement initiatives.  LASD will issue

16    public reports on the Antelope Valley stations' community engagement efforts,

17    identifying successes, obstacles, and recommendations for future improvement.

18          92.    LASD agrees to seek the assistance of community advocates in widely

19    disseminating to the public, in English and Spanish, the requirements of this

20    Agreement.

21    **B. Antelope Valley Community Advisory Committees**

22          93.    LASD will continue to support Lancaster and Palmdale's CACs to advise

23    and provide feedback to the LASD's Antelope Valley stations.  The panel will

24    leverage the insights and expertise of the community to address policing concerns,

25    including, but not limited to, racial or ethnic profiling and access to law enforcement

26    services, and promote greater transparency and public understanding of LASD.  The

27    civilian panel shall be authorized to:

28

1            a. advise the Sheriff and the station commanders on strategies and training

2               to improve community relations, bias-free policing, and access to the

3               civilian complaint system;

4            b. work with the Sheriff and station commanders to establish and carry out

5               community public safety priorities;

6            c. provide the community with information on the Agreement and its

7               implementation; and

8            d. receive and convey to LASD public comments and concerns.

9       94.    LASD will memorialize the CACs into LASD-AV policy within 90 days
10 of the Effective Date. The policy will establish the number of members and a
11 mechanism to ensure that membership is representative of the diverse communities in
12 the Antelope Valley, including members from each station, faith communities,
13 minority, ethnic, and other community organizations. LASD shall include student or
14 youth organizations on the CACs or create a separate advisory committee made up of
15 youth representatives. LASD will facilitate quarterly public meetings of the CAC to
16 discuss the Monitor's reports and to receive community feedback about LASD's
17 progress or compliance with the Agreement.

18       95.    The CAC's reports and recommendations will be posted on LASD-AV's
19 website. LASD will consider and respond to the civilian panel's recommendations in a
20 timely manner.

21       96.    The County will provide the CAC with reasonable administrative support,
22 including meeting space. In addition, the Monitor may provide advice and technical
23 assistance to the CAC.

24       97.    The CAC will not have access to any non-public information regarding an
25 individual deputy or allegation of misconduct or disciplinary action.

26    **C. Community Survey**

27       98.    LASD agrees to assist the Monitor in conducting a reliable,
28 comprehensive, and representative annual survey of members of the Antelope Valley

1   community regarding their experiences with and perceptions of LASD and of public
2   safety.

3       99.    To conduct the annual community survey, the Monitor shall retain an
4   individual or entity that shall:

5         a. develop a baseline of measures on public satisfaction with policing,
6           attitudes among police personnel, and the quality of police-citizen
7           encounters;

8         b. design, conduct, and analyze baseline and subsequent annual surveys of a
9           representative sample of Antelope Valley residents, law enforcement
10          personnel, Section 8 voucher holders, and detained arrestees;

11        c. review and consider prior law enforcement surveys in the Antelope Valley
12          and other cities (including recent community policing surveys in Palmdale
13          and Lancaster), as well as current or recent concerns in the Antelope
14          Valley, in designing the survey;

15        d. engage in informal conversation with Antelope Valley residents, LASD
16          deputies and command staff, and DOJ representatives, and observe
17          community meetings;

18        e. ensure that the resident and arrestee surveys are designed to capture a
19          representative sample of Antelope Valley residents including members of
20          each demographic category;

21        f. conduct the survey in English and Spanish as necessary to ensure
22          representation of the entire Antelope Valley community; and

23        g. formally discuss the survey methodology with LASD supervisors and
24          DOJ, and consider these opinions in development of the initial survey and
25          improvements to subsequent surveys.

26      100. LASD agrees to cooperate with the design and conduct of the survey by,
27   for example, helping to organize focus groups of deputies and obtaining and providing
28   previous survey instruments and data.

-23-

1    101.   The report of the baseline survey and subsequent annual surveys shall be
2  publically distributed and posted on the LASD-AV website.

3                          **VIII.  USE OF FORCE**

4        LASD agrees to revise its force policies and practices to reflect its commitment
5  to upholding the rights secured or protected by the Constitution of the United States,
6  protecting human life and the dignity of every individual, and maintaining public
7  safety.  LASD agrees to ensure that its accountability measures are implemented
8  appropriately so that Antelope Valley deputies use force only when objectively
9  reasonable, and in a manner that avoids unnecessary injury to deputies and civilians;
10  and to use force as a last resort and de-escalate the use of force at the earliest possible
11  moment.  Deputies and staff shall endeavor to use only that level of force necessary for
12  the situation.  To achieve these outcomes, LASD will implement the requirements
13  below.

14  **A. General Use of Force Policy and Principles**

15        LASD will revise its policies and associated training materials to abide by the
16  following requirements:

17        102.  LASD agrees to continue to prohibit the use of force above unresisted
18  handcuffing to overcome passive resistance, except where physical removal is
19  permitted as necessary and objectively reasonable.

20        103.  Deputies shall use advisements, warnings, and verbal persuasion, when
21  possible, before resorting to force; and de-escalate force immediately as resistance
22  decreases.

23        104.  LASD agrees to clarify that Antelope Valley deputies may not use force
24  against individuals who may be exhibiting resistive behavior, but who are under
25  control and do not pose a threat to the public safety, themselves, or to other deputies.
26  LASD agrees to continue to require that Antelope Valley deputies assess the threat of
27  an individual prior to using force, and emphasize that a use of force must be

28

-24-

1 | proportional to the threat or resistance of the subject. If a threat or resistance no longer
2 | exists, deputies cannot justify the use of force against a subject.

3 |     105.   LASD agrees to explicitly prohibit the use of retaliatory force,
4 | particularly against subjects who express criticism of, or disrespect for, LASD
5 | Antelope Valley deputies.

6 |     106.  LASD agrees to explicitly prohibit interfering, threatening, intimidating,
7 | blocking or otherwise discouraging a member of the public, who is not violating any
8 | other law, from taking photographs or recording video (including photographs or video
9 | of police activities) in any place the member of the public is lawfully present. Such
10 | prohibited interference includes:

11 |     a. Ordering a person to cease taking photographs or recording video;
12 |     b. Demanding that person's identification;
13 |     c. Demanding that the person state a reason why he or she is taking
14 |        photographs or recording video;
15 |     d. Detaining that person;
16 |     e. Intentionally blocking or obstructing cameras or recording devices (not
17 |        including physical barricades or screens used as part of a tactical
18 |        operation or crime scene);
19 |     f. Seizing and/or searching a camera or recording device without a warrant;
20 |     g. Using force upon that person; or
21 |     h. Detaining or arresting an individual for violating any other law where the
22 |        purpose of the detention or arrest is to prevent or retaliate for recording
23 |        police activity.

24 |     107.  LASD will continue to require, and emphasize in its training, that a hard
25 | strike to the head with any impact weapon, including a baton, is prohibited unless
26 | deadly force is justified. Unintentional or mistaken blows to these areas must be
27 | reported to ensure that all reasonable care was taken to avoid them.

28 |

-25-

1 **B. Use of Force Reporting Policy**

2     108. LASD agrees to continue to require deputies to report all uses of force

3 above un-resisted handcuffing. LASD shall continue to require Antelope Valley

4 deputies to completely and accurately describe the force used or observed, including

5 describing in detail the actions of the suspect necessitating the use of force and the

6 specific force used in response to the suspect's actions, any injuries or complaint of

7 injuries, and any medical treatment or refusal of medical treatment.

