1  THOMAS M. FERLAUTO (SBN 155503)
2  LAW OFFICE OF THOMAS M. FERLAUTO, APC
   25201 Paseo de Alicia, Suite 270
3  Laguna Hills, California 92653
   Telephone: 949-334-8650
4  Fax: 949-334-8691
5  Email: TMF@lawofficeTMF.com

6  Attorney for Plaintiff, JOSHUA ASSIFF

7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10

11 JOSHUA ASSIFF,                    | Case No. 2:22-cv-05367 RGK (MAAx)

12              Plaintiff,           | **PLAINTIFF'S RESPONSE TO
                                     | STATEMENT OF PURPORTED
13     v.                            | UNCONTROVERTED FACTS AND
                                     | CONCLUSIONS OF LAW AND
14                                   | ADDITIONAL FACTS GIVING RISE
   COUNTY OF LOS ANGELES;           | TO TRIABLE ISSUES IN
15 SHERIFF DEPUTY BADGE             | OPPOSITION TO MOTION FOR
   NUMBER 404532;                    | PARTIAL SUMMARY JUDGMENT
16 And DOES 1 through 10,           |
                                     | **REDACTED VERSION OF
17                                   | DOCUMENT PROPOSED TO BE
18              Defendants.          | FILED UNDER SEAL**

19                                   | DATE:        June 26, 2023
                                     | TIME:        9:00 a.m.
20                                   | COURTROOM:   850

21                                   | Action Filed: August 3, 2022
                                     | Pretrial Conference: July 10, 2023
22                                   | Trial Date: July 25, 2023

23

24                                   | Assigned to: Hon. R. Gary Klausner,
                                     | District Judge, Courtroom 850
25

26

27

28

                                     1

TO THE COURT, ALL PARTIES IN THIS ACTION, AND TO THEIR

RESPECTIVE ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT Plaintiff, JOSHUA ASSIFF (hereinafter

"Plaintiff") hereby respectfully submits the following response to statement of

purported uncontroverted facts and conclusions of law and additional facts giving

rise to triable issues in opposition to the motion for partial summary judgment filed

in this action by Defendants COUNTY OF LOS ANGELES and TRAVIS KELLY

(hereinafter "Defendants").

| PURPORTED UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
| --- | --- |
| 1. On or about September 24, 2021, Plaintiff Joshua Assiff ("Plaintiff"), a 21-year-old black male, was pulled over and subsequently arrested by a male Caucasian motorcycle officer ("Defendant Kelly"). | UNDISPUTED |
| 2. Defendant Kelly initiated the traffic stop at the intersection of Soledad Canyon Road and Sierra Highway because he observed a black GMC Terrain (driven by Plaintiff) make a right-hand turn without stopping for the steady circular red traffic signal (violation of California *Vehicle Code* section 21453(b)) and without yielding to pedestrians in the crosswalk (violation of California *Vehicle Code* section 21950(a)). | DISPUTED<br>There was no probable cause for the stop in the first place. Plaintiff made a legal turn on a green light. (Exhibit 1, Assiff Depo 46:20-21; 54:7-9; 60:19-20; 101:20)  As the light was green, there were no pedestrians in the crosswalk.  (Assiff Dec. 2:1-3) Note:  Defendant Kelly made no mention of the pedestrians in the crosswalk until after he needed to justify his unlawful use of force. |

| | |
|---|---|
| | (Exhibit B, Defendant Kelly's BWC generally) |
| 3. The incident was captured on video by Defendant Kelly once he activated his non-department issued personal Body Worn Camera ("BWC") as he was dismounting his motorcycle at the outset of the traffic stop. | UNDISPUTED |
| 4. From the beginning of the traffic stop, Plaintiff was argumentative with Sergeant Kelly about the reason for the traffic stop, and contradicted Defendant Kelly's statement that Plaintiff made a right-hand turn without stopping for the red traffic signal. | DISPUTED<br>Plaintiff was polite and courteous to Defendant Kelly, always referring him as either "officer" or "sir."  Plaintiff stated his position that the light was in fact green in response to Defendant Kelly's false assertions that the light was red.  (See, Exhibit B, Defendant Kelly's BWC) |
| 5. While Plaintiff was speaking, Defendant Kelly could smell a strong odor of burnt marijuana emitting from his vehicle. | DISPUTED<br>There was no marijuana smell.  It was 7:50 a.m. in the morning and Plaintiff was on his way to Basketball practice.  Plaintiff did not ingest marijuana that morning.  Plaintiff did not smoke marijuana that morning.  Plaintiff had never smoked marijuana in the Vehicle.  (Exhibit 1, Assiff |

PLAINTIFF'S RESPONSE TO STATEMENT OF PURPORTED UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW AND
ADDITIONAL FACTS GIVING RISE TO TRIABLE ISSUES IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT

| | |
|---|---|
| | Depo 39:21-23, 41:9-11, 131:6-8; Assiff Dec. 2:13-16) |
| 6. Due to Plaintiff's agitation, rapid speech, and odor of marijuana, Defendant Kelly believed Plaintiff may have been under the influence of marijuana. | DISPUTED Plaintiff was not agitated and his speech was not rapid.  (See, Exhibit B, Defendant Kelly's BWC generally)  There was no marijuana smell.  It was 7:50 a.m. in the morning and Plaintiff was on his way to Basketball practice. Plaintiff did not ingest marijuana that morning.  Plaintiff did not smoke marijuana that morning. Plaintiff had never smoked marijuana in the Vehicle. (Exhibit 1, Assiff Depo 39:21-23, 41:9-11, 131:6-8; Assiff Dec. 2:13-16) |
| 7. Defendant Kelly requested Plaintiff's driver's license three times in the first approximately 45 seconds of the BWC. | DISPUTED Defendant Kelly did not request the driver's license three times. The first claimed request was interrupted by cross-talk and never completed. (See, Exhibit B, Defendant Kelly's BWC at 07:52:58) |

| 8. In response, Plaintiff continued arguing with Defendant Kelly and did not provide his driver's license. | DISPUTED<br><br>Once Plaintiff was requested to produce his driver's license for the first time, Plaintiff immediately complied and reached for his wallet.  (See, Exhibit B, Defendant Kelly's BWC 07:53:25)  Even Defendant Kelly in his deposition conceded that Plaintiff was in the process of producing his driver's licenses when Defendant Kelly, not Plaintiff, re-engaged Plaintiff in the debate over the color of the light.  (Ferlauto Dec. 2:10-13) |
|---|---|
| 9. At the third request for Plaintiff's driver's license, Sergeant Kelly warned Plaintiff to "give me your driver's license or you're going to jail." | DISPUTED<br><br>Defendant Kelly did not request the driver's license three times. The first claimed request was interrupted by cross-talk and never completed. (See, Exhibit B, Defendant Kelly's BWC at 07:52:58) |
| 10. In response to the third request for Plaintiff's driver's license, Plaintiff stated "let me grab my phone," and began to reach | DISPUTED<br><br>Defendant Kelly did not request the driver's license three times. The first claimed request was |

| | |
|---|---|
| towards the center console of the vehicle with his right hand. | interrupted by cross-talk and never completed. (See, Exhibit B, Defendant Kelly's BWC at 07:52:58)<br><br>Plaintiff stated his intention to record the interaction on his mobile phone after Defendant Kelly irrationally threatened to throw Plaintiff in jail 42 seconds into traffic stop for a minor traffic infraction. (See, Exhibit B, Defendant Kelly's BWC at 07:53:33-37) |
| 11. Immediately thereafter, Defendant Kelly opened Plaintiff's driver's door and ordered Plaintiff to exit the vehicle. Plaintiff responded "no I'm not." | UNDISPUTED<br><br>However, it should be noted that this all happened simultaneous with Defendant Kelly grabbing Plaintiff's arm to prevent Plaintiff from recording the interaction on his mobile phone.  (See, Exhibit B, Defendant Kelly's BWC at 07:53:40) |
| 12. Between approximately 45 seconds and 1 minute and 20 seconds into the BWC footage, Defendant Kelly initiated physical contact with Plaintiff's left wrist to pull him out of the vehicle, which Plaintiff physically resisted | DISPUTED<br><br>Plaintiff did not kick Defendant Kelly (Assiff Dec. 2:17-20; Exhibit 1, Assiff Depo. 145:9-13 "There was no – there was no |

| | |
|---|---|
| by pulling his arm away; Defendant Kelly's report on the incident indicates that he felt Plaintiff kick him during this brief struggle. | fight.  It wasn't me, you know, besides me pulling back my arm, none of that.  While all that was going on, I didn't kick, I didn't punch, nothing." See also, Exhibit B, Defendant Kelly's BWC, Kelly grabs for Plaintiff's cell phone and no kick is visible, 07:53:40)  Apart from this "phantom kick" not being visible on the video record, it is implausible to the point of being impossible that it took place when Defendant Kelly claims during the fleeting moment when Plaintiff's legs are not visible, given Plaintiff's 6 foot 8 inch frame, and the fact that his long legs are seen wedged deep within the floorboard area seconds latter. Furthermore, Defendant Kelly conceded in his deposition the he did not see the kick.  His motorcycle pants were thickly padded and it may have been Plaintiff's knee with which he came into contact.  (See, Ferlauto |

