Exhibit 14

VANITA GUPTA
Principal Deputy Assistant Attorney General
JUDITH C. PRESTON (MD Bar)
STEVEN H. ROSENBAUM (NY Bar Reg. #1901958)
CHRISTY E. LOPEZ (DC Bar #473612)
R. TAMAR HAGLER (CA Bar #189441)
CHARLES HART (NY Bar Reg. # 4282281)
NORRINDA BROWN HAYAT (DC Bar #479640 )
CARRIE PAGNUCCO (DC Bar #1000551)
KATHRYN LADEWSKI (MI Bar #P74431)
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
Tel: (202) 305-3192
Fax: (202) 514-0212
Email: charles.hart@usdoj.gov
        norrinda.hayat@usdoj.gov
Attorneys for Plaintiff United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CV 15-03174 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | COMPLAINT |
| THE COUNTY OF LOS ANGELES | ) | |
| and THE LOS ANGELES COUNTY | ) | |
| SHERIFF'S DEPARTMENT | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

Plaintiff the United States of America ("United States") brings this civil cause of action against Defendants the County of Los Angeles (the "County") and the Los Angeles County Sheriff's Department ("LASD" or "the Department") under the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 and Title VIII of the Civil Rights Act of 1968, as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. §§ 3601, et seq., ("the Fair Housing Act" or "FHA").  The United States brings this action to remedy a pattern or practice of conduct by law enforcement officers of LASD, an agent of the County, that deprives persons of rights, privileges, and immunities secured and protected by the United States Constitution and the Fair Housing Act.

The United States alleges as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, and 1345 and 42 U.S.C. § 3614(a).

2.      The United States is authorized to initiate this action against the County of Los Angeles and LASD ("Defendants") under the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 ("Section 14141") and the Fair Housing Act, 42 U.S.C. § 3614(a).   The declaratory and injunctive relief sought by the United States is authorized by 42 U.S.C. § 14141(b) and 42 U.S.C. § 3614(d).  Monetary damages for persons harmed by defendants' discriminatory practices, and a civil penalty to vindicate the public interest, are authorized under the Fair Housing Act, 42 U.S.C. § 3614(d).

3.      Venue is proper under 28 U.S.C. § 1391(b) because  Defendants are located in the Central District of California, and all of the events, actions, or omissions giving rise to these claims occurred in the Central District of California.

## PARTIES

4.      Plaintiff is the United States of America.

5.     Defendant County of Los Angeles is a municipal corporation located in the Central District of California.

6.     Defendant Los Angeles County Sheriff's Department is a law enforcement agency funded and operated by the County of Los Angeles.

7.     The Los Angeles County Sheriff's Department contracts with the Cities of Lancaster and Palmdale, among others, to provide local police protection in those municipalities.

8.     The United States of America reserves any claims it may have under the Fair Housing Act against the Housing Authority of the County of Los Angeles, the County of Los Angeles as it relates to the Housing Authority of the County of Los Angeles, the City of Lancaster and the City of Palmdale.

## FACTUAL ALLEGATIONS

9.     The Antelope Valley is a region in northern Los Angeles County and includes the Cities of Lancaster and Palmdale.

10.     LASD provides policing services to Lancaster and Palmdale pursuant to separate, identical agreements, called "City-County Municipal Law Enforcement Services Agreements."  Each agreement states that "the Sheriff or his designee shall serve as Chief of Police of the City and shall perform the functions of the Chief of Police at the direction of the City."  Section 2.1, Administration of Personnel.  The agreements provide that LASD officers "shall be deemed to be [] officer[s] or employee[s] of the City while performing such service for the City."  Section 2.6.

11.     During the time relevant to the allegations in this Complaint, LASD assigned a total of approximately 400 deputies to stations in the Cities of Lancaster and Palmdale.

12.     As set forth in the Department of Justice's June 28, 2013, findings letter, attached hereto as Exhibit A, LASD engages in a pattern or practice of misconduct by law enforcement officials in its Antelope Valley stations in the Cities of Lancaster and Palmdale ("LASD-AV").  This pattern or practice of misconduct violates the

Constitution and federal law through: pedestrian and vehicle stops that violate the Fourth Amendment; stops that appear motivated by racial bias, in violation of the Fourteenth Amendment and federal statutory law; the use of unreasonable force in violation of the Fourth Amendment; and discrimination against African-American residents of the Cities of Lancaster and Palmdale on the basis of race by making housing unavailable, altering the terms and conditions of housing, and coercing, intimidating, and interfering with their housing rights, in violation of the Fair Housing Act.

A.     **The Antelope Valley Stations of the Los Angeles Sheriff's Department Engage in a Pattern or Practice of Police Misconduct that Violates the Fourth and Fourteenth Amendments**

   **1. LASD's Antelope Valley Stations Detain Individuals Without Legal Authority**

13.     LASD deputies routinely fail to articulate facts sufficient to support the predicate of reasonable suspicion required for a detention consistent with the Fourth Amendment under *Terry v. Ohio,* 392 U.S. 1, 21 (1986).  Deputy log entries instead provide conclusory statements such as:  "persons acting suspiciously," "925" (internal LASD radio code for "person acting suspiciously"), or "hanging out in narco area."

14.     In one instance, for example, a deputy detained and ran a warrant check on two individuals apparently based solely on the fact that they were in a high narcotics area.

15.     Antelope Valley deputies routinely detain community members, including domestic violence victims and minor traffic offenders, in the backseats of patrol cars without any individualized assessment of danger or suspicion, as required by the Fourth Amendment.

16.     During one encounter, for example, two Palmdale deputies handcuffed and detained a domestic violence victim in the back of a patrol car for no articulated reason.

17.     In another instance, Palmdale deputies stopped a car for a broken license plate light and detained all three passengers without apparent justification.  Two individuals were detained in the backseat of a patrol car while the deputies checked their identification. Although LASD requires documentation of the need for a backseat detention, this backseat detention was not documented at all.

18.     An LASD sergeant stated that, contrary to LASD policy, back seat detentions are conducted as a matter of course.

**2.  LASD's Antelope Valley Stations Engage in a Pattern or Practice of Unreasonable Force that Violates the Fourth Amendment to the Constitution.**

19.     LASD deputies in the Antelope Valley engage in a pattern or practice of deploying unreasonable force with respect to the use of unreasonable and/or retaliatory force against handcuffed individuals and the unnecessary use of fist strikes to the head and face of handcuffed individuals, in violation of the Fourth Amendment.

20.     In many instances, the unreasonableness of officer use of force is readily apparent from the officer's own use of force report.

21.     LASD-AV officers use excessive force against individuals who have already been taken into custody, handcuffed, or otherwise restrained and are inside of patrol cars. These uses of force are unjustified based on the diminished threat posed by the restrained suspects, and often inflict significant injuries.

22.     LASD-AV officers in the Antelope Valley use unreasonable force in retaliation for being treated disrespectfully, including using unreasonable force against individuals who are handcuffed or where the threat posed by the individual has passed.

23.     LASD-AV officers strike handcuffed individuals in the head and face without adequate legal justification unnecessarily causing serious bodily harm.

24.     This pattern or practice of excessive force pervades LASD-AV's law enforcement operations. DOJ's review of deputy statements in LASD-AV's 326 use of force reports for the period August 1, 2010 to August 1, 2011, revealed that a number

of the incidents involved force exceeding the limits prescribed by the Fourth Amendment. Examples of unreasonable force are described in Exhibit A, the Department of Justice's June 28, 2013, findings letter.

25.    Further evidence of the pattern or practice exists in other records, including accounts of excessive force contained in civilian complaints, community member interviews, and prior settled and pending civil lawsuits.

### 3. LASD Deputies Stop and Search African-American and Latino Residents in Violation of the Fourteenth Amendment

26.    LASD stops and searches of African Americans and Latinos in the Antelope Valley are based in part on impermissible consideration of race or ethnicity.

27.    Expert regression analyses of stop and search activity in the Antelope Valley indicate unlawful bias in LASD law enforcement activity.  These analyses show that African Americans and, to a lesser extent, Latinos, are more likely to be stopped or searched than whites in the Antelope Valley for reasons that appear due at least in part to race or ethnicity.

28.    With regard to pedestrian stops and searches, regression analysis of LASD data for 2011 shows that the stop rate of minority pedestrians is disproportionately high in the Antelope Valley.  In Palmdale, African-American and Latino pedestrians are stopped at a rate 33% higher than if there were no racial differences, and, in Lancaster, African-American pedestrians are stopped at a rate 38.5% higher than if there were no racial differences.

29.    The aggressive pedestrian stop rate of African Americans cannot be justified by demonstrating that the higher rate of stops resulted in discovery of more contraband.  In fact, regression analysis indicates that, in Lancaster, there is about a 50% lower rate of contraband seizure for African-American pedestrians compared to whites.  As indicated by the low contraband seizure rate for African Americans, LASD deputies in the Antelope Valley are less accurate in assessing  suspicion for searches of African Americans, and the greater frequency of searches of African Americans cannot

be explained by a greater likelihood that they are carrying contraband (such as illicit drugs or weapons).

30.     Regression analysis of LASD data for 2011 shows that, following vehicle stops, the search rate of the persons of African Americans in the Antelope Valley is 10-15 percentage points higher than that of whites, and the disparity in the search rate of Latinos in the Antelope Valley is also statistically significant.  Additionally, across the Antelope Valley, LASD searches the vehicles of African Americans at an 8-14 percentage point higher rate than whites.  The analysis also revealed that, in vehicle stops, Latinos and their vehicles are searched at a statistically significant disparate rate.

31.     The data also show a clear racial disparity for African Americans when stopped for offenses where law enforcement discretion is greatest.  Such charges include offenses such as crossing against a traffic light, jaywalking, failing to yield right of way, or walking on the wrong side of the street.  With regard to highly discretionary pedestrian stops and searches, regression analysis of LASD data for 2011 indicates that that an African-American pedestrian in Lancaster is over 25% more likely than a white pedestrian to be stopped for a discretionary offense.

32.     During the DOJ investigation, one LASD supervisor told representatives from the Civil Rights Division that all African Americans who recently moved to the Antelope Valley were gang members.  The supervisor, like other LASD supervisors, is responsible for reviewing and approving the actions of multiple deputies within his span of control.

**B.      LASD Enforcement of the Housing Choice Voucher Program in the Antelope Valley Reflected Bias and Violated the Fair Housing Act and the Fourth Amendment**

### 1.  The Housing Choice Voucher Program and the Antelope Valley

33.     Between 2004 and 2011, LASD devoted extensive resources to policing Antelope Valley participants of the federal Section 8 Housing Choice Voucher Program.

34.     The Section 8 Housing Choice Voucher Program ("voucher program" or "Section 8") is funded by the Department of Housing and Urban Development ("HUD") and administered by local public housing authorities.

35.     In the Antelope Valley, the voucher program is administered by the Los Angeles County Housing authority ("HACoLA" or "housing authority").

36.     The voucher program is intended to offer a choice in housing and to provide an opportunity for low-income citizens to relocate to higher opportunity neighborhoods such as those found in the Antelope Valley.

37.     HACoLA provides housing vouchers to approximately 23,000 low-income families ("voucher holders") throughout Los Angeles County.  In 2010, approximately 18% of voucher holders served by HACoLA resided in Lancaster and Palmdale.

38.     Between 2000 and 2008, the number of African-American Section 8 families in Lancaster tripled from 510 to 1530.  The number of African-American Section 8 families in Palmdale grew from 455 to 825.

39.     By 2010, 71% of Section 8 voucher holders in Lancaster and Palmdale were African American, compared to approximately 40% of Section 8 households throughout HACoLA's jurisdiction.

40.     The increase in African-American voucher-holder households coincided with a substantial shift in the racial demographics of the Antelope Valley.  According to the United States Census, between 1990 and 2010, the proportion of the population that is white decreased substantially in both Lancaster and Palmdale, from nearly 80% in each city to under 50% in each.

41.     Residents and officials in Lancaster and Palmdale were vocal in their opposition to increasing numbers of Section 8 voucher holders in their cities, particularly the increase in the number of African-American voucher holders.

2. **LASD-AV's Enforcement of the Section 8 Voucher Program Discriminates Against African Americans in Violation of the Fair Housing Act**

42.     Beginning in 2004, in response to racially-charged opposition to the growing presence of African-American voucher holders in Lancaster and Palmdale and amid a climate of tolerance for racially derogatory conduct within the LASD, LASD-AV teamed with HACoLA to pursue enforcement of the voucher program and of the administrative requirements of the contract between HACoLA and voucher holders.

43.     LASD-AV's enforcement of Section 8 targeted African-American voucher holders.

44.     LASD-AV deputies joined HACoLA investigators and acted independently to pursue enforcement efforts at voucher program households, including by intimidating, harassing, and facilitating the termination of voucher holders from the program.  LASD departed from ordinary procedures employed elsewhere in the county by:

a. accompanying HACoLA on a disproportionately large percentage of compliance checks in the Antelope Valley as compared to other areas of Los Angeles County where HACoLA's and LASD's jurisdictions overlap;

b.  sending deputies, sometimes as many as nine, on HACoLA compliance checks of the homes of voucher holders in the absence of any legitimate justification;

c. questioning voucher holders about their compliance with the voucher program's rules;

d. referring voucher holders for criminal prosecution for voucher program violations;

e. independently using law enforcement tools, such as probation and parole checks and arrest warrants, to obtain information about voucher program violations;

f.   failing to properly issue *Miranda* warnings even when deputies had a
legitimate reason to enter voucher-holder homes; and

g.   providing confidential information about voucher holders to third parties.

45.   LASD deputies improperly comingled their law enforcement functions with HACoLA's administrative process and participated in HACoLA investigations without justification.

46.   As a result of these practices, LASD deputies were able to interview people and conduct searches before the individuals understood their rights, including that they might be incriminating themselves by participating in the housing contract compliance check.

47.   LASD-AV deputies' questions often had no purpose other than to substantiate voucher program violations.  LASD deputies also used information gathered during these administrative compliance checks to further criminal investigations based solely on the voucher holders' alleged voucher program violations.

48.   LASD's role in the enforcement of the voucher program's rules was motivated, at least in part, by the unsubstantiated perception among some members of the Antelope Valley community, including public officials, press, residents and deputies themselves, that African Americans in the voucher program had brought increased crime to the region.

49.   LASD-AV's enforcement efforts were part of racially biased opposition to African-American voucher holders moving to and living in Lancaster and Palmdale.

50.   As a result of LASD's role in the enforcement of the voucher program in Lancaster and Palmdale, voucher holders in the Antelope Valley were subjected to far more intrusive and intimidating searches of their homes, and in some cases, harsher administrative or criminal consequences of those searches, than voucher holders elsewhere in the county.

**C.**     **LASD's Inadequate Accountability Systems Help Perpetuate Unlawful Policing**

51.     While many LASD policies and practices are appropriate, some poor LASD policies and practices, and a failure to adhere to good policy and training, permit and facilitate the unlawful conduct described above.   LASD's accountability systems, for instance, do not sufficiently detect or prevent unlawful conduct in the Antelope Valley, and LASD does not properly consider and resolve complaints from Antelope Valley community members who allege mistreatment by deputies. LASD's early warning system does not adequately identify or effectively respond to Antelope Valley deputies with repeated complaints or other histories indicating a need for intervention to prevent future violations of constitutional rights.

52.     Of the 180 misconduct complaints made by civilians over a one-year period in the Antelope Valley, only one was formally investigated as an administrative investigation.  That case resulted in criminal charges being filed against the involved deputy.  Among the other 179 complaints were several allegations of significant misconduct, including unreasonable force and discriminatory policing.  LASD minimized the seriousness of discrimination complaints by failing to investigate any as a serious complaint that could potentially result in discipline.

53.     Nearly all civilian complaints of misconduct by deputies are resolved at the unit level through "service reviews" rather than as formal administrative investigations.  By official policy, service reviews may not result in formal discipline unless elevated to an administrative investigation.  Only official administrative investigations, which are primarily conducted by LASD's Internal Affairs Bureau (IAB), may result in formal discipline.

54.     LASD's practice of handling complaints of serious misconduct as service reviews allows deputies, even those with histories of serious civilian complaints, to evade investigation and discipline, which fundamentally undermines meaningful accountability.

55.     Supervisors often also fail to investigate the full range of allegations referenced by a civilian in his or her complaint, despite obvious allegations of misconduct.  There are instances, for example, where a complainant specifically alleged that a deputy engaged in racially discriminatory behavior, yet the supervisor's investigation failed to address this allegation.  Allegations of unreasonable force that become apparent during the investigation of a less serious offense also are not always investigated. In one instance, for example, when the reporting party gave a more fulsome explanation of the incident subsequent to the initial complaint, he revealed that the deputy also used force by kicking and pushing him. The supervisor did not categorize the complaint as a force complaint, further investigate the allegation, and request that the investigation be categorized as an administrative investigation since a use of force policy violation could result in discipline.

56.     Despite policies that require mandatory referral of all allegations of racial discrimination to the Internal Affairs Bureau for formal investigation, the Antelope Valley stations tolerate racially derogatory conduct by failing to elevate discrimination complaints so that discipline, if the allegations are founded, can be imposed.

57.     LASD sets an inappropriately high bar even to investigate allegations of discriminatory treatment or racial bias.  Absent an admission or recording, witnessing deputies invariably state that they "did not hear" offensive language, and LASD consistently credits the deputy's version over the civilian's account, notwithstanding objective evidence.

58.     Even where supervisors find that the alleged conduct occurred, they do not sustain the complaint, instead finding only that the employee's behavior "could have been better."

59.     LASD's system for conducting service reviews perpetuates patterns of unlawful community interactions and provides disincentives with regard to LASD's policies prohibiting bias.  This has the effect of diminishing and devaluing allegations of discrimination made by civilians.  When assessed within the totality of the

circumstances, LASD's failure to appropriately handle discriminatory policing complaints provides evidence of an equal protection violation, adding to the statistical evidence of bias.  LASD has not yet implemented or corrected systems as necessary to routinely detect, correct, and prevent the above-noted patterns and practices of unconstitutional conduct.  The policies, training, and systems necessary to correct these patterns and practices of unconstitutional conduct are set out in the Settlement Agreement attached as Exhibit B.  This Settlement Agreement will ensure that the policies, training, and accountability systems needed to correct the identified patterns and practices of unconstitutional conduct are implemented and sustained.

60.    Upon information and belief, and in part because LASD has not yet implemented the measures and systems set out in the attached Settlement Agreement, many of the patterns or practices of unconstitutional conduct in the LASD's Antelope Valley stations continue.