8     109. The use of force reporting policy shall explicitly prohibit the use of

9 conclusory statements without supporting detail, including "boilerplate" language in

10 all statements and reports documenting use of force. Deputies shall be held

11 accountable for material omissions or inaccuracies in their use of force statements,

12 which may include being subject to disciplinary action.

13     110. LASD agrees to continue to require deputies who use or observe force to

14 notify their supervisors immediately following any reportable use of force incident or

15 upon receipt of an allegation of unreasonable or unreported use of force by any deputy.

16 Deputies who use or observe force and fail to report it shall be subject to disciplinary

17 action, up to and including termination.

18 **C. Use of Force Supervisory Investigations**

19     111. For all reportable uses of force, the investigating supervisor shall conduct

20 a thorough investigation. This investigation will require supervisors to:

21         a. respond to the scene, examine the subject of the force for injury, interview

22            the subject for complaints of pain, and ensure that the subject receives

23            medical attention from an appropriate medical provider;

24         b. identify and collect all relevant evidence;

25         c. canvass for, and interview, civilian witnesses;

26         d. collect statements from witness deputies; and

27         e. review all deputy use of force statements for adequacy, accuracy, and

28            completeness.

1    112. Following the investigation, each supervisor shall continue to complete a

2  supervisory investigation documented in a "Supervisor's Report on Use of Force."

3  This Report shall include:

4        a. the supervisor's narrative description of the incident, including a complete

5          and comprehensive description of the evidence that either justifies or fails

6          to justify the deputy's conduct based on the supervisor's independent

7          review of the facts and circumstances of the incident;

8        b. documentation of all evidence;

9        c. identities of all deputies witnessing the force;

10       d. the investigating supervisor's evaluation of force, including a

11         determination of whether the deputy's actions appear to be within LASD

12         policy and consistent with state and federal law, and an assessment of the

13         incident for tactical and training implications; and

14       e. documentation of any training or tactical concerns, and/or corrective

15         action taken or recommended.

16    113. Upon completion of the Supervisor's Report on Use of Force, the

17  investigating supervisor shall forward the report through their chain of command,

18  which will review the report to ensure that it is thorough and complete, and that the

19  analysis and findings are supported by a preponderance of the evidence.

20    114. LASD agrees to continue to require that the Executive Force Review

21  Committee review use of force incidents requiring response by the IAB

22  Force/Shooting Response Team under current policy, and to review the incidents for

23  any policy, training, or tactical concerns and/or violations.

24    115. LASD will hold deputies accountable for uses of force that violate policy

25  or law, and continue to require station commanders to refer uses of force that may

26  violate law or the Department's Prohibited Force policy, to the Internal Affairs Bureau

27  or the Internal Criminal Investigations Bureau for further investigation or review.

28

1    116.  LASD will hold supervisors accountable for not detecting, adequately
2  investigating, or responding to force that is unreasonable or otherwise contrary to
3  LASD policy.

4    117.  LASD and Antelope Valley unit commanders will be responsible for
5  identifying and reporting force trends and for taking preventive steps to curb
6  problematic trends, including issuing or revising policies, directives, training bulletins,
7  or providing additional mentoring and supervision to individual deputies.

8    118.  LASD and Antelope Valley unit commanders will regularly review and
9  track "training and tactical review" related findings, recommendations, and comments
10  to ensure that informal supervisory feedback does not replace the need for formal
11  discipline.  LASD will ensure that the supervisory feedback, including feedback
12  documented in the "training and tactical review" portion of a Supervisor's Report on
13  Use of Force, is documented in the PPI.

14  **D. Use of Force Training**

15    119.  LASD shall provide all Antelope Valley deputies with annual or biennial
16  use of force training.  The topics will include the following:

17  a. proper use of force decision making, including when force may be
18  unnecessary in response to minor resistance (biennial);

19  b. role-playing scenarios and interactive exercises that illustrate proper use
20  of force decision making, including training deputies on the importance
21  and impact of ethical decision making and peer intervention (annual);

22  c. principles of procedural justice, and avoiding the use of force in response
23  to minor resistance (biennial);

24  d. de-escalation techniques that encourage deputies to make arrests without
25  using force (annual);

26  e. threat assessment, including how race can impact deputies' threat
27  assessments (biennial);

28

-28-

1             f. LASD-AV deputies will attend LASD's Tactics and Survival (TAS), also

2               known as the Laser Village tactical firearms training (biennial); and

3            g. supervisors shall receive initial and annual refresher training on

4               conducting use of force investigations, how to effectively direct deputies

5               to minimize uses of force and to intervene effectively to prevent or stop

6               unreasonable force, using LASD's accountability and disciplinary systems

7               after encountering a potentially unreasonable use of force, and supporting

8               deputies who report unreasonable or unreported force, or who are

9               retaliated against for using only reasonable force or attempting to prevent

10             unreasonable force (annual).

11    **E. Use of Force Analysis**

12    120. Within one year of the Effective Date and at least annually thereafter,

13 LASD will analyze the Antelope Valley stations' force data, including the force-

14 related outcome data, to identify significant trends, and identify and correct

15 deficiencies revealed by this analysis.

16    121. LASD-AV's force analysis will include assessment of the frequency and

17 nature of uses of force that are: referred to IAB for investigation; the subject of

18 misconduct complaints; the subject of civil suits; related to criminal obstruction- or

19 resisting-arrest-type charges that are dismissed or declined by the prosecutor; or

20 involve repeat-deputies or units.

21    122. LASD will determine whether policy or training curricula changes must

22 be made as a result of its analysis of use of force incidents.

23    123. LASD will document the results of the use of force analysis in a public

24 report.

25              **IX.  PERSONNEL COMPLAINT REVIEW**

26    The County will ensure that all allegations of personnel misconduct are received

27 and are fully and fairly investigated, and that all personnel who commit misconduct are

28 held accountable pursuant to a disciplinary system that is fair and consistent. To

-29-

1  achieve these outcomes, LASD and the County agree to implement the requirements
2  below.

3  **A. Complaint Intake**

4      124.   LASD shall continue to make personnel complaint forms and
5  informational materials, including brochures and posters, available at appropriate
6  County or municipal properties in the Antelope Valley, including, at a minimum,
7  LASD stations, courts, county libraries, and LASD websites, and make them available
8  to community groups upon request.

9      125.   LASD will continue to accept all personnel complaints, including
10 anonymous and third-party complaints, for review and investigation.  Complaints may
11 be made in writing or verbally, in person or by mail, telephone (or TDD), facsimile, or
12 electronic mail, as well as in the field.  Any Limited English Proficient (LEP)
13 individual who wishes to file a complaint about a LASD deputy or employee shall be
14 provided with a complaint form and informational materials in the appropriate non-
15 English language and/or be provided appropriate translation services in order to file a
16 complaint.

17     126.   The refusal to accept a personnel complaint, discouraging the filing of a
18 complaint, or providing false or misleading information about filing a complaint, shall
19 be grounds for discipline, up to and including termination.

20 **B. Complaint Classification**

21     127.   LASD will revise its complaint investigation related policies, including
22 MPP 3-04 and its Service Comment Report (SCR) and Internal Affairs Bureau (IAB)
23 policy manuals, to ensure that they are complete, clear and consistent.  LASD will
24 implement mechanisms to ensure that all personnel allegations are accurately classified
25 at all investigative stages, from intake through resolution, so that each allegation
26 receives the appropriate level of review required under policy.

27     128.   LASD will ensure that personnel complaints are not misclassified as
28 service complaints.