7

| | |
|---|---|
| | Dec. 2:14-16) Basically, Defendant Kelly fabricated this claimed assault and battery on an officer to justify, after the fact, his unlawful use of force against Plaintiff. |
| 13. Defendant Kelly then stepped back slightly from Plaintiff, radioed for backup, and yelled out for assistance to Deputy Joshua Clark, who was in the same parking lot. | UNDISPUTED |
| 14. Plaintiff began to video record the incident on his cellphone. | UNDISPUTED |
| 15. Defendant Kelly then ordered Plaintiff to exit the vehicle several times, and warned about the use of pepper spray if Plaintiff failed to comply. | UNDISPUTED However, it should be noted that after Defendant Kelly threatened to pepper spray Plaintiff only 73 seconds into a traffic stop for a minor traffic infraction, Plaintiff requested to speak with Defendant Kelly's supervisor. (See, Exhibit B, Defendant Kelly's BWC at 07:54:06) |
| 16. Around 1 minute and 20 seconds into the BWC footage, Defendant Kelly deployed his pepper-spray against Plaintiff in a 1-2 second | UNDISPUTED However, it should be noted that Defendant Kelly deployed the pepper spray in immediate |

| | |
|---|---|
| burst, and initiated second physical contact with Plaintiff to pull him out of the vehicle. | response to Plaintiff's request to speak with Defendant Kelly's supervisor.  The request to speak to the supervisor was at 07:54:06, the pepper spray was deployed at 07:54:07 and Defendant Kelly can be heard angrily shouting "I AM THE SUPERVISOR" as he sprayed the pepper spray into Plaintiff's face. (See, Exhibit B, Defendant Kelly's BWC at 07:54:06-7) |
| 17. At about 1 minute and 25 seconds into the BWC footage, a second Deputy (identified as Deputy Joshua Clark) can be seen attempting to aid Defendant Kelly with Plaintiff to pull him out of the vehicle. | UNDISPUTED |
| 18. Defendant Kelly reported that he saw Plaintiff punch Deputy Clark in the chest, and he punched Plaintiff in the face with his left fist. | DISPUTED<br>Plaintiff did not punch Deputy Clark in the chest. (Assiff Dec. 2:17-20; Exhibit 1, Assiff Depo. 145:9-13 "There was no – there was no fight.  It wasn't me, you know, besides me pulling back my arm, none of that.  While all that was going on, I didn't kick, I didn't punch, nothing." See, also |

| | Defendant Kelly's BWC, no punch by Plaintiff is ever visible. Furthermore, Defendant Kelly in his deposition conceded that he could not see the punch on the video and had trouble locating where in the video it allegedly occurred. (Ferlauto Dec. 2:17-19) Again, Defendant Kelly fabricated this claimed assault and battery on an officer to justify, after the fact, his unlawful use of force against Plaintiff. |
|---|---|
| 19. The physical struggle between the two Deputies and Plaintiff continued for about 55 seconds while plaintiff was still seated in the driver's seat of his vehicle actively resisting. | DISPUTED<br><br>Plaintiff's resistance was passive. (Defendant's Exhibit G, Expert Report of Jeffrey J. Nobel, p. 18, ¶ 44)  As can be seen from Exhibit B, Defendant Kelly's BWC, generally, Plaintiff passively resisting the deputies' efforts to remove him from the vehicle, the "struggle" was one sided as the deputies pepper sprayed, punched and choked Plaintiff.  (Assiff Dec. 2:17-20; Exhibit 1, Assiff Depo. 145:9-13 |

| | |
|---|---|
| | "There was no – there was no fight.  It wasn't me, you know, besides me pulling back my arm, none of that.  While all that was going on, I didn't kick, I didn't punch, nothing.") |
| 20. At about 2 minutes and 20 seconds, a third Deputy (Deputy Garrett Gallegos) arrived on the scene. | UNDISPUTED |
| 21. Shortly thereafter, Deputy Gallegos deployed his Taser to Plaintiff's back through direct contact. | UNDISPUTED |
| 22. At about 2 minutes and 27 seconds, the three Deputies were able to bring Plaintiff out of his vehicle and to the ground next to it. | UNDISPUTED |
| 23. Once on the ground, Plaintiff continued kicking and pulling his arms away despite commands to get onto his stomach and stop resisting. | DISPUTED<br>Plaintiff was obviously involuntarily thrashing about as a result of  being pepper sprayed in the face a tased in the back.  He did not kick or punch.  (Assiff Dec. 2:17-20; Exhibit 1, Assiff Depo. 145:9-13 "There was no – there was no fight.  It wasn't me, you know, besides me pulling back my arm, none of that.  While all that was going on, I |

|  | didn't kick, I didn't punch, nothing.") |
|---|---|
| 24. At about 2 minutes and 36 seconds, Deputy Gallegos again deployed his Taser to Plaintiff in an attempt to gain compliance. | UNDISPUTED as to the facts that the Taser was deployed, disputed that is was to gain compliance. It was an unlawful use of force. |
| 25. Defendant Kelly ordered Plaintiff to roll onto his stomach and place his hands behind his back, and warned that the Taser would be used again if he did not comply. | UNDISPUTED |
| 26. Plaintiff then rolled onto his stomach, stopped resisting and was placed in handcuffs. | DISPUTED<br>Plaintiff was not resisted while on the ground (See, Additional Fact 117) |
| 27. Based on the foregoing, Defendant Kelly believed there was probable cause to arrest Plaintiff for violation of California *Penal Code* sections 69 (resisting an officer) and 243(b) (battery against the person of an officer). | DISPUTED<br>There was no probable cause for the stop in the first place. Plaintiff made a legal turn on a green light. (Exhibit 1, Assiff Depo 46:20-21; 54:7-9; 60:19-20; 101:20) As the light was green, there were no pedestrians in the crosswalk. (Assiff Dec. 2:1-3) There was no marijuana smell. It was 7:50 a.m. in the morning and Plaintiff was on his way to |

Basketball practice.  Plaintiff did not ingest marijuana that morning.  Plaintiff did not smoke marijuana that morning.  Plaintiff had never smoked marijuana in the Vehicle.  (Assiff Dec. 2:7-8, 13-16; Exhibit 1, Assiff Depo 39:21-23, 41:9-11, 131:6-8) Plaintiff did not kick Defendant Kelly.  Plaintiff did not punch Deputy Clark. (Assiff Dec. 2:17-20; Exhibit 1, Assiff Depo. 145:9-13 "There was no – there was no fight.  It wasn't me, you know, besides me pulling back my arm, none of that.  While all that was going on, I didn't kick, I didn't punch, nothing." See, also Defendant Kelly's BWC, Kelly grabs for Plaintiff's cell phone and no kick is visible, 07:53:40) Apart from this "phantom kick" not being visible on the video record, it is implausible to the point of being impossible that it took place when Defendant Kelly claims during the fleeting