## FIRST CLAIM FOR RELIEF:
## DEFENDANTS' LAW ENFORCEMENT ACTIVITIES VIOLATE SECTION 14141 AND THE FOURTEENTH AMENDMENT

61.    The United States re-alleges and incorporates by reference the allegations set forth above.

62.    The United States is authorized under 42 U.S.C. § 14141(b) to seek declaratory and equitable relief to eliminate a pattern or practice of law enforcement officer conduct that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States.

63.    Defendants and their agents, including LASD deputies, have intentionally discriminated against African-American and Latino persons in Los Angeles County on the basis of their race, ethnicity, or national origin.

64.    Defendants' discriminatory law enforcement practices and those of their agents constitute a pattern or practice of depriving persons of rights protected by the

Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, in violation of 42 U.S.C. § 14141(a).

65.     On information and belief, unless Defendants are restrained by this Court, Defendants will continue to engage in the illegal conduct averred herein, or other similar illegal conduct, against African Americans and Latinos in the Antelope Valley.

**SECOND CLAIM FOR RELIEF:**

**DEFENDANTS' LAW ENFORCEMENT ACTIVITIES VIOLATE SECTION 14141 AND THE FOURTH AMENDMENT**

66.     The United States re-alleges and incorporates by reference the allegations set forth above.

67.     The United States is authorized under 42 U.S.C. § 14141(b) to seek declaratory and equitable relief to eliminate a pattern or practice of law enforcement officer conduct that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States.

68.     Defendants and their agents, including LASD deputies, have unreasonably seized numerous persons in Los Angeles County. These unreasonable seizures include seizures made without probable cause or reasonable suspicion.

69.     Defendants and their agents, including LASD deputies, use force that is objectively unreasonable against individuals.

70.     The unreasonable seizures made by Defendants and their agents constitute a pattern or practice of conduct by law enforcement officers that deprives persons of their rights under the Fourth Amendments, in violation of 42 U.S.C. § 14141(a).

71.     On information and belief, unless Defendants are restrained by this Court, Defendants will continue to engage in the illegal conduct averred herein, or other similar illegal conduct targeted against the people of the Antelope Valley.

///

///

///

**THIRD CLAIM FOR RELIEF:**
**DEFENDANTS' LAW ENFORCMENT ACTIVITIES VIOLATE**
**THE FAIR HOUSING ACT**

72.   Plaintiff re-alleges and incorporates by reference the allegations set forth above.

73.   The houses and apartments of voucher holders are dwellings within the meaning of 42 U.S.C. § 3602(b).

74.   The conduct of Defendants described above constitutes:

a. A denial of housing or making housing unavailable because of race, in violation of Section 804(a) of the Fair Housing Act, 42 U.S.C. § 3604(a);

b. Discrimination in the terms, conditions, or privileges of rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, in violation of Section 804(b) of the Fair Housing Act, 42 U.S.C. § 3604(b); and

c. Coercion, intimidation, threats, or interference with persons in the exercise or enjoyment of, or on account of their having exercised or enjoyed, their rights under Section 804 of the Fair Housing Act, in violation of Section 818 of the Fair Housing Act, 42 U.S.C. § 3617.

75.   The conduct of Defendants described above constitutes:

a. A pattern or practice of resistance to the full enjoyment of rights granted by the Fair Housing Act, in violation of 42 U.S.C.§ 3614(a); or

b. A denial to a group of persons of rights granted by the Fair Housing Act, which raises an issue of general public importance, in violation of 42 U.S.C. § 3614(a).

76.   Persons who may have been victims of the Defendants' discriminatory practices include African-American voucher holders and members of their households in the Antelope Valley. Such persons are aggrieved persons as defined in 42 U.S.C. § 3602(i), and may have suffered damages as a result of Defendant's conduct.

77.     Defendant's conduct was intentional, willful, or taken with reckless disregard for the rights of others.

### PRAYER FOR RELIEF

WHEREFORE, the United States prays that the Court:

78.     Declare that the Defendants have engaged in a pattern or practice of conduct by LASD officers that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, in violation of § 14141 and the FHA;

79.     Order the Defendants, their officers, agents, and employees to refrain from engaging in any of the predicate acts forming the basis of the pattern or practice of conduct described herein;

80.     Order the Defendants, their officers, agents, and employees to adopt and implement systems that identify, correct, and prevent the unlawful conduct described herein that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States;

81.     Order the Defendants, their officers, agents, and employees to take such action as may be necessary to restore all persons aggrieved by the Defendants' discriminatory housing practices to the position they would have occupied but for such discriminatory conduct;

82.     Award monetary damages, pursuant to 42 U.S.C. § 3614(d)(1)(B), to all persons harmed by the Defendants' discriminatory practices;

83.     Assess a civil penalty against the Defendants to vindicate the public interest, in an amount authorized by 42 U.S.C. § 3614(d)(1)(C); and

84.     Order such other appropriate relief as the interests of justice may require.

///

///

///

///

Respectfully submitted this 28th day of April, 2015.

LORETTA E. LYNCH
Attorney General

_____/s/_____

STEPHANIE YONEKURA
Acting United States Attorney

VANITA GUPTA
Principal Deputy Assistant Attorney
General
Civil Rights Division

LEON W. WEIDMAN
Assistant United States Attorney
Chief, Civil Division

_____/s/_____

JUDITH C. PRESTON
Acting Chief, Special Litigation Section

_____/s/_____

ROBYN-MARIE LYON MONTELEONE
Assistant United States Attorney
Assistant Division Chief
Civil Rights Unit Chief, Civil Division

STEVEN H. ROSENBAUM
Chief, Housing and Civil Enforcement
Section

_____/s/_____

CHRISTY E. LOPEZ
Deputy Chief, Special Litigation Section

_____/s/_____

R. TAMAR HAGLER
Deputy Chief, Housing and Civil
Enforcement Section

_____/s/_____

CHARLES HART
Trial Attorney, Special Litigation Section

_____/s/_____

NORRINDA BROWN HAYAT
CARRIE PAGNUCCO
KATHRYN LADEWSKI
Trial Attorneys, Housing and Civil
Enforcement Section

**U.S. Department of Justice**

Civil Rights Division

*Assistant Attorney General*
*950 Pennsylvania Ave, NW - RFK*
*Washington, DC 20530*

JUN 2 8 2013

**VIA ELECTRONIC AND U.S. MAIL**

Sheriff Leroy D. Baca
Los Angeles County Sheriff's Department
4700 Ramona Boulevard
Monterey Park, CA 91754

> RE: Investigation of Los Angeles County Sheriff's Department Stations in Antelope Valley

Dear Sheriff Baca:

The Civil Rights Division has concluded its investigation of the Los Angeles Sheriff's Department (LASD) regarding allegations of unconstitutional conduct by deputies at two stations located in the Antelope Valley cities of Lancaster and Palmdale, California.

LASD pledged complete cooperation throughout the investigation, and began taking immediate steps to proactively fix the deficiencies identified in the investigation. Since the conclusion of the investigation, LASD has additionally memorialized its commitment to implement further reform efforts by entering into a Statement of Intent, which broadly outlines remedies that will be negotiated in a final Settlement Agreement.

We found that LASD's Antelope Valley stations have engaged in a pattern or practice of discriminatory and otherwise unlawful searches and seizures, including the use of unreasonable force, in violation of the Fourth Amendment, the Fourteenth Amendment, and Title VI. We found also that deputies assigned to these stations have engaged in a pattern or practice of discrimination against African Americans in violation of the Fair Housing Act.

The LASD policies we reviewed were, for the most part, consistent with constitutional policing. However, our investigation showed that these policies are not consistently followed, and that some types of policy violations are routinely tolerated. This tolerance for misconduct occurs in part because the accountability measures LASD has in place are not effectively implemented in the Antelope Valley. We found that LASD must do more to ensure that deputies adhere to policies, and that supervisors and commanders provide appropriate redirection, guidance, and accountability when errant conduct occurs.

We recognize the inherent challenges of policing and the daily risks that deputies take to protect the communities they serve. LASD's Core Values reflect that policing cannot be effective unless it is constitutional. LASD, through its commitment to Trust-Based Policing,

-18-
EXHIBIT A

recognizes that "[i]t is incumbent upon law enforcement to recognize that without the full faith and cooperation of the public, the mission of public safety is severely impaired."

LASD leadership's clear recognition that effective policing is undermined if deputies do not respect the rights of the individuals they serve, alongside the robust accountability infrastructure that LASD already has in place, including two forms of independent civilian oversight, is cause for optimism. We believe that this investigation and its resulting findings can serve as the foundation for more consistent adherence by all Antelope Valley deputies to LASD policies, and better implementation of LASD's accountability mechanisms. We have great confidence that we and LASD leadership share the same goals of reducing crime, ensuring respect for the Constitution, and building public confidence in LASD's policing in the Antelope Valley. We look forward to partnering with LASD and Antelope Valley leadership to devise sustainable and workable remedies in a final Settlement Agreement that will ensure that every Antelope Valley deputy shares LASD's Core Values and carries out their law enforcement duties consistent with these values and the Constitution.

We thank all the members of LASD with whom we interacted, in particular, Sheriff Baca, Chief Anthony La Berge, former Chief Neal Tyler, Commander Bobby Denham, former Captain Robert Jonsen, the Office of the County Counsel, the Office of Independent Review, and the Office of Special Counsel, for the cooperation, transparency, diligence and professionalism demonstrated throughout our investigation. We look forward to continuing our collaborative relationship in crafting and implementing sustainable remedies to correct the problems our investigation revealed.

## I.  BACKGROUND

The Antelope Valley lies approximately 70 miles northeast of Los Angeles, California, and includes the cities of Lancaster and Palmdale along with unincorporated areas. LASD is the primary law enforcement agency for the Antelope Valley, and the cities of Lancaster and Palmdale contract with LASD to provide law enforcement services through two stations that are each independently operated by a captain. A total of approximately 400 sworn LASD deputies are assigned to these two stations. Historically, LASD's contracts with the cities have included the provision of patrol services. Between 2004 and 2011, LASD devoted extensive resources to policing Antelope Valley participants of the Housing Choice Voucher Program (commonly referred to as the Section 8 program), which is a rental assistance program that provides housing opportunities for low-income families.

Racial intolerance is an unfortunate part of the history of the Antelope Valley. As of 2010, the Antelope Valley had the highest rate of hate crimes of any region in Los Angeles County. In the 1960s, African-American families who wanted to live in Lancaster and Palmdale were directed to the historically minority neighboring community of Sun Village because of discriminatory real estate practices throughout the Antelope Valley. In the 1980s, demographics in the Antelope Valley began to change as lower real estate prices attracted families from other parts of Los Angeles County, who were predominantly African-American and Latino. As the African-American and Latino populations increased, so did racial tensions. During the 1990s, there was a series of hate crimes in the Antelope Valley. In 1990, during Palmdale city elections,

-19-
EXHIBIT A

an African-American female candidate's campaign sign was spray-painted, "vote white." In 1997, three white youths allegedly murdered a black man in Palmdale so that one of the youths could earn a white supremacist tattoo. In the last decade, hate crimes have continued to take place: two black men were allegedly stabbed by a white mayoral candidate's son, who was reciting "white power" slogans the night of the crime; two homes in Palmdale were vandalized with racially offensive words and a swastika; and in August 2010, a predominantly African-American church in Palmdale was firebombed.

In recent decades, the racial demographics of the Antelope Valley have undergone a sizeable shift. According to the Census Bureau, between 1990 and 2010, the population of Lancaster grew from 97,291 to 156,633, while the proportion of whites in the total population decreased from 79% of the population to 49.6% of the population. During that time, the proportion of African Americans almost tripled, increasing from 7.4% of the population to 20.5% of the population; and the Latino/Hispanic population increased from 15% to 38% of the population. During the same 20-year time period, Palmdale's population grew from 68,917 to 152,750, while the percentage of whites in the total population fell from 76% to 49% of the population. Also during that time, the proportion of African Americans more than doubled, increasing from 6.4% of the population to 14.8% of the population; and the Latino/Hispanic population increased dramatically from 22% to 54.4% of the population. In addition, the number of African-American housing voucher holders in the Antelope Valley has increased in the last ten years. Between 2000 and 2008, the approximate number of African-American voucher holder families in Lancaster increased from 510 to 1,530, and in Palmdale, from 455 to 825. By 2010, 73% of the voucher holder households in Lancaster and 69% in Palmdale were African American. By comparison, for that same time period in 2010, only 37% of HACoLA's entire voucher holder population and approximately 40% of households on its wait list were black.

In Lancaster and Palmdale, some residents have been vocal about their opposition to the increase in the number of voucher holders, particularly the increase in the number of African-American voucher holders. Residents' statements about this increase have included thinly veiled references to their Section 8 neighbors' race, including references to the neighborhood "growing darker" and "the creeping darkness." Social media sites and public message boards provided a platform for numerous community members to voice their opposition to the influx of African-American Section 8 voucher holders in the Antelope Valley, including but not limited to a Facebook Page titled "I Hate Section 8." By way of example, on one such site, one citizen wrote, "My earlier prediction that the entire LA county section of the Antelope Valley is being 'ghettoized' has been confirmed by a tour of the area this week.... I see 'creeping darkness' even on the west side as well." On another site, a June 2012 post included racist lyrics from a song entitled, "Nigger, Nigger," which was written by a white supremacist in the mid-1960s in response to the civil rights movement. Sites like this one not only facilitated biased speech against African-American voucher holders, but also the targeting of specific voucher holders. In 2010, an LASD deputy took photographs of luxury vehicles in a home's garage during a Section 8 compliance check, and sent them to the administrator of the "I Hate Section 8" Facebook page. Subsequently, the family's home was vandalized with the message, "I hate Section 8 you fucking niggers," scrawled on their garage door, and the family's son had urine thrown on him as

the perpetrator yelled, "Dirty Section 8 nigger." The family relocated from Palmdale back to inner city Los Angeles for fear of further harassment. The "I Hate Section 8" Facebook page was removed immediately after this incident.

Some Lancaster and Palmdale city officials also repeatedly expressed hostility towards certain types of Section 8 voucher holders. While couching their opposition to Section 8 in terms of fraudulent voucher holders, Lancaster's Mayor Rex Parris and other City Council members made clear that their opposition to Section 8 extended even to legitimate Section 8 households. Mayor Parris, for example, stated that housing seniors and persons with disabilities is "the reason that [the Section 8] program" should exist. While vowing not to do anything that would in any way create obstacles for Section 8 housing for seniors or the disabled, Mayor Parris spoke of a "monster that comes with Section 8" and stated an intent to try to keep Section 8 voucher holders from outside the Antelope Valley from moving there. Mayor Parris also stated publicly his belief that it is "unfair" that African Americans receive a higher percentage of Section 8 program vouchers than their population share. Mayor Parris repeatedly said that Lancaster should be "waging a war" against the voucher program, arguing that the program is a "problem that is crushing [the Antelope Valley] community." On February 19, 2009, during a Lancaster Section 8 Commission meeting, former Lancaster City Council Member Sherry Marquez[1] stated ,"Unfortunately, those that receive the vouchers do not stay in the City of Los Angeles; they migrate to the Antelope Valley …. Lancaster soon will be inundated with another group." In Palmdale, the City Manager commented that the City needed to be "as vigilant as possible" with respect to enforcement of the voucher program rules, and a Palmdale Councilman stated that he wanted to make sure that voucher holders did not "swarm the valley."

In response to these hostilities, the NAACP and The Community Action League filed a lawsuit against Lancaster, Palmdale, the Housing Authority of the County of Los Angeles (HACoLA), and LASD, that resulted in agreements by both Cities to address the hostile messaging about voucher holders and the voucher program that have come from some city officials.[2] Both cities entered similar agreements with the plaintiffs in which they promised to, among other items, issue press releases announcing that the cities condemn discrimination and welcome people from diverse backgrounds, including participants in the voucher program, and to abide by all federal, state, and local fair housing laws. At the announcement of the Lancaster agreement, Mayor Parris stated, "I'm looking forward to working with [TCAL and NAACP leaders], they're good men and bright men and we seem to want the same things." He went on to state, "Make no mistake about it, 97 percent of the people that are getting Section 8 are benefiting this community."

---

[1]     During her 2008 campaign Sherry Marquez ran on an "anti-crime" platform that conflated the issue of crime and the voucher program. Her campaign materials stated Sherry Marquez was the "the best choice to fight crime and Section 8" and that she would "ensure that [the] city fights gangs and Section 8."

[2]     See agreements between plaintiffs and the cities of Palmdale and Lancaster resolving civil complaints in *The Cmty. Action League, et al. v. City of Palmdale, et al.*, No. CV 11-4817 ODW (VBKx) (C.D. Cal. Feb. 8, 2012). Neither city admitted to violations alleged in the civil complaint.

EXHIBIT A

Racial stereotypes evident in past statements by some within Lancaster and Palmdale leadership are also reflected within LASD ranks in the Antelope Valley. During our investigative tour, a sworn LASD supervisor offered an unsolicited opinion that all newly arrived African-American residents of the Antelope Valley were or are gang members. As early as 2004, the then Lancaster Sheriff Station Captain made statements to the press about voucher holders that included a similar conflation of race, crime, and the voucher program: "A lot of the time [voucher holders are] trying to do a good thing: their nephew from South Central is getting in trouble so they send him up here. He rewards them by continuing his gang activity." Between 2010 and 2011, civilians filed at least 25 complaints regarding deputies' discriminatory conduct, including at least two complaints alleging that deputies used racially derogatory language (with one of those remarks captured on a video recording). The allegations in these formally reported complaints of discrimination are consistent with the scores of unreported complaints of discrimination and harassment that were relayed to us during the course of our investigation.

## II.    **SUMMARY OF FINDINGS**

Policing practices in the Antelope Valley reflect, and unfortunately contribute to, a harmful divide between some of the more long-standing, primarily white residents of the community, and newer, more often non-white arrivals to the Antelope Valley. Our investigation demonstrated reasonable cause to believe that LASD Antelope Valley deputies engage in a pattern or practice of misconduct in violation of the Constitution and federal law in a number of ways, including:

- Pedestrian and vehicle stops that violate the Fourth Amendment;

- Stops that appear motivated by racial bias, in violation of the Fourteenth Amendment and federal statutory law;

- The use of unreasonable force in violation of the Fourth Amendment; and

- Discrimination against Antelope Valley residents on the basis of race by making housing unavailable, altering the terms and conditions of housing, and coercing, intimidating, and interfering with their housing rights, in violation of the Fair Housing Act (FHA).[3]

Our investigation also showed that LASD's accountability systems are not effectively detecting or preventing these patterns of unlawful conduct in the Antelope Valley. LASD's Antelope Valley stations do not properly consider and resolve complaints from community

---

[3]    Alongside these findings, we found that, while LASD had a past practice of violating voucher holders' Fourth Amendment rights, this pattern of constitutional violations appears to have been corrected, in part because LASD, with the assistance of its Office of Independent Review, instituted new policies and practices that became effective in March 2012 (after our investigation began) to prevent constitutionally impermissible searches of voucher holders' homes.