1          129.   In consultation with the Monitor and subject to DOJ approval, LASD will
2    revise policies to clarify and strengthen requirements related to:

3               a. which allegations of inappropriate behavior by LASD personnel, if true,
4                   would require imposition of discipline, as opposed to non-disciplinary
5                   action, to address the misconduct;

6               b. what types of personnel complaints must be investigated as administrative
7                   investigations rather than handled exclusively as Service Comment
8                   Reviews;

9               c. what types of administrative investigations must be handled by IAB rather
10                  than at the unit level.

11         130.   Antelope Valley unit commanders shall be responsible for appropriately
12   classifying each allegation and personnel complaint raised at the outset or during the
13   investigation/review of a complaint. LASD shall investigate every allegation of
14   misconduct that arises during an investigation even if an allegation is not specifically
15   articulated as such by the complainant.

16   **C. Investigations**

17         131.   All investigations of Antelope Valley personnel complaints, including
18   reviews, shall be as thorough as necessary to reach reliable and complete findings. In
19   each investigation, LASD shall consider all relevant evidence, including
20   circumstantial, direct and physical evidence, as appropriate, and make credibility
21   determinations based upon that evidence. There will be no automatic preference for a
22   deputy's statement over a non-deputy's statement, nor will LASD disregard a witness'
23   statement merely because the witness has some connection to the complainant or
24   because of any criminal history. LASD shall make efforts to resolve material
25   inconsistencies between witness statements.

26         132.   LASD agrees to continue to require station commanders in the Antelope
27   Valley to refer alleged incidents of misconduct to the IAB or ICIB for further
28   investigation or review consistent with the Administrative Investigations Handbook. If

-31-

1  the case proceeds criminally, the Division Chief over the Antelope Valley will review

2  the matter with the unit commander of IAB to determine whether the administrative

3  investigation may proceed on a parallel track. The Division Chief or unit commander

4  of IAB may consult with the prosecuting agency for its input. If the matter proceeds

5  on a parallel track, any compelled interview of the subject deputies may be delayed.

6  The Division Chief shall document the reasons for the decision.

7      133.   LASD will not permit any involved supervisor, or any supervisor who

8  authorized the conduct that led to the complaint, to conduct a complaint investigation.

9      134.   The misconduct investigator shall seek to identify all persons at the scene

10 giving rise to a misconduct allegation, including all LASD deputies. The investigator

11 shall note in the investigative report the identities of all deputies and other witnesses

12 who were on the scene but assert they did not witness and were not involved in the

13 incident. The investigator shall conduct further investigation of any such assertions

14 that appear unsupported by the evidence.

15     135.   All witnesses, including deputies witnessing or involved in an incident

16 that becomes the subject of a personnel complaint, shall provide a written statement

17 regarding the incident or be interviewed as described below.

18     136.   The SCR complaint investigator shall interview each complainant in

19 person, if practical. Misconduct investigators will conduct additional interviews as

20 necessary to reach reliable and complete findings. Interviews shall be recorded in their

21 entirety, absent documented extraordinary circumstances.

22     137.   Consistent with current policy, interviews shall be conducted separately.

23 An interpreter not involved in the underlying complaint will be used when taking

24 statements or conducting interviews of any LEP complainant or witness.

25 **D. Complaint Review and Investigation Training**

26     138.   LASD agrees to provide updated and revised training to Antelope Valley

27 deputies and supervisors about proper complaint intake, classification, and

28 investigation techniques. LASD will provide training about how to record complete

-32-

1  and thorough complaints from individuals, including how to obtain complaints from
2  individuals who may not be proficient in English, and the consequences for failing to
3  properly take complaints.

4      139.  All personnel conducting Service Comment Reviews and unit level
5  administrative investigations in the Antelope Valley shall receive initial training
6  regarding conducting deputy misconduct investigations, and shall receive refresher
7  training each year.  This training shall include instruction in:

8          a. investigative skills, including proper interrogation and interview
9            techniques, gathering and objectively analyzing evidence, and data and
10           case management;

11         b. the particular challenges of personnel complaint reviews/investigations,
12           including identifying alleged misconduct that is not clearly stated in the
13           complaint or that  becomes apparent during the investigation, properly
14           weighing credibility of civilian witnesses against deputies, using objective
15           evidence to resolve inconsistent statements, and the proper application of
16           the preponderance of the evidence standard;

17         c. relevant state, local, and federal law, including state employment law
18           related to deputies and the rights of public employees, as well as criminal
19           discovery rules such as those set out in *Garrity v. New Jersey*, 385 U.S.
20           493 (1967), and *Brady v. Maryland*, 373 U. S. 83 (1963); and

21         d. LASD rules and policies, including the requirements of this Agreement,
22           and protocols related to criminal and administrative investigations of
23           alleged deputy misconduct.

24 **E. Personnel Complaint Audits**

25     140.  LASD shall conduct a semiannual, randomized audit of LASD-AV's
26 complaint intake, classification, and investigations.  This audit will assess whether
27 complaints are accepted and classified consistent with policy, investigations are
28

-33-

1  complete, and complaint dispositions are consistent with a preponderance of the
2  evidence.

## X.  **ACCOUNTABILITY**

4  LASD will strengthen its accountability mechanisms to provide personnel with
5  the support, mentoring, and direction necessary to consistently police constitutionally.

6  ### A. Personnel Performance Index

7  141.  LASD will continue to implement and modify the Personnel Performance
8  Index (PPI) system and expects that it will be complete within three years.  PPI will
9  continue to serve as an LASD-wide decision support system in matters related to risk
10  management and service reviews.  LASD will modify PPI so that it can make peer
11  comparisons between deputies and units.  If PPI is not modified to make such
12  comparisons during the compliance period, the comparisons will be made through an
13  alternative process.  Antelope Valley unit commanders and supervisors will conduct
14  periodic reviews of all deputies and units under their command to identify potential
15  trends.

16  142.  LASD will modify PPI (and capture through an alternative process
17  pending PPI modification) to be able to access and report additional data relevant to
18  determining compliance with the Agreement, including but not limited to data about
19  stops, searches, and arrests (described in the Data Collection and Analysis Section),
20  individual compliance with community engagement requirements, and criminal
21  obstruction arrests.  LASD will modify its procedure for Performance Log Entries so
22  that all entries are maintained in an electronic format and noted in PPI.  LASD-AV
23  will ensure that PPI data is accurate and hold responsible Antelope Valley personnel
24  accountable for inaccuracies in any data entered.

25  143.  In consultation with the Monitor, LASD will develop a plan, to be
26  approved by DOJ, to periodically review how the Antelope Valley stations analyze PPI
27  to respond to concerns unique to their stations, such as trends identified through
28  civilian complaints, the CAC, community survey, or other means.

1    **B. Performance Mentoring Program**

2        144.   LASD will continue to provide mentorship to deputies in the North Patrol
3    Division's locally based Performance Mentoring Program (PMP), as well as through
4    LASD's department-wide PMP, based upon appropriate determination of eligibility.
5    To increase the effectiveness of the remedies and corrective action used to address a
6    deputy's behavior, LASD will support and implement a plan to ensure that the LASD
7    wide PMP program provides mentoring of AV personnel within 30 days after the need
8    for mentoring is identified, and that appropriate procedures are in place for supervising
9    deputies whose performance fails to improve subsequent to mentoring.

10       145.   LASD will ensure that the Department-wide PMP and the North Patrol
11   Division's PMP coordinate as appropriate with each other and share information about
12   deputies and their individual mentoring programs.