PLAINTIFF'S RESPONSE TO STATEMENT OF PURPORTED UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW AND ADDITIONAL FACTS GIVING RISE TO TRIABLE ISSUES IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT

|  | moment when Plaintiff's legs are not visible, given Plaintiff's 6 foot 8 inch frame, and the fact that his long legs are seen wedged deep within the floorboard area seconds latter. Furthermore, Defendant Kelly conceded in his deposition the he did not see the kick.  His motorcycle pants were thickly padded and it may have been Plaintiff's knee with which he came into contact.  (See, Ferlauto Dec. 2:14-16)  Basically, Defendant Kelly fabricated this claimed assault and battery on an officer to justify, after the fact, his unlawful use of force against Plaintiff. |
|---|---|
| 28. On September 25, 2021, a judicial officer of the State of California found that there was probable cause for Plaintiff's subject arrest for California *Penal Code* sections 69 (resisting an officer) and 243(b) (battery against the person of an officer). | DISPUTED<br>This alleged "finding" is objectionable, irrelevant, and inadmissible.  The judicial officer had no personal knowledge of the incident and his alleged finding on a one-paged ex parte e-signed booking form, is not entitled to |

any collateral estoppel effect. The issue was never litigated. Plaintiff was not present. Plaintiff was not represented. Plaintiff was not given any opportunity to be heard.  Only Defendant Kelly's short one-sided declaration was even considered.  Also, this "proceeding" did not end with a final judgment on the merits. Plaintiff was never convicted of anything. *There was not even a preliminary hearing where Plaintiff might have had an opportunity to be heard.*  There was no preliminary hearing, because there were no criminal proceedings.  **This was a DA reject** – no charges were even brought by the District Attorney. There was not even probable cause for the traffic stop itself. (See, Response to Purported Uncontroverted Fact 27, above, and Additional Facts 101-103, below)

PLAINTIFF'S RESPONSE TO STATEMENT OF PURPORTED UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW AND ADDITIONAL FACTS GIVING RISE TO TRIABLE ISSUES IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT

| | |
|---|---|
| 29. Based upon his education, training, experience, and review of materials to date, Defendants' disclosed expert, Michael Gray, opines that there was probable cause for Plaintiff's arrests. | DISPUTED<br><br>This purported expert opinion on "probable cause" is improper inadmissible and irrelevant. Legal conclusions (i.e., opinions on an ultimate issue of law) are *not* "helpful" and therefore should be excluded. "Each courtroom comes equipped with a 'legal expert' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards." [*Burkhart v. Washington Metropolitan Area Transit Auth.* (DC Cir. 1997) 112 F3d 1207, 1213; *Nationwide Transport Finance v. Cass Information Systems, Inc.* (9th Cir. 2008) 523 F3d 1051, 1058-1060  It is error to permit an expert to testify in terms having specialized legal meaning distinct from ordinary usage. [*Burkhart v. Washington Metropolitan Area Transit Auth.*, supra, 112 F3d at 1215; *Woods v. Lecureux* (6th Cir. 1997) 110 F3d 1215, 1219- |

| | |
|---|---|
| | 1220—in 42 USC § 1983 civil rights action against prison warden, expert witness prohibited from using term "deliberately indifferent" to describe defendant's conduct] There was not even probable cause for the traffic stop itself. (See, Response to Purported Uncontroverted Fact 27, above, and Additional Facts 101-103, below) |
| 30. Plaintiff alleges that he was pulled over and subsequently arrested for no apparent reason and without probable cause. | UNDISPUTED |
| 31. Plaintiff further alleges that he was tasered, choked, pepper sprayed, beaten, and arrested, all in violation of his constitutional rights. | UNDISPUTED |
| 32. As to Defendant Kelly, Plaintiff alleges that he "acting under color or law or color of authority, deprived Plaintiff of his rights, privileges, or immunities secured by the State and Federal Constitutions, by arresting Plaintiff without probable cause and with use of excess force in violation of the Fourth and | UNDISPUTED |

| | |
|---|---|
| Fourteenth Amendment to the United States Constitution." | |
| 33. Defendant Kelly's BWC footage indicates that Plaintiff both verbally and physically resisted Defendant Kelly's detention; specifically, Plaintiff verbally argued with Sergeant Kelly regarding the legality of the traffic stop, he declined to provide his driver's license when requested (three times) (a violation of California Vehicle Code 12951(b), a misdemeanor) and, even after he was warned that failure to do so would result in an arrest, he refused to exit the vehicle despite being ordered to do so several times. | DISPUTED<br>See, Exhibit B, Defendant Kelly's BWC video, generally, as well as Plaintiff's responses to Defendants' purported uncontroverted facts 1-26, above, and Plaintiff's Additional Facts 101-117, below. See also, Additional Facts 118-139 |
| 34. Citizens are aware (California DMV Handbook and CVC 12951(b)) that when stopped by law enforcement they must produce a driver's license, proof of insurance and vehicle registration and if told to exit a vehicle they must comply. Citizens are generally aware they do have a First Amendment right to record interactions with law enforcement but do not have a right to interfere with the officer's lawful duties or commands. | UNDISPUTED |
| 35. Plaintiff was warned that failure to do so would result in him being pepper sprayed, | DISPUTED |

18

| | |
|---|---|
| and he physically resisted and fought Defendant Kelly's attempts to remove him from his vehicle to effectuate an arrest a violation of *Penal Code* Section 148. | See, Exhibit B, Defendant Kelly's BWC video, generally, as well as Plaintiff's responses to Defendants' purported uncontroverted facts 1-26, above, and Plaintiff's Additional Facts 101-117, below. See also, Additional Facts 118-139. |
| 36. Collectively, this series of failures to comply and the escalation from passive to aggressive resistance on the Plaintiff's behalf provided Defendant Kelly with the probable cause to lawfully arrest Plaintiff pursuant to California Penal Code section 836—which allows a peace officer to arrest a person without a warrant if the officer has probable cause to believe that the person to be arrested has committed a public offense in the officer's presence. | DISPUTED<br>This purported expert opinion on "probable cause" is improper inadmissible and irrelevant. Legal conclusions (i.e., opinions on an ultimate issue of law) are *not* "helpful" and therefore should be excluded. "Each courtroom comes equipped with a 'legal expert' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards." [*Burkhart v. Washington Metropolitan Area Transit Auth*. (DC Cir. 1997) 112 F3d 1207, 1213; *Nationwide Transport Finance v. Cass Information Systems, Inc*. (9th Cir. 2008) 523 F3d 1051, 1058- |

19

| | |
|---|---|
| | <u>1060</u>  It is error to permit an expert to testify in terms having specialized legal meaning distinct from ordinary usage. [*Burkhart v. Washington Metropolitan Area Transit Auth*<u>., supra, 112 F3d at 1215</u>; *Woods v. Lecureux* <u>(6th Cir. 1997) 110 F3d 1215, 1219-1220</u>—in <u>42 USC § 1983</u> civil rights action against prison warden, expert witness prohibited from using term "deliberately indifferent" to describe defendant's conduct] See, Exhibit B, Defendant Kelly's BWC video, generally, as well as Plaintiff's responses to Defendants' purported uncontroverted facts 1-26, above, and Plaintiff's Additional Facts 101-117, below.  See also, Additional Facts 118-139. |
| 37. Based on Plaintiff's aforementioned conduct, Defendant Kelly's conduct was objectively reasonable under the circumstances and is compliant with law | DISPUTED See, Exhibit B, Defendant Kelly's BWC video, generally, as well as Plaintiff's responses to Defendants' purported |

| | |
|---|---|
| enforcement training, policies, and procedures. | uncontroverted facts 1-26, above, and Plaintiff's Additional Facts 101-117, below.  See also, Additional Facts 118-139. |
| 38. Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. | UNDISPUTED However, there was no probable cause even for the stop itself. (See, Additional Facts 101-103) |
| 39. Defendant Kelly's conduct was not excessive force and, instead, was an appropriate degree of force, that is objectively reasonable, in light of Plaintiff's continued resistance and failure to comply with Defendant Kelly's reasonable orders. | DISPUTED See, Exhibit B, Defendant Kelly's BWC video, generally, as well as Plaintiff's responses to Defendants' purported uncontroverted facts 1-26, above, and Plaintiff's Additional Facts 101-117, below.  See also, Additional Facts 118-139. |
| 40. As to the County, Plaintiff alleges in a conclusory manner that the "County knowingly and intentionally promulgated, maintained, applied, enforced, and continued policies, customs, practices and usages... include[ing], without limitation, the employment of motorcycle and other officers to make unnecessary and unwarranted traffic stops to bully and harass African American | DISPUTED The allegation was not "conclusory" and in fact was found to be sufficiently specific in the Court's ruling on Defendant's motion to dismiss. (February 16, 2023, Docket No. 35) |