EXHIBIT A

members who allege mistreatment by deputies. LASD's early warning system does not adequately identify or effectively respond to Antelope Valley deputies with repeated complaints or other histories indicating a need for intervention to prevent further and perhaps more egregious violations of LASD policy and the law.

Our analysis of stop and search activity in the Antelope Valley revealed biased law enforcement activity, as African Americans and, to a lesser extent, Latinos, are more likely to be stopped or searched than whites in the Antelope Valley. Despite the belief that more aggressive law enforcement practices are warranted due to recent fluctuations in crime rates in the area, there is no apparent public safety explanation to justify this pattern of racially disparate stops and searches. The higher rate of searching African-American pedestrians, for example, has not correlated to a higher discovery rate of contraband. In fact, in Lancaster, the contraband seizure rate is about 50% lower for African Americans than for whites.[4] Additionally, even using regression analysis to control for a variety of factors, we found that for offenses where law enforcement discretion is especially high, African-American pedestrians in Lancaster are 25% more likely to be stopped than whites.

Consistent with the overall disproportionate effect of policing activity on communities of color in the Antelope Valley, our review of incident reports and interviews with community members revealed problematic and, at times, unconstitutional deputy interactions with individuals. Community members relayed consistent reports of deputies conducting inappropriate detentions, and our observations confirmed that these incidents were not aberrational. We found, for example, that Antelope Valley deputies, in violation of the law, routinely detain community members, including domestic violence victims and minor traffic offenders, in the backseats of patrol cars without any individualized assessment of danger or suspicion.

We found that deputies use unreasonable force against handcuffed detainees who do not pose threats to the deputies or to the public. Notably, the vast majority of the use of force incidents that involved handcuffed subjects were against people of color. While most of these incidents appeared contrary to LASD policy, some LASD policies and practices appear to permit and even encourage deputies to use force that is out of proportion to the threat of harm presented.

We found that LASD's activities relating to homes occupied by voucher holders in Lancaster and Palmdale resulted in violations of the Fair Housing Act and, in some instances, the Fourth Amendment. At least from 2008 through mid-2011, LASD participated in HACoLA's investigations of homes participating in the voucher program at disproportionate rates in the Antelope Valley compared to the remaining parts of the County where HACoLA's and LASD's jurisdictions overlap. Because the Antelope Valley's population of voucher holders has a significantly higher percentage of African Americans than voucher holders living in the rest of HACoLA's jurisdiction — 70% compared to 40% — LASD's practice of accompanying HACoLA on compliance checks in the Antelope Valley disproportionately impacted African-American voucher holders.

---

[4]     We did not find a disproportionate contraband seizure rate in Palmdale.

LASD's Lancaster and Palmdale stations played a critical role in the campaign against voucher holders in the Antelope Valley, including by intimidating, harassing, and facilitating the termination of voucher holders from the program, both in conjunction with HACoLA investigators and independently. Our investigation showed that LASD's conduct targeted at African-American voucher holders violated the FHA. Despite the level of LASD's involvement with HACoLA's administrative checks in the Antelope Valley, LASD deputies involved in enforcement of the voucher program received no training on the program, the elements that constitute a violation of the voucher holder's contract, or the difference between conducting administrative and criminal investigations, until May 2012.

Though LASD's policies are generally consistent with constitutional policing, we found that systemic failures in the application of these policies and procedures in the Antelope Valley — especially those related to accountability — have allowed unconstitutional policing to persist and have fueled the distrust of LASD by Antelope Valley's African-American and Latino communities. For example, despite LASD's comprehensive protocol for responding to, classifying, and reviewing civilian complaints, deputy violations of policy in civilian interactions rarely result in any meaningful response from LASD. Of all the 180 misconduct complaints, called "service comment reports," made by civilians over a one-year period in the Antelope Valley, only one was ever formally investigated as an administrative investigation. That case resulted in criminal charges being filed against the involved deputy. Among the other 179 complaints, handled as informal service reviews instead of formal investigations, were complaints of significant misconduct, including complaints of unreasonable force and discriminatory policing. The classification of these investigations as "service reviews" is significant. Only complaints that are elevated to a formal administrative investigation, as opposed to an informal service review, may result in discipline. This means that during this one-year period, only one personnel complaint filed by a civilian was considered serious enough to be elevated to an administrative investigation (as serious misconduct must be investigated via administrative investigation rather than via service review) so that discipline was even possible. As discussed further below, LASD minimized the seriousness of discrimination complaints by failing to investigate any as a serious complaint that could potentially result in discipline.

The unlawful practices we identified undermine LASD's legitimacy and foster distrust within the community, especially with African-American and Latino residents. Such distrust perpetuates a divide between deputies and residents, making law enforcement efforts less effective and unnecessarily escalating daily encounters between deputies and community members. For example, routine questioning of community members about their probation and parole status, which our review indicated happens more with African-American and Latino community members, fosters distrust in the community. Although LASD increased its efforts at community engagement in the Antelope Valley after the initiation of our investigation, and these efforts have been well-received by many members of the community, these efforts do not displace the need to ensure that basic police functions, such as conducting stops and searches, are conducted constitutionally and in a manner that builds community trust.

Alongside the troubling patterns and practices we observed, we also found reasons to believe that LASD has the potential to more quickly resolve many of the problems we found than many other agencies. First, LASD has a uniquely independent and knowledgeable oversight

infrastructure. The Special Counsel to the Los Angeles County Board of Supervisors, Merrick Bobb, in particular, has provided monitoring and recommendations to LASD since 1993 and reports directly to the Board of Supervisors. Special Counsel Bobb previously warned the department of the problems our investigation confirms. Additionally, LASD receives legal advice and operational input from the Office of Independent Review (OIR), a civilian oversight group created by the Board of Supervisors in 2001 and led by Michael Gennaco. We understand that Los Angeles County plans to create a new oversight position of Office of the Inspector General, which would be responsible for oversight and monitoring of LASD. It does not appear that this entity need displace the Special Counsel or OIR and, in any event, their deep knowledge of LASD and its systems would appear useful in addressing the concerns we raise.

In addition to our confidence in LASD's oversight mechanisms, our interactions with LASD leadership during the investigation also give us optimism about swiftly addressing the findings set out in this letter. Sheriff Baca has been clear in his commitment to ensuring that all LASD deputy officers comport their conduct to the agency's core values and the Constitution. Antelope Valley commanders, Chiefs Tyler and La Berge, were proactive in reaching out to the DOJ during the investigation, seeking information throughout the investigation to facilitate an immediate response to concerns we raised. Their initiative has led already to the implementation of many community outreach efforts, which have begun to repair relationships with many segments of the community in the Antelope Valley. This kind of proactive response from a law enforcement agency bodes well for remediation, and we commend LASD for embracing the investigation with this attitude.

## III. GENERAL METHODOLOGY

On August 19, 2011, we notified LASD of our investigation, which was brought pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 (Section 14141), and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (Title VI). These laws authorize the United States to file a legal action when it has reasonable cause to believe that a law enforcement agency engages in a pattern or practice of violations of the Constitution or laws of the United States. A pattern or practice may be found by examples representing typical conduct, as opposed to isolated instances. *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 n.16 (1977) (noting that the phrase "pattern or practice" "was not intended as a term of art," but should be interpreted according to its usual meaning "consistent with the understanding of the identical words" used in other federal civil rights statutes). For a court to find a pattern or practice, it does not need to find a set number of incidents or acts. *See United States v. W. Peachtree Tenth Corp.*, 437 F.2d 221, 227 (5th Cir. 1971) ("The number of [violations] . . . is not determinative . . . . In any event, no mathematical formula is workable, nor was any intended. Each case must turn on its own facts").

Our investigation was also brought pursuant to the Fair Housing Act, Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3601-3631, as amended (FHA). The FHA prohibits discrimination in housing on the basis of race, national origin, religion and other protected categories. More specifically, it is unlawful under the Act to make housing unavailable to any person on the basis of being a member of a protected class; to subject persons to different terms and conditions on the basis of being a member of a protected class; or to coerce, intimidate,

threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected under the Act. 42 U.S.C. §§ 3604(a), 3604(b), 3617.

The investigation was conducted by two Civil Rights Division sections: the Special Litigation Section and the Housing & Civil Enforcement Section. The investigation involved a review of over 35,000 LASD documents, including, but not limited to, policies, training materials, use of force reports, arrest reports, civilian complaint files, and operations plans. We also conducted a six-day long site visit to Palmdale and Lancaster, and interviewed numerous LASD command and line staff, rode with patrol deputies, toured the Antelope Valley stations and reporting districts, interviewed local government officials, and met with other relevant government agencies. While on-site, we held two community meetings that were attended by hundreds of community members, and conducted outreach efforts to interview additional community members. In total, over the course of the entire investigation, we interviewed approximately 400 community members in-person and by telephone. In reaching our findings, we worked closely with two police practices consultants with extensive experience in police practices and systems of accountability, as well as an expert who conducted statistical analyses of LASD's search and seizure data of nearly 49,000 pedestrian and vehicle contacts for the entire calendar year of 2011.

Our review also included analyses of LASD files reflecting contact by deputies with voucher holders. LASD provided 157 files regarding voucher holders dated between March 2007 and August 2011, which do not capture every instance in which LASD accompanied HACoLA for an inspection. Nor do these files reflect every time that LASD conducted investigations of voucher holders without HACoLA present. Generally, LASD did not maintain records of the voucher holders it investigated unless a referral was made for termination of voucher program benefits or criminal prosecution.

## IV.    **LEGAL STANDARDS**

### A.    **Fourth Amendment**

#### 1.    **Searches and Seizures**

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. The Fourth Amendment permits law enforcement officers to briefly detain individuals for investigative purposes if the officers possess reasonable suspicion that criminal activity is afoot. *Terry v. Ohio*, 392 U.S. 1, 21 (1968). Possessing reasonable suspicion requires an officer to be able to articulate more than an "inchoate and unparticularized suspicion or 'hunch' of criminal activity," but also "specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for *particularized* suspicion." *Id.* at 27; *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc) (emphasis in original). Certain factors by themselves – including nervousness, suspicion of drug use, race, and presence in a high crime area – are insufficient to establish reasonable suspicion. *See, e.g., Moreno v.*

*Baca*, 431 F.3d 633, 642 (9th Cir. 2005) (nervousness in a high crime area); *United States v. Hernandez*, 489 Fed. Appx. 157, 159 (9th Cir. 2012) (nervousness, "suspicion of drug use or a conclusory statement about officer safety do not provide the reasonable suspicion necessary to conduct a search for weapons"); *Miller v. City of Simi Valley*, 324 Fed. Appx. 681, 684 (9th Cir. 2009) ("persons of a particular racial or ethnic group may not be stopped and questioned because of such appearance") (quoting *Montero-Camargo*, 208 F.3d at 1134 n.22).

Warrantless searches are *"per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions," including searches incident to valid arrests. *Katz v. United States*, 389 U.S. 347, 357 (1967). Searches of vehicles are unreasonable when there is no officer safety reason for the search, such as when individuals are already handcuffed and the search is unlikely to uncover evidence of the offense underlying the arrest. *Gant v. Arizona*, 556 U.S. 332, 337-38 (2009) (vehicle search following arrest for suspended license unreasonable); *United States v. Cervantes*, 678 F.3d 798, 802 (9th Cir. 2012) ("police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained." ) (quoting *California v. Acevedo*, 500 U.S. 565, 580 (1991)).

LASD's searches of voucher holders' homes are subject to Fourth Amendment restrictions, whether deemed "administrative" searches or otherwise. *Camara v. Mun. Court of City & Cnty. of San Francisco*, 387 U.S. 523, 540 (1967) (Fourth Amendment standards apply to administrative housing inspections). Administrative searches by law enforcement agents that exceed the authorized scope of their regulatory purpose are illegal. *Michigan v. Clifford*, 464 U.S. 287, 294-95 (1984) (arson investigators authorized to conduct administrative search into cause of home fire violated Fourth Amendment when they continued to search home with primary purpose of gathering criminal evidence of the crime of arson).

Whether a nominally administrative search exceeds the authorized scope of its regulatory purpose, and thereby violates the Fourth Amendment, is determined by looking at both the actual purpose of the search and how the search is conducted. *See Alexander v. City & County of San Francisco*, 29 F.3d 1355, 1360 (9th Cir. 1994) (finding Fourth Amendment violation where two police officers entered plaintiff's home with administrative warrant to inspect for violations of health and building codes, but for the true purpose of making an arrest); *United States v. McCarty*, 648 F.3d 820, 831 (9th Cir. 2011) (quoting *United States v. $124,570 U.S. Currency*, 873 F.2d 1240, 1246 n.5 (9th Cir. 1989)) ("once a search is conducted for a criminal investigatory purpose, it can no longer be justified under an administrative search rationale"). The manner and method in which an administrative inspection is carried out must be sufficiently tailored to the administrative goals of the regulatory scheme leading to the inspection. *United States v. Bulacan*, 156 F.3d 963, 967 (9th Cir. 1998). Administrative inspections conducted in a raid-like manner violate the reasonableness standard of the Fourth Amendment. *Gordon v. City of Moreno Valley*, 687 F. Supp. 2d 930, 944-52 (C.D. Cal. 2009) (unnecessarily extensive and intrusive manner of warrantless health and safety inspections that included five police officers with bulletproof vests and firearms contravened reasonableness standard of Fourth Amendment because "they were more akin to those conducted during criminal sweeps").

EXHIBIT A

Consent can make a warrantless criminal search constitutionally valid. *See Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990); *United States v. Graham*, 480 Fed. Appx 453, 454 (9th Cir. 2012). However, valid consent to a search must be truly voluntary. Consent to search – criminal or administrative – cannot be established by "mere acquiescence to a claim of lawful authority." *United States v. Shaibu*, 920 F.2d 1423, 1426 (9th Cir. 1990). This is particularly true where the overwhelming display of authority removes the ability to meaningfully consent. *See United States v. Marshall*, 488 F.2d 1169, 1188-89 (9th Cir. 1973) (finding consent not voluntary when resident answering door was confronted by several officers who rushed the door with drawn guns. Any indication of consent would have been "in response to an overwhelming display of authority under the compulsion of the badge and the guns.").

## 2. Use of Force

Excessive force claims in the context of an investigatory stop, arrest, or other "seizure" of a free citizen are analyzed under the Fourth Amendment's objective reasonableness standard. *Graham* v. *Connor*, 490 U.S. 386, 397 (1989); *see also Davis v. City of Las Vegas*, 478 F.3d 1048, 1054 (9th Cir. 2007) (considering the "quantum of force" used relative to the availability of less severe alternatives). To determine whether the force used is reasonable, "the nature and quality of the intrusion on the individual's Fourth Amendment interests" are balanced against the legitimate governmental interests at stake. *Graham*, 490 U.S. at 396; *see also Blankenhorn v. City of Orange*, 485 F.3d 463, 477 (9th Cir. 2007).

In determining whether force is reasonable, courts consider the totality of the circumstances, including: "the severity of the crime at issue; whether the subject poses an immediate threat to the safety of the officers or others; and whether [the subject] is actively resisting or attempting to evade arrest. *Graham*, 490 U.S. at 396; *Davis*, 478 F.3d at 1054. The "most important" factor under *Graham* is whether the suspect objectively posed an "immediate threat to the safety of the officers or others." *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005). "A simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001). As the touchstone of *Graham* is whether the use of force is reasonable, courts have considered a number of factors beyond those specifically articulated in *Graham*, which are not exclusive. Other factors may include, for example, "the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *Glenn v. Washington Cnty.*, 673 F.3d 864, 872 (9th Cir. 2011).

In the Ninth Circuit, "police tactic[s] that needlessly or unreasonably create[] a dangerous situation necessitating an escalation in the use of force" are "a course of action this circuit has expressly refused to endorse." *Deorle*, 272 F.3d at 1282 n. 20 (citing *Cunningham v. Gates*, 229 F.3d 1271, 1291 n.23 (9th Cir. 2000)). Other courts have similarly denounced unnecessary escalation of force and have held that each use of force during an incident must be justified and should be evaluated independently for reasonableness. *See, e.g., Plakas v. Drinski*, 19 F.3d 1143, 1150 (7th Cir. 1994) ("[W]e carve up the incident into segments and judge each on its own terms to see if the officer was reasonable at each stage"); *Livermore v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007) (noting that "the proper approach under Sixth Circuit precedent is to view

excessive force claims in segments"); *Wiegel v. Broad*, 544 F.3d 1143, 1153 (10th Cir. 2008) ("[T]here is evidence that for three minutes the troopers subjected [the individual] to force that they knew was unnecessary to restrain him . . . .").

### B. Fourteenth Amendment

The Equal Protection Clause of the Fourteenth Amendment prohibits selective or discriminatory enforcement of the law based on race. *Whren v. U.S.*, 517 U.S. 806, 813 (1996). Discriminatory policing may arise from an explicit classification, or from a facially neutral policy or practice that is implemented or administered with discriminatory intent. *See United States v. Armstrong*, 517 U.S. 456, 457 (1996); *Washington v. Davis*, 426 U.S. 229, 239-41 (1976).