13                            **XI.   MONITORING**

14   **A. Selection of Monitor**

15       146.   The Parties have jointly selected the team of Joseph Brann, Alex
16   Busansky, and Angela Wolf as Monitor to oversee the terms of this Agreement. As
17   described in greater detail below, the Monitor will assess the County's progress in
18   implementing, and achieving compliance with, the Agreement; report on the status of
19   implementation to the Parties and the Court; work with the Parties to address any
20   barriers to compliance; and assist the Parties to informally resolve disputes or
21   differences should they emerge.

22       147.   The Monitor shall be subject to the supervision and orders of the Court,
23   consistent with this Agreement and the Monitoring Plan. The Monitor shall only have
24   the duties, responsibilities, and authority conferred by this Agreement. The Monitor
25   shall not, and is not intended to, replace or assume the role and duties of the Sheriff.

26       148.   In order to assess and report on LASD's implementation of this
27   Agreement and whether implementation is resulting in constitutional policing, the
28   Monitor shall conduct compliance reviews and audits and outcome assessments as

-35-

1    specified below, and such additional audits, reviews, and assessments that the Monitor
2    or Parties deem appropriate.

3    **B. Compliance Reviews and Audits**

4        149. The Monitor shall conduct compliance reviews or audits as necessary to
5    determine whether LASD has implemented and continues to comply with the material
6    requirements of this Agreement. Compliance with, or implementation of, a material
7    requirement of this Agreement means that LASD has: (a) incorporated the
8    requirement into policy; (b) trained all relevant personnel as necessary to fulfill their
9    responsibilities pursuant to the requirement; and (c) ensured that the requirement is
10   being carried out in practice. Compliance reviews and audits will contain both
11   qualitative and quantitative elements as necessary for reliability and
12   comprehensiveness. Where appropriate, the monitor will make use of audits
13   conducted by the Internal Monitoring, Performance Audits and Accountability
14   Command (IMPAAC) taking into account the importance of internal auditing capacity
15   and independent assessment of this agreement.

16       150. Where the Monitor recommends and the Parties agree, the Monitor may
17   refrain from conducting a compliance audit or review of a requirement previously and
18   consistently found to be in compliance by the Monitor pursuant to audit or review.
19   Thereafter the County will be deemed to have achieved compliance with those
20   requirements for purposes of this Agreement, absent evidence to the contrary.

21       151. The monitor will conduct an ongoing review and report on LASD use of
22   force on restrained individuals, use of force in response to spitting, and use of OC
23   spray.

24       152. The monitor, in conjunction with LASD, will conduct an ongoing audit of
25   incidents where deputies draw or point their firearms. The audit will include a review
26   of all civilian complaints and an appropriate sample of police reports related to any use
27   or display of a firearm.

28

1 | **C. Outcome Assessments**

2 |     153. In addition to compliance reviews and audits, the Monitor shall conduct

3 | qualitative and quantitative outcome assessments to measure whether LASD's

4 | implementation of this Agreement has eliminated practices that resulted in DOJ's

5 | finding a pattern and practice of constitutional violations. These outcome assessments

6 | shall include collection and analysis, both quantitative and qualitative, of the following

7 | outcome data:

8 |     a. Stop and Search Measurements, including:

9 |       1. the number and rate of stops and searches for which there is

10 |       sufficient documented reasonable suspicion, overall and

11 |       broken down by geographic area, type of arrest, and

12 |       demographic category;

13 |       2. the number and rate of searches that result in a finding of

14 |       contraband, overall and broken down by authority to conduct

15 |       search, reporting district, type of arrest, and demographic

16 |       category;

17 |       3. the number and rate of arrests, overall and broken down by

18 |       type of arrest and demographic category;

19 |       4. the number of consent searches conducted overall and broken

20 |       down by reporting area, type of arrest and demographic

21 |       category, and;

22 |       5. the number and rate of backseat detentions, overall and

23 |       broken down by reporting area and demographic category

24 |       including the number of those incidents where there is a

25 |       reasonably articulated explanation justifying the detention.

26 |     b. Biased-Free Policing and Community Engagement Measurements,

27 |       including:

28 |

1. a regression analysis that will determine, controlling for

other intervening factors such as crime rates, etc., whether:

    (a) LASD deputies working in the Antelope Valley are

        more likely to stop, cite, search, or arrest based on race

        or ethnicity;

    (b) LASD deputies working in the Antelope Valley are

        more likely to ask persons of certain races or

        ethnicities for consent searches, and about their

        probation or parole status;

    (c) LASD deputies working in the Antelope Valley are

        more likely to stop or search persons of certain races

        or ethnicities for discretionary and non-violent

        offenses; and

    (d) LASD deputies working in the Antelope Valley are

        more likely to impound the vehicles belonging to

        people of certain races or ethnicities.

2. the results of the Community Survey set out in Section

VII.C.;

3. an assessment of responses to calls for service in different

reporting districts of Lancaster and Palmdale;

4. feedback provided by the CACs; and

5. an assessment of LASD-AV deputies' participation in

community meetings and events, including new and

continuing partnerships between LASD-AV and community

members.

c. Section 8 Compliance Enforcement Measurements, including:

1       1. the number and rate of LASD-AV deputy interactions with

2        voucher holders in a voucher holder's home for a compliance

3        check; and

4       2. the number and rate of LASD-AV independent investigations

5        for criminal fraud based on voucher holder compliance with

6        the voucher contract and how those numbers and rates

7        compare with LASD throughout the rest of the County.

8    d. Use of Force Measurements, including:

9       1. the rate of force used by LASD-AV per arrest, reporting

10        district (i.e. street address, neighborhood, or reporting

11        district), type of arrest, and demographic category;

12       2. the number and rate of uses of force resulting in training or

13        tactical reviews, with formal discipline and/or with informal

14        corrective action; and

15       3. the number and rate of use of external force complaints that

16        result in formal administrative investigations/reviews, and in

17        which each  finding is supported by a preponderance of the

18        evidence.

19    e. Training Measurements, including:

20       1. deputy and agency reports of adequacy of training in type

21        and frequency;

22       2. responsiveness to training needs identified by reviews of

23        deputy activity, use of force investigations, and personnel

24        complaint investigations; and

25       3. documentation that training is completed as required.

26    f. Supervision Measurements, including initial identification of deputy

27    violations and performance problems by supervisors (including sergeants,

28

1                          lieutenants, captains, and region commanders), and effectiveness of

2                          supervisory response.

3                      g. Accountability Measurements, including:

4                                1. the number of personnel complaints (by type of complaint),

5                                 with a qualitative assessment of whether any notable increase

6                                 or decrease appears related to access to the complaint

7                                 process;

8                                2. rate of administrative investigations resolved as founded,

9                                 unfounded, unresolved, inactivated or administrative

10                                 investigations;

11                                3. rate of SCRs resolved in all resolution categories;

12                                4. the number of deputies who are subjects of repeated

13                                 personnel complaints or have repeated instances of sustained

14                                 personnel complaints;

15                                5. the number, nature, and settlement amount of all known civil

16                                 suits against LASD-AV deputies; and

17                                6. the number of use of force and discriminatory policing

18                                 complaints that are handled by the stations or referred to

19                                 IAB.

20         154. In conducting audits, reviews, and outcome assessments, the Monitor may

21 use any relevant data collected and maintained by LASD that the Monitor and DOJ

22 deem reliable and sufficiently complete, provided that the Monitor has determined, and

23 the Parties agree, that this data is reasonably reliable and complete.