| | |
|---|---|
| drivers. This would include among other things, the initiation of frivolous traffic stops, arrest without probably cause, and the use of excessive force to effectuate the arrest." | |
| 41. Plaintiff cites to a 2013 Department of Justice, Civil Rights Division's review of LASD's Antelope Valley stations which eventually led to a legal settlement with federal authorities. Plaintiff alleges the Department of Justice's findings regarding racial profiling and discriminatory traffic stops in Antelope Valley are persistent and ongoing recognized by the Department of Justice, Civil Rights Division. | UNDISPUTED |
| 42. However, the legal settlement and findings do not mention nor provide findings as to LASD Santa Clarita Valley station. | UNDISPUTED<br><br>However, the incident that is the subject matter of this lawsuit happened while Plaintiff was traveling to the Antelope Valley. However, it occurred in Santa Clarita, in a northern part of the County, but just one Sheriff's Department station adjacent to but just south of the actual Antelope Valley. (Additional Fact 152) |
| 43. On or about September 24, 2021, Defendant Kelly was assigned to LASD Santa | UNDISPUTED |

| | |
|---|---|
| Clarita Valley station. At no point has Defendant Kelly been assigned to nor worked with LASD Antelope Valley stations, including LASD Lancaster and Palmdale stations. | However, the incident that is the subject matter of this lawsuit happened while Plaintiff was traveling to the Antelope Valley. However, it occurred in Santa Clarita, in a northern part of the County, but just one Sheriff's Department station adjacent to but south of the actual Antelope Valley.  (Additional Fact 152) |
| 44. Moreover, the DOJ's failure to include, mention, or review LASD Santa Clarita Valley station in their study in fact suggests no pervasive, continuous, or known unconstitutional policies or practices existed or allowed for Plaintiff's alleged constitutional violation. | DISPUTED<br>This is an improper expert opinion as it constitutes a legal opinion on an ultimate issue of law. [*Burkhart v. Washington Metropolitan Area Transit Auth.* (DC Cir. 1997) 112 F3d 1207, 1213; *Nationwide Transport Finance v. Cass Information Systems, Inc.* (9th Cir. 2008) 523 F3d 1051, 1058-1060]  Furthermore, this opinion is based upon an inadequate review of necessary evidence and thus lacks a proper foundation for this opinion. |

| | Additional Facts 140-151, 152-156 |
|---|---|
| 45. Plaintiff has failed to provide any evidence or identify any specific policies or customs that LASD Santa Clarita Valley, Deputy's assigned station which had jurisdiction over Defendant Kelly, held or allowed which caused Plaintiff's alleged constitutional violation. | DISPUTED<br><br>This is an improper expert opinion as it constitutes a legal opinion on an ultimate issue of law. [*Burkhart v. Washington Metropolitan Area Transit Auth.* (DC Cir. 1997) 112 F3d 1207, 1213; *Nationwide Transport Finance v. Cass Information Systems, Inc.* (9th Cir. 2008) 523 F3d 1051, 1058-1060] Furthermore, this opinion is based upon an inadequate review of necessary evidence and thus lacks a proper foundation for this opinion.<br><br>Additional Facts 140-151, 152-156 |
| 46. The County of Los Angeles neither promulgates, maintains, nor enforces customs or policies that allowed for nor caused Plaintiff injury. | DISPUTED<br><br>This is an improper expert opinion as it constitutes a legal opinion on an ultimate issue of law. [*Burkhart v. Washington Metropolitan Area Transit Auth.* (DC Cir. 1997) 112 F3d |

| | |
|---|---|
| | 1207, 1213; *Nationwide Transport Finance v. Cass Information Systems, Inc.* (9th Cir. 2008) 523 F3d 1051, 1058-1060]  Furthermore, this opinion is based upon an inadequate review of necessary evidence and thus lacks a proper foundation for this opinion.<br><br>Additional Facts 140-151, 152-156 |
| 47. The County of Los Angeles and its Sheriff's Department take steps to ensure that its deputies act lawfully and do not violate civil rights when enforcing the law. | DISPUTED<br><br>This is an improper expert opinion as it constitutes a legal opinion on an ultimate issue of law. [*Burkhart v. Washington Metropolitan Area Transit Auth.* (DC Cir. 1997) 112 F3d 1207, 1213; *Nationwide Transport Finance v. Cass Information Systems, Inc.* (9th Cir. 2008) 523 F3d 1051, 1058-1060]  Furthermore, this opinion is based upon an inadequate review of necessary evidence and thus lacks a proper foundation for this opinion. |

| | Additional Facts 140-151, 152-156 |
|---|---|
| 48. There does not exist, nor did there exist at the time of the events underlying this action that gives rise to this litigation in September 2021, within the LASD, nor does the LASD condone, a custom, practice or policy of conducting unreasonable searches and seizures. | DISPUTED<br><br>This is an improper expert opinion as it constitutes a legal opinion on an ultimate issue of law. [*Burkhart v. Washington Metropolitan Area Transit Auth.* (DC Cir. 1997) 112 F3d 1207, 1213; *Nationwide Transport Finance v. Cass Information Systems, Inc.* (9th Cir. 2008) 523 F3d 1051, 1058-1060] Furthermore, this opinion is based upon an inadequate review of necessary evidence and thus lacks a proper foundation for this opinion.<br><br>Additional Facts 140-151, 152-156 |
| 49. There has never existed any policy, custom, or practice of random stopping of citizens without cause, nor has there ever been any policy, custom, or practice of racial profiling or discriminating against citizens based on their race or ethnicity. | DISPUTED<br><br>This is an improper expert opinion as it constitutes a legal opinion on an ultimate issue of law. [*Burkhart v. Washington Metropolitan Area Transit Auth.* (DC Cir. 1997) 112 F3d |

|  | 1207, 1213; *Nationwide Transport Finance v. Cass Information Systems, Inc.* (9th Cir. 2008) 523 F3d 1051, 1058-1060] Furthermore, this opinion is based upon an inadequate review of necessary evidence and thus lacks a proper foundation for this opinion.<br>Additional Facts 140-151, 152-156 |
|---|---|
| 50. There does not exist, nor did there exist at the time of the events underlying this action that gives rise to this litigation, within the LASD, nor does the LASD condone, a custom, practice or policy of permitting the use of excessive force against any person. | DISPUTED<br>This is an improper expert opinion as it constitutes a legal opinion on an ultimate issue of law. [*Burkhart v. Washington Metropolitan Area Transit Auth.* (DC Cir. 1997) 112 F3d 1207, 1213; *Nationwide Transport Finance v. Cass Information Systems, Inc.* (9th Cir. 2008) 523 F3d 1051, 1058-1060] Furthermore, this opinion is based upon an inadequate review of necessary evidence and thus lacks a proper foundation for this opinion. |

|  | Additional Facts 140-151, 152-156 |
|---|---|
| 51. There does not exist, nor did there exist at the time of the events underlying this action that gives rise to this litigation, within the LASD, nor does the LASD condone, a custom, practice or policy of permitting unlawful arrests. | DISPUTED<br><br>This is an improper expert opinion as it constitutes a legal opinion on an ultimate issue of law. [*Burkhart v. Washington Metropolitan Area Transit Auth.* (DC Cir. 1997) 112 F3d 1207, 1213; *Nationwide Transport Finance v. Cass Information Systems, Inc.* (9th Cir. 2008) 523 F3d 1051, 1058-1060]  Furthermore, this opinion is based upon an inadequate review of necessary evidence and thus lacks a proper foundation for this opinion.<br><br>Additional Facts 140-151, 152-156 |
| 52. There does not exist, nor did there exist at the time of the events underlying this action that gives rise to this litigation, within the LASD, nor does the LASD condone, a custom, practice or policy of retaliating against citizens based on their exercise of First Amendment rights. | DISPUTED<br><br>This is an improper expert opinion as it constitutes a legal opinion on an ultimate issue of law. [*Burkhart v. Washington Metropolitan Area Transit Auth.* (DC Cir. 1997) 112 F3d |