To assess discriminatory intent, courts consider direct and circumstantial evidence. *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977). Sometimes intent may also be established when the effect of a state action leads to the existence of a "clear pattern, unexplainable on grounds other than race." *Id.* at 266. Additionally, proof of disproportionate impact may provide circumstantial evidence of invidious intent. *Id.* In some cases, "proof of discriminatory impact 'may for all practical purposes demonstrate unconstitutionality because in various circumstances the discrimination is very difficult to explain on nonracial grounds." *Miller-El v. Cockrell*, 537 U.S. 322, 345 (2003) (quoting *Batson v. Kentucky*, 476 U.S. 79, 93 (1986)). A law enforcement activity may violate the Equal Protection Clause where discriminatory intent was a contributing factor motivating the action or decision; the plaintiff need not show that "the challenged action rested *solely* on racially discriminatory purposes." *Arlington Heights*, 429 U.S. at 265 (emphasis added); *see also Wayte v. United States*, 470 U.S. 598, 610 (1985) (discriminatory purpose implies that a decision maker selected course of action at least in part "because of" adverse effects on identifiable group). In *Arlington Heights*, the Supreme Court also suggested a "totality of the circumstances" approach by providing a non-exhaustive list of other types of circumstantial evidence for courts to consider when trying to determine whether discriminatory intent was a motivating factor, including: (1) the historical background of a local government's decision; (2) the specific sequence of events leading to a decision; (3) departures from normal procedural sequence; (4) substantive departures from a decisionmaker's normal decisionmaking; and (5) legislative or administrative history, including contemporary statements by members of a decisionmaking body. *Arlington Heights*, 429 U.S. at 266-68.

### C. Fair Housing Act

The Fair Housing Act prohibits a broad range of conduct that has the purpose or effect of discriminating on the basis of race, and the Act applies to the conduct of law enforcement agencies. *See, e.g., Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 711 (9th Cir. 2009) (fact issue precluded summary judgment as to FHA claim regarding differing response times of law enforcement personnel in Latino neighborhoods as compared to white neighborhoods). Section 804(a) of the FHA makes it unlawful to "refuse to sell or rent . . . or to refuse to negotiate for the sale or rental of, *or otherwise make unavailable or deny*, a dwelling to any person because of race [or] color. . . ." 42 U.S.C. § 3604(a) (emphasis added). Courts, including the Ninth Circuit, have broadly construed the "otherwise make unavailable" language

in section 3604(a), opining that it "appears 'to be as broad as Congress could have made it, and all practices which have the effect of denying dwellings on prohibited grounds are therefore unlawful." *S. Calif. Housing Rights Ctr. v. Krug*, 564 F. Supp. 2d 1138, 1150 (C.D. Cal. 2007); *Housing Rights Ctr. v. Sterling*, 404 F. Supp. 2d 1179, 1190 (C.D. Cal. 2004) ("3604(a) also prohibits actions that make apartments *effectively* unavailable") (emphasis in original); *see also United States v. City of Parma*, 661 F.2d 562, 568 (6th Cir. 1981) (section 3604(a) claim in context of city's racially motivated opposition to public housing).

It is also unlawful under Section 804(b) of the FHA to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, *or in the provision of services or facilities in connection therewith*, because of race [or] color . . . ." 42 U.S.C. § 3604(b) (emphasis added). Section 3604(b) applies "broadly" and "is not limited to those who are engaged in the 'sale or rental' of dwellings." *The Cmty. Action League, et al. v. City of Palmdale, et al.*, No. CV 11-4817 ODW (VBKx) (C.D. Cal. Feb. 1, 2012) (Order Denying Motions to Dismiss). This provision has been applied in the context of allegations of discriminatory policing, including enforcement policies and practices alleged to have been implemented in a racially discriminatory manner. *See Comm. Concerning Cmty. Improvement*, 583 F.3d at 713-14; *Davis v. City of New York*, No. 10 CV 0699, 2012 WL 4761494 (S.D.N.Y. Oct. 9, 2012) (fact issue precluded summary judgment as to claim that the NYPD and the NYC Housing Authority's trespass enforcement policies and practices, which were allegedly conducted in a racially discriminatory and unlawful manner, violated 42 U.S.C. § 3604(b) by limiting public housing residents' ability to enter and exit their homes and their ability to receive guests).

Finally, Section 818 of the FHA, 42 U.S.C. § 3617, makes it unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected" by the FHA. This Section prohibits conduct designed to harass members of a protected class and drive them out of the neighborhood. The Ninth Circuit has held that the provision should be "broadly applied 'to reach all practices which have the effect of interfering with the exercise of rights' under the federal fair housing laws, . . . [ranging] from racially motivated firebombings to exclusionary zoning and insurance redlining." *United States v. City of Hayward*, 36 F.3d 832, 835 (9th Cir. 1994) (citations omitted).

Proof that actions violate the FHA can be demonstrated under either a "disparate treatment" or a "disparate impact" theory. With respect to disparate treatment claims, intent can be shown through direct evidence of discrimination, such as through open statements evincing discriminatory animus, or, as is more often the case, through circumstantial evidence, because "municipal officials ... seldom, if ever, announce on the record that they are pursuing a course of action ... to discriminate." *Smith v. Town of Clarkton*, 682 F.2d 1064 (4th Cir. 1982); *Contreras v. City of Chicago*, 119 F.3d 1280, 1291-92 (7th Cir. 1997). Moreover, a court is not limited to considering the motives of the official decision-makers themselves when considering whether an official action was taken for discriminatory reasons. Instead, public officials may be held liable for intentional discrimination if they take official action in response to private citizens' discriminatory motivations. *See United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1224 (2d

Cir. 1987) ("[A] governmental body may not escape liability . . . merely because its discriminatory action was undertaken in response to the desires of a majority of its citizens"); *Town of Clarkton*, 682 F.2d at 1066 (upholding municipal liability because there "can be no doubt that the defendants knew that a significant portion of the public opposition was racially inspired, and their public acts were a direct response to that opposition"). As discussed in the Fourteenth Amendment section above, in *Arlington Heights*, 429 U.S. at 266-68, the Supreme Court suggested some types of circumstantial evidence that courts should consider when determining whether discriminatory intent was a motivating factor in an official action by a local government.

A plaintiff can also establish a violation of the Fair Housing Act by showing a "disparate impact," which is to say a discriminatory effect without a showing of discriminatory intent. *Gamble v. City of Escondido*, 104 F.3d 300, 306 (9th Cir. 1997); *Keith v. Volpe II*, 858 F.2d 467, 482 (9th Cir. 1988); 24 C.F.R. 100.500 ("Liability may be established under the [FHA] based on a practice's discriminatory effect . . . even if the practice was not motivated by a discriminatory intent.")[5]. Under the adverse impact theory, a facially neutral policy or decision has a "discriminatory effect" if it "actually or predictably results in racial discrimination." *Keith II*, 858 F.2d at 482. In addition to the adverse impact theory of disparate impact, the Central District of California has recognized "a second type of racially discriminatory effect that a facially neutral decision about housing can produce." *Keith v. Volpe I*, 618 F. Supp. 1132, 1150 (C.D. Cal. 1985). "This is 'the effect which the decision has on the community involved; if it perpetuates segregation and thereby prevents interracial association it will be considered invidious under the Fair Housing Act independently of the extent to which it produces a disparate effect on different racial groups.'" *Id.* at 1150-51; *see also Huntington Branch NAACP v. Town of Huntington*, 844 F.2d 926, 937 (2d Cir.1988) (finding perpetuation of segregation after a town blocked a housing project that would have started to desegregate a white neighborhood); *United States v. City of Black Jack*, 508 F.2d 1179, 1186 (8th Cir. 1974) (finding perpetuation of segregation where there was "proof that many blacks would live in the development" that would be located in exclusively white community); *Keith I*, 618 F. Supp. at 1151 (finding perpetuation of segregation when the ultimate result of the city's actions was to "prevent low income minority displacees from continuing to reside in [the city]").

**D.    Title VI**

Title VI prohibits law enforcement agencies that receive federal financial assistance from engaging in law enforcement activities that have an unnecessary disparate impact based on race, color, or national origin. Specifically, Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving

---

[5]    HUD issued 24 C.F.R. 100.500 under its delegated authority to implement the FHA. *See* 42 U.S.C. § 3614a. The regulation is therefore entitled to deference. *Chevron USA, Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 843-44 (1984).

EXHIBIT A

federal financial assistance." 42 U.S.C. § 2000d.  LASD receives federal financial assistance made eligible under Title VI and currently has at least $30 million in open federal awards.[6]

# V.  DISCUSSION

## A.  LASD's Antelope Valley Stations Engage in a Pattern of Unconstitutional Stops and Searches, Unreasonable Force, and Biased Policing

We have reasonable cause to believe that LASD's Antelope Valley deputies engage in a pattern or practice of unconstitutional law enforcement activity that reflects unlawful bias and that violates individuals' rights not to be subjected to unreasonable searches and seizures, including the use of unreasonable force.  These practices violate the Fourth Amendment, the Fourteenth Amendment, the Fair Housing Act, and Title VI.  Our investigation uncovered an apparently unjustified disparate impact of stops and searches of African Americans and Latinos, as well as a practice of racially biased enforcement of the voucher program, unlawful backseat detentions, and a pattern of stops and searches without adequate legal justification.

### 1.  Antelope Valley Deputies' Stop and Search Practices Have an Unnecessary Disparate Impact on African-American and Latino Residents and Violate the Fourth Amendment

LASD deputies stop and search African Americans and Latinos in the Antelope Valley in a manner indicating that stops and searches are motivated, at least in part, by bias.  With the assistance of a statistical expert, we conducted a regression analysis of all 4,084 pedestrian and 44,672 vehicle stops and searches recorded in Lancaster and Palmdale during 2011.[7]  This analysis allowed us to control for factors other than race that could potentially influence the reason why African Americans and Latinos are stopped and/or searched at a disproportionately higher rate.  All of the regression analyses conducted of this data accounted for a multitude of factors, including (1) the demographic composition of each LASD reporting district, (2) the ages of residents, (3) the gender of residents, and (4) the crime rates by race reported by each reporting district.  Each statistic described in the following paragraphs was conducted using a regression analysis, which accounted for these four different variables, to determine whether there is a disproportionate effect on African Americans and Latinos.  Additionally, the regressions are weighted by district populations, because the estimates of population and crime characteristics are more reliable in districts with larger populations.  While it is impossible to account for every single factor that could affect law enforcement activity, the regression analyses account for the major factors that influence law enforcement activity, including crime rates.  Even after accounting for all these factors, the analysis shows that none of these factors could

---

[6]     This estimated amount is very conservative as it does not take into account subgrants that LASD may receive as part of larger awards.

[7]     Regression analyses demonstrating racial disparities may be used to prove a pattern or practice of discrimination.  *See Bazemore v. Friday*, 478 U.S. 385, 400-02 (1986) (alleging pattern or practice of employment discrimination); *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 337-40 (1977) (alleging pattern or practice of employment discrimination).

account for the clear disproportionate effect that Antelope Valley policing practices still have on African-American and, to a lesser extent, Latino residents. This disproportionate impact thus provides circumstantial evidence of discriminatory intent in violation of the Fourteenth Amendment. *See Arlington Heights*, 429 U.S. at 266 (intent may be established by clear pattern unexplainable on grounds other than race); *Miller-El*, 537 U.S. at 345 (discriminatory impact may demonstrate unconstitutionality). This disparate impact also appears to be unnecessary and thus in violation of Title VI.

Pedestrian Stops and Searches. Our statistical analysis of 2011 pedestrian stop data showed that the stop rate of minority pedestrians is disproportionately high in the Antelope Valley. In Palmdale, African-American and Latino pedestrians are stopped at a rate 33% higher than if there were no racial differences, and, in Lancaster, African-American pedestrians are stopped at a rate 38.5% higher than if there were no racial differences. In Lancaster, the aggressive pedestrian stop rate of African Americans cannot be justified by demonstrating that the higher rate of stops results in discovery of more contraband. In fact, a regression analysis controlling for the factors described above indicates that there is about a 50% lower rate of contraband seizure for African-American pedestrians compared to whites. In Palmdale, there was no statistically significant difference in contraband discovery rates by race. The low contraband seizure rate for African Americans indicates that, overall, LASD deputies in the Antelope Valley appear to have a less accurate threshold of suspicion for searching African Americans, and that the greater frequency of searches of African Americans cannot be explained by a greater likelihood that they are carrying contraband (such as illicit drugs or weapons).

Vehicle Stops and Searches. Though the analysis of Antelope Valley's 2011 vehicle stops alone did not reveal any racial disparities, the analysis of the searches resulting from vehicle stops revealed a stark effect on African Americans and, to a lesser extent, Latinos. Controlling for potential intervening factors, the regression analysis revealed a finding that, following vehicle stops, the search rate of the persons of African Americans in the Antelope Valley is 10-15 percentage points higher than that of whites, and the disparity in the search rate of Latinos in the Antelope Valley is also statistically significant. Additionally, across the Antelope Valley, the vehicles of African Americans are searched at an 8-14 percentage point higher rate than whites. The analysis also revealed that, in vehicle stops, Latinos and their vehicles are searched at a statistically significant disparate rate.[8]

---

[8]   These analyses are statistically significant because the likelihood that the racial disparities in the analyses arose randomly or by chance is less than five percent. Additionally, differences between the expected and observed values for African Americans and Latinos subjected to policing activity that are outside two standard deviations may be sufficient to show discrimination. *See Castaneda v. Partida,* 430 U.S. 482, 496 n.17 (1977) (In a case involving underrepresentation of Mexican Americans on grand juries, the Court stated, "[I]f the difference between the expected value and the observed number is greater than two or three standard deviations, then the hypothesis that the jury drawing was random would be suspect to a social scientist.")

Discretionary Offenses. The data also shows a clear racial disparity for African Americans when stopped for offenses where law enforcement discretion is greatest. Such charges include offenses such as crossing against a traffic light, jaywalking, failing to yield right of way, or walking on the wrong side of the street. Controlling for possible intervening factors discussed above, we found that an African-American pedestrian in Lancaster is over 25% more likely than a white pedestrian to be stopped for a discretionary offense. A large number of these stops, for minor offenses such as jaywalking, also resulted in questionable pat downs and consent searches.

The disparate contraband discovery rate discussed above can alone indicate biased policing. The discovery rate should be the same regardless of race if individualized suspicion of criminal wrongdoing, rather than race, is fueling the suspicion that leads to the search. It is unclear, however, whether disparate discovery rates in the Antelope Valley stem from bias because of the significant number of purported consent searches and, to a lesser extent, parolee/probationer searches conducted by Antelope Valley deputies, which do not require individualized suspicion of criminal wrongdoing. *See Samson v. California,* 547 U.S. 843, 856 (holding that suspicionless searches of parolees are constitutional because parolees consent to suspicionless searches as condition of parole).[9]

What is clear, however, is that LASD's search tactics place a disproportionate burden on African Americans in the Antelope Valley, in that African Americans are significantly more likely to be searched even if they are not carrying contraband. We know also, based upon the scores of complaints we received about LASD's search practices during our interviews of community members, that this practice is a significant cause of the divide between LASD, and Latinos and African Americans in the Antelope Valley. Over and over again, we heard disturbingly similar accounts of Antelope Valley deputies pulling over African-American and Latino pedestrians and drivers, searching their persons and/or cars, and releasing them without a citation or any information about why they were initially stopped.

In addition, if a deputy's decision to ask an individual whether he or she is on probation or parole prior to a search is in part prompted by the race of the individual, this constitutes unlawful discrimination. *See Whren v. United States*, 517 U.S. 806, 813 (Fourteenth Amendment prohibits the selective enforcement of the law based on race); *Richards v. City of Los Angeles*, 261 Fed. Appx. 63, 65-66 (9th Cir. 2007) (holding that a claim of racial harassment by police on the basis of race constitutes Fourteenth Amendment claim). While it is lawful to ask about an individual's probation or parole status even if there is no reasonable suspicion of

---

[9]    While the patrol log contains a data field for deputies to record the category of a search – for example, as a consent search, a search incident to arrest, or a pat down – there is no separate data field where deputies document whether a civilian was subject to search because of his parole or probation status. Further, LASD's directive regarding "Logging Public Contacts" does not require deputies to provide a narrative that articulates the probable cause justifying the search as opposed to the stop. There does not appear to be any documentation of an individual's informed consent to search, outside the recent policy changes regarding the voucher program, other than a deputy's patrol log entry.

EXHIBIT A

criminal activity, the practice of routinely asking individuals whether they are on probation or parole has an impact on both the perception and reality of bias in LASD. [10] Our review of a year's worth of civilian complaints indicates that all people who stated that they were asked about their probation or parole status were African-American or Latino.

It is thus clear that LASD spends significant resources, in terms of time and community trust, conducting searches that turn up nothing. Therefore, it is incumbent upon LASD to: (1) better track and analyze data so that it can ensure that a legitimate law enforcement purpose, rather than bias, is fueling these disparate seizure rates; (2) reassess its emphasis on consent and probation or parole status searches and determine whether there are steps it can take to reduce the divisiveness and potential for constitutional harm of this heavy handed approach; [11] and, (3) enhance policy and training to ensure that officers understand that it is a violation of law to ask, based on an individual's race or ethnicity, whether someone would consent to search or is on probation or parole. *See Whren*, 517 U.S. at 813 (Fourteenth Amendment prohibits the selective enforcement of the law based on race); *Rodriguez v. Cal. Hwy. Patrol*, 89 F. Supp. 2d 1131, 1140 n.5 (N.D. Cal. 2000) ("It is settled law that race or appearance alone is insufficient to justify a stop or arrest.").

---

[10]     During an investigation into one African-American civilian's complaint that he was questioned about his probation or parole status for no reason during a traffic stop, one involved deputy told the LASD investigator that he "always asks everyone he stops" about their probation or parole status "to get into cars," that is, as a pretext to search vehicles. The other involved deputy told the investigator that he instructs all deputy trainees to ask those same questions during every stop. To his credit, the lieutenant who reviewed this civilian complaint advised both deputies that some people "will be offended and become angry if they are immediately asked about being on parole, or probation, when they are first contacted on a traffic stop." The deputy still insisted that he would continue to ask such questions, dismissive of the potential impact that the practice might have on his relationship with the community. A recent 2012 Lancaster Fourth Amendment training curriculum provides guidance about searches of probationers and parolees, but still does not address the underlying practice of questioning. The deputy's statements are consistent with what we heard from African-American and Latino Antelope Valley residents who felt that deputies assumed they had criminal records when they were asked about probation or parole status at the outset of minor police-civilian interactions, such as low-level traffic stops.

[11]     Other jurisdictions have significantly more restrained stop and consent search policies, whether voluntarily or by law, with no indication that this compromises public safety. *See e.g., State v. Carty*, 790 A.2d 903, 912 (N.J. 2002) (consent searches of vehicles without independent reasonable suspicion violate state constitution); *State v. Ferrier*, 960 P.2d 927, 929-30 (Wash. 1998) (failure to provide informed consent vitiates legitimacy of consent); *State v. Ladson*, 979 P.2d 833, 838-39 (Wash. 1999) (use of pretext stops for warrantless searches or seizures violates state constitution).