24 **D. Monitoring Plan and Review Methodology**

25                                 Monitoring Plan

26         155. Within 90 days of the Monitor's appointment, the Monitor will develop a

27 monitoring plan, including proposed deadlines for implementation for conducting the

28 compliance reviews and audits ("Monitoring Plan"). This Monitoring Plan will

-40-

1    include specific deadlines and timelines for the first year of implementation of the

2    Agreement, including: (1) deadlines for the development of policies and training

3    materials, and    (2) schedules for conducting compliance reviews and outcome

4    assessments.

5        156.  The Monitor will submit the Monitoring Plan to the Parties for review and

6    approval. The Parties will have 30 days to either approve or propose changes to the

7    Monitoring Plan. If either Party proposes changes, the Monitor will have 15 days to

8    accept or object to those changes. If the Monitor objects to any of the proposed

9    changes and/or the Parties suggest changes that are in conflict, either Party or the

10    Monitor will provide the rationale for its proposal or objection, in writing, and the

11    Parties and Monitor will attempt to confer to resolve the disagreement.

12        157.  If after good faith attempts, disagreement regarding the Monitoring Plan

13    remains unresolved between the Parties and/or Monitor so that the Monitoring Plan is

14    not approved by the Parties, either Party or the Monitor may petition the Court

15    thereafter to resolve it.

16        158.  For each subsequent year, the Monitor will develop a detailed Monitoring

17    Plan for implementation of the Agreement.

18        159.  At least 45 days prior to the initiation of any outcome measure assessment

19    or compliance review, the Monitor shall submit a proposed methodology for the

20    assessment or review to the Parties. The Parties shall submit any comments or

21    concerns regarding the proposed methodology to the Monitor within 15 days of the

22    proposed date of assessment or review. The Monitor shall modify the methodology as

23    necessary to address any concerns, or shall inform the Parties in writing of the reasons

24    s/he is not modifying the methodology as proposed.

25                  Development of Policies, Procedures, and Training

26        160.  LASD will submit policies, training curricula, and lesson plans required to

27    be written, revised, or maintained by the Agreement to the Monitor and DOJ prior to

28    publication and implementation. The Parties will share draft policies and meet and

1    confer as needed to reach agreement on whether revised policies and training materials
2    are in compliance with the requirements of the Agreement, the Constitution, federal
3    and statutory law, best practices, and current professional standards.

4        161. Forty-five days before a compliance deadline, as set out in the Monitoring
5    Plan, the Parties will submit the policy, training curriculum or lesson plan to the
6    Monitor for review. The Monitor will provide written comments to DOJ and LASD,
7    which the DOJ shall consider in determining whether to approve the policy, training
8    curriculum and lesson plan.

9        162. If LASD, DOJ, and the Monitor do not all agree that the policy, training
10    curriculum or lesson plan is consistent with this Agreement, legal requirements, and
11    best practices, either Party or the Monitor will provide the rationale for its objection in
12    writing and the Parties and Monitor will attempt to confer to resolve the Agreement. If
13    the disagreement remains unresolved, either Party or the Monitor may petition the
14    Court thereafter to resolve.

15        163. LASD will begin implementation of policies and procedures within 30
16    days of DOJ approval or the Court's decision if a dispute arises, unless otherwise
17    specified or agreed to by the Parties in the Monitoring Plan.

18        164. Within 30 days after issuing a policy or procedure pursuant to this
19    Agreement, LASD shall ensure that all relevant LASD personnel assigned to AV have
20    received, read, and understand their responsibilities pursuant to the policy or
21    procedure, including the requirement that each deputy or employee report violations of
22    policy; that supervisors of all ranks shall be held accountable for identifying and
23    responding to policy or procedure violations by personnel under their command; and
24    that personnel will be held accountable for policy and procedure violations. LASD
25    shall document that each relevant LASD deputy or other employee has received, read,
26    and sufficiently understands policy. Training beyond roll-call or similar training will
27    be necessary for many new policies to ensure deputies understand and can perform
28    their duties pursuant to the policy.

1       165.   Within 180 days from the effective date of the agreement, LASD shall

2  ensure that each LASD-AV sworn personnel member and custody assistant attends a

3  training briefing on the content of this Agreement and the responsibilities of each

4  deputy and employee pursuant to it.  LASD shall begin providing this training briefing

5  within 45 days of the effective date of the agreement.

6       166.   All training will include periodic testing to ensure that employees are

7  appropriately comprehending, retaining, and applying the knowledge and skills

8  conveyed during the training required by the Agreement.  Based on results of testing,

9  LASD will provide additional periodic training as needed to deputies, supervisors, and

10  commanders that is sufficient in duration and scope to ensure that all deputies can

11  consistently and effectively carry out LASD's policies.

12       167.   LASD shall completely and accurately record information regarding

13  LASD-AV deputies' training attendance in LASD's Learning Management System

14  (LMS) system or its successor.

15  **E. Monitor Recommendations**

16       168.   The Monitor may also make recommendations to the Parties regarding

17  measures necessary to ensure timely, full, and effective compliance with the

18  Agreement and its underlying objectives.  Such recommendations may include a

19  recommendation to change, modify, or amend a provision of the Agreement, a

20  recommendation for additional training related to the Agreement, or a recommendation

21  to seek technical assistance. The Monitor may also, at the request of either Party,

22  provide technical assistance consistent with the Agreement.

23       169.   The Monitor will also review and consider the relevant reports of the

24  Office of the Inspector General and IMPAAC.

25       170.   The Monitor shall conduct a comprehensive assessment one year after the

26  Effective Date to determine whether and to what extent: (1) the outcomes intended by

27  the Agreement have been achieved, and (2) any modifications to the Agreement are

28  necessary for continued achievement in light of changed circumstances or

-43-

1   unanticipated impact (or lack of impact) of a requirement. Based upon this

2   comprehensive assessment, the Monitor shall recommend what modifications to the

3   Agreement, if any, are necessary to achieve and sustain intended outcomes. Where the

4   Parties agree with the Monitor's recommendations, the Parties shall work to adopt

5   mutually acceptable modifications of the Agreement. LASD will have the option to

6   delay this comprehensive assessment for one additional year if they deem this to be the

7   appropriate time period for the comprehensive assessment. If LASD decides to seek

8   this delay of the comprehensive assessment, they will advise the monitor and DOJ

9   within six months of the effective date of this agreement.

10   **F. Monitor Reports**

11      171. The Monitor will publicly issue a report every six months that details the

12   Parties' progress in implementing the Agreement and achieving compliance with the

13   Agreement. The reports will include:

14         a. a description of the work conducted by the Monitor during the reporting

15            period;

16         b. a listing of each Agreement requirement indicating which requirements

17            have been: (1) incorporated into policy; (2) the subject of sufficient

18            training for all relevant LASD deputies and employees; (3) reviewed or

19            audited by the Monitor to determine whether they have been fully

20            implemented in actual practice, including the date of the review or audit;

21            and (4) found by the Monitor to have been fully implemented in practice;

22         c. the methodology and specific findings for each audit or review conducted,

23            redacted as necessary for privacy concerns. The underlying data for each

24            audit or review will not be publicly available but will be retained by the

25            Monitor and provided to either or both Parties upon request;

26         d. for any requirements that were reviewed or audited and found not to have

27            been fully implemented in practice, the Monitor's recommendations

28            regarding necessary steps to achieve compliance;

1      e. the methodology and specific findings for each outcome assessment
2         conducted;

3      f. a qualitative assessment of LASD's progress in achieving the desired
4         outcomes for each area covered by the Agreement, noting issues of
5         concern or particular achievement; and

6      g. a projection of the work to be completed during the upcoming reporting
7         period and any anticipated challenges or concerns related to
8         implementation of, and achieving compliance with, the Agreement.