28

| | |
|---|---|
| | 1207, 1213; *Nationwide Transport Finance v. Cass Information Systems, Inc.* (9th Cir. 2008) 523 F3d 1051, 1058-1060] Furthermore, this opinion is based upon an inadequate review of necessary evidence and thus lacks a proper foundation for this opinion. Additional Facts 140-151, 152-156 |
| 53. There does not exist at the LASD, nor did there exist at the time of the events underlying this action, a custom, practice or policy of employing and retaining as deputies and other personnel who the County of Los Angeles knew or reasonably should have known had dangerous propensities for abusing their authority and/or for mistreating citizens by failing to follow written LASD policies, including by conducting unreasonable searches and seizures or using excessive force. | DISPUTED This is an improper expert opinion as it constitutes a legal opinion on an ultimate issue of law. [*Burkhart v. Washington Metropolitan Area Transit Auth.* (DC Cir. 1997) 112 F3d 1207, 1213; *Nationwide Transport Finance v. Cass Information Systems, Inc.* (9th Cir. 2008) 523 F3d 1051, 1058-1060] Furthermore, this opinion is based upon an inadequate review of necessary evidence and thus lacks a proper foundation for this opinion. |

| | Additional Facts 140-151, 152-156 |
|---|---|
| 54. There does not exist at the LASD, nor did there exist at the time of the events underlying this action, a custom, practice or policy of inadequately supervising, training, controlling, assigning, and disciplining deputies and other personnel including who the County of Los Angeles allegedly knew, or in the exercise of reasonable care, should have known had a propensity for abusing their authority and/or for mistreating citizens by failing to follow written LASD policies, including by conducting unreasonable searches and seizures or using excessive force. | DISPUTED<br>This is an improper expert opinion as it constitutes a legal opinion on an ultimate issue of law. [*Burkhart v. Washington Metropolitan Area Transit Auth.* (DC Cir. 1997) 112 F3d 1207, 1213; *Nationwide Transport Finance v. Cass Information Systems, Inc.* (9th Cir. 2008) 523 F3d 1051, 1058-1060]  Furthermore, this opinion is based upon an inadequate review of necessary evidence and thus lacks a proper foundation for this opinion.<br>Additional Facts 140-151, 152-156 |
| 55. There does not exist at the LASD, nor did there exist at the time of the events underlying this action, a custom, practice or policy of maintaining inadequate procedures for reporting, supervising, investigating, reviewing, disciplining and controlling | DISPUTED<br>This is an improper expert opinion as it constitutes a legal opinion on an ultimate issue of law. [*Burkhart v. Washington Metropolitan Area Transit Auth.* (DC Cir. 1997) 112 F3d |

| alleged intentional misconduct by deputies of the LASD. | 1207, 1213; *Nationwide Transport Finance v. Cass Information Systems, Inc.* (9th Cir. 2008) 523 F3d 1051, 1058-1060] Furthermore, this opinion is based upon an inadequate review of necessary evidence and thus lacks a proper foundation for this opinion.<br>Additional Facts 140-151, 152-156 |
| 56. There does not exist at the LASD, nor did there exist at the time of the events underlying this action, a custom, practice or policy of failing to discipline County of Los Angeles deputies' misconduct. | DISPUTED<br>This is an improper expert opinion as it constitutes a legal opinion on an ultimate issue of law. [*Burkhart v. Washington Metropolitan Area Transit Auth.* (DC Cir. 1997) 112 F3d 1207, 1213; *Nationwide Transport Finance v. Cass Information Systems, Inc.* (9th Cir. 2008) 523 F3d 1051, 1058-1060] Furthermore, this opinion is based upon an inadequate review of necessary evidence and thus lacks a proper foundation for this opinion. |

| | Additional Facts 140-151, 152-156 |
|---|---|
| 57. There does not exist at the LASD, nor did there exist at the time of the events underlying this action, a custom, practice or policy of ratifying any alleged intentional misconduct of deputies of the LASD. | DISPUTED<br><br>This is an improper expert opinion as it constitutes a legal opinion on an ultimate issue of law. [*Burkhart v. Washington Metropolitan Area Transit Auth.* (DC Cir. 1997) 112 F3d 1207, 1213; *Nationwide Transport Finance v. Cass Information Systems, Inc.* (9th Cir. 2008) 523 F3d 1051, 1058-1060] Furthermore, this opinion is based upon an inadequate review of necessary evidence and thus lacks a proper foundation for this opinion.<br><br>Additional Facts 140-151, 152-156 |
| 58. As such, there is no evidence to indicate that the LASD has a custom or practice of violating the civil rights of citizens. | DISPUTED<br><br>This is an improper expert opinion as it constitutes a legal opinion on an ultimate issue of law. [*Burkhart v. Washington Metropolitan Area Transit Auth.* (DC Cir. 1997) 112 F3d |

| | |
|---|---|
| | 1207, 1213; *Nationwide Transport Finance v. Cass Information Systems, Inc.* (9th Cir. 2008) 523 F3d 1051, 1058-1060] Furthermore, this opinion is based upon an inadequate review of necessary evidence and thus lacks a proper foundation for this opinion.<br>Additional Facts 140-151, 152-156 |
| 59. The LASD has a very comprehensive Use of Force manual that gives thorough and specific details on the use of force and the reporting of such use of force. | UNDISPUTED |
| 60. Defendant Kelly knew that the County and LASD maintained and strictly enforced policies and procedures regarding traffic stops, as well as the use of force, including de-escalation procedures. | |

33



| | |
|---|---|
| 61. Defendant Kelly received all required LASD training concerning how to conduct traffic stops and how to appropriately respond to passive and active resistance from motorists while conducting traffic stops. | DISPUTED<br>Defendant Kelly did not receive adequate training as he did not appropriately respond in this incident. (See, Additional Facts 118-128)  |
| 62. Further, Defendant Kelly received LASD training concerning de-escalation procedures that may be used while conducting these traffic stops. | DISPUTED<br>Defendant Kelly did not receive adequate training as he did not use any de-escalation techniques |



| | |
|---|---|
| | in this incident. (See, Additional Facts 118-128) [redacted] |
| 63. Nothing in Defendant Kelly's personnel history presented as concerns that would give Defendant County of Los Angeles the impression that Defendant Kelly is either unfit for duty or dismissive of relevant policies and procedures. | DISPUTED Defendant Kelly is a bad motorcycle cop. [redacted] |



| | |
|---|---|
| | [redacted] |
| 64. Supervisor and management personnel of the LASD, who supervise and manage Defendant Kelly for The County of Los Angeles, responded appropriately in the review and handling of this incident, specifically shown in Defendant Kelly's superiors review and follow up report of the incident. | DISPUTED [redacted] |



| 65. Based upon his education, training, experience, and review of materials to date, Defendants' disclosed expert, Michael Gray, opines that the County of Los Angeles responded appropriately to the incident, and; no pattern of unconstitutional acts by Defendant Kelly or the County of Los Angeles exist that caused Plaintiff injury. | PLAINTIFF DOES NOT DISPUTE THAT GRAY OPINED, BUT HIS OPINIONS ARE DISPUTED<br>See Additional Facts 118-156 |
|---|---|
| 66. There is nothing in the record(s) reviewed that would indicate that the LASD failed to properly supervise Defendant Kelly. | DISPUTED<br>When Plaintiff requested to speak to Defendant Kelly's supervisor, Defendant Kelly pepper sprayed Plaintiff in the face and *claimed to be his own supervisor.* Thus, Defendant Kelly apparently had |

| | |
|---|---|
| | no supervision whatsoever. (See, Additional Fact 113) |
| 67. The reporting process and follow up investigation was proper, thorough and followed LASD policies and procedures. | DISPUTED [redacted] |

| 68. Defendant Kelly did not intend to use unreasonable or excessive force against Plaintiff at any point during the incident. | DISPUTED<br>Defendant Kelly's use of pepper spray on Plaintiff was objectively unreasonable, excessive and inconsistent with generally accepted police practices. (See, Additional Fact 129)  Defendant Kelly's punch to Plaintiff's face was objectively unreasonable, excessive and inconsistent with generally accepted police practices. (See, Additional Fact 138) |
| --- | --- |
| 69. At no point during his encounter with Plaintiff did Defendant Kelly ever retaliate against Plaintiff for anything he said or did to Defendant Kelly or other LASD deputies, nor did I ever retaliate against Plaintiff for recording the incident. | DISPUTED<br>Defendant Kelly retaliated against Plaintiff for trying to record the encounter on his mobile phone. (See, Additional Facts 108 and 109)  Defendant Kelly retaliated against Plaintiff for requesting to speak to Defendant Kelly's supervisor. (See, Plaintiff's Additional Facts 112 and 113) |
| 70. At no point during his encounter with Plaintiff were Defendant Kelly's actions due to racial animus or discriminatory motive. | DISPUTED<br>Defendants Uncontroverted Fact 1; Plaintiff's Additional Facts |