2.   **Enforcement of the Housing Choice Voucher Program in the Antelope Valley Reflected Bias and Violated the Fair Housing Act and the Fourth Amendment**

In response to racially-charged opposition to the growing presence of African-American voucher holders in the Antelope Valley, and amid a climate of tolerance for racially derogatory conduct within the LASD, the LASD teamed with the Housing Authority of Los Angeles County (HACoLA) to pursue enforcement of the voucher program. Lancaster and Palmdale city officials initiated the campaign of enforcement by entering into Memoranda of Understanding (MOUs) with HACoLA to hire and pay for dedicated fraud investigators. As a result of the MOUs, enforcement of the voucher program in Lancaster and Palmdale differed from enforcement of the voucher program throughout the rest of the county in both qualitative and quantitative ways, and was carried out with the intent that African-American voucher holders leave Antelope Valley. All of the fraud investigators were former LASD deputies, worked out of office space in the Lancaster or Palmdale sheriff's stations, and were issued LASD email addresses to conduct their HACoLA business. In addition, a Palmdale deputy coordinated with a dedicated district attorney investigator to specifically develop criminal fraud cases against voucher holders in the city for violations of the voucher program's rules. The MOUs were renewed and expanded every year beginning in 2004 until June 2011, when Los Angeles County instituted a moratorium on the MOUs in response to the filing of private litigation.[12]

LASD played a critical role in enforcement of the voucher program in the Antelope Valley, teaming with HACoLA investigators and acting independently to pursue enforcement efforts at voucher program households, including by intimidating, harassing, and facilitating the termination of voucher holders from the program. Among other things, LASD: (1) sent numerous deputies on HACoLA compliance checks of the homes of voucher holders, often in the absence of any legitimate justification; (2) accompanied HACoLA on a disproportionately large percentage of compliance checks in the Antelope Valley as compared to other areas of Los Angeles County where HACoLA's and LASD's jurisdictions overlap; (3) allowed deputies to directly question voucher holders about their compliance with the voucher program's rules; (4) referred voucher holders for criminal prosecution for voucher program violations; (5) independently used law enforcement tools, such as probation/parole checks and arrest warrants, to obtain information about voucher program violations; (6) failed to properly issue *Miranda* warnings even when deputies had a legitimate reason to enter the home; and (7) provided confidential information about voucher holders to third parties.

As mentioned above, LASD's efforts with respect to voucher program compliance in the Antelope Valley were conducted in a manner that was qualitatively and quantitatively different from enforcement of the voucher program throughout the rest of the county. In the conduct of these efforts, LASD departed from standard or proper procedures in a number of important ways; for example, as described below and elsewhere in this letter, deputies often departed from department policies and procedures that require a warrant or, in its absence, consent to enter and

---

[12]   The County agreed not to renew the MOUs with Lancaster and Palmdale for a period of three years as part of a settlement agreement reached with private plaintiffs in March 2012.

search a resident's home. Moreover, LASD's conduct had serious consequences for voucher holders in the Antelope Valley, including (in some cases) termination from the voucher program, criminal prosecution for administrative violations, and relocation from the Antelope Valley for fear of further law enforcement harassment.

Vigorous enforcement of the voucher program would not, on its own, violate the FHA. However, here, LASD's enforcement efforts were part of racially biased opposition to voucher holders, and were based on an unsubstantiated and racially stereotypical correlation of race and crime – including that African-American voucher holders in the Antelope Valley were gang members and that the increase in voucher holders had brought crime to the Antelope Valley. As described above, in determining whether conduct violates the FHA, courts look to a wide range of circumstantial evidence, including the historical background against which the conduct takes place; the specific sequence of events leading to the conduct; departures from normal procedures; and statements by the actors evidencing racial bias. *See Arlington Heights*, 429 U.S. at 266. Reliance on circumstantial evidence is necessary, especially when dealing with municipal entities, because courts recognize "municipal officials … seldom, if ever, announce on the record that they are pursuing a course of action … to discriminate." *Smith v. Town of Clarkton*, 682 F.2d 1055, 1064 (4th Cir. 1982); *see also Contreras v. City of Chicago*, 119 F.3d 1286, 1294 (7th Cir. 1997).

> a)   LASD's Enforcement of Voucher Program Rules Differed in the Antelope Valley and Was Not Justified by Legitimate Law Enforcement Concerns

HACoLA may initiate compliance investigations when it has information that a voucher holder is not abiding by the program requirements. A compliance investigation may include an evaluation of the voucher holder's home, which is commonly referred to as a compliance check. These compliance checks are not criminal investigations and HACoLA investigators are not entitled to enter the voucher holder's home without first obtaining consent to enter. Refusal by a person present at the residence to provide consent cannot itself jeopardize the household's housing assistance benefits. If a household refuses to consent to a compliance check, HACoLA may schedule an appointment with the voucher holder to address the program compliance concerns. HACoLA Administrative Plan Sec. 10.7.3.

In a departure from ordinary procedures employed elsewhere in the county, LASD deputies accompanied HACoLA investigators on virtually all voucher program compliance checks in the Antelope Valley from 2004 through 2007, and to a more limited degree until 2011, when LASD was notified of this investigation and when a private civil rights lawsuit alleging similar facts was filed against Lancaster and Palmdale. Our analysis of data provided by HACoLA revealed that LASD's practice of accompanying HACoLA investigators occurred in a disproportionately high percentage of compliance checks in the Antelope Valley as compared to the rest of the County, including areas that border on inner-city Los Angeles and that are policed by LASD. Between January 2008 and August 2011, a much higher percentage of HACoLA field contacts in the Antelope Valley (where the majority of voucher holders are African American) involved LASD deputies, as compared to field contacts in the remaining parts of the county in which HACoLA's and LASD's jurisdiction overlap (where African Americans are not the majority of voucher holders).

More often than not, multiple deputy sheriffs, sometimes as many as nine, would accompany HACoLA investigators on their administrative housing checks. Deputies would routinely approach the voucher holder's home with guns drawn, occasionally in full SWAT armor, and conduct searches and questioning once inside. In over 40% of the cases in which LASD's files indicated the number of deputies involved, six or more deputies were present. The sheer numbers of armed, uniformed deputies who participated in many of the compliance checks call into question whether voucher holders were able to give meaningful consent to compliance inspections by HACoLA investigators. *See Gordon v. City of Moreno Valley*, 687 F. Supp. 2d 930, 944-52 (C.D. Cal. 2009) (concluding that the unnecessarily extensive and intrusive manner of warrantless health and safety inspections that included five police officers with bulletproof vests and firearms contravened the reasonableness standard of Fourth Amendment because "they were more akin to those conducted during criminal sweeps"); *United States v. Marshall*, 488 F.2d 1169, 1188-89 (9th Cir. 1973) (finding that consent was not voluntary when a resident answering the door was confronted by several officers who rushed the door with drawn guns because any indication of consent would have been "in response to an overwhelming display of authority under the compulsion of the badge and the guns"). Moreover, LASD deputies failed to acquire separate consent to enable them to legally accompany HACoLA investigators into voucher holders' homes. *See* discussion below for Fourth Amendment implications.

Of the 157 files provided by LASD, less than one-half included information demonstrating any reason for deputy presence, whether ensuring the safety of HACoLA investigators or furthering a proper law enforcement purpose, such as conducting a probation or parole compliance search or serving a warrant. Moreover, only one-quarter of the files that indicate the number of deputies present describe circumstances that would justify the number of deputies who responded. For example, of the files that specifically articulated a need to provide for investigator safety and stated no other basis for deputy presence, often four to six deputies were involved when one or two deputies should have adequately addressed that need.

Additionally, LASD deputies often improperly comingled their law enforcement functions with the administrative process and participated in HACoLA investigations beyond the scope of securing investigator safety. Courts have emphasized the importance of keeping criminal investigations separate from administrative searches. *See Wyman v. James*, 400 U.S. 309 (1971), *Sanchez v. Cnty. of San Diego*, 464 F.3d 916 (9th Cir. 2006). Moreover, courts have held that the manner and method in which an administrative inspection is carried out must be narrowly tailored to the administrative goals of the inspection. *See United States v. Bulacan*, 156 F.3d 963, 967-68 (9th Cir. 1998). As a result of these practices, LASD deputies were able to interview people and conduct searches before the individuals understood their rights, including that they might be incriminating themselves by participating in the housing contract compliance check. For example, deputies questioned voucher holders during compliance checks about information such as employment history and who resided in the home; these questions had no purpose other than to substantiate voucher program violations. LASD deputies would also use information gathered during these compliance checks to further criminal investigations based solely on the voucher holders' alleged voucher program violations. In some cases, LASD also used voucher program compliance checks as a vehicle to further unrelated criminal investigations, gaining access to voucher holders' homes and their residents without providing

EXHIBIT A

notice of their true purpose or administering necessary *Miranda* warnings. For example, in 2007, LASD arrived at a voucher holder's residence to serve an arrest warrant for driving without a license and to assist with a HACoLA compliance check. The deputy also suspected the voucher holder of stealing property from her former landlord. The deputy participated in the compliance check, but did not disclose to the voucher holder the fact that a criminal investigation was also underway regarding the stolen property. During the compliance check, the deputy noted the presence of an item similar to the reported stolen property and photographed it. As a result of information obtained during this improper search, the deputy later obtained a search warrant to recover the property.

As a result of LASD's conduct in accompanying HACoLA investigators on compliance checks as described above, voucher holders in the Antelope Valley were subjected to far more intrusive and intimidating searches of their homes, and in some cases, harsher administrative or criminal consequences to those searches, than voucher holders elsewhere in the county. Given the demographics and evidence of what led to this focused enforcement of the voucher program's rules in the Antelope Valley, this differential treatment of voucher holders in the Antelope Valley violates the FHA.

b)      LASD Deputies Independently Targeted Voucher Holders in the Antelope Valley

LASD went beyond simply assisting HACoLA in its enforcement efforts. LASD independently employed otherwise legitimate law enforcement powers, including probation and parole checks, arrest warrants, traffic stops, and criminal prosecutions, in order to further the enforcement of HACoLA program rules, facilitate the termination of voucher holders, and harass and intimidate voucher holders. Otherwise legitimate law enforcement action, aggressive or otherwise, does not itself violate the law, but here, actions taken by LASD deputies were part of racially-motivated bias against the voucher program (sometimes following specific emails making such bias explicit) and appear to have been focused on the ultimate goal not just to terminate voucher holders from the voucher program, but to force them out of their homes. This conduct, taken as a whole and considered against the social, historical, and procedural context, violated the FHA. "Even intrinsically lawful acts may lose that character when they are constituent elements of an unlawful scheme." *United States v. City of Parma*, 494 F. Supp. 1049, 1055 (N.D. Ohio 1980) (citations omitted) ("The character and effect of a general policy is to be judged in its entirety, and not by dismembering it as if it consisted of unrelated parts."); *Harris v. Itzhaki*, 183 F.3d 1043, 1052 (9th Cir. 1999) (holding that circumstantial evidence, when viewed as a whole, may establish a genuine factual issue about whether facially unrelated actions were discriminatory).

By relying on probation or parole checks, which do not require consent, LASD deputies were able to enter voucher holders' homes to conduct searches and collect information pertinent to voucher program compliance that HACoLA could then use to support termination. Had HACoLA investigators sought to conduct those searches, they would have needed consent to enter. Similarly, LASD used traffic and pedestrian stops and arrest warrants as a means to question individuals to obtain information relating to voucher program enforcement. The following examples from LASD's files demonstrate this problematic conduct:

-39-
EXHIBIT A

- In 2011, seven LASD deputies and a HACoLA investigator arrived at a voucher holder's home both to investigate possible violations of her voucher program contract and to conduct a probation compliance check. However, the lead deputy disclosed to the voucher holder only that they were there to conduct a "routine" probation check. Once the lead deputy entered the home and the voucher holder gave him information about the home's residents, the deputy told the HACoLA investigator — who was waiting outside — that the voucher holder's response did not match the voucher program contract. The HACoLA investigator and lead deputy then jointly questioned the voucher holder about her compliance with the voucher program's rules, which is documented in an incident report to substantiate criminal charges based solely on violations of the voucher program contract. While LASD was purportedly at the home to conduct a probation check, LASD's file contains no information regarding the nature or scope of the probation search or any probation consequences that resulted.

- During a 2008 traffic stop, deputies determined that an African-American woman had a warrant for driving without a license. A deputy then contacted a HACoLA investigator and determined that the woman participated in the voucher program. The deputy and investigator then engaged in a joint investigation into the woman's employment and the occupants of her home in order to find evidence of voucher program violations. At one point, the deputy told the woman that if she was honest about her violations, he would not file a criminal report and the only consequence would be termination of her benefits. When the deputy did not receive the admissions he desired, he filed an incident report to substantiate criminal charges based solely on alleged violations of the voucher program contract.

- In another case, in 2008, four deputies and a HACoLA investigator visited the home of a voucher holder for the purpose of conducting a probation compliance check of one of the residents of the home. The deputies had invited a HACoLA investigator to participate in the search although they had no evidence of any voucher program violations. Once inside the home, the deputies and the investigator identified property that they suspected was stolen, including a dolly marked as property of the United Parcel Service. Ultimately, the deputies arrested the voucher holder for unlawful possession of the dolly, which was estimated to cost $125, even though they could not confirm that it was stolen. Following the probation compliance check, HACoLA terminated the voucher holder from the voucher program for allegedly stealing the UPS dolly, along with other program violations they uncovered during the probation compliance check.

Furthermore, our investigation revealed that LASD took criminal enforcement action against some voucher holders, solely on the basis of violations of the voucher program rules. Notably, in some of these cases LASD pursued criminal charges despite the fact that HACoLA had already terminated the voucher holder from the voucher program. HACoLA administrators informed us that it was not their ordinary policy to refer contract violations to LASD for criminal enforcement. LASD referred these voucher holders to the District Attorney for charges of perjury (*i.e.*, false statements on their housing contract) and/or grand theft (*i.e.*, overpayments made by HACoLA). These charges resulted in some voucher holders being arrested, prosecuted for felonies, jailed, left in debt to HACoLA for restitution, typically in five-digit sums and,

importantly, forced from their homes. In just one example, three months after a voucher holder was terminated from the voucher program and opted to stay in the home and pay market rent to their landlord, a Palmdale deputy initiated an investigation into the family for "lying about their financial status to the Los Angeles County Housing Authority and . . . defrauding the county in regards to receiving housing assistance." As part of that investigation, the deputy obtained a search warrant for the family's home. During the execution of that warrant, the deputy questioned the head of household about how the family could afford to continue living in the house even after being terminated from the voucher program and how they could afford various household items, including groceries, cellular telephones, a lawnmower, and exercise equipment, on such a limited income. At the conclusion of the search and interview, the deputy arrested the couple and confiscated all of the property (including the family automobile) that he believed the family should not have been able to afford as evidence of fraud against the Housing Authority. Ultimately, LASD successfully recommended to the District Attorney that the couple be prosecuted for perjury and grand theft of the total rent that had been paid by the Housing Authority, in the amount of $27,971.

Finally, LASD provided information obtained in the course of its participation in voucher program compliance checks to third parties, which led to the harassment of voucher holders. For example, shortly after a compliance check conducted by HACoLA and LASD where they photographed luxury vehicles in the voucher holder's garage, an LASD deputy sent those photographs to the administrator of the Antelope Valley-based "I Hate Section 8" Facebook page. Subsequently, the family's home was vandalized with the message "I hate Section 8 you fucking niggers" scrawled on their garage door, and the family's son had urine thrown on him as the perpetrator yelled, "You dirty Section 8 nigger." The family relocated from Palmdale back to inner city Los Angeles for fear of further harassment.

        c)      No Law Enforcement Justification Exists for LASD's Targeting of Voucher Program Households

LASD's involvement in enforcement of the voucher program's rules was motivated, at least in part, by the unsubstantiated perception among some members of the Antelope Valley community, including public officials, press, residents and deputies themselves, that AfricanAmericans in the voucher program had brought increased crime to the region. The only crime-related analyses LASD provided to us in the course of this investigation disprove the purported link between the voucher program and crime in the Antelope Valley. In 2007, a Lancaster sergeant conducted a study which concluded that "Section 8 housing did not change the crime statistics within their respective communities." In August 2009, a statistician employed by the city of Lancaster, at the request of the Mayor and City Manager, conducted an analysis revealing that for the period analyzed there was no link between crime and voucher holders in Lancaster. The Lancaster analysis further asserted that in certain neighborhoods, voucher program households might actually keep crime rates lower. Despite these findings, LASD invested significant resources to investigate voucher program participants. Notwithstanding this focus and the widely-accepted belief, including within the LASD, that voucher holders had brought serious, gang-related crime to the Antelope Valley, there is no evidence that these investigations resulted in arrests for gang-related criminal activity.

EXHIBIT A

We recognize that "problem-solving" crime prevention efforts require that law enforcement agencies develop relationships with other public agencies, such as county housing authorities like HACoLA. Effective problem-solving policing, however, requires that partnerships with communities be at least as strong as the partnerships with fellow enforcement agencies and LASD's Core Values reflect this principle. In any event, problem-solving partnerships do not obviate the requirement that law enforcement officers respect individuals' legal rights.

> d) LASD Searches of Voucher Program Homes Violated the Fourth Amendment

Between approximately 2008 and 2011, evidence suggests that LASD engaged in a pattern or practice of Fourth Amendment violations, which included conducting searches of voucher holders' homes that exceeded the regulatory scope of the voucher program compliance check, and that were not justified by meaningful consent since so many LASD deputies were often present. *See Michigan v. Clifford*, 464 U.S. 287, 294 (1984); *United States v. Shaibu*, 920 F.2d 1423, 1426 (9th Cir. 1990). In mid-2011, LASD, with the assistance of OIR, implemented a new Field Operations Directive, titled "Housing Authority Non-Criminal Investigations/ Inspections," that ceased the practice of LASD deputies accompanying HACoLA investigators as a matter of course. The Directive became officially effective in March 2012. The Directive notes that HACoLA investigations are "non-criminal in nature," and that LASD deputies may ensure the safety of HACoLA personnel but must not participate in such investigations or inspections. The directive requires deputies to follow specific procedures to ensure that LASD personnel are present at HACoLA inspections only when necessary, such as when HACoLA staff have had prior confrontations with a resident, the resident has made threats, the resident is known to be in a gang, or other established reasons for concern over the HACoLA worker's safety. We further note that, on May 10, 2012, approximately 60 deputies and supervisors from the Lancaster and Palmdale stations attended a four-hour long voucher program awareness course, which was intended to enhance deputies' knowledge about fair housing laws and to inform them about how the voucher program works in Los Angeles County.