9      172.  The Monitor shall provide a copy of the reports to the Parties in draft form
10   at least ten business days prior to releasing them publicly.  The Parties may provide
11   comment on the reports, and the Monitor shall consider the Parties' comments and
12   make appropriate changes before issuing the report.

13     173.  The reports shall be public with the exception of material covered by
14   applicable privacy laws.  The reports will not include information specifically
15   identifying any individual deputy.  To facilitate public access to the reports, LASD
16   shall post the reports to its public website.

17     174.  Except as required or authorized by the terms of this Agreement or the
18   Parties acting together:  the Monitor, including, for the purposes of this paragraph, any
19   agent, employee, or independent contractor thereof, shall not make any public
20   statements or issue findings with regard to any act or omission of LASD, or their
21   agents, representatives, or employees; or disclose non-public information provided to
22   the Monitor pursuant to this Agreement.  Prior to making any press statement
23   regarding their employment or monitoring activities under this Agreement, the Monitor
24   shall first provide notice to both the DOJ and LASD.

25   **G. Public Statements, Testimony, and Conflicts of Interest**

26     175.  The Monitor may testify as to their observations, findings, and
27   recommendations before the Court with jurisdiction over this matter; however, no
28   Monitor shall testify in any other litigation or proceeding with regard to any act or

1   omission of LASD or any of its agents, representatives, or employees related to this
2   Agreement or regarding any matter or subject that the Monitor may have received
3   knowledge of as a result of his or her performance under this Agreement. This
4   paragraph does not apply to any proceeding before a court related to performance of
5   contracts or subcontracts for monitoring this Agreement.

6       176.   Unless such conflict is waived by the Parties, the Monitor shall not accept
7   employment or provide consulting services that would present a conflict of interest
8   with the Monitor's responsibilities under this Agreement, including being retained (on
9   a paid or unpaid basis) by any current or future litigant or claimant, or such litigant's or
10  claimant's attorney, in connection with a claim or suit against LASD or its
11  departments, deputies, agents, or employees. This provision does not preclude the
12  Monitor from being retained by the Department of Justice on other matters unrelated to
13  LASD.

14      177.   The Monitor is not a state or local agency, or an agent thereof, and
15  accordingly the records maintained by the Monitor shall not be deemed public records
16  subject to public inspection.

17      178.   The Monitor shall not be liable for any claim, lawsuit, or demand arising
18  out of the Monitor's performance pursuant to this Agreement.

19  **H. Communication Between Monitor and Parties**

20      179.   The Monitor will maintain regular contact with the Parties in order to
21  ensure effective and timely communication regarding the status of the LASD's
22  implementation of, and compliance with, the Agreement. To facilitate this
23  communication, the Monitor will conduct meetings every two months, or as needed,
24  which will include participation by LASD-AV, LASD, representatives of the County
25  Counsel's office, and DOJ.

26  **I. Communication Between Monitor and Community Members**

27      180.   The Monitor will regularly meet with the CACs and/or other interested
28  community stakeholders to discuss the Monitor's reports, and to receive community

1  feedback about LASD's progress in implementing and achieving compliance with the
2  Agreement.

3  **J. Access and Confidentiality**

4  181.  To facilitate its work, the Monitor may conduct on-site visits and
5  assessments without prior notice to the County.  The Monitor shall have access to all
6  necessary individuals, facilities, and documents, which shall include access to
7  Agreement-related trainings, meetings, and reviews such as critical incident reviews,
8  executive force review committee meetings, and disciplinary hearings.

9  182.  The County shall provide the Monitor with office space and reasonable
10  office support, such as office furniture, secure internet access, telephone, secure
11  document storage, and photocopying, faxing, and scanning equipment, that the
12  Monitor may use while in the Antelope Valley.

13  183.  LASD shall ensure that the Monitor shall have full and direct access to all
14  County staff, employees, and facilities that the Monitor reasonably deems necessary to
15  carry out the duties assigned to the Monitor by this Agreement.  The Monitor shall
16  cooperate with the County to access people and facilities in a reasonable manner that,
17  consistent with the Monitor's responsibilities, minimizes interference with daily
18  operations.

19  184.  LASD shall ensure that the Monitor shall have full and direct access to all
20  LASD documents and data that the Monitor reasonably deems necessary to carry out
21  the duties assigned to the Monitor by this Agreement, except any documents or data
22  protected by the attorney-client privilege.  The attorney-client privilege may not be
23  used to prevent the Monitor from observing reviews, meetings, and trainings such as
24  use of force review boards; disciplinary hearings; or discussions of misconduct
25  complaint investigations.  Should LASD decline to provide the Monitor access to
26  documents or data based on attorney-client privilege, the Defendants shall inform the
27  Monitor and DOJ that it is withholding documents or data on this basis and shall
28  provide the Monitor and DOJ with a log describing the documents or data.

1     185. For the purpose of implementing this Agreement, DOJ and its
2  consultative experts and agents shall have full and direct access to all LASD staff,
3  employees, facilities, and documents and data who have pertinent information about
4  AV. DOJ and its consultative experts and agents shall cooperate with LASD to access
5  involved personnel, facilities, and documents in a reasonable manner that, consistent
6  with DOJ's responsibilities to enforce this agreement, minimizes interference with
7  daily operations. Should LASD decline to provide DOJ with access to documents or
8  data based on attorney-client privilege, LASD shall inform DOJ that it is withholding
9  documents or data on this basis and shall provide DOJ with a log describing the
10  documents or data.

11     186. The Monitor or DOJ shall provide the County with reasonable notice of a
12  request for copies of documents or data. Upon such request, the County shall provide
13  in a timely manner copies (electronic, where readily available) of the requested
14  documents to the Monitor and DOJ.

15     187. The Monitor shall have access to all records and information relating to
16  criminal investigations of LASD-AV deputies as permissible by law. The Monitor
17  shall have access to all documents in criminal investigation files that have been closed
18  by LASD. The Monitor shall also have reasonable access to all arrest reports,
19  warrants, and warrant applications whether or not contained in open criminal
20  investigation files. Where practicable, arrest reports, warrants, and warrant
21  applications shall be obtained from sources other than open criminal investigation
22  files.

23     188. The Monitor and DOJ shall maintain all non-public information provided
24  by the County in a confidential manner. Other than as expressly provided in this
25  Agreement, this Agreement shall not be deemed a waiver of any privilege or right the
26  County may assert, including those recognized at common law or created by statute,
27  rule or regulation, against any other person or entity with respect to the disclosure of
28  any document.

1    **K. LASD Antelope Valley Compliance Coordinator**

2        189.   The Parties agree that LASD will hire and retain, or reassign a current

3    LASD employee for the duration of the Agreement, to serve as a full-time Compliance

4    Coordinator.  The Compliance Coordinator will serve as a liaison between LASD, the

5    Antelope Valley stations, the Monitor, and DOJ, and will assist with LASD's

6    compliance with the Agreement.  At a minimum, the Compliance Coordinator will:

7            a.  coordinate compliance and implementation activities;

8            b.  facilitate the provision of data, documents, and other access to LASD

9                employees, and material to the Monitor and DOJ, as needed;

10           c.  ensure that all documents and records are maintained as provided in the

11               Agreement; and

12           d.  assist in assigning compliance tasks to LASD personnel, as directed by

13               the Sheriff or his designee. The Compliance Coordinator will take

14               primary responsibility for collecting the information the Monitor requires

15               to carry out the terms of the Agreement.