PLAINTIFF'S RESPONSE TO STATEMENT OF PURPORTED UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW AND ADDITIONAL FACTS GIVING RISE TO TRIABLE ISSUES IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT

| | |
|---|---|
| | 101-103, 148, 149-150, and 152-156 |
| 71. Nor at any point during the encounter with Plaintiff did Defendant Kelly witness any other LASD deputy act out of racial animus or discriminatory motive, or otherwise conduct themselves unlawfully or unreasonably. | DISPUTED<br>Plaintiff's Additional Fact 139 |
| 72. Defendant Kelly did not racially profile Plaintiff in initiating the traffic stop. | DISPUTED<br>Defendants Uncontroverted Fact 1; Plaintiff's Additional Facts 101-103, 148, 149-150, and 152-156 |
| 73. Furthermore, at no point during my interaction with Plaintiff did Defendant Kelly act with malice, oppression or in reckless disregard of Plaintiff's rights, nor did Defendant Kelly observe any other deputy act in such manner toward Plaintiff. | DISPUTED<br>See, Plaintiff's Additional Facts 101-139 |
| 74. On May 10, 2023, Plaintiff made an expert disclosure which attached an expert report which provided no facts, opinions or conclusions with respect to either Plaintiff's claims or allegations regarding unlawful arrest, Monell liability or punitive damages. | DISPUTED<br>Mr. Nobel's report speaks for itself. |

| PLAINTIFF'S ADDITIONAL FACTS GIVING RISE TO TRIABLE ISSUES | SUPPORTING EVIDENCE |
|---|---|
| 101.  The light was green when Plaintiff made a legal right hand turn. | Exhibit 1, Assiff Depo 46:20-21; 54:7-9; 60:19-20; 101:20; Assiff Dec. 2:1-3 |
| 102.  There were no pedestrians in the crosswalk when Plaintiff made a legal right hand turn. | Assiff Dec. 2:1-3 |
| 103.  There was not a smell of burnt marijuana emanating from Plaintiff's vehicle.  It was 7:50 a.m. in the morning and Plaintiff, a college athlete, was on his way to basketball practice.  Plaintiff did not smoke any marijuana on that morning.  Plaintiff never smoked marijuana in his Vehicle. | Assiff   Dec.   2:7-8,   2:13-16; Exhibit 1, Assiff Depo 39:21-23, 41:9-11, 131:6-8 |
| 104. Plaintiff was not agitated and his speech was not rapid. | Exhibit   B,   Defendant   Kelly's BWC video, generally |
| 105. Defendant Kelly did not request the driver's license three times.  The first claimed request was interrupted by cross-talk and never completed. | Exhibit   B,   Defendant   Kelly's BWC at 07:52:58 |
| 106. Once Plaintiff was requested to produce his driver's license for the first time, Plaintiff immediately complied and reached for his wallet. | Exhibit   B,   Defendant   Kelly's BWC 07:53:25 |

| | |
|---|---|
| 107. Even Defendant Kelly in his deposition conceded that Plaintiff was in the process of producing his driver's licenses when Defendant Kelly, not Plaintiff, re-engaged Plaintiff in the debate over the color of the light. | Ferlauto Dec. 2:10-13; Exhibit B, Defendant Kelly's BWC 07:53:25 |
| 108. Plaintiff stated his intention to record the interaction on his mobile phone after Defendant Kelly irrationally threatened to throw Plaintiff in jail 42 seconds into a traffic stop for a minor traffic infraction. | Exhibit B, Defendant Kelly's BWC at 07:53:33-37 |
| 109. Immediately after Plaintiff stated his intention to record the interaction on his mobile phone, Defendant Kelly threw open the door to Plaintiff's vehicle and grabbed Plaintiff's arm in an effort to prevent Plaintiff from recording the encounter. | Exhibit B, Defendant Kelly's BWC at 07:53:40 |
| 110. Plaintiff never kicked Defendant Kelly. | Assiff Dec. 2:17-18; Exhibit 1, Assiff Depo. 145:9-13 "There was no – there was no fight.  It wasn't me, you know, besides me pulling back my arm, none of that.  While all that was going on, I didn't kick, I didn't punch, nothing." See, also Defendant Kelly's BWC, Kelly grabs for Plaintiff's cell phone and no kick is visible, 07:53:40 |

| | |
|---|---|
| 111. Defendant Kelly conceded in his deposition the he did not see the kick.  His motorcycle pants were thickly padded and it may have been Plaintiff's knee with which he came into contact. | Ferlauto Dec. 2:14-16 |
| 112. After Defendant Kelly threatened to pepper spray Plaintiff only 73 seconds into a traffic stop for a minor traffic infraction, Plaintiff requested to speak with Defendant Kelly's supervisor. | Exhibit B, Defendant Kelly's BWC at 07:54:06 |
| 113.  Defendant Kelly deployed the pepper spray in immediate response to Plaintiff's request to speak with Defendant Kelly's supervisor. | Exhibit B, Defendant Kelly's BWC at 07:54:06-7; The request to speak to the supervisor was at 07:54:06, the pepper spray was deployed at 07:54:07 and Defendant Kelly can be heard angrily shouting "I AM THE SUPERVISOR" as he sprayed the pepper spray into Plaintiff's face. |
| 114. Plaintiff did not punch Deputy Clark in the chest. | Assiff Dec. 2:18-19; Exhibit 1, Assiff Depo. 145:9-13 "There was no – there was no fight.  It wasn't me, you know, besides me pulling back my arm, none of that.  While all that was going on, I didn't kick, I didn't punch, nothing." See, also Exhibit B, Defendant Kelly's |

| | |
|---|---|
| | BWC, no punch by Plaintiff is ever visible. |
| 115. Defendant Kelly in his deposition conceded that he could not see the punch on the video and had trouble locating where in the video it allegedly occurred. | Ferlauto Dec. 2:17-19 |
| 116. Plaintiff merely passively resisted the deputies' efforts to remove Plaintiff from his vehicle, while the two deputies pepper sprayed, punched and choked Plaintiff. | Exhibit B, Defendant Kelly's BWC generally; Assiff Dec. 2:4-6, 2;17-20; Exhibit 1, Assiff Depo. 145:9-13; Defendant's Exhibit G, Expert Report of Jeffrey J. Nobel, p. 18, ¶ 44 |
| 117. After being removed from his vehicle, Plaintiff was not resisting. He was involuntarily thrashing about as a result of being pepper sprayed in the face and tased in the back. He did not kick or punch. | Exhibit B, Defendant Kelly's BWC generally; Exhibit 1, Assiff Depo. 145:9-13 "There was no – there was no fight. It wasn't me, you know, besides me pulling back my arm, none of that. While all that was going on, I didn't kick, I didn't punch, nothing." |
| 118. Sergeant Kelly's Failure to Use De-Escalation Techniques Was Inconsistent with Generally Accepted Police Practices | Defendant's Exhibit G, Expert Report of Jeffrey J. Nobel, pp. 14-15, ¶¶ 30-37 |
| 119. Police officers are taught that it is generally preferable to avoid conflict (i.e., conflict avoidance) or use communication skills to reduce or resolve conflict (e.g., de- | Defendant's Exhibit G, Expert Report of Jeffrey J. Nobel, p. 14, ¶ 30 |

| | |
|---|---|
| escalation) than it is to use force. Doing so increases both officer safety and the safety of the individuals with whom officers are interacting. | |
| 120. De-escalation means taking action to stabilize the situation and reduce the immediacy of the threat so that more time, options, and resources are available to resolve the situation. The goal of de-escalation is to gain the voluntary compliance of subjects, when feasible, and thereby reduce or eliminate the necessity to use physical force. | Defendant's Exhibit G, Expert Report of Jeffrey J. Nobel, p. 14, ¶ 31 |
| 121. Police officers are trained that de-escalation is accomplished through verbal persuasion; slowing down a situation allowing for more time, options and resources; avoiding or minimizing physical confrontation; maximizing tactical advantage by increasing distance to allow for greater reaction time; and the use of shielding, when possible, for cover and concealment. | Defendant's Exhibit G, Expert Report of Jeffrey J. Nobel, p. 14, ¶ 31 |
| 122. The Los Angeles Sheriff's Department Policy states, "Department members shall only use that level of force which is objectively reasonable, and force should be used as a last resort. Whenever feasible, Department members should endeavor to de- | Defendant's Exhibit G, Expert Report of Jeffrey J. Nobel, p. 15, ¶ 32 |