Likely as a result of sensible departmental developments, we do not have evidence of a continued pattern or practice of unlawful searches of voucher holders' homes in violation of the Fourth Amendment. However, LASD is still liable under the Fair Housing Act for its past conduct described above.[13]

> 3. **Deputies Unnecessarily Detain Residents in the Backseat of Patrol Cars in Violation of LASD Policy and the Fourth Amendment**

Generally, an individual would not expect to be detained in the backseat of a patrol car when stopped for a minor vehicle infraction or while an officer writes a citation. Similarly, a victim of domestic violence who has dialed 9-1-1 would not expect that the responding officers

---

[13]    For the six-month time period from June to December 2012, HACoLA did not request law enforcement assistance on any compliance checks, and law enforcement was present during one compliance check in Lancaster.

will confine her to the backseat of a patrol car as if she were a suspect. Unfortunately, many Antelope Valley residents have come to expect this unnecessary and unlawful treatment from LASD deputies as a matter of course. LASD documentation indicates that Antelope Valley deputies conduct hundreds of backseat detentions every year.[14] Backseat detentions also are frequently associated with complaints against deputies: of 180 civilian complaints received in a one-year period, at least 30 involved backseat detentions.

While there are many valid reasons to conduct backseat detentions, the widespread use of backseat detentions without individualized justification constitutes a pattern or practice of unreasonable seizures under the Fourth Amendment. Temporary detention of an individual during the stop of an automobile, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' under the Fourth Amendment. *Whren*, 517 U.S. at 809-10; *Torres v. City of Madera*, 524 F.3d 1053, 1055-56 (9th Cir. 2008) (officers' conduct governed by Fourth Amendment where individual was handcuffed and placed in back of patrol car). In each instance, "[t]he length and scope of detention must be justified by the circumstances authorizing its initiation," and an officer must be able to articulate specific facts and rational inferences drawn from those facts that a person may have committed or is about to commit a crime. *Pierce v. Multnomah Cnty., Or.*, 76 F.3d 1032, 1038 (9th Cir. 1996); *United States v. Garcia-Acuna*, 175 F.3d 1143, 1146 (9th Cir. 1999) (quoting *United States v. Sutton*, 794 F.2d 1415, 1426 (9th Cir. 1986)). LASD routinely fails to make constitutionally required determinations of criminality, threat, or risk when placing individuals in the rear of patrol cars. Improper use of this tactic undermines LASD legitimacy by frightening and humiliating the people that deputies are sworn to serve and reflects an apparent presumption that every person encountered presents a criminal threat.

Not only is the indiscriminate use of backseat detentions unconstitutional, it also violates LASD policies that mandate judicious use of this practice. LASD's COPS Bureau Training Bulletin, reissued in January 2012 (and containing the same guidance provided in March 6, 1999), describes the backseat detention as "a tactic used by deputy personnel who believe the person they are detaining may pose a threat or be an escape risk." The Bulletin continues to state that backseat detentions "should only be used when necessary and fully justified, not as a matter of routine or convenience," and that it is a technique that "should be used primarily as a precautionary measure by single deputy units when conducting vehicle searches or other investigations on detained persons." A Palmdale Unit Order from 2001 notes that backseat detentions are "not generally appropriate for traffic citation issuance or non-investigative contacts." If the deputy is able to obtain additional LASD support right away, backseat detention should not be used "absent some compelling justification." The Palmdale station order provides further detail about what deputies should consider a compelling justification, such as when an individual is suspected of a crime involving violence; the subject poses a threat to officer safety; or to prevent a possible flight. Recognizing the constitutional consequences of abuse, LASD's Advanced Training Bureau Bulletin warns, "If the procedure is overused, or used in inappropriate situations, the courts may take this valuable tool away from law enforcement."

---

[14]     Patrol logs document 391 backseat detentions. Deputies are not required to document when they conduct a backseat detention, so this number likely undercounts backseat detentions significantly.

EXHIBIT A

While LASD's backseat detention policy and training bulletin could benefit from some refinement, they provide generally good guidance about limiting the use of this tactic. However, even though the Department has had these directives for quite some time – since as early as 2001 and re-issued as recently as January 2012 – our review indicates that Antelope Valley deputies have, for years, routinely ignored this guidance. One sergeant told us directly that deputies use backseat detentions as a matter of course, which was corroborated through our review of documents and interviews with community members. Deputies even conducted improper backseat detentions while in the presence of Civil Rights Division representatives, about which we immediately informed LASD leadership. The following examples illustrate the pattern and practice of inappropriate backseat detentions that we discovered through our review of LASD policy, civilian complaints (otherwise known as SCRs), use of force reports, interviews with LASD deputies and leadership, and information provided to us by community members.

During one encounter, according to an LASD use of force investigation, two Palmdale deputies handcuffed and detained a domestic violence victim in the back of a patrol car for no articulated reason. The apparently unjustified detention of the victim agitated the domestic violence suspect, which then led to a physical struggle between the suspect and deputies, who deployed a Taser on him. This use of force in turn upset the victim, who began to kick the window of the patrol car. In response to the kicking, a deputy sprayed the victim in the face with O.C. spray. Not only did the backseat detention itself constitute an unlawful seizure, but it may have been a poor choice tactically, as it escalated the situation and led to risk of injury to the deputies, two significant uses of force, and vehicle damage, all of which may have been entirely avoidable.

According to another LASD investigation resulting from a civilian complaint, two Palmdale deputies stopped a car for a broken license plate light and detained all three passengers without apparent justification. All three people were asked to exit the car, and two of them — the driver and a Latino male — were detained in the backseat of a patrol car while the deputies checked their identification. According to the complaint, one of the deputies sarcastically commented he was surprised that the Latino male had valid identification. The investigation demonstrated that the deputy failed to document any "compelling justification" for the backseat detention despite policy requiring an explanation if two or more deputies are present. In fact, the deputy failed to document that the backseat detention had even occurred at all. The civilian complainant agreed to resolve the complaint with the deputy through informal dispute resolution, so LASD never formally determined whether the deputy's conduct was outside of policy.

In a similar incident, a Lancaster deputy conducted a pat down search and backseat detention of a young African-American female after stopping her for failing to use her headlights and having tinted windows. The deputy removed the woman from the car, directed her to place her hands behind her back, and conducted a pat down search. The deputy then placed the young woman into the backseat of the patrol car. During the complaint investigation, the deputy stated that the pat down and backseat detention were justified because the young woman became upset. The deputy offered no facts that would explain how the woman's emotion — a reasonable human reaction — rose to such a level that necessitated the deputy's intrusive actions. Rather, the deputy's decision to order the driver to exit her car, pat her down, and then endure backseat detention without adequate justification would be expected to escalate the interaction unnecessarily. Unjustified backseat detentions contribute to tension and diminished trust

EXHIBIT A

between Antelope Valley deputies and the community. LASD does appear to be sensitive to the fact that backseat detentions can evoke strong reactions from the community, and has issued guidance cautioning deputies to perform justified backseat detentions with "courtesy, respect and professionalism." If a detention does not result in an arrest, the policy requires deputies to "explain to the detainee again the reason for the backseat detention," "request a field sergeant if the detainee wishes to complain," and make a detailed record log entry specifically noting the backseat detention. These built-in accountability and risk management procedures, when applied, could help to ensure that deputies use the tactic judiciously and that civilians are treated respectfully.

We laud LASD for the steps it has taken to eliminate unlawful backseat detentions since we alerted it to this practice at the end of our on-site visit. But LASD's policies regarding backseat detentions have been routinely ignored for years with impunity. Sustained supervision, and accountability for officers who persist in conducting unlawful backseat detentions, will be necessary to reverse this deeply entrenched practice. In sum, as in other areas we reviewed, LASD must do more to ensure that deputies adhere to policies, and that supervisors and commanders provide appropriate redirection, guidance, and accountability when errant conduct occurs.

### 4. Deputies Detain Individuals Without Adequately Articulating Reasonable Suspicion

The Fourth Amendment requires deputies to have reasonable suspicion before detaining individuals. *See e.g., Montero-Camargo*, 208 F.3d at 1129. LASD policy additionally requires each deputy to articulate the factual basis for each pedestrian or vehicle stop in his or her patrol log. The policies specifically state that nervousness, furtive gestures, prior arrests, high crime area, or the fact that the suspect does not appear to fit the general ethnic make-up of the area are not factors sufficient to demonstrate reasonable suspicion. Our review found, however, that many log entries do not describe facts sufficient to support the predicate of reasonable suspicion required for a detention under *Terry*, or other legal authority. Deputy log entries instead provide conclusory statements such as: "persons acting suspiciously," "925" (internal LASD radio code for "person acting suspiciously"), or "hanging out in narco area."

The apparent lack of concern for articulating any basis for suspicion for even more intrusive detentions was striking. For example, a deputy ran a warrant check of two individuals in a high narcotics area, with no additional facts noted, except that it turned out the individuals were "just talking." Behavior that constitutes "common conduct exhibited by the population at large" is insufficient to establish reasonable suspicion. *United States v. Adler*, 70 F.3d 121, at *1 (9th Cir. 1995) (unpublished) ("hunching" over in an open-air phone booth is not uncharacteristic public behavior and insufficient to establish reasonable suspicion).

The general lack of further detail in patrol log entries, such as a corresponding call for service or deputy observation of crime, indicates that deputies are detaining individuals without articulating legal authority. This is especially problematic when considered in the context of our findings that African Americans and Latinos are stopped and/or searched at a disproportionate rate, and our finding of unconstitutional backseat detentions.

LASD requires that all vehicle and pedestrian stops be recorded in a patrol log.[15] Field Operations Directive 00-04 specifically requires that the narrative portion of the logged incident include the name, sex, race, and age of the involved person, the reason for the contact, and a brief description of the action taken by deputies. Unit commanders are also supposed to ensure that the patrol logs are reviewed in a timely manner and that appropriate corrections are made. We commend LASD for requiring documentation that provides such useful information and data to assess the propriety of encounters that occur between deputies and civilians. However, LASD does not appear to make meaningful use of this information itself in that it does not regularly review or audit the narratives to assess the reasonableness or lawfulness of deputies' stops. At least one training deputy told us that supervisors only review trainees' patrol logs with any regularity. Additionally, the narrative portion of the entries typically just records how a contact was cleared (or what citation or arrest resulted). This does not allow a supervisor to determine whether a stop was justified before the eventual citation or arrest. As in the other areas we reviewed, we found that in order to give meaning to these policies and procedures, LASD must ensure that its supervisors supervise more closely.

### 5. Deputies Use Unreasonable Force

While society entrusts law enforcement officials with the authority to use force, the Constitution places limits on this power to ensure that it is not abusively used against the very people that officers are sworn to protect. Unfortunately, based on our review of the 326 Lancaster and Palmdale use of force reports originating between August 1, 2010, and August 1, 2011; all 180 civilian complaints filed during the same period; policy and training materials; and interviews with Antelope Valley deputies, command staff, and community members, we find reasonable cause to believe that LASD is engaged in a pattern or practice of unreasonable force in the Antelope Valley.

Although we found that force was used unreasonably in a number of ways, we focus below on two practices that were particularly prevalent: the use of unreasonable and/or retaliatory force against handcuffed individuals and the unnecessary use of fist strikes to the head and face of handcuffed individuals. We uncovered numerous instances in which the inappropriateness of the force used was readily apparent from the face of the report, and each incident mentioned in this section is based upon the involved deputy's own words describing the event.

Further, we found deficiencies in how the Antelope Valley stations implement the use of force review systems that LASD has put in place, deficiencies that compromise LASD's ability to effectively respond to problematic uses of force by Antelope Valley deputies. While LASD supervisors in the Antelope Valley appeared willing to offer guidance or mild critiques of officer uses of force, we found a pattern of reluctance to hold deputies accountable even when they

---

[15] A patrol log, otherwise known as a Deputy Daily Worksheet (DDWS), compiles a deputy's daily entries from his Mobile Digital Terminal (MDT). Also known as Mobile Digital Communications System, these terminals are located in patrol cars and some designated locations within the stations. LASD is transitioning to Mobile Digital Systems, which is for all practical purposes here the same system as MDT. An MDT entry serves as the only record for *Terry* stops that do not result in an arrest or use of force.

commit serious violations of LASD policy, including significant uses of unreasonable force.

        a)     Deputies Use Unreasonable Force Against Handcuffed Individuals

            (1)     Handcuffed Individuals in Patrol Cars

In approximately 18 of 326 use of force incidents, we found that deputies used force against handcuffed individuals that, based on LASD's own reports, appeared unreasonable. Force used against handcuffed individuals should be rare and, when it does occur, should be subject to close scrutiny. This is because a handcuffed individual has usually surrendered, and in any event is restrained, greatly diminishing any immediate threat to the safety of the officers or others. *See Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (the "most important" factor is whether suspect posed "immediate threat to safety"); *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 961 (9th Cir. 2001) (when "an arrestee surrenders and is rendered helpless, any reasonable officer would know that a continued use of the weapon or a refusal without cause to alleviate its harmful effects constitutes excessive force."); *Deorle*, 227 F.3d at 1281 (an officer's "desire to resolve quickly a potentially dangerous situation" cannot alone justify the use of force that may cause serious injury). We found Antelope Valley deputies use force against handcuffed individuals with surprising frequency and under circumstances where the force appears clearly unreasonable. It is notable that in the sole case that was administratively investigated (and is currently being criminally prosecuted) out of the 180 civilian complaints received in the Antelope Valley over a year, the allegations involve the use of force against a man who was handcuffed while being transported in the backseat of a patrol car. Also, 15 of these 18 uses of force against handcuffed individuals involved African-American or Latino individuals. *See Arlington Heights*, 429 U.S. at 265-66 (discriminatory impact can sometimes show discriminatory intent).

Antelope Valley deputies frequently rationalize the use of force against handcuffed individuals as a necessary control tactic for individuals who threaten to, or are, kicking out the windows of patrol cars. But the force used in these situations does not appear to be a reasonable response to the risk of property damage since other options were available to address the harm. Several use of force incidents demonstrate the fact that supervisors provide deputies with guidance on an ad hoc basis in their informal debriefing sessions on how to prevent detainees from damaging vehicles without resorting to higher levels of force. For example, supervisors have recommended that deputies consider using the hobble; calling a field supervisor to the scene before transporting the individual to the station; or properly placing seat belts on subjects so that they are not able to kick the windows as easily. While this supervisory direction is laudable, as in other areas, we found that accountability for repeatedly failing to use reasonable alternatives rather than unreasonable force, was largely absent. In fact, our review revealed that one deputy used unreasonable force against a handcuffed subject at least three times and was not held accountable for this improper tactic.

            (2)     Retaliatory Force Against Handcuffed Individuals

We find that LASD deputies in the Antelope Valley use unreasonable force in retaliation for being treated disrespectfully. Deputies routinely use OC spray against individuals who act

out in nonviolent ways, even when the individual is handcuffed and does not pose a threat. The language used by deputies to describe these incidents in use of force reports often sounded so canned that reviewers had to check to confirm that they were not rereading reports they had previously reviewed. As reprehensible and provocative as some expressions of disapproval towards officers are, including profanity, racial slurs, or spitting, such behavior cannot alone justify using force. Properly trained police officers are expected to exercise a higher degree of restraint than would the average citizen. *See Houston v. Hill*, 482 U.S. 451, 462 (1987); *see also Johnson v. Campbell*, 332 F.3d 199, 213 (3d Cir. 2003) (detainee's words "son of a bitch" to police officer were not fighting words). Indeed, the credibility of law enforcement rests in part upon the belief that officers respond based on the rule of law, not upon emotional impulse, no matter how justified those emotions may be.

The following use of force incidents illustrate the consistent pattern in which deputies use force unreasonably in retaliation for a perceived threat that has already passed. In one instance, a deputy OC-sprayed multiple times a handcuffed and hobbled man after the man spat at the deputy. The deputy successfully applied a hobble restraint to the legs of a handcuffed man in the backseat of a patrol car after he began kicking the car window. When the man later began to spit at the deputy from the backseat of the car, the deputy stopped the vehicle, opened the back door, and warned the man that he would be pepper sprayed if he continued to spit. The man then spat at the deputy again, and the deputy sprayed him with multiple bursts of OC spray, each lasting for approximately two seconds. The deputy's actions constituted excessive force because the individual – whose arms and legs were completely restrained in the rear of the vehicle – did not pose an immediate threat to the safety of the officer or the public warranting use of OC spray. In a separate incident, a handcuffed man spat at a deputy while the deputy was standing the man against a wall in the Lancaster jail lobby. In response, the deputy immediately hit the man on the side of the face with an open hand. The deputy offered no facts that would objectively warrant this level of force and it appears the force was prompted by the spitting.

LASD's guidance on this topic is problematic and may help explain the retaliatory force incidents we reviewed. The guidance justifies the use of deputies' force to *prevent* spitting because it is a "battery" and viewed as an "attack," and provides that a heel palm strike is an appropriate use of force to re-direct or stop such an attack. The guidance does not make clear that force may not be used *after* the threat has dissipated. Furthermore, in its summary, the guidance takes an aggressive tone that may encourage retaliatory force: "Remember that the word 'force' is part of the very title of our profession: Law Enforcement." The aggressive tone of the guidance is consistent with a recurring theme that we observed in reviewing use of force reports and interviewing community members — that deputies unnecessarily escalate situations to unreasonable uses of force that are not necessary to obtain compliance from the subject, and that LASD practices, and in some instances policies, condone this. *See Deorle*, 272 F.3d at 1282. It appears that LASD guidance on appropriate deputy response to spitting is being conflated by deputies with the situations described above, where the deputies' force occurred after any perceived threat occurred, and where the force was simply retaliatory and could not be justified as preventing further risk.

        (3)    Unreasonable Head and Face Strikes of Handcuffed Individuals

Punches to the head or face can cause severe injuries to the individual, and additionally carry a high risk of injury to the deputy using such force. Deputies should only use this extremely dangerous level of force where lower force levels are not available or are ineffective, especially when the individual is already handcuffed and less severe use of force alternatives are available. *See Graham*, 490 U.S. at 396. LASD's Deputy Field Operations Manual and Defensive Tactics Manual state that "personnel are discouraged from striking an attacker's head with a fist," and encourages deputies "to use an open hand palm heel strike to lessen the potential of cutting injuries." LASD policy prescribing situational uses of force essentially ranks head strikes as akin to deadly force, stating they are appropriate only when a subject's behavior is "likely to result in serious injury or possibly in the death of a person." Punches to the face, as opposed to the head, are not considered deadly force, but this poor tactic can result in more injury to a subject and a deputy. The pattern of head and face strikes against handcuffed individuals we observed in LASD appears unreasonable under the Fourth Amendment. The following incidents are illustrative of this practice.