16   **L. Monitor Budget and Payment**

17       190.   The County shall bear all fees and costs of the Monitor.  In approving

18   budgets, the Parties recognize the importance of ensuring that all fees and costs borne

19   by the County are reasonable.  The Parties shall work with the Monitor to reach

20   mutually agreed upon reasonable limits on the Monitor's fees and costs.  The Parties

21   will agree on the terms of invoicing and payments and the County will pay invoices

22   within a reasonable period of time.

23       191.   Within 30 days of appointment, the Monitor shall submit to the Parties for

24   approval a proposed budget for the first year of implementation of the Agreement.  The

25   proposed budget will describe the qualifications of all the persons or entities to be

26   hired or employed by the Monitor as well as the monitoring tasks that they will

27   perform.  The Monitor, at any time after his/her appointment, may request to be

28   allowed to hire, employ, or contact such additional persons or entities as are reasonably

1 | necessary to perform the tasks assigned to the Monitor by the Agreement provided that
2 | those expenditures fall within the approved budget. The Monitor will notify the
3 | County and DOJ in writing if the Monitor wishes to select such additional persons or
4 | entities. The notice will identify and describe the qualifications of the person or entity
5 | to be hired or employed and the monitoring task to be performed. The County and
6 | DOJ must both approve of the person or entity before they may be hired or employed,
7 | although substantial deference will be afforded to the Monitor's choice. Any person or
8 | entity hired or otherwise retained by the Monitor will be subject to the provisions of
9 | the Agreement.

10 | 192. Thereafter, the Monitor shall submit annually a proposed budget for the
11 | Parties' approval in accordance with the process set forth above.

12 | 193. At any time, the Monitor may submit to the Parties for approval proposed
13 | revisions to the approved budget, along with any explanation of the reason for the
14 | proposed revision. Such proposed changes may only be made upon written agreement
15 | by the Parties. In the event that a dispute arises regarding the reasonableness or
16 | payment of the Monitor's fees and costs, the Parties and the Monitor shall attempt to
17 | resolve such dispute cooperatively prior to seeking the assistance of the Court to
18 | resolve the dispute.

19 | 194. In the event that the Monitor is no longer able to perform his/her
20 | functions, within 60 days thereof, the County and DOJ will together select and advise
21 | the Court of the selection of a replacement Monitor, acceptable to both. The Parties'
22 | selection of the Monitor will be made pursuant to a method jointly established by DOJ
23 | and the County. If the Parties are unable to agree on a Monitor or an alternative
24 | method of selection within 60 days of the Monitor's incapacitation, each Party will
25 | submit the names of three candidates, or three groups of candidates, along with
26 | resumes and cost proposals, to the Court, and the Court will select and appoint the
27 | Monitor from among the qualified candidates/candidate groups.

28 |

1    195.    Should either of the Parties to the Agreement determine that the Monitor
2    or any member of the Monitor's consulting teams, their agents, employees, or
3    independent contractors have exceeded their authority or failed to satisfactorily
4    perform the duties required by the Agreement, the Party may petition the Court for
5    such relief as the Court deems appropriate, including replacement of the Monitor,
6    and/or any individual members, agents, employees, or independent contractors.  Any
7    Party bringing such a petition is required to meet and confer with the other Party at
8    least 21 days prior to such a petition in a good faith attempt to resolve the concern.

9    ## XII.    COMPENSATION FOR AGGRIEVED PERSONS FOR FAIR
10                              HOUSING ACT VIOLATIONS

11    196.    LASD will pay Seven Hundred Thousand Dollars ($700,000.00) to
12    compensate any persons harmed by LASD's allegedly discriminatory conduct in
13    violation of the Fair Housing Act ("aggrieved persons"), which shall be referred to as
14    the "LASD Settlement Fund."  The LASD Settlement Fund shall be distributed to
15    aggrieved persons pursuant to the terms and schedule that the parties have agreed to in
16    principle, which the parties will memorialize in an addendum to this Agreement and
17    file with the Court within ninety (90) days of the Effective Date.  Within thirty (30)
18    days of the Effective Date, LASD shall deposit the full amount of the LASD
19    Settlement Fund into an interest bearing escrow account.

20    ## XIII.  CIVIL PENALTY

21    197.    Within thirty (30) days of the Effective Date, LASD shall pay Twenty-
22    Five Thousand Dollars ($25,000.00) to the United States Treasury as a civil penalty
23    pursuant to 42 U.S.C. 3614(d)(1)(C) to vindicate the public interest.  The payment
24    shall be in the form of an electronic funds transfer pursuant to written instructions to be
25    provided by the United States.

26    198.    In the event that LASD engages in any future violation(s) of the Fair
27    Housing Act, such violation(s) shall constitute a "subsequent violation" pursuant to 42
28    U.S.C. §3614(d)(1)(C)(ii).

## XIV. <u>COURT JURISDICTION, MODIFICATION OF THE AGREEMENT, AND ENFORCEMENT</u>

199. The Parties agree jointly to file this Agreement with the United States District Court for the Central District of California, in a matter to be captioned *United States* v. *Los Angeles County*, et. al., Civil Action No. --CV--. The joint motion shall request that the Court enter the Agreement pursuant to Federal Rule of Civil Procedure 41(a)(2), and conditionally dismiss the complaint in this action without prejudice, while retaining jurisdiction to enforce the Agreement. The joint motion shall further request that this action be removed from the Court's active caseload until further application by the Parties or order of the Court. The Parties will request that the Court retain jurisdiction over this action and that the Court's conditional dismissal will not prejudice any party to the action.

200. The Agreement will become effective upon entry by the Court.

201. This Agreement resolves all of the United States' claims under the §14141 and the FHA against LASD. No prior drafts or prior contemporaneous communications, oral or written, will be relevant or admissible for the purposes of determining the meaning of any provisions herein in any litigation or other proceeding.

202. The Agreement is binding upon all Parties hereto, by and through their officials, agents, employees, and successors. If the County establishes or reorganizes a government agency or entity whose function includes overseeing, regulating, accrediting, investigating, or otherwise reviewing the operations of LASD or any aspect thereof, the County agrees to ensure these functions and entities are consistent with the terms of the Agreement and will incorporate the terms of the Agreement into the oversight, regulatory, accreditation, investigation, or review functions of the government agency or entity as necessary to ensure consistency.

203. The Agreement is enforceable only by the Parties. No person or entity is intended to be a third-party beneficiary of the provisions of the Agreement for purposes of any civil, criminal, or administrative action, and accordingly, no person or

1 entity may assert any claim or right as a beneficiary or protected class under the
2 Agreement.

3     204.  Unless stated otherwise in the Agreement, if either party disagrees with
4 any aspect of the implementation of the Agreement, that party will engage in good
5 faith informal consultation with the other party and the Monitor to attempt to resolve
6 the disagreement. If the disagreement persists, that party will, within ten days of the
7 apparent impasse, inform the other Parties and the Monitor in writing of the fact of the
8 disagreement. Within 21 days thereafter, the Parties will meet and confer on the
9 disagreement at a mutually agreeable time. If necessary, any party may petition the
10 Court thereafter to resolve the dispute pursuant to the provisions below.

11     205.  To ensure that the requirements of the Agreement are properly and timely
12 implemented, the Court will retain jurisdiction of this action for all purposes, including
13 but not limited to any disputed changes to policies, procedures, training, and practices,
14 until such time as the County has achieved full and effective compliance with the
15 Agreement and maintained such compliance for no less than one year.