45

| | |
|---|---|
| escalate confrontations through tactical communication, crisis intervention, advisements, warnings, verbal persuasion, and other common-sense methods (such as utilizing alternative tactics) which can prevent the need to use force, or reduce the amount of force, that is required." | |
| 123. Sergeant Kelly unnecessarily escalated the contact with Mr. Assiff creating the need to use force that would have likely not have been otherwise necessary. | Defendant's Exhibit G, Expert Report of Jeffrey J. Nobel, p. 15, ¶ 33 |
| 124. Police officers are trained that they should strive to be courteous and professional during a traffic stop. Officers are trained that the attitude of the officer can affect the reaction of the driver and the outcome of a vehicle stop. Officers should make their approach in a businesslike manner while also employing verbal communication techniques. Flexibility and courtesy are important in making contact with the vehicle occupants. | Defendant's Exhibit G, Expert Report of Jeffrey J. Nobel, p. 15, ¶ 33 |
| 125. Police officers are trained that a major goal of law enforcement is to generate voluntary compliance without resorting to physical force. | Defendant's Exhibit G, Expert Report of Jeffrey J. Nobel, p. 15, ¶ 34 |

| | |
|---|---|
| 126. Here, instead of simply telling Mr. Assiff why he had been stopped, Sergeant Kelly initiated the conversation by asking Mr. Assiff the color of the light when he made his turn. When Mr. Assiff told Sergeant Kelly he believed the light was green, Sergeant Kelly told Mr. Assiff to stop and extended his hand out to Mr. Assiff in a manner consistent with telling Mr. Assiff to stop talking and told Mr. Assiff that he was "freaking out." Mr. Assiff tried to explain his perspective to Sergeant Kelly and Sergeant Kelly told Mr. Assiff he was not going to talk. 37 seconds after his initial contact with Mr. Assiff, Sergeant Kelly told him to provide his driver's license, or he would be going to jail. | Defendant's Exhibit G, Expert Report of Jeffrey J. Nobel, p. 15, ¶ 35 |
| 127. Sergeant Kelly failed to take basic reasonable steps to de-escalate the situation before telling Mr. Assiff that he would be arrested and using force to gain compliance. It is not unusual for motorist to question the reason for their stop and to spend a few minutes explaining the reasons for the stop and de-escalating the situation to gain voluntary compliance. Indeed, the LAPD supervisor's report states that Sergeant Kelly was able to use de-escalation skills to gain | Defendant's Exhibit G, Expert Report of Jeffrey J. Nobel, p. 15, ¶ 36 |

| | |
|---|---|
| voluntary compliance on the stop he made immediately prior to his stop of Mr. Assiff. | |
| 128. Had Sergeant Kelly followed generally accepted police practices and his department policy and used de-escalation to gain voluntary compliance, it is likely that no force would have been necessary. | Defendant's Exhibit G, Expert Report of Jeffrey J. Nobel, p. 15, ¶ 37 |
| 129. Sergeant Kelly's Use of Pepper Spray on Mr. Assiff was Objectively Unreasonable, Excessive and Inconsistent with Generally Accepted Police Practices | Defendant's Exhibit G, Expert Report of Jeffrey J. Nobel, p. 15-19, ¶¶ 38-46 |
| 130. Police officers are trained that the U.S. Supreme Court in its landmark decision *Graham v. Connor* held that to determine whether the force used to affect a particular seizure is reasonable, one must balance the nature and quality of the intrusion on the individual's rights against the countervailing government interests at stake. This balancing test is achieved by the application of what the Court labeled the objective reasonableness test. The factors to be considered include: 1.) The severity of the crime, 2.) Whether the suspect poses an immediate threat to the safety of the officers or others, and 3.) Whether the suspect is actively resisting or attempting to evade arrest by flight. | Defendant's Exhibit G, Expert Report of Jeffrey J. Nobel, p. 15, ¶ 38 |

| | |
|---|---|
| 131. Whether one's actions were objectively reasonable cannot be considered in a vacuum, but must be considered in relation to the totality of the circumstances. The standard for evaluating the unreasonable use of force reflects deference to the fact that peace officers are often forced to make split-second judgments in tense circumstances concerning the amount of force required. The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. | Defendant's Exhibit G, Expert Report of Jeffrey J. Nobel, p. 16, ¶ 39 |
| 132. Police officers are trained and prepared to assess dangerous situations and respond accordingly. Police officers are trained that for their force to be reasonable the level and manner of force must be proportional to the level of resistance and threat with which they are confronted. Proportionality is best understood as a range of permissible conduct based on the totality of the circumstances, rather than a set of specific, sequential, predefined force tactics arbitrarily paired to specified types or levels of resistance or threat. | Defendant's Exhibit G, Expert Report of Jeffrey J. Nobel, p. 16, ¶ 40 |

| | |
|---|---|
| 133. Whether or not the suspect poses an immediate threat to the safety of the officer or others is the most important of the *Graham* factors. There must be objective factors to justify an immediate threat, as a simple statement by an officer that he fears for his safety or the safety of others is insufficient. There is no requirement that a police officer wait until a suspect harms another to confirm that a serious threat of harm exists, but merely a subjective fear or a hunch will not justify the use of force by police. | Defendant's Exhibit G, Expert Report of Jeffrey J. Nobel, p. 16, ¶ 41 |
| 134. When determining whether or not there is an immediate threat to the officer or others, police officers are trained to assess a number of factors. These factors include, but are not limited to: <br> a. Severity of the threat to officers or others. <br> b. The conduct of the individual being confronted as reasonably perceived by the officer at the time. <br> c. Officer/subject factors (age, size, relative strength, skill level, injury/exhaustion and number of officers vs. subjects). <br> d. The effects of drugs or alcohol. <br> e. Subject's mental state or capacity. | Defendant's Exhibit G, Expert Report of Jeffrey J. Nobel, pp. 16-17, ¶ 42 |

f. Proximity of weapons or dangerous improvised devices.

g. The degree to which the subject has been effectively restrained and his/her ability to resist despite being restrained.

h. The availability of other options and their possible effectiveness.

i. Seriousness of the suspected offense or reason for contact with the individual.

j. Training and experience of the officer.

k. Potential for injury to citizens, officers and suspects.

l. Whether the person appears to be resisting, attempting to evade arrest by flight or is attacking the officer.

m. The risk and reasonable foreseeable consequences of escape.

n. The apparent need for immediate control of the subject or a prompt resolution of the situation.

o. Whether the conduct of the individual being confronted no longer reasonably appears to pose an immediate threat to the officer or others.

p. Prior contacts with the subject or awareness of any propensity for violence.

q. Other exigent circumstances

| | |
|---|---|
| 135. Here, Sergeant Kelly said when he opened the driver's door of Mr. Assiff's vehicle, he grabbed Mr. Assiff's left wrist because he could not see where he was reaching to control him as he exited the vehicle. Sergeant Kelly said as soon as he grabbed Mr. Assiff's risk, Mr. Assiff aggressively pulled his arm away and kicked him in the left leg with his left foot. | Defendant's Exhibit G, Expert Report of Jeffrey J. Nobel, p. 17-18, ¶ 43 |

a.  The video evidence from Sergeant Kelly's BWC contradicts his statement that Mr. Assiff kicked him.

b.  Instead, the video shows Sergeant Kelly yelling at Mr. Assiff to "Give me your driver's license now or you're going to jail!" Mr. Assiff immediately responds, "I'm going to . . .bro, hold on bro, let me get on my phone." Mr. Assiff appears to be holding his phone. Sergeant Kelly immediately opens the driver's door and tells Mr. Assiff to get out of the car. Sergeant Kelly appears to grab for Mr. Assiff and Mr. Assiff screams, "Whoa, whoa, whoa," and leans toward the passenger side of the vehicle as Sergeant Kelly backs away. Sergeant Kelly radios for a back up officer and yells to another deputy who is nearby. Sergeant Kelly then again orders Mr.