In one incident, Palmdale deputies used excessive force when they delivered fist strikes to a man's head while transporting him, already handcuffed, to the station. When one of the deputies attempted to assist the man out of the patrol car, he began to kick at the deputy, who then sprayed him with OC spray. According to the use of force report, the deputy believed that the man was attempting to lunge towards the door of the car to escape or further assault the deputy. In response to this behavior, the deputy punched the man once with his fist to the side of the head and then pushed the man back into the patrol car. While the man continued to kick the deputy, the deputy struck the man two to three times under the ear with elbow strikes. The deputy then grabbed the man's legs and pulled him out of the car. Even giving the deputy the benefit of the doubt that he believed that the handcuffed man was either a serious flight risk or safety risk, the use of this high level of force against a handcuffed man in the backseat of a patrol car was unreasonable and unnecessary to gain control of him.

A Lancaster deputy punched another handcuffed woman in the jaw while three other deputies held her down. The individual had been arrested for driving under the influence of alcohol and, while handcuffed, was placed in a holding cell without being properly searched for weapons or contraband. A sergeant then directed three LASD deputies and a custody assistant to conduct the search. Upon entering the cell, the woman yelled, refused to comply with orders, and began to kick her legs at the sergeant and one of the deputies. Two deputies secured the woman's legs as a third deputy held her on the mat. During this search, the woman continued to yell and jerk her head around. One of the deputies who had secured her legs was kneeling on the woman's back and struck her once on the jaw with his fist. Though the woman was exhibiting resistive behavior, a punch to the face under the circumstances was unreasonable, especially when considering the fact that four deputies – each 200 pounds or more – were holding down one woman who weighed much less than 200 pounds.

LASD recognized that this use of force was problematic. During the "training and tactical review" of this force incident, the supervisor advised the deputy who had punched the woman of the possible hazards associated with using personal weapons and striking boney areas of the body. The watch commander counseled the deputy regarding available options when dealing with handcuffed individuals and spoke with him regarding his duty to control emotions

during stressful circumstances. This informal counseling session was documented in a Unit Performance Log Entry, however, no formal discipline or accountability measures resulted from this incident. Two months later, a Training Unit lieutenant also reviewed the incident, and found that "continued control holds may have been a better choice," and that the "use of a strike to the face of a female handcuffed drunk was not likely the best option available." He continued by noting that an uninvolved individual's review of the video could result in a questioning of "the necessity of the 'punch' to the face." This review should have resulted in formal finding that the use of force violated LASD policy and led to formal discipline accordingly. The tepid language used by multiple reviewers to describe a clear instance of unreasonable force reflects the reluctance we found to hold deputies accountable when they commit even clear violations of LASD policy.

                        b)      Use of Force Related to Obstruction Charges Raises Concerns

When an officer uses force and arrests someone only for obstruction of justice, it raises the question of what legitimate law enforcement objective was being obstructed. Because of the potential nexus between obstruction and similar arrests and improper uses of force, these uses of force warrant special attention. LASD has been on notice of the need to focus on this issue since at least 2010, when LASD's Special Counsel issued a report on obstruction arrests and related use of force in the Antelope Valley. The Special Counsel noted that Lancaster and Palmdale had a high rate of obstruction arrests when compared to the rest of LASD, with the number of obstruction arrests at Lancaster and Palmdale stations accounting for 25% of all obstruction arrests by LASD and exceeding the number of obstruction arrests for every other station. Lancaster and Palmdale also reported disproportionately high proportions of African Americans arrested for obstruction. The report noted also that, based on 2007 data, 30% of Palmdale's arrests where obstruction was the highest charge involved a reported use of force, and 24% of Lancaster's obstruction arrests involved a reported use of force.

We examined use of force reports from August 2010 to August 2011 in which the subject was charged only with the following and no other crimes: resisting arrest or obstructing an officer in his or her duties, whether a felony, California Penal Code (PC) § 69; misdemeanor, PC § 148(a)(1); and battery on a peace officer or other public officer without the infliction of injury, PC § 243(b)). Of all the use of force reports reviewed, approximately 22% fit into this category.

Perhaps most strikingly, we found that 81% of the uses of force we reviewed where the only charge was obstruction-related involved targets who were African American or Latino. For the 25 felony obstruction-only arrests, 88% involved victims who were people of color. This is an extraordinarily disproportionate number of obstruction charges involving use of force against people of color and warrants close attention by the Department. *See Arlington Heights*, 429 U.S. at 266 (intent may be established by "clear pattern, unexplainable on grounds other than race").

The 2010 Special Counsel report recommended that supervisors "carefully scrutinize these arrests to ensure that they are not being misused," and LASD drafted a new directive in December 2011 to address some categories of obstruction arrests. We commend LASD for developing a new directive that provides guidelines for addressing resistance and obstruction arrests, and believe that this directive, if implemented properly, will help ameliorate the issue.

EXHIBIT A

The information we reviewed indicates that LASD must continue to review these types of arrests, and also pay particular attention to force used during obstruction arrests of African Americans and Latinos.

### B. The Antelope Valley Stations' Civilian Complaint Process Undermines Accountability and Reflects Bias

To LASD's considerable credit, its policies reflect an understanding that for policing to be most effective, the community must see the police as legitimate partners in a cooperative effort to prevent crime. LASD calls this approach "Trust-Based Policing," and describes this as "the use of police resources in a manner that includes the public participation in the mission of public safety." LASD understands that "[t]he purpose of public trust policing is to provide a higher level of public safety" and that "[i]t is incumbent upon law enforcement to recognize that without the full faith and cooperation of the public, the mission of public safety is severely impaired."

LASD policies further recognize that this police-community partnership depends in part on fair treatment, and how the department responds when people complain about mistreatment. As described in the introduction to LASD's Service Comment Report (SCR) Handbook:

> Public trust is vital to our mission, and rests on Department responsiveness to community needs and expectations. To foster public confidence in the Department and to promote constructive communication, commendations and complaints must be received with equal professional interest and courtesy, and given appropriate supervisory attention. This is a vital component of Trust-Based Policing.

In practice, however, the misconduct complaint investigation systems in place in the Antelope Valley fails to live up to these words, undermining community trust in and respect for the LASD through an unacceptable tolerance of biased and discourteous conduct. LASD gives too little credence to claims of misconduct originating from the community, and these claims are not being recorded in a manner that facilitates meaningful assessment of individual and unit-wide conduct.

Our assessment of LASD's handling of misconduct complaints is based not only on conversations with scores of community members, but also our review of civilian complaints, administrative investigations, use of force investigations, and policy handbooks on investigative processes, discipline, and discipline alternatives. Our analysis of these sources indicates that LASD's accountability systems fail to appropriately classify and therefore review serious civilian complaints; fail to adequately investigate or track discriminatory policing complaints; use inappropriate techniques while conducting civilian complaint investigations; and fail to identify and provide appropriate mentoring to deputies. These failings undermine Antelope Valley deputies' legitimacy and, as LASD recognizes, risk making LASD less effective at preventing crime than it would be if it had greater trust and cooperation within the Antelope Valley communities most in need of public safety protection.

1.    **LASD Complaint Classification Undermines Effective Accountability**

Our review showed that, at least in the Antelope Valley, LASD overuses the service review process in a manner that undermines accountability. LASD's Antelope Valley stations have a practice of resolving nearly all civilian complaints of misconduct at the unit level through "service reviews" rather than as formal administrative investigations — in the one-year period we reviewed, all but one of the civilian complaints of misconduct were resolved as service reviews. Even misconduct allegations that are required by policy to be investigated by LASD's Internal Affairs Bureau (IAB) are instead handled as service reviews. The distinction is significant, as discipline may not be imposed when a complaint is resolved via service review, even where the misconduct is found to violate LASD policy. In addition, service comment review resolutions are tracked differently and in a manner that makes it more difficult to identify and respond to problematic trends in officer conduct.

LASD's policy manuals lay out a comprehensive process for determining how to handle civilian (*i.e.* "externally generated") complaints.[16] When a civilian makes a complaint of deputy misconduct, a Watch Commander must immediately complete a "Service Comment Report" (SCR) to document the complaint.[17] The Unit Commander, which for the Lancaster and Palmdale stations is a Captain, reviews this information and determines whether to conduct a service review; conduct a unit level administrative investigation; request an IAB administrative investigation; or request a criminal investigation. If there is insufficient information to make this determination, the Watch Commander must conduct a service review and report back so that the Captain can decide how to proceed. If, during the course of a service review, it becomes evident that the allegation is more serious than expected, the Watch Commander must stop and consult with the Captain regarding how to proceed.

LASD's policy manuals provide some guidance about whether a complaint should be resolved via a service review or administrative investigation. LASD policy states that the nature and seriousness of the allegation, the potential for employee discipline, and the deputy's performance history are "potential factors" the Captain may consider in deciding whether to resolve the complaint via review or investigation. Policy also states that a case should be assigned to a Watch Commander for service review where, if true, the violation can be addressed through non-disciplinary means, such as training, counseling, or mentoring. Administrative investigations must be conducted where an allegation, if true, would require formal discipline.

---

[16]    LASD's complaint investigation policies are set out in MPP 3-04 and in its Administrative Investigation and Service Comment Report Handbooks. While in many respects quite thoughtful, these three sets of directives are sometimes inconsistent, and, as discussed below, require clarification and strengthening in some aspects.

[17]    Service Comment Reports document commendations and service complaints, as well as "personnel" complaints, which are defined as external allegations of misconduct against a member of LASD that would amount to a violation of law or LASD policy. A service complaint is an external communication of dissatisfaction with an LASD "service, procedure or practice" that does not involve misconduct by a particular employee.

While most administrative investigations are conducted at the unit level, a Captain may request that IAB conduct the administrative investigation, based on the following criteria: allegations that, if founded, may result in discharge; allegations involving witnesses spread over a large geographic area; allegations involving incidents of high media attention; allegations involving subjects who are supervisory personnel; allegations concerning sexual harassment; allegations concerning racial discrimination; allegations concerning gender discrimination or hostile work environment; domestic violence issues; and workplace violence. Some allegations must be conducted by IAB, including allegations regarding racial discrimination and those that, if founded, may result in discharge.

LASD's loose guidance for classifying misconduct complaints places broad discretion for accountability at the station-level in a number of respects. First, and most significantly, station Captains have wide latitude to decide at the outset whether there is even a potential for a misconduct complaint to result in discipline, as service complaint reviews "cannot result in any action beyond counseling, instruction, or informal verbal admonishment."[18] As noted elsewhere, during the one-year period we reviewed, Captains precluded the possibility of discipline for every misconduct complaint filed in the Antelope Valley except one.

In addition, the prevalence of service reviews means that inquiries into civilian complaints of officer misconduct are kept within the Antelope Valley. The Antelope Valley stations tend to use administrative investigations for clear *internal* policy violations, such as a failure to perform to standards, but not to resolve external misconduct complaints. With most complaints being handled as service reviews, LASD's IAB has a much smaller role in reviewing or providing centralized oversight to the civilian complaints received by the Antelope Valley stations.

---

[18]    By LASD policy, service reviews may be resolved with one of the following dispositions: (1) conduct was reasonable; (2) conduct could have been better; (3) conduct should have been different; (4) unable to make a determination; and (5) conflict resolution. LASD directives provide this additional guidance for each potential disposition:

(1) "Conduct appears reasonable" is the disposition used for complaints when review indicates that the employee's actions appear to be in compliance with procedures, policies, guidelines, or training;

(2) "Conduct could have been better" is the disposition used "when the employee's conduct was determined to be within policy and training, but the manner in which the employee handled the contact or incident primarily caused the complaint [or] cases where employees chose less-desirable or effective options between technically acceptable alternatives;"

(3) "Conduct should have been different" is the disposition used "when the employee's conduct was not consistent with policy or training, but not at a level warranting formal discipline;"

(4) "Unable to make a determination" is the disposition used when there is insufficient information to assess conduct or identify employees; and

(5) "Resolved through conflict resolution" is the disposition used when "employee(s) and reporting party participate in adequate discussion or dialogue about all of the reporting party's concerns."

EXHIBIT A

Because of these effects on accountability, including the negligible impact of a service review finding that a deputy's conduct was contrary to policy, it is critical that LASD take care that service reviews are used only as strictly appropriate. Unfortunately we found that the service review process is overused in the Antelope Valley. LASD's Antelope Valley stations effectively have done away with "seriousness" and the deputy's performance history as factors in determining whether a complaint will be handled as a service review or administrative investigation, and handle nearly all complaints as service reviews, even complaints alleging misconduct that could result in discipline (including complaints of force or discrimination), or involving deputies with multiple complaints.

During the year-long period from August 2010 to August 2011, Antelope Valley deputies received 180 civilian complaints of which only one was elevated to an administrative investigation. Thus, of the 180 civilian complaints about Antelope Valley deputies, only one of the complaints could even potentially have resulted in any formal discipline to the deputy, regardless of whether the complaint was substantiated. Of those 180 civilian complaints, 25 related to allegations of racial discrimination (as discussed below), and nine related to use of force. These complaints should have at least been referred to IAB for central tracking and assignment and, by policy, the discrimination complaints should have been investigated administratively. Conversely, all but one of the 25 administrative investigations involving LASD employees that were completed during the one-year period ending August 1, 2011, concerned internal policy violations as opposed to externally-generated civilian complaints.

The impact of this failure to conduct administrative investigations, and thereby preclude the potential for any discipline, is particularly striking considering the types of allegations that were substantiated when they were investigated as service reviews, and the complaint histories of the involved deputies, for example:

- A deputy was found to have engaged in behavior that was inconsistent with policy and training after a civilian complained that the deputy inappropriately contacted a domestic violence victim, whom he had met while on duty, to flirt with her and to try to begin a personal relationship. Given the seriousness of the allegation, the station should have referred this complaint to the Internal Affairs Bureau. Further, during the one-year period we reviewed, this deputy had received an additional complaint, that did not result in discipline, for allegedly telling a female burglary suspect, "Don't think by showing your tits you're gonna get out of this." The deputy was not disciplined because both complaints were kept at the service review level. In addition, despite the similarities between the two complaints lodged against this deputy, he was not identified as a candidate for the department or unit-level performance mentoring program. (A further description of the performance mentoring program is described below in Section III.C.)

- A training officer and deputy were found to have engaged in behavior that was inconsistent with policy and/or training for improperly citing an African-American driver for tinted windows. The driver alleged that he was racially profiled and asked by one of the deputies whether or not he had just come from jail. The deputy and training officer stated that asking about probation and parole status was a good way to

be able to conduct searches of cars. (This same complaint is described in more detail in Section A.1 above.) For both the training officer and deputy, this complaint was the first of three complaints in a single month. For the deputy, this was one of seven complaints received in an eight-month period. Because this complaint was kept at the service review level, neither employee was disciplined. Nor was either employee identified as a candidate for the department or unit-level performance mentoring program.

- Supervisors often also fail to investigate the full range of allegations referenced by the civilian in his or her complaint. We found several examples of service reviews where a complainant described several allegations, but the supervisor did not formally mark all of those allegations on the complaint form, or investigate them. For example, as described below in Section B.2, we found instances where a complainant specifically alleged that a deputy engaged in racially discriminatory behavior, yet the supervisor's investigation failed to specifically investigate this type of conduct. In another complaint, a civilian alleged harassment and an improper search by a deputy during a traffic stop. However, when the reporting party gave a more fulsome explanation of the incident, he revealed that the deputy also used force by kicking and pushing him, and the supervisor should have additionally categorized the complaint as a force complaint, further investigated the allegation, and categorized the investigation as an administrative investigation since a use of force policy violation could result in discipline.

The Antelope Valley stations' practice of handling complaints of even serious misconduct as SCRs, and of allowing even deputies with histories of civilian complaints to evade being investigated with the possibility of discipline, fundamentally undermines any system of meaningful accountability. It also runs afoul of LASD's own policies meant to ensure that civilian complaints are handled in a manner that engenders trust and community cooperation. LASD reports that the Antelope Valley stations have undertaken efforts to make the civilian complaint system more accessible in response to DOJ's feedback. These efforts are a welcome step that, alongside taking steps to ensure that complaints are classified properly and investigations are conducted appropriately, will help ensure that deputy behavior comports with LASD policy and the federal law, and increase community confidence in LASD.

## 2.    LASD Does Not Adequately Investigate or Track Discriminatory Policing Complaints.

LASD's policies and Core Values strongly prohibit discrimination and bias. LASD's policy against derogatory language explicitly requires that deputies "not use coarse, profane or insulting language nor use threatening or uncomplimentary terms of speech, or use terms which would defame or demean the nationality or culture of any individual." In addition, deputies are not to "intentionally antagonize any person with whom they come in contact and shall treat all persons in a respectful, courteous and civil manner." In spite of these policies, and the Administrative Investigations Handbook's requirement that racial discrimination allegations require mandatory referral to the IAB, the Antelope Valley stations appear to tolerate deputies'

racially derogatory conduct by failing to elevate complaints to the administrative investigation level and failing to hold deputies accountable for policy violations. This has the effect of diminishing and devaluing allegations of discrimination made by civilians.

None of the civilian complaints of discriminatory conduct for the one-year period preceding August 2011 resulted in sustained allegations. Of the 114 Lancaster complaints, we found that 18 involved allegations of discrimination, profiling, or bias on the basis of race or ethnicity, either initially alleged or discovered during the course of the subsequent review.[19] However, ten of the 18 cases were not identified by LASD on the SCR as involving such allegations at all. Of the 66 complaints we reviewed for Palmdale, seven involved allegations of discrimination, profiling or bias, and six of those seven were not marked as "discrimination," and were instead categorized as complaints of "harassment," "discourtesy," and/or "improper tactics." When a complaint is not properly marked as discrimination — by checking a box on the service comment report — the total number of discrimination allegations from the community, or regarding a particular deputy, unit, or behavior, is not accurately reflected in PPI, compromising accountability and risk management purposes. Given the statistical and anecdotal evidence of bias described in the sections above, claims of bias and discrimination should be taken more seriously by the LASD.

We reviewed a number of civilian complaints that should have been handled as administrative investigations because they clearly involved allegations of racial discrimination. In one complaint, a civilian alleged that a deputy called her a "pickaninny." Despite the alleged use of this racially offensive language, the complaint was not marked as a discrimination complaint, and instead was marked as a complaint regarding the more minor issue of discourtesy. Instead of recommending an administrative investigation, the watch commander elected to resolve the complaint by conflict resolution, which is an inappropriate mechanism for dealing with a complaint, such as a discriminatory policing complaint, that could potentially result in discipline. In another service review, a supervisor reviewed a video in which a deputy clearly told the complainant he was talking in "African-American double talk," and still did not elevate the complaint to the level of an administrative investigation. The supervisor asserted that the complainant's reiteration of the comment as "African-American mumbo-jumbo," somehow discredited the allegation of inappropriate language, despite the video recording demonstrating that the deputy in fact used inappropriate language. Our contention here is not that these allegations should necessarily have been sustained; it is that LASD should treat such allegations more seriously.

These two complaints illustrate the severity of misclassifying civilian complaints. Even though these complaints were clearly complaints of discrimination, they were not properly

---

[19]     According to LASD's Policy of Equality, "Discrimination is the disparate or adverse treatment of an individual based on or because of that individual's sex, race, color, ancestry, religion, national origin, ethnicity, age (40 and over), disability, sexual orientation, marital status, or medical condition." Using this definition, we considered allegations to involve "discrimination, profiling or bias" only where complainants specifically alleged adverse treatment, including, among others, derogatory language and profiling on the basis of race or ethnicity.

EXHIBIT A

classified and therefore not elevated to formal administrative investigations, which meant that the deputies would not have been eligible to receive formal discipline had the allegations been founded. If founded, LASD policy states that any use of derogatory language results in a discipline ranging from a written reprimand to 10 days suspension.

The handling of these complaints also demonstrates the high bar civilians must meet when alleging discrimination. Absent an admission or recording, witnessing deputies invariably state that they "did not hear" offensive language, and, as discussed above, the deputy's version is always credited over the civilian's account. Even in the complaint described above, where the supervisor reviewed a video, he only found that the employee's behavior "could have been better." To ensure that LASD sends a consistently strong message that racially biased language will not be tolerated, and to hold deputies who use such language accountable, the Antelope Valley stations must refer all allegations of racially derogatory language to the IAB for administrative investigation and must substantiate complaints where a preponderance of the evidence supports the allegation.

We found evidence that complaints of racial bias among LASD deputies have merit. One supervisor stated directly to DOJ officials that he thought all African Americans who recently moved to the Antelope Valley were gang members. This statement helps explain the view of another African-American complainant who commented that he felt deputies viewed all African Americans as criminals. We heard this same sentiment — of being stereotyped and criminalized — repeatedly expressed during our meetings with African-American and Latino community members.

In sum, LASD's handling of civilian complaints of discrimination in the Antelope Valley is deficient to the point that, rather than acting as an effective accountability mechanism, it reinforces deputy misconduct, including bias. When civilian complaints are very rarely elevated to administrative investigations, and deputies know that the worst practical consequence for improper treatment of an individual is a "should have been different" disposition and non-disciplinary corrective action, then the accountability system fails. LASD's current system for conducting service reviews serves to perpetuate patterns of improper community interactions because it provides no incentive for deputies to behave in accordance with LASD's strong policies prohibiting bias. When assessed within the totality of the circumstances, LASD's failure to appropriately handle discriminatory policing complaints provides evidence of an equal protection violation. *See Arlington Heights*, 429 U.S. at 266.

Ensuring that LASD sends a consistent message about bias through its complaint investigation process will require greater scrutiny of civilian complaints by commanders reviewing complaint investigations; a willingness to send back investigations for more work or to ensure that the findings fit the facts; and the formal administrative investigation of these complaints. LASD leadership in the Antelope Valley also must be vigilant about identifying problematic practices or trends identified in civilian complaints and taking steps to correct such practices and trends.

EXHIBIT A

LASD reported that, in mid-June 2012, virtually all Antelope Valley deputies attended a four-hour racial profiling course taught by the Museum of Tolerance at the Simon Wiesenthal Center. According to LASD, this training exceeds the minimum hourly requirement set by the state Commission on Peace Officer Standards and Training, and limits class attendance to 25 personnel to maximize discussion. Enhancing deputies' racial profiling training is an important preventive measure. As stated above, LASD must also implement accountability backstops to ensure that deputies are held accountable if and when complaints of discriminatory policing are sustained.

### C. LASD's Early Warning and Intervention Systems Do Not Provide Effective Oversight for Antelope Valley Deputies

LASD's data systems and early intervention programs provide the department with an enormous capacity for self-analysis and self-correction. The Personnel Performance Index (PPI) is a sophisticated electronic database that serves as an early identification system to discover problematic behavior trends in deputy conduct. The PPI captures many different performance indicators, among them an employee's administrative investigations, civil lawsuits, uses of force, including lethal force, public commendations, and complaints. PPI data enables invaluable analysis that makes deputy supervision more effective and informs LASD's risk management system. Towards both these ends, the PPI identifies deputies who are eligible for LASD's non-disciplinary Performance Mentoring Program (PMP). Together, PPI and PMP form the basis of a solid early warning and intervention system. However, our review indicated the need for certain updates and modifications to allow it to adequately respond to the systemic problems we found.

LASD should tailor PPI data collection and analysis to address the specific challenges facing the Antelope Valley, and to be responsive to the expressed concerns of the community. As discussed, community members in the Antelope Valley feel that policing by the LASD is unnecessarily intrusive and heavy-handed. This sentiment is consistent with our findings regarding pedestrian and vehicle stops, searches, and arrests. Yet, according to the materials provided to us by LASD, PPI does not track basic stop, search, and detention data. This omission is particularly striking given that LASD's own Special Counsel has repeatedly recommended since at least 2003 that LASD add this data to PPI, and given that other law enforcement agencies, including the Los Angeles Police Department, have incorporated this data into updates of their own early intervention systems. Similarly, the information provided to us by LASD indicates that, while LASD's performance review protocols require consideration of the nature of an employee's assignments when considering whether intervention is appropriate, PPI does not have the same capacity as other early intervention databases to make peer-comparisons between deputies who work similar shifts or assignments, or to compare similar units. It is incumbent upon LASD to use PPI to collect and analyze the data as necessary to address community concerns, especially in light of our findings regarding unconstitutional practices.

Alongside this data enhancement, LASD supervisors, training officers, and training curricula should fully embrace the performance mentoring program as a real opportunity to explore how the culture of their policing has led to strife with the community, and to examine how to truly change the culture of their work so that they can more effectively police and more

meaningfully engage with the community. Unfortunately, as discussed above, our review in the Antelope Valley showed that some potential mentors harbor sentiments that are counterproductive to this effort. This underscores the need for LASD to address the attitudes and values among its supervisors and commanders to ensure that they act as models of appropriate policing behavior.

LASD should also ensure that its Performance Mentoring Program is operated to timely address deputies' mentoring needs. The PMP is a non-disciplinary, "proactive, early intervention program designed to enhance a member's professional performance through guidance and supervision when it is determined the member may benefit from a more structured plan." Alternatively, a unit commander, the IAB, or the Internal Criminal Investigations Bureau may refer potential candidates to the PMP. If an employee is selected for participation in the PMP, the employee will meet regularly with a designated mentor for a period of no less than two years to discuss the employee's progress, ensure that performance objectives of the employee's plan are met, and provide the employee's unit commander with regular written reports.

One significant obstacle to making the PMP fully effective is that it can take months for a deputy to be appropriately considered and begin to receive mentoring. Recognizing this failing, the North Patrol Division[20], which encompasses Lancaster and Palmdale, has implemented a local unit version of the performance mentoring program. We commend LASD's North Patrol Division for taking the initiative to develop a locally based performance program that responds to employee need for closer supervision at an earlier stage than the department-wide PMP would. We further encourage LASD to ensure that it is taking all steps necessary to ensure timely and effective mentoring for its deputies.

Another obstacle to timely and accurate identification of deputies in need of mentoring is that the PPI is only as good as the information it contains. If data on civilian complaints, uses of force, or other indicators are not accurately recorded, then the integrity of the PPI is compromised. We have found this to be the case. In addition to complaint allegations being mismarked in PPI, as described in the above sections, we found misconduct complaints that did not attach to individual deputies because they were improperly marked as "all patrol," "all station," or another aggregate for the "involved employee" category, even where investigation identified a specific deputy, or deputies, as the subject of the complaint. Therefore, LASD Antelope Valley stations should improve the quality of data entered into the PPI.

Overall, LASD has an excellent framework for early warning and intervention already in place. However, LASD does not realize the true value of this resource. Fortunately, LASD has already done the time-consuming and expensive work of putting into place such a system. LASD should make the relatively straight-forward changes described above in order to fully capitalize on this investment.

---

[20]    As of April 13, 2013, the geographic area previously known as Field Operations Region 1 is now called North Patrol Division.

EXHIBIT A

**D.  LASD Has Not Responded Adequately to Community Concerns**

As noted above, effective crime prevention includes partnerships not only with sister agencies like HACoLA, but with community members as well.  In the Antelope Valley, a community with a history of racial tensions, it is also incumbent upon LASD to be aware of the biased attitudes that may be espoused by some individuals in the community to the extent this affects its discharge of law enforcement activities.  LASD policies demonstrate that it recognizes the importance of developing and maintaining trust while protecting the community it serves, and during the course of the investigation, we saw LASD's increasing commitment to responding to the community's concerns.

Yet there is more work to do.  Some recurring patterns specifically identified by community members are captured below.  Though we did not obtain documentation that corroborated these types of community-reported allegations, we believe that the consistency and similarity of these community reports warrant LASD's attention.  While these allegations could be isolated instances of errant behavior, the prevalence of these complaints, especially in the context of our findings above, suggests more patterns of unprofessional, and potentially unlawful, conduct.  *See Arlington Heights*, 429 U.S. at 266 (totality of circumstances can suggest discriminatory intent).

- In the Antelope Valley, the practice of impounding vehicles whose drivers are unable to produce a valid drivers' license has an extreme disparate impact on the African-American and Latino population.  In 2011, there were 3,811 vehicle impoundments in Lancaster, and 1,061 vehicle impoundments in Palmdale.  In Lancaster, 82.6% of these impoundments were of vehicles belonging to African-Americans and Latinos, who only comprise 58.5% of the population.  In Palmdale, 88.9% of the vehicle impoundments were of cars driven by African-Americans and Latinos, who only comprise 69.2% of the population.  The toll that this practice takes on communities of color is particularly troubling given the hundreds of dollars required for release of the vehicle, the impound period imposed, and the fact that it is often difficult to maintain a job or attend school or work training in this part of the County without access to a vehicle.  Though we did not assess the appropriateness of individual vehicle impoundments, given the impact this has on the quality of life for minority residents of the Antelope Valley, and on LASD-community relationships, we urge LASD to use the practice only when necessary to serve a "community caretaking function." Cal. Veh. Code § 22651(h)(1).  A recent California Attorney General opinion provides guidance that cars belonging to unlicensed drivers do not have to be automatically impounded.  Cal. Attorney General Opinion, No. 12-301, May 3, 2012, at p. 15.

- We heard several complaints from Latino small business owners that their calls for service were routinely not addressed in a timely manner.  For example, one Latino business owner of a clothing store alleged that his calls for service are not addressed in a timely manner.  He stated that his business has been broken into nine times over the past four years, but deputies have only responded to his calls

for service twice. A failure to provide basic law enforcement services to certain communities, if substantiated, could potentially rise to the level of a constitutional violation. LASD reported that the Antelope Valley stations have begun working on this issue by comparing 2011 response times on the east-side versus the west-side of Lancaster and Palmdale. In its initial analysis, LASD reported comparable response times on the east and west sides of Lancaster, and attributed longer response times on Palmdale's east side to the higher frequency of routine calls for service. We look forward to a more thorough analysis of this issue, including surveys of the community's opinions about responses to calls for service.

- We heard multiple accounts of probation and parole compliance checks during which Antelope Valley deputies subjected family members and companions to degrading and potentially unlawful conditions. In one particularly egregious instance, an elderly woman was forced to sit in her yard in the winter while deputies conducted a probation compliance check for a family member. This is reminiscent of deputies' treatment of an elderly couple during a 2007 compliance check. We also heard several accounts of deputies searching the companions of probationers or parolees, even though they lacked any suspicion that the companion had engaged in criminal activity.

- We heard multiple accounts of day laborers being cited for loitering while soliciting employment in public places in Lancaster. Solicitation is a form of expression protected under the First Amendment, meaning that there are limitations regarding the restrictions the state can place on an individual's attempts to look for work. *See Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 945 (9th Cir. 2011); *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 828 (9th Cir. 2013). We caution LASD against any activity that unlawfully restricts the rights of day laborers soliciting employment.

- Some Antelope Valley deputies wear tattoos or share paraphernalia with an intimidating skull and snake symbol as a mark of their affiliation with the Antelope Valley stations. Though there are varying interpretations of what these tattoos may symbolize, they provide an undeniable visual representation of a gulf between deputies and the community, and are an unfortunate reminder of LASD's history of symbols associated with problematic deputy behavior. LASD has assured us that the Antelope Valley stations have tried to suppress the skull and snake image while promoting the official, and more appropriate, Antelope Valley symbol. We remain concerned, however, that these unofficial images still appear widely visible throughout the Antelope Valley – just recently, the image was seen on a bumper sticker on a car in the parking lot of the Lancaster's sheriff's station. Because many Antelope Valley deputies both live and work in the Valley, these insignia are perhaps more widely visible within the Antelope Valley than they would be otherwise. We encourage LASD to take stronger measures to dissuade deputies from displaying these symbols, including training to ensure that deputies understand the inconsistent and divisive message sent by deputies' apparent adoption of such insignia, while respecting their First Amendment rights.

We recognize that the Antelope Valley stations have been working to improve their community outreach efforts. We commend LASD for undertaking new community outreach initiatives and for proactively seeking advice on these efforts during the course of this investigation. For example, LASD has committed to improving its community outreach efforts to enhance the level of trust between the Department and the community. In a June 2012 letter to the DOJ regarding LASD's latest reform efforts, Sheriff Baca reiterated that it is the Lancaster and Palmdale captains' responsibility to "re-double their efforts to identify all opportunities to develop trust with community members who may feel less enfranchised, underrepresented by government entities, or simply less heard." Antelope Valley station captains have also developed Community Advisory Committees (CAC). The CACs are comprised of community members who meet with lead station personnel and discuss a range of topics, including deputy-involved shootings, minority relations, voucher program housing, civilian oversight, and community outreach. In Palmdale, the Captain specifically selected minority community leaders to participate in the CAC, several of whom were recently and publicly critical of Antelope Valley law enforcement.

Antelope Valley station leadership has also attended meetings of the Antelope Valley Human Relations Commission, participated in the Café Con Leche Hispanic Talk Radio Program, and met with the League of United Latin American Citizens Board of Directors. We further understand that the Antelope Valley stations, in partnership with the Community Oriented Policing Services, have conducted community surveys in Lancaster and Palmdale to identify neighborhood crime and nuisance problems.

Community members have begun to express their appreciation to DOJ for LASD leadership's recent efforts to engage in meaningful outreach. We also are pleased to hear that community members have had positive experiences working with the new Antelope Valley station leadership, Captain Don Ford and Captain Patrick Nelson. We encourage LASD to continue on this path of developing this collaborative relationship with the community, and to strategize about how best to involve other Antelope Valley personnel, including patrol deputies, in this effort. This concerted effort to engage in community outreach is one important way to begin to remedy the difficult relationship between the Antelope Valley stations and the community. Changing entrenched practices and the culture at the stations will require LASD to continue to work on changes to its practices in the areas of use of force, stops, searches, and arrests, as well as in the accountability systems discussed above.

We also encourage LASD to continue its recruitment efforts of African-American and Latino deputies, especially those who are interested and willing to work in the Antelope Valley, and to review its recruitment, selection, and assignment procedures to determine whether any of these create unnecessary barriers to the increased presence of African-American and Latino deputies in the Antelope Valley. As recently as November 1, 2012, only 21 of the 391 sworn personnel at the Antelope Valley stations were African-American (6.6% of Lancaster's sworn personnel and 6.7% of Palmdale's sworn personnel), and 46 sworn personnel were Latino (22.1% of Lancaster's sworn personnel and 18.6% of Palmdale's sworn personnel). LASD's Antelope Valley stations are in a unique situation because the majority of their sworn deputies both live and work in the Antelope Valley. As a result, we believe it is even more important in

the Antelope Valley that LASD focus on recruiting additional qualified African-American and Latino deputies in an attempt to reflect the increasingly diverse demographics of the communities, and generally improve the relationship between LASD and the Antelope Valley community.

As the stations move to strengthen the bonds with the communities they serve, we urge LASD to redouble efforts to listen to the community openly and to be responsive to the articulated concerns. We caution both LASD and community members against thinking that the deep-rooted cultural divide between LASD and the broader community will change overnight, and we encourage the slow and steady development of relationships that will ultimately mend the relationship between the Antelope Valley stations and many segments of the community.

## VI.  **CONCLUSION**

We are encouraged by the proactive and genuine assistance we received from LASD and Antelope Valley leadership throughout this investigation. As noted throughout this letter, we are further encouraged by the steps that the commanders at LASD Antelope Valley stations have already taken to proactively address the concerns we have already shared with the Department during this investigation, including our concerns about LASD's previous lack of sufficient community engagement in the Antelope Valley. We look forward to continuing to work with LASD to craft sustainable remedies that ensure that LASD's important Core Values and commitment to constitutional policing are embraced by all patrol deputies, and that those values are expressed in all Antelope Valley deputies' daily law enforcement activities. We are confident that we can work with LASD to resolve the concerns outlined in this letter. Our goal for every investigation is to work cooperatively to develop and implement sustainable reform measures. LASD's strong leadership, policies, and existing structures, in particular its two existing forms of civilian oversight, make us confident that we can partner together to tackle the concerns effectively. We urge LASD to help us craft remedies that will make law enforcement efforts in Antelope Valley more effective, while simultaneously restoring the community's confidence in LASD.

Thank you again for your ongoing cooperation throughout this investigation. Please note that this letter is a public document and will be posted on the Civil Rights Division's website. If you have any questions, please contact Jonathan Smith, Chief of the Special Litigation Section, at (202) 514-5393.

Sincerely,

Thomas E. Perez
Assistant Attorney General

EXHIBIT A