16     206.  The United States acknowledges the good faith of the County in trying to
17 address the remedial measures that are needed to ensure constitutional policing in the
18 Antelope Valley. The United States, however, reserves its right to seek enforcement of
19 the provisions of the Agreement if it determines that the County and LASD have failed
20 to fully comply with any provision of this Agreement. The United States agrees to
21 consult with officials from the County before commencing enforcement proceedings,
22 and to provide opportunity to cure consistent with the informal dispute resolution
23 procedure set forth in Paragraph 204.

24     207.  The Monitor, County, and DOJ may jointly stipulate to make changes,
25 modifications, and amendments to the Agreement. Such changes, modifications, and
26 amendments to the Agreement will be encouraged when the Parties agree, or where the
27 reviews, assessments, and/or audits of the Monitor demonstrate, that a Agreement
28 provision as drafted is not furthering the purpose of the Agreement or that there is a

-53-

1 preferable alternative that will achieve the same purpose. The Parties may jointly
2 move for approval of any proposed changes, modifications, and/or amendments, which
3 will become effective upon approval by the Court. No change, modification, or
4 amendment to the Agreement will have any force or effect if not set forth in writing,
5 signed by all the Parties to the Agreement, and approved by the Court.

6     208. The Parties agree to defend the provisions of this Agreement. The Parties
7 shall notify each other of any court or administrative challenge to this Agreement. In
8 the event any provision of this Agreement is challenged in any state, county, or
9 municipal court, the Parties shall seek removal to federal court.

10     209. Nothing in this Agreement is intended to: (a) alter the existing collective
11 bargaining agreements; or (b) impair the collective bargaining rights of employees
12 under State and local law. Nothing in this Agreement is intended to amend or
13 supersede any provision of State or local law.

14     210. All Parties agree that, as of the date of entry of this Agreement, litigation
15 is not "reasonably foreseeable" concerning the matters described in this Agreement.
16 To the extent that either Party previously implemented a litigation hold to preserve
17 documents, electronically stored information, or things related to the matters described
18 in this Agreement, the Party is no longer required to maintain such a litigation hold.

19 ## XV. TERMINATION OF THE AGREEMENT

20     211. The Parties anticipate that LASD can reach full and effective compliance
21 with this Agreement within four years of the Effective Date.

22     212. The Parties may jointly petition the Court to terminate this Agreement
23 after four years if the Parties believe that LASD has reached full and effective
24 compliance with this Agreement and has maintained that compliance for one year. If,
25 after four years from the Effective Date, the Parties disagree about whether LASD has
26 been full and effective compliance for one year, either party may seek to terminate the
27 Agreement. In the case of termination sought by the County, prior to filing a motion to
28 terminate, the County agrees to notify DOJ in writing when the County has determined

1   that LASD is in full and effective compliance with this Agreement, including through
2   the alternative method of compliance using outcome assessments, and that such
3   compliance has been maintained for no less than one year. Thereafter, the Parties shall
4   promptly confer as to the status of compliance. The Monitor will certify whether he or
5   she agrees that the County is in compliance with the Agreement or portions of the
6   Agreement at the time of the notification. No later than 21 days thereafter, the Parties
7   will meet and confer at a mutually agreeable time as to the status of compliance. If,
8   after a reasonable period of consultation and the completion of any additional audit or
9   evaluation that DOJ and/or the Monitor may wish to undertake, including on-site
10  observations, document review, or interviews with the County and LASD personnel,
11  the Parties cannot resolve any compliance issues, the County may file a motion to
12  terminate the Agreement. At all times, LASD shall bear the burden of demonstrating
13  compliance with this Agreement.

14  ///
15  ///
16  ///
17  ///
18  ///
19  ///
20  ///
21  ///
22  ///
23  ///
24  ///
25  ///
26  ///
27  ///
28  ///

1    Respectfully submitted this 28ᵗʰday of ___April___, 2015.

2

3

4

5    For the UNITED STATES OF AMERICA:

6

7

8                                LORETTA E. LYNCH

9                                Attorney General

10

11    STEPHANIE YONEKURA         VANITA GUPTA

12    Acting United States Attorney     Principal Deputy Assistant Attorney
                                       General

13                                Civil Rights Division

14    LEON W. WEIDMAN

15    Assistant United States Attorney         /s/
     Chief, Civil Division             MARK KAPPELHOFF

16                              Acting Deputy Assistant Attorney
                                 General

17    ROBYN-MARIE LYON MONTELEONE

18    Assistant United States Attorney

19    Assistant Division Chief            /s/
     Civil Rights Unit Chief, Civil Division    GREGORY B. FRIEL

20                              Deputy Assistant Attorney General

21                                  /s/

22                              JUDITH C. PRESTON
                             Acting Chief

23

24                                  /s/

25                              STEVEN H. ROSENBAUM
                             Chief

26

27                                  /s/

28                              CHRISTY E. LOPEZ
                             Deputy Chief

/s/
R. TAMAR HAGLER
Deputy Chief

/s/
CHARLES HART
Trial Attorney

/s/
NORRINDA BROWN HAYAT
CARRIE PAGNUCCO
KATHRYN LADEWSKI
Trial Attorneys

For the COUNTY OF LOS ANGELES and the LOS ANGELES SHERIFF'S DEPARTMENT:

MARK J. SALADINO
County Counsel
County of Los Angeles

ROGER GRANBO
Senior Assistant County Counsel
County of Los Angeles

-57-

JIM MCDONNELL
Sheriff

SO ORDERED this _____ day of _____, 2015.

_____
UNITED STATES DISTRICT JUDGE

# CERTIFICATE OF SERVICE

I am employed in the County of Los Angeles, State of California; I am over the age of eighteen years and not a party to the within action; my business address is 841 Apollo Street, Suite 100, El Segundo, California 90245.

On March 15, 2023, I served the foregoing document described as **DEFENDANT COUNTY OF LOS ANGELES AND LOS ANGELES COUNTY SHERIFF'S DEPARTMENT RESPONSES TO PLAINTIFF'S REQUEST FOR PRODUCTION, SET ONE** on all interested parties in this action by placing a true copy thereof in a sealed envelope addressed as follows:

## SEE ATTACHED SERVICE LIST

**By Mail**  I caused such envelope(s) to be deposited in the mail at El Segundo, California.  The envelope was mailed with postage thereon fully prepaid and addressed to the parties listed on the Service List. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  It is deposited with U.S. postal service on that same day in the ordinary course of business.  I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than 1 day after date of deposit for mailing in affidavit.

XX    **By Email** Based upon a court order or an agreement of the parties to accept electronic service, I caused the documents to be sent to the persons at the electronic service addresses listed in the Service List.  My email address is scarter@kmslegal.com.

**By Personal Service** I caused such document to be Personally Served on the parties listed in the Service List.

XX    **State**  I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on March 15, 2023, at El Segundo, California.

_____
Spencer Carter

## <u>SERVICE LIST</u>

### <u>Assiff, Joshua vs. County of Los Angeles, et al.</u>
Central District- Case No.: 2:22-cv-05367 RGK(MAAx)

| | |
|---|---|
| Thomas M. Ferlauto, Esq.<br>Law Office of Thomas M. Ferlauto, APC<br>25201 Paseo de Alicia, Ste. 270<br>Laguna Hills, CA 92653<br>EM: tmf@lawofficetmf.com | Attorney for Plaintiff,<br>**JOSHUA ASSIFF** |

DEFENDANT COUNTY OF LOS ANGELES AND LOS ANGELES COUNTY SHERIFF'S DEPARTMENT
RESPONSES TO PLAINTIFF'S REQUEST FOR PRODUCTION, SET ONE