| | |
|---|---|
| Assiff to exit the vehicle and tells him if he doesn't, he will get pepper sprayed. Mr. Assiff is holding his phone up apparently videotaping Sergeant Kelly and asks to speak with his supervisor. Sergeant Kelly yells, "I am a supervisor," and sprays Mr. Assiff with his OC spray in the face.<br><br>c. Sergeant Assiff said he used his OC spray because Mr. Assiff reached toward the center console with his right hand and fearing that he may be retrieving a weapon, he sprayed a 1-2 second burst of his OC spray at Mr. Assiff's face.<br><br>d. The video shows both of Mr. Assiff's hands just prior to Sergeant Kelly's use of the OC spray and Mr. Assiff never reached for the center console as claimed by Sergeant Kelly. | |
| 136. While Mr. Assiff was not complying with Sergeant Kelly's commands he was not actively resisting, but merely passively resisting.<br><br>a. Passive resistance is defined as "Does not respond to verbal commands but also offers no physical form of resistance."<br><br>b. Active resistance is defined as "Physically evasive movements to defeat an officer's | Defendant's Exhibit G, Expert Report of Jeffrey J. Nobel, p. 18, ¶ 44 |

| | |
|---|---|
| attempt at control, including bracing, tensing, running away, or verbally or physically signaling an intention to avoid or prevent being taken into or retained in custody." | |
| 137. Police officers are trained that the use of OC spray for someone engaging in passive resistance is excessive. | Defendant's Exhibit G, Expert Report of Jeffrey J. Nobel, p. 18, ¶ 45 |
| 138. Sergeant Kelly and Deputy Clark claimed that Mr. Assiff punched Deputy Clark in the chest and Sergeant Kelly said in response he punched Mr. Assiff in the face.<br>a. The video evidence does not show Mr. Assiff punching Deputy Clark, or anyone else, during the incident and Mr. Assiff denied that he ever punched or kicked anyone.<br>b. There is no legitimate police training that instructs officers to strike subjects in the head or face; indeed, police agencies commonly instruct officers to avoid such strikes unless circumstances justify the application of deadly force. Under some circumstances strikes to the head or face can be reasonably expected to risk of causing death or serious physical injury. There is a substantial likelihood, depending on the type of strike and where the strikes connect, that a strike | Defendant's Exhibit G, Expert Report of Jeffrey J. Nobel, pp. 18-19, ¶ 46 |

| | |
|---|---|
| will damage the eyes, nose, orbital bone, cheekbone, or jaw through blunt trauma; cause permanent scarring by, for example, tearing the skin or damaging the outer ear; cause a head to twist beyond normal rotation in a way that injures the cervical spine and or associated muscles; or cause an epidural hematoma, which can carry a substantial risk of death. Police officers in California are trained that serious bodily harm or injury means a serious impairment of physical condition, including, but not limited to, the following: loss of consciousness, concussion, bone fracture, protracted loss or impairment of function of any bodily member or organ, a wound requiring extensive suturing, and serious disfigurement. c. The use of a punch to the face in these circumstances was excessive, objectively unreasonable and inconsistent with generally accepted police practices. | |
| 139. Deputy Clark said that he reached into the vehicle and attempted to wrap his right arm around Mr. Assiff's upper torso, but Mr. Assiff pulled his upper body back into the passenger seat and as a result, his right arm slid up around Mr. Assiff's shoulders and | Defendant's Exhibit G, Expert Report of Jeffrey J. Nobel, pp. 19-20, ¶ 47 |

neck. Deputy Clark said he did not apply pressure to Mr. Assiff's neck or attempt to apply a carotid restraint hold. Deputy Clark said he let go of Mr. Assiff's upper body and again tried to grab his left wrist and grabbed his hair in an attempt to pull him out of the vehicle.

a. Deputy Clark's actions were captured by Mr. Assiff's cell phone video.

b. While Deputy Clark claims he immediately released his neck hold, it appears that deputy Clark pulled Mr. Assiff from the vehicle by use of his neck hold.

c. The use of a neck hold in these circumstances is excessive, objectively unreasonable and inconsistent with generally accepted police practices.

140.

141.

| | |
|---|---|
| 142. [redacted] | [redacted] |
| 143. [redacted] | [redacted] |
| 144. [redacted]. | [redacted] |
| 145. [redacted] | [redacted] |

| | |
|---|---|
| [redacted] | |
| 146. [redacted] | See [redacted] |
| 147. [redacted] | [redacted] |
| 148. [redacted] | [redacted] |

149.

PLAINTIFF'S RESPONSE TO STATEMENT OF PURPORTED UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW AND
ADDITIONAL FACTS GIVING RISE TO TRIABLE ISSUES IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT

150.

151.

PLAINTIFF'S RESPONSE TO STATEMENT OF PURPORTED UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW AND
ADDITIONAL FACTS GIVING RISE TO TRIABLE ISSUES IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT

| | |
|---|---|
| ████████████████ | |
| 152. The incident that is the subject matter of this lawsuit happened while Plaintiff was traveling to the Antelope Valley. However, it occurred in Santa Clarita, in a northern part of the County, but just one Sheriff's Department station adjacent to but south of the actual Antelope Valley. | Assiff Dec. 2:9-12 |
| 153. The Los Angeles County Sheriff's Department has a long and sordid history of racial profiling and discriminatory traffic stops, particularly in the County's northern stations, such as the Antelope Valley. For years, black and Latino residents in the Antelope Valley complained they were the victims of racially biased stops and searches along with other mistreatment by Los Angeles County Sheriff's deputies. In 2013, the US Department of Justice, Civil Rights Division analyzed Sheriff's Department data from tens of thousands of vehicle and pedestrian stops, interviewed hundreds of people and reviewed volumes of internal sheriff's documents, and after this thorough analysis the Department of Justice "found that LASD's Antelope Valley stations have | Exhibits 14 and 15. |

| | |
|---|---|
| engaged in a pattern or practice of discriminatory and otherwise unlawful searches and seizures, including the use of unreasonable force, in violation of the Fourth Amendment, the Fourteenth Amendment, and Title VI." The findings forced the county to reach a legal settlement with federal authorities in 2015 that called for significant reforms and continued oversight. | |
| 154. However, despite all of this, the racial profiling and discriminatory traffic stops persist, as evidenced by continued gross racial disparities. An NCCD report from 2020 found on the Sheriff's Department's own website entitled, "An Analysis of Racial/Ethnic Disparities in Stops by Los Angeles County Sheriff's Deputies in the Antelope Valley" the report found that Black drivers make up 32% of all traffic stops even though they account for only 17% of the population. The report also found that black drivers once stopped were more likely to have both their vehicle and their persons searched, more likely to experience backseat detentions, and more likely to be asked if they are on probation or parole. All this is in spite of the fact that black drivers have a much lower | Exhibit 16. |

| | |
|---|---|
| contraband discovery rate (15.4%) than either their white or Hispanic counterparts (24.4% and 22.3% respectfully). This problem with racial profiling and discriminatory traffic stops in the Antelope Valley is not an isolated single incident, but rather a persistent and ongoing problem with the Los Angeles County Sheriff's Department recognized by the US Department of Justice, Civil Rights Division. | |
| 155.  The racial disparities also existed in those suspicious use of force incidents (such as the incident between Plaintiff and Defendant KELLY) where a suspect was charged with only resisting arrest or obstructing an officer but no other crimes.  U.S. Department of Justice, Civil Rights Division found as follows:  "Perhaps most strikingly, we found that 81% of the uses of force we reviewed where the only charge was obstruction-related involved targets who were African American or Latino. For the 25 felony obstruction-only arrests, 88% involved victims who were people of color. This is an extraordinarily disproportionate number of obstruction charges involving use of force against people of color and warrants close attention by the | Exhibit 14, Exhibit 1, p. 50 |

| | |
|---|---|
| Department. See, *Arlington Heights*, 429 U.S. at 266 (intent may be established by "clear pattern, unexplainable on grounds other than race")." | |
| 156. The US DOJ's findings and the findings of the Sheriff's Department's own oversight monitors show that the unconstitutional racial profiling and discriminatory traffic stops in the northern parts of the Sheriff's Department's jurisdiction, as well as the County's supervision, training, retention, promotion and rewarding of violent and abusive deputies such as Defendant Kelly reflect the County's unwritten policies, customs, practices and usages in violation of the Fourth and Fourteenth Amendment respectively to the United States Constitution, which policies, customs, practices, and usages resulted in Plaintiff's injury and the County's *Monell* liability. | Exhibits 14, 15, 16; Additional Facts 118-139, 140-151 |

DATED: June 5th , 2023          The Law Office Of Thomas M. Ferlauto, APC


By: _____

Thomas M. Ferlauto
Attorney For:  Plaintiff, JOSHUA ASSIFF

PLAINTIFF'S RESPONSE TO STATEMENT OF PURPORTED UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW AND ADDITIONAL FACTS GIVING RISE TO TRIABLE ISSUES IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT