Exhibit 15

1   VANITA GUPTA
2   Principal Deputy Assistant Attorney General
    JUDITH C. PRESTON (MD Bar)
3   STEVEN H. ROSENBAUM (NY Bar Reg. #1901958)
4   CHRISTY E. LOPEZ (DC Bar #473612)
    R. TAMAR HAGLER (CA Bar #189441)
5   CHARLES HART (NY Bar Reg. # 4282281)
6   NORRINDA BROWN HAYAT (DC Bar #479640)
    CARRIE PAGNUCCO (DC Bar #1000551)
7   KATHRYN LADEWSKI (MI Bar #P74431)
8   Civil Rights Division
9   U.S. Department of Justice
    950 Pennsylvania Avenue, N.W.
10  Washington, DC 20530
11  Tel: (202) 305-3192
    Fax: (202) 514-0212
12  Email: charles.hart@usdoj.gov
13       norrinda.hayat@usdoj.gov
14  Attorneys for Plaintiff United States of America

15              UNITED STATES DISTRICT COURT

16         FOR THE CENTRAL DISTRICT OF CALIFORNIA

17

18  UNITED STATES OF AMERICA,    )    No. CV 15-03174
                                 )
19          Plaintiff,           )
                                 )
20                               )
                                 )
21      v.                       )
                                 )    SETTLEMENT AGREEMENT
22                               )
    THE COUNTY OF LOS ANGELES    )
23  and THE LOS ANGELES COUNTY   )
    SHERIFF'S DEPARTMENT         )
24                               )
25          Defendants.          )
                                 )
26                               )
                                 )
27  _____)

28

## I.   **INTRODUCTION**

The United States, the County of Los Angeles, and the Los Angeles Sheriff's Department ("LASD") (collectively "the Parties") enter into a Settlement Agreement ("Agreement") with the goal of ensuring that police services are delivered to the people of Lancaster and Palmdale, and the surrounding unincorporated areas, in a manner that fully complies with the Constitution and laws of the United States, effectively ensures public and deputy safety, and promotes public confidence in LASD and its deputies. The Parties also recognize that the County of Los Angeles' law enforcement officers often work under difficult circumstances, risking their physical safety and well-being for the public good.

For these reasons, and noting the general principle that settlements are to be encouraged, particularly settlements between government entities, the Parties agree to implement this Agreement under the following terms and conditions.

The United States has filed a complaint in the Federal District Court for the Central District of California pursuant to the authority granted to the United States Department of Justice ("DOJ") under 42 U.S.C. § 14141 to seek declaratory or equitable relief to remedy a pattern or practice of conduct by law enforcement officers that deprives individuals of rights, privileges, or immunities secured by the Constitution or federal law. The complaint is also filed pursuant to the Fair Housing Act, 42 U.S.C. § 3614(a), which grants DOJ the authority to seek declaratory, equitable, and monetary relief to remedy a pattern of practice of housing discrimination. LASD does not admit or agree with DOJ's findings and conclusions. Nothing in this Agreement will be construed as an acknowledgment, agreement, admission, statement, or evidence of liability of the County, LASD, or any of its deputies or officials under 42 U.S.C § 14141, the Safe Streets Act, Title VI, or the Fair Housing Act. LASD enters into the Agreement because it wishes to ensure that its department is functioning at an exceptional level and that it has positive relationships with all its communities.

# II.   DEFINITIONS

1. "LASD-AV" or "Antelope Valley stations" means the Los Angeles County Sheriff's Department Lancaster Station and Palmdale Station of the Antelope Valley, and these stations' agents, deputies, supervisors, and employees (both sworn and unsworn).

2. "County" means the County of Los Angeles, including its agents, deputies, and employees.

3. "DOJ" means the United States Department of Justice's Civil Rights Division and its agents and employees.

4. "Court" means the United States District Judge for the Central District of California presiding over this case.

5. "Active resistance" means a subject's physical actions to defeat a deputy's attempt at control and to avoid being taken into custody, such as attacking or striking a deputy. Verbal statements, bracing, tensing, pulling away, or fleeing the scene, do not alone constitute active resistance.

6. "Administrative investigations" mean investigations conducted by the Internal Affairs Bureau or Palmdale or Lancaster unit-level investigations. Administrative investigations can result in formal discipline.

7. "Backseat detention" means restraining a person's freedom by placing him or her in the backseat of a patrol car for any period of time.

8. "Community Advisory Committee" means the group of community members currently working with the LASD's Antelope Valley Stations to advise and consult on community related policing issues and assist with the implementation of this agreement as enumerated in Section VII.

9. "Defensive resistance" means a subject's attempts to evade deputy attempts to control, including pulling away from an officer's grasp or fleeing the scene.

10. "Discriminatory policing" means selective enforcement or non-enforcement of the law, including the selecting or rejecting of particular policing

1  tactics or strategies based on membership in a demographic category specified in this
2  Agreement.  Discriminatory policing does not include using race, ethnicity, or any
3  other status in any reliable and recent suspect-specific description.

4          11.    "Effective Date" means the day this Agreement is entered by the Court.

5          12.    "Executive Force Review Committee" refers to the LASD committee that
6  reviews all uses of force requiring a rollout by the Internal Affairs Bureau
7  force/shooting response team.

8          13.    "Force" means any physical effort used to control or restrain another, or
9  to overcome the resistance of another.

10         14.    "Fraud Compliance Check" means search of a voucher holder's home by
11  an agent of the Housing Authority, with or without third parties, including LASD
12  deputies, to determine whether the voucher holder is in compliance with the rules of
13  the Section 8 program.

14         15.    "Full and effective compliance" means achieving both sustained
15  compliance with all material requirements of this Agreement and sustained and
16  continuing improvement in constitutional policing and public trust, as demonstrated
17  pursuant to the Agreement's outcome measures.

18         16.    "Housing Authority" means Housing Authority of the County of Los
19  Angeles (HACoLA).

20         17.    "IAB" means the Internal Affairs Bureau.

21         18.    "ICIB" means the Internal Criminal Investigations Bureau, which is the
22  LASD unit that investigates any conduct where a deputy may be criminally liable.

23         19.    "Including" and "include(s)" mean including but not limited to.

24         20.    "Implement" or "implementation" means the development or putting into
25  place of a policy or procedure, including the appropriate training of all relevant
26  personnel, and the consistent and verified performance of that policy or procedure in
27  actual practice.

28

-4-

1  21. "Investigatory stop" or "investigatory detention" means a temporary
2 restraint where the reasonable person subjected to the stop or detention would
3 reasonably believe that s/he is not free to leave.  An investigatory stop or detention
4 may be a pedestrian, vehicle, or bicycle stop.

5  22. "LEP" means Limited English Proficient, and refers to a person who does
6 not speak English as his/her primary language and has a limited ability to read, write,
7 speak, or understand English.  LEP individuals may be competent in certain types of
8 communication (e.g., speaking or understanding), but still be LEP for other purposes
9 (e.g., reading or writing).

10  23. "MDC" means the Mobile Digital Computer or Mobile Digital Systems
11 (MDS), which is the electronic system where deputies record daily patrol activity.

12  24. "Monitor" means a person or team of people who shall be selected to
13 monitor and report on implementation of this Agreement.

14  25. "North Patrol Division" means the LASD geographic area covering the
15 cities of Lancaster and Palmdale and the surrounding unincorporated areas of the
16 Antelope Valley.  North Patrol Division was previously called Region 1.

17  26. "Personnel complaints" are external allegations of misconduct against an
18 LASD deputy or employee that could be a violation of law or LASD policy.  In
19 contrast, a "service complaint" is an external complaint about an LASD service,
20 procedure, or practice that does not involve misconduct by an LASD deputy or
21 employee.

22  27. "PLE" means Performance Log Entry and refers to the hard copy
23 documentation of supervisory notations about a deputy's performance, including
24 commendations, weaknesses, career guidance, and training recommendations.

25  28. "Performance Mentoring Program" refers both to LASD's department-
26 wide mentoring program as well as the North Patrol Division's mentoring program.
27 These performance mentoring programs identify and assist deputies in need of
28 specialized or additional training, supervision, or mentoring.

29.    "Policy" means regulations, directives, unit orders or manuals, regardless of the name, describing the duties, functions, and obligations of LASD deputies and/or employees, and providing specific direction in how to fulfill those duties, functions, or obligations.

30.    "PPI" means the Personnel Performance Index, which is LASD's early intervention database.  The PPI provides a systematic recording of data relevant to incidents such as uses of force, shootings, commendations, and complaints regarding LASD personnel.  In addition, PPI tracks the progress of administrative investigations, civil claims and lawsuits, and Pitchess motions that are handled by the Department.

31.    "Reasonable suspicion" means articulable facts that, within the totality of the circumstances, lead a deputy to reasonably suspect that a crime has been, is being, or is about to be committed.

32.    "Reportable use of force" means any use of force that is greater than that required for unresisted searching or handcuffing.  Additionally, any use of force which results in injury or a complaint of pain must be reported.

33.    "SCR" means a service comment review, which is the review of an external civilian complaint about an LASD deputy or employee's behavior.

34.    "Section 8" or the "Voucher Program" means the federal Section 8 Housing Choice Voucher Program, which is authorized under 42 U.S.C. § 1437f and funded by the United States Department of Housing and Urban Development (HUD), under which qualifying persons may receive a voucher for a portion of their rental housing costs, which they can use on the open market to obtain housing.

35.    "Seizure" or "detention" occurs when a deputy's words or actions convey to a reasonable person that he or she is not free to leave.

36.    "Settlement Agreement" or "Agreement" means this document, filed as a part of the action, United States v. Los Angeles County et al., Civil Action No. _____.

1      37.    "Shall" or "will" or "agrees to" means that the provision imposes a
2   mandatory duty.

3      38.    "Supervisor" means a sworn LASD-AV employee at the rank of sergeant
4   or above (or anyone acting in those capacities) and non-sworn LASD-AV personnel
5   with oversight responsibility for other deputies.

6      39.    "Use of force" means any physical coercion used to effect, influence, or
7   persuade an individual to comply with an order by a deputy.

8      40.    "Voucher Participant" means a person who is a participant in Section 8.

9                    **III.   STOPS, SEIZURES, AND SEARCHES**

10     LASD agrees to ensure that all investigatory stops, seizures, and searches are
11  conducted in accordance with the rights, privileges, or immunities secured or protected
12  by the Constitution or laws of the United States.  LASD shall ensure that investigatory
13  stops and searches are part of an effective overall crime prevention strategy, do not
14  contribute to counter-productive divisions between LASD and the community, and are
15  adequately documented for tracking and supervision purposes.  To achieve these
16  outcomes, LASD shall implement the requirements below.

17    **A. Investigatory Stops and Detentions**

18     41.    LASD-AV deputies shall only conduct investigatory stops or detentions
19  where the deputy   has reasonable suspicion that a person has been, is being, or is
20  about to be engaged in the commission of a crime.

21     42.    LASD agrees to incorporate the following elements in its training of
22  Antelope Valley deputies:  (1) introducing themselves at the initiation of contact with a
23  civilian when reasonable and practical; (2) stating the reason for an investigatory stop
24  or detention as soon as practicable; (3) ensuring that an investigatory stop or detention
25  is no longer than necessary to take appropriate action; and (4) acting with
26  professionalism and courtesy throughout the interaction.

27     43.    LASD-AV deputies shall not use race, color, ethnicity, national origin,
28  religion, gender, gender identity, disability, or sexual orientation as a factor, to any

1   extent or degree, in establishing reasonable suspicion or probable cause, except as part
2   of actual and credible description(s) of a specific suspect or suspects in any criminal
3   investigation.

4       44.    LASD-AV deputies shall document the following information about
5   patrol activity in their MDC patrol logs:

6       a.  the deputy's name;

7       b.  the date and time of the stop;

8       c.  the location of the stop;

9       d.  the race/ethnicity of each individual stopped, detained, or searched;

10      e.  the disposition of the stop, including whether a citation was issued or an
11          arrest made;

12      f.  a concise narrative articulating specific facts and circumstances that
13          support reasonable suspicion or probable cause for investigative stops and
14          detentions consistent with the radio clearance code (Noting a radio
15          clearance code, or the code for the resulting citation or other result, will
16          not be deemed sufficient articulation of legal support for the stop or
17          search.);

18      g.  whether they asked an individual about his/her probation or parole status,
19          and what the answer was;

20      h.  where a backseat detention was conducted, a narrative articulating a
21          reason, consistent with LASD policy and the law, as to why each backseat
22          detention was necessary, as well as the reasonable suspicion for the
23          investigation;

24      i.  the length of any backseat detention;

25      j.  whether a consent search of an individual was conducted, and if so, the
26          reason for seeking consent; and

27      k.  whether a vehicle was impounded and the justification for the
28          impoundment.

1      45.    LASD-AV deputies shall use accurate and specific descriptive language
2  and not rely solely on "boilerplate" or form language in any reports describing factual
3  circumstances of investigatory stops, detentions, and searches.

4      46.    LASD-AV shall collect and analyze data related to searches based on
5  probation or parole status.  LASD shall assess the efficacy of this tactic and its impact
6  on the community and make policy changes accordingly.

7      47.    LASD will revise its policy and training about backseat detentions to
8  ensure that they only occur when a LASD-AV deputy has individualized reasonable
9  suspicion that justifies the detention and when a deputy can articulate reasonable
10  deputy safety concerns, and to ensure that supervisors understand how to assess the
11  reasonableness of a backseat detention.

12      48.    LASD-AV deputies may not conduct backseat detentions as a matter of
13  course during routine traffic stops or domestic violence situations.  When LASD-AV
14  deputies do conduct backseat detentions, LASD shall continue to require deputies to
15  explain to civilians in a professional and courteous manner why they are being
16  detained in the backseat of patrol cars.  LASD will not permit backseat detentions
17  based on unreasonable or factually unsupported assertions of deputy safety.  Backseat
18  detentions shall not be used except where the deputy has an objectively reasonable
19  belief that the detained person may pose a threat or be an escape risk.  In instances
20  where the backseat detention is premised on weather conditions or the detainee's
21  articulated desire for privacy or personal safety, the deputy will inform the individual
22  that the detention is optional.

23      49.    LASD policy will specify that if an individual complains about being
24  detained in the backseat of a patrol car, the LASD-AV deputy shall call for a field
25  sergeant to respond to the scene and take the individual's complaint.  If the individual
26  does not want to wait for the field sergeant to respond to the scene, the deputy shall
27  provide the individual with a complaint information brochure, currently called
28  "Procedures for Public Comment" and the deputy's business card.

**B. Searches**

50.    LASD-AV deputies shall not use race, color, ethnicity, national origin, religion, gender, gender identity, disability, sexual orientation, or gender identity in exercising discretion to conduct a search, except as part of an actual and credible description of a specific suspect or suspects in any criminal investigation.

51.    LASD-AV deputies shall not conduct arbitrary searches.  The request to conduct a consent search must be reasonable and a deputy must be able to articulate a valid reason under law and LASD policy for initially having stopped the individual.

52.    All LASD-AV deputies equipped with body worn audio or video recorders shall record all requests for consent to search and the individual's response. Where a subject is Limited English Proficient, the deputy shall affirmatively inform the subject in the appropriate non-English language.  LASD agrees to work with Community Advisory Committees (CACs) to conduct outreach to explain to AV residents their right to refuse or revoke consent before or during a search.  This outreach will include a one-page written explanation of an individual's right to refuse or revoke consent.  This written explanation will be posted on the LASD-AV website and provided at community meetings.  An LASD-AV deputy shall immediately notify a supervisor when considering a home search based on consent, and the supervisor shall approve the search before it is conducted.

53.    In conducting searches, particularly searches related to Section 8 compliance checks, LASD-AV will use only the number of deputies reasonably necessary for efficacy and officer safety based on the circumstances of the search.  A supervisor must approve the use of more than two deputies for any consent search.  If a supervisor is not available within a reasonable amount of time, a supervisor will review the documentation or recording of consent as soon after the search as possible.

54.    LASD-AV deputies shall only be involved with a Section 8 compliance check where the housing authority agent has sufficiently articulated legitimate safety concerns.

1      55.    When LASD-AV deputies conduct searches or Section 8 compliance

2  checks and individuals other than the subject of the search are present, the individuals

3  shall not be detained longer than reasonably necessary to conduct the search and secure

4  the area, and the individuals shall not be subject to frisk or search without the legally

5  requisite level of individualized suspicion or probable cause.

6      56.    LASD-AV deputies shall only conduct searches of individuals on

7  probation or parole in accordance with the provisions of this section and when

8  knowledge of a probation or parole search condition has been established.

9  **C. Stop, Search, and Seizure Training**

10      57.    LASD shall provide all Antelope Valley deputies with training on stops,

11  searches, and detentions, including the requirements of this Agreement.  Such training

12  shall be taught by a qualified legal instructor with significant experience in Fourth

13  Amendment issues, and shall:

14          a.  ensure officers understand Fourth Amendment and related legal

15               restrictions on searches and seizures, including consent searches, backseat

16               detentions, probation and parole searches, and Section 8 related activity,

17               as well as additional limitations under LASD policy;

18          b.  address the differences between various police contacts by:

19                  1.  the scope and level of police intrusion,

20                  2.  differences between probable cause, reasonable suspicion,

21                     and mere speculation, and

22                  3.  true voluntary consent;

23          c.  provide guidance on the facts and circumstances in addition to legal and

24               policy limitations, that should be considered in initiating, conducting,

25               terminating, and expanding a stop or search, including consent searches,

26               probation and parole searches, backseat detentions, and Section 8-related

27               activities;

28

     d. incorporate role playing scenarios and other adult-learning mechanisms to facilitate deputy ability to exercise good judgment about whether and how to stop and search individuals; and

     e. provide guidance on stopping and/or searching individuals for discretionary and non-violent offenses, including providing guidance about procedural justice, alternatives to conducting investigatory stops and searches, and the impact on civilians of conducting apparently arbitrary stops and searches.

**D. Supervisory Review**

58.    LASD agrees to implement additional accountability and supervision practices outlined below in the Antelope Valley, and ensure that existing policies are followed, to ensure that unlawful stops, searches, and seizures are detected and effectively addressed.

59.    Sergeants assigned as raters shall regularly audit their assigned deputies' stop, search, and seizure documentation in addition to arrest reports and citations for completeness, accuracy, and legal sufficiency. Sergeants shall audit at least one CAD log for each deputy under their supervision each week.  Sergeants shall conduct further review as indicated by weekly audits, PPI information and other indicia.

60.    If a deputy's stop, search, or seizure documentation does not provide sufficient detail or articulate sufficient legal and policy justification for the action, the supervisor shall review the action with the deputy to determine whether there was sufficient legal and LASD policy justification.

61.    Antelope Valley supervisors and commanders shall take appropriate action to address all violations or deficiencies in stops, searches, and seizures including non-disciplinary corrective action for the involved deputy, and/or referring the incident for disciplinary action.

1    62.    Antelope Valley supervisors and commanders shall track repeated

2  violations of the provisions of this agreement or deficiencies and the corrective action

3  taken, if any, in PPI.

4    63.    LASD agrees to hold accountable supervisors and Antelope Valley station

5  commanders for appropriately and thoroughly reviewing reports and documentation

6  related to stops, searches, and seizures, and requiring deputies to articulate sufficient

7  rationale under law and LASD policy.

8                        **IV.    BIAS-FREE POLICING**

9    LASD agrees to deliver police services that are equitable, respectful, and bias-

10  free, in a manner that promotes broad community engagement and confidence in the

11  department.

12  **A. Bias-Free Policing**

13    64.    In conducting its activities, LASD agrees to ensure that members of the

14  public receive equal protection of the law, without bias based on race, color, ethnicity,

15  national origin, religion, gender, gender identity, disability, or sexual orientation, and

16  in accordance with the rights secured or protected by the Constitution or laws of the

17  United States.  Deputies shall not initiate stops or other field contacts because of an

18  individual's actual or perceived immigration status.

19    65.    LASD agrees to continue to consult with the Museum of Tolerance

20  personnel and others to ensure clear guidance for LASD-AV deputies, through policy,

21  training, and supervision, on prohibited conduct, including selective enforcement or

22  non-enforcement of the law and the selection or rejection of particular tactics or

23  strategies, based upon stereotypes or bias.  LASD agrees to consult with experts to

24  ensure that the manner in which guidance is provided to personnel takes into account

25  the influences of implicit bias and stereotype threat.

26    66.    LASD agrees to effectively communicate with and provide timely and

27  meaningful access to police services to all members of the Antelope Valley

28

1   community, regardless of their limited ability to speak, read, write, or understand

2   English.  To achieve this outcome, LASD agrees to:

3         a.   develop and implement a language assistance plan and policy that

4            complies with Title VI of the Civil Rights Act of 1964, as amended, (42

5            U.S.C. § 2000d et seq.) and other applicable law, and comports with best

6            practices and current professional standards; and

7         b.   ensure that all LASD personnel shall take reasonable steps to provide

8            timely, meaningful language assistance services to LEP individuals they

9            encounter.

10       67.   LASD-AV agrees to incorporate requirements regarding bias-free

11   policing and equal protection into its performance assessment processes, including

12   giving significant weight to an individual's history of sustained bias-related violations,

13   as well as using all available methods to assess the individual's ability to effectively

14   practice bias-free policing.

15       68.   Within one year of the Effective Date, and annually thereafter, LASD will

16   assess all programs, initiatives, and activities involving the Antelope Valley Stations to

17   determine the extent of any disparate impact and to ensure that no program, initiative,

18   or activity is applied or administered in a manner that unlawfully discriminates against

19   individuals on the basis of race, color, ethnicity, national origin, religion, gender,

20   gender identity, disability, or sexual orientation.

21       69.   LASD agrees to utilize experts and the community survey outlined below

22   to study organizational climate and culture in the Antelope Valley stations to aid in

23   developing the requirements of this section.  Personnel will be allowed to

24   confidentially provide information for the study.  LASD will conduct longitudinal

25   climate and culture studies during the course of this Agreement.

26   **B. Training to Promote Bias-Free Policing**

27       70.   LASD will continue to conduct regular training for deputies, training

28   deputies, supervisors, and command staff regarding discriminatory policing.  In

1 | addition to LASD's current state-mandated training for Antelope Valley deputies,
2 | LASD will provide training that emphasizes how bias may occur in law enforcement
3 | activity, and the impact of biased policing on effective crime prevention and police
4 | legitimacy.  This training further shall include:

5       a.  methods and strategies for more effective policing that relies upon non-
6           discriminatory factors;

7       b.  police and community perspectives related to discriminatory policing;

8       c.  constitutional and other legal requirements related to equal protection and
9           unlawful discrimination, including the requirements of this Agreement;

10      d.  the protection of civil rights as a central part of the police mission and as
11          essential to effective policing;

12      e.  the requirements of the FHA, with specific emphasis on discrimination on
13          the basis of race;

14      f.  the existence and impact of arbitrary classifications, stereotyping, and
15          implicit or subconscious bias;

16      g.  instruction in the data collection protocols required by this Agreement,
17          including reasons for data collection/analysis;

18      h.  identification of key decision points where prohibited discrimination can
19          take effect at both the incident and strategic-planning levels; and

20      i.  methods, strategies, and techniques to reduce misunderstanding, conflict,
21          and complaints due to perceived bias or discrimination, including
22          problem-oriented policing strategies.

23      71.    LASD-AV will conduct roll call trainings at least quarterly to emphasize
24 | the importance of preventing discriminatory policing.  These roll call sessions will
25 | include scenario-based discussions of real and hypothetical situations.

26      72.    LASD agrees to utilize experts and the survey below to study
27 | organizational climate and culture in the Antelope Valley stations to aid in developing
28 | these training requirements.

## V.  ENFORCEMENT OF SECTION 8 COMPLIANCE

LASD agrees not to violate the FHA by: (a) making unavailable or denying a dwelling unit to any person because of race; (b) discriminating against any person in the terms, conditions or privileges of renting a dwelling unit, or in the provision of services or facilities in connection therewith, because of race; (c) making, printing, publishing, or causing to be made, printed, or published any notice, statement, or advertisement with respect to the rental of a dwelling unit that states any preference, limitation or discrimination based on race; or (d) coercing, intimidating, threatening or interfering with any person in the exercise or enjoyment of, or on account of having exercised or enjoyed, or on account of their having aided and encouraged any other person in the exercise or enjoyment of, any right granted by the Fair Housing Act.

### A. Housing Non-Discrimination Policy

73.    LASD shall implement a Housing Non-discrimination Policy which reflects LASD's commitment to the requirements of the FHA and explains how to file a complaint of discrimination in housing.

74.    LASD shall provide a copy the Housing Non-discrimination Policy to all sworn LASD-AV deputies.  LASD shall secure signed statements from each individual subject to this paragraph acknowledging that he or she has received and read the Housing Non-discrimination Policy, has had the opportunity to have questions answered, and agrees to abide by the relevant provisions of this Order and the Housing Non-discrimination Policy.

75.    During the term of this Settlement Agreement, within 15 days after each new deputy is assigned to LASD-AV, LASD shall provide the individual with a copy of the Housing Non-discrimination Policy and shall secure the same signed acknowledgment.

### B. Policy Regarding Accompaniment of Section 8 Compliance Checks

76.    LASD shall revise its policies regarding the review of requests from a housing authority for deputy accompaniment on compliance checks in Field Directive

1   12-02.  The revised policies shall, among other things, specifically outline factors to be
2   considered when assessing the need for deputy accompaniment and the number of
3   deputies necessary for accompaniment.

4   **C. Policy Regarding Independent Investigations of Compliance with Section 8**

5         77.   LASD shall institute policies regarding LASD's own independent
6   investigations upon referral of a housing authority of allegations of fraud on the
7   voucher program to ensure that those investigations are not being used to harass
8   residents in their homes or motivate residents to relocate from their homes.  LASD's
9   policies shall be revised to include guidance on proper procedures for sharing
10  information with a housing authority and guidelines for referral of cases for criminal
11  prosecution for fraud based solely on compliance with the Section 8 contract.

12  **D. Fair Housing Reporting and Analysis**

13        78.   LASD shall require all deputies to document all voucher holder
14  compliance checks using stat code 787 pursuant to Field Operations Directive 12-02.

15        79.   LASD shall require all deputies to document each independent
16  investigation for criminal fraud based on voucher holder compliance with the voucher
17  contract using stat code 787.

18        80.   LASD shall require all deputies to document calls, observations, or
19  incidents involving voucher holders using stat code 787.  Nothing in this paragraph
20  shall authorize deputies to inquire into an individual's Section 8 status during routine
21  law enforcement activity.

22  **VI.   DATA COLLECTION AND ANALYSIS**

23        To identify shortcomings, assess improvement, and increase community
24  confidence in LASD's law enforcement activity in the Antelope Valley, LASD agrees
25  to enhance its data collection, analysis, and reporting as set out below.  LASD will
26  develop and implement a protocol for the collection and regular analysis of data to
27  assess whether there are trends and patterns that indicate bias or practices that
28  otherwise run counter to constitutional and effective policing.

1        81.    LASD will continue to collect data currently required by the Statistical

2  Code Guide, Radio Code Book, and related policies and shall create new statistical

3  codes and/or data fields requiring documentation of the following in the MDC patrol

4  log system and Regional Allocation of Police Service (RAPS) database:

5           a.  bicycle stops;

6           b.  backseat detentions;

7           c.  probation or parole stops and searches;

8           d.  consent searches; and

9           e.  vehicle impoundments.

10        82.    LASD will conduct at least semi-annual analysis of, at a minimum, the

11  following AV data:

12           a.  stop, search, contraband seizure, and arrest data, including backseat

13               detentions, probation and parole searches, and consent searches;

14           b.  stops, searches, and/or arrests for discretionary offenses such as

15               jaywalking, crossing against a traffic light, failing to yield right of way or

16               walking on the wrong side of the street;

17           c.  uses of force, including force associated with obstruction arrests and

18               similar violations;

19           d.  arrests for California Penal Codes § 69 (felony obstruction or resisting

20               arrest),    § 148(a)(1) (misdemeanor obstruction or resisting arrest), and §

21               243(b) (battery on a peace officer or other public officer without infliction

22               of injury);

23           e.  vehicle impoundments;

24           f.  civilian complaints, by category; and

25           g.  Voucher Holder compliance checks involving LASD personnel.

26        83.    LASD agrees to base its analysis on accurate, complete, and reliable data.

27  Analysis of this data will include a regression analysis to determine whether law

28  enforcement activity has a disparate impact on any racial or ethnic group.  This

1  regression analysis will control for factors other than race, including but not limited to
2  demographics and crime rates, in describing any potential disparate impact.  The
3  regression analysis will include determining whether, after controlling for alternate
4  explanations:

     a. LASD deputies working in the Antelope Valley are more likely to stop,
       cite, search, or arrest based race or ethnicity;

     b. LASD deputies working in the Antelope Valley are more likely to ask
       persons of certain races or ethnicities for consent searches, and about their
       probation or parole status;

     c. LASD deputies working in the Antelope Valley are more likely to stop or
       search persons of certain races or ethnicities for discretionary and non-
       violent offenses; and

     d. LASD deputies working in the Antelope Valley are more likely to
       impound or store the vehicles of persons of certain races or ethnicities.

84. Through this data analysis, LASD will identify any trends or issues that compromise constitutional policing and respond accordingly.  Appropriate responses may include reviewing and revising any policies or training that may be leading to problematic trends; and assessing whether any practices should be changed to ensure adherence to constitutional requirements and/or more effective policing.

85. This analysis will also determine whether there are reporting districts and deputies with potentially problematic trends and respond accordingly.  LASD will make efforts to incorporate regular analysis of this data into its routine operational decisions.

86. On a semi-annual basis for the first year of the agreement and annually thereafter, LASD agrees to issue a report summarizing the results of the AV data collected, and the steps taken to correct problems and build on successes.  The report will be publicly available in English and Spanish and posted on LASD's website.

## VII.  COMMUNITY ENGAGEMENT

LASD agrees to promote and strengthen partnerships within the community, to engage constructively with the community to ensure collaborative problem-solving and bias-free policing, and to increase community confidence in the Department.  To achieve this outcome, LASD agrees to implement the requirements below.

**A. Community and Problem-Oriented Policing**

87.    LASD agrees to actively participate in community engagement efforts in the Antelope Valley, including participating in local community meetings, making itself available for community feedback, developing the Community Advisory Committees (CAC), and working with the community on the development of diversion programs.

88.    All sworn personnel at the Antelope Valley stations shall actively attend community meetings and events.  LASD agrees to develop a plan for such attendance based on the results of annual community satisfaction surveys and feedback from the civilian panel, discussed below.  The plan shall indicate the number and types of events to be attended on a regular basis and take into account the need to enhance relationships with particular groups within the community, including, but not limited to, youth, and communities of color.

89.    LASD agrees to provide structured annual in-service training on community policing and problem-oriented policing methods and skills for all AV deputies, including station supervisors and unit commanders.  This training shall include:

      a. methods and strategies to improve public safety and crime prevention through community engagement;

      b. scenario-based training that promotes the development of new partnerships between the police and community targeting problem solving and prevention;

      c. leadership, ethics, and interpersonal skills;

1          d.  community engagement techniques, including how to establish formal

2                partnerships and actively engage community organizations, including

3                youth, immigrant, and LGBT communities;

4          e.  problem-oriented policing tactics;

5          f.  conflict resolution and verbal de-escalation of conflict; and

6          g.  cultural awareness and sensitivity training.

7       90.    LASD agrees to ensure that monthly Crime Management Forum meetings

8 with the Assistant Sheriff or his designee and semiannual Risk Management Forum

9 meetings include discussion and analysis of trends in misconduct complaints and

10 community priorities to identify areas of concern, and to better develop interventions

11 to address them. LASD agrees to use techniques such as spatial mapping and scientific

12 deployment analysis to enable the Risk Management Forum to better support and

13 measure community and problem-solving policing efforts.

14       91.    To continually improve police-community partnerships, LASD will assess

15 and report on the impact of community engagement initiatives. LASD will issue

16 public reports on the Antelope Valley stations' community engagement efforts,

17 identifying successes, obstacles, and recommendations for future improvement.

18       92.    LASD agrees to seek the assistance of community advocates in widely

19 disseminating to the public, in English and Spanish, the requirements of this

20 Agreement.

21    **B. Antelope Valley Community Advisory Committees**

22       93.    LASD will continue to support Lancaster and Palmdale's CACs to advise

23 and provide feedback to the LASD's Antelope Valley stations. The panel will

24 leverage the insights and expertise of the community to address policing concerns,

25 including, but not limited to, racial or ethnic profiling and access to law enforcement

26 services, and promote greater transparency and public understanding of LASD. The

27 civilian panel shall be authorized to:

28

1     a. advise the Sheriff and the station commanders on strategies and training

2       to improve community relations, bias-free policing, and access to the

3       civilian complaint system;

4     b. work with the Sheriff and station commanders to establish and carry out

5       community public safety priorities;

6     c. provide the community with information on the Agreement and its

7       implementation; and

8     d. receive and convey to LASD public comments and concerns.

9    94. LASD will memorialize the CACs into LASD-AV policy within 90 days

10 of the Effective Date.  The policy will establish the number of members and a

11 mechanism to ensure that membership is representative of the diverse communities in

12 the Antelope Valley, including members from each station, faith communities,

13 minority, ethnic, and other community organizations. LASD shall include student or

14 youth organizations on the CACs or create a separate advisory committee made up of

15 youth representatives.  LASD will facilitate quarterly public meetings of the CAC to

16 discuss the Monitor's reports and to receive community feedback about LASD's

17 progress or compliance with the Agreement.

18    95. The CAC's reports and recommendations will be posted on LASD-AV's

19 website.  LASD will consider and respond to the civilian panel's recommendations in a

20 timely manner.

21    96. The County will provide the CAC with reasonable administrative support,

22 including meeting space.  In addition, the Monitor may provide advice and technical

23 assistance to the CAC.

24    97. The CAC will not have access to any non-public information regarding an

25 individual deputy or allegation of misconduct or disciplinary action.

26  **C. Community Survey**

27    98. LASD agrees to assist the Monitor in conducting a reliable,

28 comprehensive, and representative annual survey of members of the Antelope Valley

1   community regarding their experiences with and perceptions of LASD and of public
2   safety.

3        99.    To conduct the annual community survey, the Monitor shall retain an
4   individual or entity that shall:

5          a.  develop a baseline of measures on public satisfaction with policing,
6              attitudes among police personnel, and the quality of police-citizen
7              encounters;

8          b.  design, conduct, and analyze baseline and subsequent annual surveys of a
9              representative sample of Antelope Valley residents, law enforcement
10             personnel, Section 8 voucher holders, and detained arrestees;

11         c.  review and consider prior law enforcement surveys in the Antelope Valley
12             and other cities (including recent community policing surveys in Palmdale
13             and Lancaster), as well as current or recent concerns in the Antelope
14             Valley, in designing the survey;

15         d.  engage in informal conversation with Antelope Valley residents, LASD
16             deputies and command staff, and DOJ representatives, and observe
17             community meetings;

18         e.  ensure that the resident and arrestee surveys are designed to capture a
19             representative sample of Antelope Valley residents including members of
20             each demographic category;

21         f.  conduct the survey in English and Spanish as necessary to ensure
22             representation of the entire Antelope Valley community; and

23         g.  formally discuss the survey methodology with LASD supervisors and
24             DOJ, and consider these opinions in development of the initial survey and
25             improvements to subsequent surveys.

26      100.    LASD agrees to cooperate with the design and conduct of the survey by,
27  for example, helping to organize focus groups of deputies and obtaining and providing
28  previous survey instruments and data.

1      101.   The report of the baseline survey and subsequent annual surveys shall be

2  publically distributed and posted on the LASD-AV website.

### VIII. <u>USE OF FORCE</u>

4      LASD agrees to revise its force policies and practices to reflect its commitment

5  to upholding the rights secured or protected by the Constitution of the United States,

6  protecting human life and the dignity of every individual, and maintaining public

7  safety.  LASD agrees to ensure that its accountability measures are implemented

8  appropriately so that Antelope Valley deputies use force only when objectively

9  reasonable, and in a manner that avoids unnecessary injury to deputies and civilians;

10  and to use force as a last resort and de-escalate the use of force at the earliest possible

11  moment.  Deputies and staff shall endeavor to use only that level of force necessary for

12  the situation.  To achieve these outcomes, LASD will implement the requirements

13  below.

14  **A. General Use of Force Policy and Principles**

15      LASD will revise its policies and associated training materials to abide by the

16  following requirements:

17      102.   LASD agrees to continue to prohibit the use of force above unresisted

18  handcuffing to overcome passive resistance, except where physical removal is

19  permitted as necessary and objectively reasonable.

20      103.   Deputies shall use advisements, warnings, and verbal persuasion, when

21  possible, before resorting to force; and de-escalate force immediately as resistance

22  decreases.

23      104.   LASD agrees to clarify that Antelope Valley deputies may not use force

24  against individuals who may be exhibiting resistive behavior, but who are under

25  control and do not pose a threat to the public safety, themselves, or to other deputies.

26  LASD agrees to continue to require that Antelope Valley deputies assess the threat of

27  an individual prior to using force, and emphasize that a use of force must be

28

1  proportional to the threat or resistance of the subject.  If a threat or resistance no longer

2  exists, deputies cannot justify the use of force against a subject.

3       105.   LASD agrees to explicitly prohibit the use of retaliatory force,

4  particularly against subjects who express criticism of, or disrespect for, LASD

5  Antelope Valley deputies.

6       106.   LASD agrees to explicitly prohibit interfering, threatening, intimidating,

7  blocking or otherwise discouraging a member of the public, who is not violating any

8  other law, from taking photographs or recording video (including photographs or video

9  of police activities) in any place the member of the public is lawfully present. Such

10  prohibited interference includes:

11       a.  Ordering a person to cease taking photographs or recording video;

12       b.  Demanding that person's identification;

13       c.  Demanding that the person state a reason why he or she is taking

14           photographs or recording video;

15       d.  Detaining that person;

16       e.  Intentionally blocking or obstructing cameras or recording devices (not

17           including physical barricades or screens used as part of a tactical

18           operation or crime scene);

19       f.  Seizing and/or searching a camera or recording device without a warrant;

20       g.  Using force upon that person; or

21       h.  Detaining or arresting an individual for violating any other law where the

22           purpose of the detention or arrest is to prevent or retaliate for recording

23           police activity.

24       107.   LASD will continue to require, and emphasize in its training, that a hard

25  strike to the head with any impact weapon, including a baton, is prohibited unless

26  deadly force is justified.  Unintentional or mistaken blows to these areas must be

27  reported to ensure that all reasonable care was taken to avoid them.

28

**B. Use of Force Reporting Policy**

108.   LASD agrees to continue to require deputies to report all uses of force above un-resisted handcuffing.  LASD shall continue to require Antelope Valley deputies to completely and accurately describe the force used or observed, including describing in detail the actions of the suspect necessitating the use of force and the specific force used in response to the suspect's actions, any injuries or complaint of injuries, and any medical treatment or refusal of medical treatment.

109.   The use of force reporting policy shall explicitly prohibit the use of conclusory statements without supporting detail, including "boilerplate" language in all statements and reports documenting use of force.  Deputies shall be held accountable for material omissions or inaccuracies in their use of force statements, which may include being subject to disciplinary action.

110.   LASD agrees to continue to require deputies who use or observe force to notify their supervisors immediately following any reportable use of force incident or upon receipt of an allegation of unreasonable or unreported use of force by any deputy. Deputies who use or observe force and fail to report it shall be subject to disciplinary action, up to and including termination.

**C. Use of Force Supervisory Investigations**

111.   For all reportable uses of force, the investigating supervisor shall conduct a thorough investigation.  This investigation will require supervisors to:

      a.  respond to the scene, examine the subject of the force for injury, interview the subject for complaints of pain, and ensure that the subject receives medical attention from an appropriate medical provider;

      b.  identify and collect all relevant evidence;

      c.  canvass for, and interview, civilian witnesses;

      d.  collect statements from witness deputies; and

      e.  review all deputy use of force statements for adequacy, accuracy, and completeness.

112.   Following the investigation, each supervisor shall continue to complete a supervisory investigation documented in a "Supervisor's Report on Use of Force." This Report shall include:

    a. the supervisor's narrative description of the incident, including a complete and comprehensive description of the evidence that either justifies or fails to justify the deputy's conduct based on the supervisor's independent review of the facts and circumstances of the incident;

    b. documentation of all evidence;

    c. identities of all deputies witnessing the force;

    d. the investigating supervisor's evaluation of force, including a determination of whether the deputy's actions appear to be within LASD policy and consistent with state and federal law, and an assessment of the incident for tactical and training implications; and

    e. documentation of any training or tactical concerns, and/or corrective action taken or recommended.

113.   Upon completion of the Supervisor's Report on Use of Force, the investigating supervisor shall forward the report through their chain of command, which will review the report to ensure that it is thorough and complete, and that the analysis and findings are supported by a preponderance of the evidence.

114.   LASD agrees to continue to require that the Executive Force Review Committee review use of force incidents requiring response by the IAB Force/Shooting Response Team under current policy, and to review the incidents for any policy, training, or tactical concerns and/or violations.

115.   LASD will hold deputies accountable for uses of force that violate policy or law, and continue to require station commanders to refer uses of force that may violate law or the Department's Prohibited Force policy, to the Internal Affairs Bureau or the Internal Criminal Investigations Bureau for further investigation or review.

116.   LASD will hold supervisors accountable for not detecting, adequately investigating, or responding to force that is unreasonable or otherwise contrary to LASD policy.

117.   LASD and Antelope Valley unit commanders will be responsible for identifying and reporting force trends and for taking preventive steps to curb problematic trends, including issuing or revising policies, directives, training bulletins, or providing additional mentoring and supervision to individual deputies.

118.   LASD and Antelope Valley unit commanders will regularly review and track "training and tactical review" related findings, recommendations, and comments to ensure that informal supervisory feedback does not replace the need for formal discipline.  LASD will ensure that the supervisory feedback, including feedback documented in the "training and tactical review" portion of a Supervisor's Report on Use of Force, is documented in the PPI.

**D. Use of Force Training**

119.   LASD shall provide all Antelope Valley deputies with annual or biennial use of force training.  The topics will include the following:

    a.  proper use of force decision making, including when force may be unnecessary in response to minor resistance (biennial);

    b.  role-playing scenarios and interactive exercises that illustrate proper use of force decision making, including training deputies on the importance and impact of ethical decision making and peer intervention (annual);

    c.  principles of procedural justice, and avoiding the use of force in response to minor resistance (biennial);

    d.  de-escalation techniques that encourage deputies to make arrests without using force (annual);

    e.  threat assessment, including how race can impact deputies' threat assessments (biennial);

1    f. LASD-AV deputies will attend LASD's Tactics and Survival (TAS), also

2     known as the Laser Village tactical firearms training (biennial); and

3    g. supervisors shall receive initial and annual refresher training on

4     conducting use of force investigations, how to effectively direct deputies

5     to minimize uses of force and to intervene effectively to prevent or stop

6     unreasonable force, using LASD's accountability and disciplinary systems

7     after encountering a potentially unreasonable use of force, and supporting

8     deputies who report unreasonable or unreported force, or who are

9     retaliated against for using only reasonable force or attempting to prevent

10     unreasonable force (annual).

11 **E. Use of Force Analysis**

12   120. Within one year of the Effective Date and at least annually thereafter,

13 LASD will analyze the Antelope Valley stations' force data, including the force-

14 related outcome data, to identify significant trends, and identify and correct

15 deficiencies revealed by this analysis.

16   121. LASD-AV's force analysis will include assessment of the frequency and

17 nature of uses of force that are: referred to IAB for investigation; the subject of

18 misconduct complaints; the subject of civil suits; related to criminal obstruction- or

19 resisting-arrest-type charges that are dismissed or declined by the prosecutor; or

20 involve repeat-deputies or units.

21   122. LASD will determine whether policy or training curricula changes must

22 be made as a result of its analysis of use of force incidents.

23   123. LASD will document the results of the use of force analysis in a public

24 report.

25      **IX. PERSONNEL COMPLAINT REVIEW**

26   The County will ensure that all allegations of personnel misconduct are received

27 and are fully and fairly investigated, and that all personnel who commit misconduct are

28 held accountable pursuant to a disciplinary system that is fair and consistent.  To

1 achieve these outcomes, LASD and the County agree to implement the requirements

2 below.

3  **A. Complaint Intake**

4   124. LASD shall continue to make personnel complaint forms and

5 informational materials, including brochures and posters, available at appropriate

6 County or municipal properties in the Antelope Valley, including, at a minimum,

7 LASD stations, courts, county libraries, and LASD websites, and make them available

8 to community groups upon request.

9   125. LASD will continue to accept all personnel complaints, including

10 anonymous and third-party complaints, for review and investigation.  Complaints may

11 be made in writing or verbally, in person or by mail, telephone (or TDD), facsimile, or

12 electronic mail, as well as in the field.  Any Limited English Proficient (LEP)

13 individual who wishes to file a complaint about a LASD deputy or employee shall be

14 provided with a complaint form and informational materials in the appropriate non-

15 English language and/or be provided appropriate translation services in order to file a

16 complaint.

17   126. The refusal to accept a personnel complaint, discouraging the filing of a

18 complaint, or providing false or misleading information about filing a complaint, shall

19 be grounds for discipline, up to and including termination.

20  **B. Complaint Classification**

21   127. LASD will revise its complaint investigation related policies, including

22 MPP 3-04 and its Service Comment Report (SCR) and Internal Affairs Bureau (IAB)

23 policy manuals, to ensure that they are complete, clear and consistent.  LASD will

24 implement mechanisms to ensure that all personnel allegations are accurately classified

25 at all investigative stages, from intake through resolution, so that each allegation

26 receives the appropriate level of review required under policy.

27   128. LASD will ensure that personnel complaints are not misclassified as

28 service complaints.

1     129.   In consultation with the Monitor and subject to DOJ approval, LASD will

2    revise policies to clarify and strengthen requirements related to:

3           a.  which allegations of inappropriate behavior by LASD personnel, if true,

4                would require imposition of discipline, as opposed to non-disciplinary

5                action, to address the misconduct;

6           b.  what types of personnel complaints must be investigated as administrative

7                investigations rather than handled exclusively as Service Comment

8                Reviews;

9           c.  what types of administrative investigations must be handled by IAB rather

10              than at the unit level.

11     130.   Antelope Valley unit commanders shall be responsible for appropriately

12    classifying each allegation and personnel complaint raised at the outset or during the

13    investigation/review of a complaint.  LASD shall investigate every allegation of

14    misconduct that arises during an investigation even if an allegation is not specifically

15    articulated as such by the complainant.

16    **C. Investigations**

17     131.   All investigations of Antelope Valley personnel complaints, including

18    reviews, shall be as thorough as necessary to reach reliable and complete findings.  In

19    each investigation, LASD shall consider all relevant evidence, including

20    circumstantial, direct and physical evidence, as appropriate, and make credibility

21    determinations based upon that evidence.  There will be no automatic preference for a

22    deputy's statement over a non-deputy's statement, nor will LASD disregard a witness'

23    statement merely because the witness has some connection to the complainant or

24    because of any criminal history.  LASD shall make efforts to resolve material

25    inconsistencies between witness statements.

26     132.   LASD agrees to continue to require station commanders in the Antelope

27    Valley to refer alleged incidents of misconduct to the IAB or ICIB for further

28    investigation or review consistent with the Administrative Investigations Handbook.  If

1  the case proceeds criminally, the Division Chief over the Antelope Valley will review
2  the matter with the unit commander of IAB to determine whether the administrative
3  investigation may proceed on a parallel track.  The Division Chief or unit commander
4  of IAB may consult with the prosecuting agency for its input.  If the matter proceeds
5  on a parallel track, any compelled interview of the subject deputies may be delayed.
6  The Division Chief shall document the reasons for the decision.

7      133.  LASD will not permit any involved supervisor, or any supervisor who
8  authorized the conduct that led to the complaint, to conduct a complaint investigation.

9      134.  The misconduct investigator shall seek to identify all persons at the scene
10  giving rise to a misconduct allegation, including all LASD deputies.  The investigator
11  shall note in the investigative report the identities of all deputies and other witnesses
12  who were on the scene but assert they did not witness and were not involved in the
13  incident.  The investigator shall conduct further investigation of any such assertions
14  that appear unsupported by the evidence.

15      135.  All witnesses, including deputies witnessing or involved in an incident
16  that becomes the subject of a personnel complaint, shall provide a written statement
17  regarding the incident or be interviewed as described below.

18      136.  The SCR complaint investigator shall interview each complainant in
19  person, if practical.  Misconduct investigators will conduct additional interviews as
20  necessary to reach reliable and complete findings.  Interviews shall be recorded in their
21  entirety, absent documented extraordinary circumstances.

22      137.  Consistent with current policy, interviews shall be conducted separately.
23  An interpreter not involved in the underlying complaint will be used when taking
24  statements or conducting interviews of any LEP complainant or witness.

25  **D. Complaint Review and Investigation Training**

26      138.  LASD agrees to provide updated and revised training to Antelope Valley
27  deputies and supervisors about proper complaint intake, classification, and
28  investigation techniques.  LASD will provide training about how to record complete

1  and thorough complaints from individuals, including how to obtain complaints from

2  individuals who may not be proficient in English, and the consequences for failing to

3  properly take complaints.

4       139.  All personnel conducting Service Comment Reviews and unit level

5  administrative investigations in the Antelope Valley shall receive initial training

6  regarding conducting deputy misconduct investigations, and shall receive refresher

7  training each year.  This training shall include instruction in:

8           a.  investigative skills, including proper interrogation and interview

9               techniques, gathering and objectively analyzing evidence, and data and

10              case management;

11          b.  the particular challenges of personnel complaint reviews/investigations,

12              including identifying alleged misconduct that is not clearly stated in the

13              complaint or that  becomes apparent during the investigation, properly

14              weighing credibility of civilian witnesses against deputies, using objective

15              evidence to resolve inconsistent statements, and the proper application of

16              the preponderance of the evidence standard;

17          c.  relevant state, local, and federal law, including state employment law

18              related to deputies and the rights of public employees, as well as criminal

19              discovery rules such as those set out in *Garrity v. New Jersey*, 385 U.S.

20              493 (1967), and *Brady v. Maryland*, 373 U. S. 83 (1963); and

21          d.  LASD rules and policies, including the requirements of this Agreement,

22              and protocols related to criminal and administrative investigations of

23              alleged deputy misconduct.

24  **E. Personnel Complaint Audits**

25       140.  LASD shall conduct a semiannual, randomized audit of LASD-AV's

26  complaint intake, classification, and investigations.  This audit will assess whether

27  complaints are accepted and classified consistent with policy, investigations are

28

1  complete, and complaint dispositions are consistent with a preponderance of the
2  evidence.

3              X.    **ACCOUNTABILITY**

4       LASD will strengthen its accountability mechanisms to provide personnel with
5  the support, mentoring, and direction necessary to consistently police constitutionally.

6    **A. Personnel Performance Index**

7       141.   LASD will continue to implement and modify the Personnel Performance
8  Index (PPI) system and expects that it will be complete within three years.  PPI will
9  continue to serve as an LASD-wide decision support system in matters related to risk
10 management and service reviews.  LASD will modify PPI so that it can make peer
11 comparisons between deputies and units.   If PPI is not modified to make such
12 comparisons during the compliance period, the comparisons will be made through an
13 alternative process.  Antelope Valley unit commanders and supervisors will conduct
14 periodic reviews of all deputies and units under their command to identify potential
15 trends.

16      142.   LASD will modify PPI (and capture through an alternative process
17 pending PPI modification) to be able to access and report additional data relevant to
18 determining compliance with the Agreement, including but not limited to data about
19 stops, searches, and arrests (described in the Data Collection and Analysis Section),
20 individual compliance with community engagement requirements, and criminal
21 obstruction arrests.   LASD will modify its procedure for Performance Log Entries so
22 that all entries are maintained in an electronic format and noted in PPI.  LASD-AV
23 will ensure that PPI data is accurate and hold responsible Antelope Valley personnel
24 accountable for inaccuracies in any data entered.

25      143.   In consultation with the Monitor, LASD will develop a plan, to be
26 approved by DOJ, to periodically review how the Antelope Valley stations analyze PPI
27 to respond to concerns unique to their stations, such as trends identified through
28 civilian complaints, the CAC, community survey, or other means.

1   **B. Performance Mentoring Program**

2   144.   LASD will continue to provide mentorship to deputies in the North Patrol

3   Division's locally based Performance Mentoring Program (PMP), as well as through

4   LASD's department-wide PMP, based upon appropriate determination of eligibility.

5   To increase the effectiveness of the remedies and corrective action used to address a

6   deputy's behavior, LASD will support and implement a plan to ensure that the LASD

7   wide PMP program provides mentoring of AV personnel within 30 days after the need

8   for mentoring is identified, and that appropriate procedures are in place for supervising

9   deputies whose performance fails to improve subsequent to mentoring.

10   145.   LASD will ensure that the Department-wide PMP and the North Patrol

11   Division's PMP coordinate as appropriate with each other and share information about

12   deputies and their individual mentoring programs.

13   **XI.   MONITORING**

14   **A. Selection of Monitor**

15   146.   The Parties have jointly selected the team of Joseph Brann, Alex

16   Busansky, and Angela Wolf as Monitor to oversee the terms of this Agreement.  As

17   described in greater detail below, the Monitor will assess the County's progress in

18   implementing, and achieving compliance with, the Agreement; report on the status of

19   implementation to the Parties and the Court; work with the Parties to address any

20   barriers to compliance; and assist the Parties to informally resolve disputes or

21   differences should they emerge.

22   147.   The Monitor shall be subject to the supervision and orders of the Court,

23   consistent with this Agreement and the Monitoring Plan.  The Monitor shall only have

24   the duties, responsibilities, and authority conferred by this Agreement.  The Monitor

25   shall not, and is not intended to, replace or assume the role and duties of the Sheriff.

26   148.   In order to assess and report on LASD's implementation of this

27   Agreement and whether implementation is resulting in constitutional policing, the

28   Monitor shall conduct compliance reviews and audits and outcome assessments as

1    specified below, and such additional audits, reviews, and assessments that the Monitor
2    or Parties deem appropriate.

3    **B. Compliance Reviews and Audits**

4        149.   The Monitor shall conduct compliance reviews or audits as necessary to
5    determine whether LASD has implemented and continues to comply with the material
6    requirements of this Agreement.  Compliance with, or implementation of, a material
7    requirement of this Agreement means that LASD has:  (a) incorporated the
8    requirement into policy; (b) trained all relevant personnel as necessary to fulfill their
9    responsibilities pursuant to the requirement; and (c) ensured that the requirement is
10   being carried out in practice.  Compliance reviews and audits will contain both
11   qualitative and quantitative elements as necessary for reliability and
12   comprehensiveness.  Where appropriate, the monitor will make use of audits
13   conducted by the Internal Monitoring, Performance Audits and Accountability
14   Command (IMPAAC) taking into account the importance of internal auditing capacity
15   and independent assessment of this agreement.

16       150.   Where the Monitor recommends and the Parties agree, the Monitor may
17   refrain from conducting a compliance audit or review of a requirement previously and
18   consistently found to be in compliance by the Monitor pursuant to audit or review.
19   Thereafter the County will be deemed to have achieved compliance with those
20   requirements for purposes of this Agreement, absent evidence to the contrary.

21       151.   The monitor will conduct an ongoing review and report on LASD use of
22   force on restrained individuals, use of force in response to spitting, and use of OC
23   spray.

24       152.   The monitor, in conjunction with LASD, will conduct an ongoing audit of
25   incidents where deputies draw or point their firearms.  The audit will include a review
26   of all civilian complaints and an appropriate sample of police reports related to any use
27   or display of a firearm.

28

**C. Outcome Assessments**

153.   In addition to compliance reviews and audits, the Monitor shall conduct qualitative and quantitative outcome assessments to measure whether LASD's implementation of this Agreement has eliminated practices that resulted in DOJ's finding a pattern and practice of constitutional violations.  These outcome assessments shall include collection and analysis, both quantitative and qualitative, of the following outcome data:

  a.  Stop and Search Measurements, including:

      1.  the number and rate of stops and searches for which there is sufficient documented reasonable suspicion, overall and broken down by geographic area, type of arrest, and demographic category;

      2.  the number and rate of searches that result in a finding of contraband, overall and broken down by authority to conduct search, reporting district, type of arrest, and demographic category;

      3.  the number and rate of arrests, overall and broken down by type of arrest and demographic category;

      4.  the number of consent searches conducted overall and broken down by reporting area, type of arrest and demographic category, and;

      5.  the number and rate of backseat detentions, overall and broken down by reporting area and demographic category including the number of those incidents where there is a reasonably articulated explanation justifying the detention.

  b.  Biased-Free Policing and Community Engagement Measurements, including:

1.   a regression analysis that will determine, controlling for other intervening factors such as crime rates, etc., whether:

      (a) LASD deputies working in the Antelope Valley are more likely to stop, cite, search, or arrest based on race or ethnicity;

      (b) LASD deputies working in the Antelope Valley are more likely to ask persons of certain races or ethnicities for consent searches, and about their probation or parole status;

      (c) LASD deputies working in the Antelope Valley are more likely to stop or search persons of certain races or ethnicities for discretionary and non-violent offenses; and

      (d) LASD deputies working in the Antelope Valley are more likely to impound the vehicles belonging to people of certain races or ethnicities.

2.   the results of the Community Survey set out in Section VII.C.;

3.   an assessment of responses to calls for service in different reporting districts of Lancaster and Palmdale;

4.   feedback provided by the CACs; and

5.   an assessment of LASD-AV deputies' participation in community meetings and events, including new and continuing partnerships between LASD-AV and community members.

c.  Section 8 Compliance Enforcement Measurements, including:

1        1. the number and rate of LASD-AV deputy interactions with

2         voucher holders in a voucher holder's home for a compliance

3         check; and

4        2. the number and rate of LASD-AV independent investigations

5         for criminal fraud based on voucher holder compliance with

6         the voucher contract and how those numbers and rates

7         compare with LASD throughout the rest of the County.

8     d. Use of Force Measurements, including:

9        1. the rate of force used by LASD-AV per arrest, reporting

10         district (i.e. street address, neighborhood, or reporting

11         district), type of arrest, and demographic category;

12        2. the number and rate of uses of force resulting in training or

13         tactical reviews, with formal discipline and/or with informal

14         corrective action; and

15        3. the number and rate of use of external force complaints that

16         result in formal administrative investigations/reviews, and in

17         which each  finding is supported by a preponderance of the

18         evidence.

19     e. Training Measurements, including:

20        1. deputy and agency reports of adequacy of training in type

21         and frequency;

22        2. responsiveness to training needs identified by reviews of

23         deputy activity, use of force investigations, and personnel

24         complaint investigations; and

25        3. documentation that training is completed as required.

26     f. Supervision Measurements, including initial identification of deputy

27      violations and performance problems by supervisors (including sergeants,

28

1    lieutenants, captains, and region commanders), and effectiveness of
2    supervisory response.

3         g.   Accountability Measurements, including:

4              1. the number of personnel complaints (by type of complaint),
5                 with a qualitative assessment of whether any notable increase
6                 or decrease appears related to access to the complaint
7                 process;

8              2. rate of administrative investigations resolved as founded,
9                 unfounded, unresolved, inactivated or administrative
10                investigations;

11             3. rate of SCRs resolved in all resolution categories;

12             4. the number of deputies who are subjects of repeated
13                personnel complaints or have repeated instances of sustained
14                personnel complaints;

15             5. the number, nature, and settlement amount of all known civil
16                suits against LASD-AV deputies; and

17             6. the number of use of force and discriminatory policing
18                complaints that are handled by the stations or referred to
19                IAB.

20    154.   In conducting audits, reviews, and outcome assessments, the Monitor may

21  use any relevant data collected and maintained by LASD that the Monitor and DOJ

22  deem reliable and sufficiently complete, provided that the Monitor has determined, and

23  the Parties agree, that this data is reasonably reliable and complete.

24  **D. Monitoring Plan and Review Methodology**

25                        Monitoring Plan

26    155.   Within 90 days of the Monitor's appointment, the Monitor will develop a

27  monitoring plan, including proposed deadlines for implementation for conducting the

28  compliance reviews and audits ("Monitoring Plan"). This Monitoring Plan will

-40-

1 | include specific deadlines and timelines for the first year of implementation of the
2 | Agreement, including:  (1) deadlines for the development of policies and training
3 | materials, and      (2) schedules for conducting compliance reviews and outcome
4 | assessments.

5 |      156.   The Monitor will submit the Monitoring Plan to the Parties for review and
6 | approval. The Parties will have 30 days to either approve or propose changes to the
7 | Monitoring Plan.  If either Party proposes changes, the Monitor will have 15 days to
8 | accept or object to those changes.  If the Monitor objects to any of the proposed
9 | changes and/or the Parties suggest changes that are in conflict, either Party or the
10 | Monitor will provide the rationale for its proposal or objection, in writing, and the
11 | Parties and Monitor will attempt to confer to resolve the disagreement.

12 |      157.   If after good faith attempts, disagreement regarding the Monitoring Plan
13 | remains unresolved between the Parties and/or Monitor so that the Monitoring Plan is
14 | not approved by the Parties, either Party or the Monitor may petition the Court
15 | thereafter to resolve it.

16 |      158.   For each subsequent year, the Monitor will develop a detailed Monitoring
17 | Plan for implementation of the Agreement.

18 |      159.   At least 45 days prior to the initiation of any outcome measure assessment
19 | or compliance review, the Monitor shall submit a proposed methodology for the
20 | assessment or review to the Parties.  The Parties shall submit any comments or
21 | concerns regarding the proposed methodology to the Monitor within 15 days of the
22 | proposed date of assessment or review.  The Monitor shall modify the methodology as
23 | necessary to address any concerns, or shall inform the Parties in writing of the reasons
24 | s/he is not modifying the methodology as proposed.

25 |                    Development of Policies, Procedures, and Training

26 |      160.   LASD will submit policies, training curricula, and lesson plans required to
27 | be written, revised, or maintained by the Agreement to the Monitor and DOJ prior to
28 | publication and implementation.  The Parties will share draft policies and meet and

1 confer as needed to reach agreement on whether revised policies and training materials

2 are in compliance with the requirements of the Agreement, the Constitution, federal

3 and statutory law, best practices, and current professional standards.

4      161.   Forty-five days before a compliance deadline, as set out in the Monitoring

5 Plan, the Parties will submit the policy, training curriculum or lesson plan to the

6 Monitor for review.  The Monitor will provide written comments to DOJ and LASD,

7 which the DOJ shall consider in determining whether to approve the policy, training

8 curriculum and lesson plan.

9      162.   If LASD, DOJ, and the Monitor do not all agree that the policy, training

10 curriculum or lesson plan is consistent with this Agreement, legal requirements, and

11 best practices, either Party or the Monitor will provide the rationale for its objection in

12 writing and the Parties and Monitor will attempt to confer to resolve the Agreement.  If

13 the disagreement remains unresolved, either Party or the Monitor may petition the

14 Court thereafter to resolve.

15      163.   LASD will begin implementation of policies and procedures within 30

16 days of DOJ approval or the Court's decision if a dispute arises, unless otherwise

17 specified or agreed to by the Parties in the Monitoring Plan.

18      164.   Within 30 days after issuing a policy or procedure pursuant to this

19 Agreement, LASD shall ensure that all relevant LASD personnel assigned to AV  have

20 received, read, and understand their responsibilities pursuant to the policy or

21 procedure, including the requirement that each deputy or employee report violations of

22 policy; that supervisors of all ranks shall be held accountable for identifying and

23 responding to policy or procedure violations by personnel under their command; and

24 that personnel will be held accountable for policy and  procedure violations.  LASD

25 shall document that each relevant LASD deputy or other employee has received, read,

26 and sufficiently understands policy.  Training beyond roll-call or similar training will

27 be necessary for many new policies to ensure deputies understand and can perform

28 their duties pursuant to the policy.

1   165. Within 180 days from the effective date of the agreement, LASD shall

2 ensure that each LASD-AV sworn personnel member and custody assistant attends a

3 training briefing on the content of this Agreement and the responsibilities of each

4 deputy and employee pursuant to it.  LASD shall begin providing this training briefing

5 within 45 days of the effective date of the agreement.

6   166. All training will include periodic testing to ensure that employees are

7 appropriately comprehending, retaining, and applying the knowledge and skills

8 conveyed during the training required by the Agreement.  Based on results of testing,

9 LASD will provide additional periodic training as needed to deputies, supervisors, and

10 commanders that is sufficient in duration and scope to ensure that all deputies can

11 consistently and effectively carry out LASD's policies.

12   167. LASD shall completely and accurately record information regarding

13 LASD-AV deputies' training attendance in LASD's Learning Management System

14 (LMS) system or its successor.

15 **E. Monitor Recommendations**

16   168. The Monitor may also make recommendations to the Parties regarding

17 measures necessary to ensure timely, full, and effective compliance with the

18 Agreement and its underlying objectives.  Such recommendations may include a

19 recommendation to change, modify, or amend a provision of the Agreement, a

20 recommendation for additional training related to the Agreement, or a recommendation

21 to seek technical assistance.  The Monitor may also, at the request of either Party,

22 provide technical assistance consistent with the Agreement.

23   169. The Monitor will also review and consider the relevant reports of the

24 Office of the Inspector General and IMPAAC.

25   170. The Monitor shall conduct a comprehensive assessment one year after the

26 Effective Date to determine whether and to what extent:  (1) the outcomes intended by

27 the Agreement have been achieved, and (2) any modifications to the Agreement are

28 necessary for continued achievement in light of changed circumstances or

1  unanticipated impact (or lack of impact) of a requirement.  Based upon this
2  comprehensive assessment, the Monitor shall recommend what modifications to the
3  Agreement, if any, are necessary to achieve and sustain intended outcomes.  Where the
4  Parties agree with the Monitor's recommendations, the Parties shall work to adopt
5  mutually acceptable modifications of the Agreement.  LASD will have the option to
6  delay this comprehensive assessment for one additional year if they deem this to be the
7  appropriate time period for the comprehensive assessment.  If LASD decides to seek
8  this delay of the comprehensive assessment, they will advise the monitor and DOJ
9  within six months of the effective date of this agreement.

10  **F. Monitor Reports**

11      171.  The Monitor will publicly issue a report every six months that details the
12  Parties' progress in implementing the Agreement and achieving compliance with the
13  Agreement.  The reports will include:

14          a. a description of the work conducted by the Monitor during the reporting
15              period;
16          b. a listing of each Agreement requirement indicating which requirements
17              have been:  (1) incorporated into policy; (2) the subject of sufficient
18              training for all relevant LASD deputies and employees; (3) reviewed or
19              audited by the Monitor to determine whether they have been fully
20              implemented in actual practice, including the date of the review or audit;
21              and (4) found by the Monitor to have been fully implemented in practice;
22          c. the methodology and specific findings for each audit or review conducted,
23              redacted as necessary for privacy concerns.  The underlying data for each
24              audit or review will not be publicly available but will be retained by the
25              Monitor and provided to either or both Parties upon request;
26          d. for any requirements that were reviewed or audited and found not to have
27              been fully implemented in practice, the Monitor's recommendations
28              regarding necessary steps to achieve compliance;

1        e.  the methodology and specific findings for each outcome assessment
2            conducted;
3        f.  a qualitative assessment of LASD's progress in achieving the desired
4            outcomes for each area covered by the Agreement, noting issues of
5            concern or particular achievement; and
6        g.  a projection of the work to be completed during the upcoming reporting
7            period and any anticipated challenges or concerns related to
8            implementation of, and achieving compliance with, the Agreement.
9        172.   The Monitor shall provide a copy of the reports to the Parties in draft form
10   at least ten business days prior to releasing them publicly.  The Parties may provide
11   comment on the reports, and the Monitor shall consider the Parties' comments and
12   make appropriate changes before issuing the report.
13       173.   The reports shall be public with the exception of material covered by
14   applicable privacy laws.  The reports will not include information specifically
15   identifying any individual deputy.  To facilitate public access to the reports, LASD
16   shall post the reports to its public website.
17       174.   Except as required or authorized by the terms of this Agreement or the
18   Parties acting together:  the Monitor, including, for the purposes of this paragraph, any
19   agent, employee, or independent contractor thereof, shall not make any public
20   statements or issue findings with regard to any act or omission of LASD, or their
21   agents, representatives, or employees; or disclose non-public information provided to
22   the Monitor pursuant to this Agreement.  Prior to making any press statement
23   regarding their employment or monitoring activities under this Agreement, the Monitor
24   shall first provide notice to both the DOJ and LASD.
25       **G. Public Statements, Testimony, and Conflicts of Interest**
26       175.   The Monitor may testify as to their observations, findings, and
27   recommendations before the Court with jurisdiction over this matter; however, no
28   Monitor shall testify in any other litigation or proceeding with regard to any act or

1   omission of LASD or any of its agents, representatives, or employees related to this

2   Agreement or regarding any matter or subject that the Monitor may have received

3   knowledge of as a result of his or her performance under this Agreement.  This

4   paragraph does not apply to any proceeding before a court related to performance of

5   contracts or subcontracts for monitoring this Agreement.

6       176.   Unless such conflict is waived by the Parties, the Monitor shall not accept

7   employment or provide consulting services that would present a conflict of interest

8   with the Monitor's responsibilities under this Agreement, including being retained (on

9   a paid or unpaid basis) by any current or future litigant or claimant, or such litigant's or

10  claimant's attorney, in connection with a claim or suit against LASD or its

11  departments, deputies, agents, or employees.  This provision does not preclude the

12  Monitor from being retained by the Department of Justice on other matters unrelated to

13  LASD.

14      177.   The Monitor is not a state or local agency, or an agent thereof, and

15  accordingly the records maintained by the Monitor shall not be deemed public records

16  subject to public inspection.

17      178.   The Monitor shall not be liable for any claim, lawsuit, or demand arising

18  out of the Monitor's performance pursuant to this Agreement.

19      **H. Communication Between Monitor and Parties**

20      179.   The Monitor will maintain regular contact with the Parties in order to

21  ensure effective and timely communication regarding the status of the LASD's

22  implementation of, and compliance with, the Agreement.  To facilitate this

23  communication, the Monitor will conduct meetings every two months, or as needed,

24  which will include participation by LASD-AV, LASD, representatives of the County

25  Counsel's office, and DOJ.

26      **I. Communication Between Monitor and Community Members**

27      180.   The Monitor will regularly meet with the CACs and/or other interested

28  community stakeholders to discuss the Monitor's reports, and to receive community

1  feedback about LASD's progress in implementing and achieving compliance with the
2  Agreement.

3  **J. Access and Confidentiality**

4    181.   To facilitate its work, the Monitor may conduct on-site visits and
5  assessments without prior notice to the County.  The Monitor shall have access to all
6  necessary individuals, facilities, and documents, which shall include access to
7  Agreement-related trainings, meetings, and reviews such as critical incident reviews,
8  executive force review committee meetings, and disciplinary hearings.

9    182.   The County shall provide the Monitor with office space and reasonable
10  office support, such as office furniture, secure internet access, telephone, secure
11  document storage, and photocopying, faxing, and scanning equipment, that the
12  Monitor may use while in the Antelope Valley.

13    183.  LASD shall ensure that the Monitor shall have full and direct access to all
14  County staff, employees, and facilities that the Monitor reasonably deems necessary to
15  carry out the duties assigned to the Monitor by this Agreement.  The Monitor shall
16  cooperate with the County to access people and facilities in a reasonable manner that,
17  consistent with the Monitor's responsibilities, minimizes interference with daily
18  operations.

19    184.   LASD shall ensure that the Monitor shall have full and direct access to all
20  LASD documents and data that the Monitor reasonably deems necessary to carry out
21  the duties assigned to the Monitor by this Agreement, except any documents or data
22  protected by the attorney-client privilege.  The attorney-client privilege may not be
23  used to prevent the Monitor from observing reviews, meetings, and trainings such as
24  use of force review boards; disciplinary hearings; or discussions of misconduct
25  complaint investigations.  Should LASD decline to provide the Monitor access to
26  documents or data based on attorney-client privilege, the Defendants shall inform the
27  Monitor and DOJ that it is withholding documents or data on this basis and shall
28  provide the Monitor and DOJ with a log describing the documents or data.

1    185.   For the purpose of implementing this Agreement, DOJ and its

2    consultative experts and agents shall have full and direct access to all LASD staff,

3    employees, facilities, and documents and data who have pertinent information about

4    AV. DOJ and its consultative experts and agents shall cooperate with LASD to access

5    involved personnel, facilities, and documents in a reasonable manner that, consistent

6    with DOJ's responsibilities to enforce this agreement, minimizes interference with

7    daily operations.  Should LASD decline to provide DOJ with access to documents or

8    data based on attorney-client privilege, LASD shall inform DOJ that it is withholding

9    documents or data on this basis and shall provide DOJ with a log describing the

10   documents or data.

11   186.   The Monitor or DOJ shall provide the County with reasonable notice of a

12   request for copies of documents or data.  Upon such request, the County shall provide

13   in a timely manner copies (electronic, where readily available) of the requested

14   documents to the Monitor and DOJ.

15   187.   The Monitor shall have access to all records and information relating to

16   criminal investigations of LASD-AV deputies as permissible by law.  The Monitor

17   shall have access to all documents in criminal investigation files that have been closed

18   by LASD.  The Monitor shall also have reasonable access to all arrest reports,

19   warrants, and warrant applications whether or not contained in open criminal

20   investigation files.  Where practicable, arrest reports, warrants, and warrant

21   applications shall be obtained from sources other than open criminal investigation

22   files.

23   188.   The Monitor and DOJ shall maintain all non-public information provided

24   by the County in a confidential manner.  Other than as expressly provided in this

25   Agreement, this Agreement shall not be deemed a waiver of any privilege or right the

26   County may assert, including those recognized at common law or created by statute,

27   rule or regulation, against any other person or entity with respect to the disclosure of

28   any document.

1    **K. LASD Antelope Valley Compliance Coordinator**

2    189.   The Parties agree that LASD will hire and retain, or reassign a current

3    LASD employee for the duration of the Agreement, to serve as a full-time Compliance

4    Coordinator.  The Compliance Coordinator will serve as a liaison between LASD, the

5    Antelope Valley stations, the Monitor, and DOJ, and will assist with LASD's

6    compliance with the Agreement.  At a minimum, the Compliance Coordinator will:

7         a.  coordinate compliance and implementation activities;

8         b.   facilitate the provision of data, documents, and other access to LASD

9             employees, and material to the Monitor and DOJ, as needed;

10        c.  ensure that all documents and records are maintained as provided in the

11            Agreement; and

12        d.  assist in assigning compliance tasks to LASD personnel, as directed by

13            the Sheriff or his designee. The Compliance Coordinator will take

14            primary responsibility for collecting the information the Monitor requires

15            to carry out the terms of the Agreement.

16   **L. Monitor Budget and Payment**

17   190.   The County shall bear all fees and costs of the Monitor.  In approving

18   budgets, the Parties recognize the importance of ensuring that all fees and costs borne

19   by the County are reasonable.  The Parties shall work with the Monitor to reach

20   mutually agreed upon reasonable limits on the Monitor's fees and costs.  The Parties

21   will agree on the terms of invoicing and payments and the County will pay invoices

22   within a reasonable period of time.

23   191.   Within 30 days of appointment, the Monitor shall submit to the Parties for

24   approval a proposed budget for the first year of implementation of the Agreement.  The

25   proposed budget will describe the qualifications of all the persons or entities to be

26   hired or employed by the Monitor as well as the monitoring tasks that they will

27   perform.  The Monitor, at any time after his/her appointment, may request to be

28   allowed to hire, employ, or contact such additional persons or entities as are reasonably

1  necessary to perform the tasks assigned to the Monitor by the Agreement provided that
2  those expenditures fall within the approved budget.  The Monitor will notify the
3  County and DOJ in writing if the Monitor wishes to select such additional persons or
4  entities.  The notice will identify and describe the qualifications of the person or entity
5  to be hired or employed and the monitoring task to be performed.  The County and
6  DOJ must both approve of the person or entity before they may be hired or employed,
7  although substantial deference will be afforded to the Monitor's choice.  Any person or
8  entity hired or otherwise retained by the Monitor will be subject to the provisions of
9  the Agreement.

10      192.   Thereafter, the Monitor shall submit annually a proposed budget for the
11  Parties' approval in accordance with the process set forth above.

12      193.   At any time, the Monitor may submit to the Parties for approval proposed
13  revisions to the approved budget, along with any explanation of the reason for the
14  proposed revision.  Such proposed changes may only be made upon written agreement
15  by the Parties.  In the event that a dispute arises regarding the reasonableness or
16  payment of the Monitor's fees and costs, the Parties and the Monitor shall attempt to
17  resolve such dispute cooperatively prior to seeking the assistance of the Court to
18  resolve the dispute.

19      194.   In the event that the Monitor is no longer able to perform his/her
20  functions, within 60 days thereof, the County and DOJ will together select and advise
21  the Court of the selection of a replacement Monitor, acceptable to both.  The Parties'
22  selection of the Monitor will be made pursuant to a method jointly established by DOJ
23  and the County.  If the Parties are unable to agree on a Monitor or an alternative
24  method of selection within 60 days of the Monitor's incapacitation, each Party will
25  submit the names of three candidates, or three groups of candidates, along with
26  resumes and cost proposals, to the Court, and the Court will select and appoint the
27  Monitor from among the qualified candidates/candidate groups.

28

1    195.   Should either of the Parties to the Agreement determine that the Monitor

2  or any member of the Monitor's consulting teams, their agents, employees, or

3  independent contractors have exceeded their authority or failed to satisfactorily

4  perform the duties required by the Agreement, the Party may petition the Court for

5  such relief as the Court deems appropriate, including replacement of the Monitor,

6  and/or any individual members, agents, employees, or independent contractors.  Any

7  Party bringing such a petition is required to meet and confer with the other Party at

8  least 21 days prior to such a petition in a good faith attempt to resolve the concern.

9            **XII.   COMPENSATION FOR AGGRIEVED PERSONS FOR FAIR**

10                    **HOUSING ACT VIOLATIONS**

11    196.   LASD will pay Seven Hundred Thousand Dollars ($700,000.00) to

12  compensate any persons harmed by LASD's allegedly discriminatory conduct in

13  violation of the Fair Housing Act ("aggrieved persons"), which shall be referred to as

14  the "LASD Settlement Fund."  The LASD Settlement Fund shall be distributed to

15  aggrieved persons pursuant to the terms and schedule that the parties have agreed to in

16  principle, which the parties will memorialize in an addendum to this Agreement and

17  file with the Court within ninety (90) days of the Effective Date.  Within thirty (30)

18  days of the Effective Date, LASD shall deposit the full amount of the LASD

19  Settlement Fund into an interest bearing escrow account.

20                    **XIII.  CIVIL PENALTY**

21    197.   Within thirty (30) days of the Effective Date, LASD shall pay Twenty-

22  Five Thousand Dollars ($25,000.00) to the United States Treasury as a civil penalty

23  pursuant to 42 U.S.C. 3614(d)(1)(C) to vindicate the public interest.  The payment

24  shall be in the form of an electronic funds transfer pursuant to written instructions to be

25  provided by the United States.

26    198.   In the event that LASD engages in any future violation(s) of the Fair

27  Housing Act, such violation(s) shall constitute a "subsequent violation" pursuant to 42

28  U.S.C. §3614(d)(1)(C)(ii).

## XIV.  COURT JURISDICTION, MODIFICATION OF THE AGREEMENT, AND ENFORCEMENT

199.    The Parties agree jointly to file this Agreement with the United States District Court for the Central District of California, in a matter to be captioned *United States* v. *Los Angeles County*, et. al., Civil Action No. --CV--.  The joint motion shall request that the Court enter the Agreement pursuant to Federal Rule of Civil Procedure 41(a)(2), and conditionally dismiss the complaint in this action without prejudice, while retaining jurisdiction to enforce the Agreement.  The joint motion shall further request that this action be removed from the Court's active caseload until further application by the Parties or order of the Court.  The Parties will request that the Court retain jurisdiction over this action and that the Court's conditional dismissal will not prejudice any party to the action.

200.    The Agreement will become effective upon entry by the Court.

201.    This Agreement resolves all of the United States' claims under the §14141 and the FHA against LASD.  No prior drafts or prior contemporaneous communications, oral or written, will be relevant or admissible for the purposes of determining the meaning of any provisions herein in any litigation or other proceeding.

202.    The Agreement is binding upon all Parties hereto, by and through their officials, agents, employees, and successors.  If the County establishes or reorganizes a government agency or entity whose function includes overseeing, regulating, accrediting, investigating, or otherwise reviewing the operations of LASD or any aspect thereof, the County agrees to ensure these functions and entities are consistent with the terms of the Agreement and will incorporate the terms of the Agreement into the oversight, regulatory, accreditation, investigation, or review functions of the government agency or entity as necessary to ensure consistency.

203.    The Agreement is enforceable only by the Parties.  No person or entity is intended to be a third-party beneficiary of the provisions of the Agreement for purposes of any civil, criminal, or administrative action, and accordingly, no person or

1  entity may assert any claim or right as a beneficiary or protected class under the

2  Agreement.

3      204.   Unless stated otherwise in the Agreement, if either party disagrees with

4  any aspect of the implementation of the Agreement, that party will engage in good

5  faith informal consultation with the other party and the Monitor to attempt to resolve

6  the disagreement.  If the disagreement persists, that party will, within ten days of the

7  apparent impasse, inform the other Parties and the Monitor in writing of the fact of the

8  disagreement.  Within 21 days thereafter, the Parties will meet and confer on the

9  disagreement at a mutually agreeable time.  If necessary, any party may petition the

10  Court thereafter to resolve the dispute pursuant to the provisions below.

11      205.   To ensure that the requirements of the Agreement are properly and timely

12  implemented, the Court will retain jurisdiction of this action for all purposes, including

13  but not limited to any disputed changes to policies, procedures, training, and practices,

14  until such time as the County has achieved full and effective compliance with the

15  Agreement and maintained such compliance for no less than one year.

16      206.   The United States acknowledges the good faith of the County in trying to

17  address the remedial measures that are needed to ensure constitutional policing in the

18  Antelope Valley.  The United States, however, reserves its right to seek enforcement of

19  the provisions of the Agreement if it determines that the County and LASD have failed

20  to fully comply with any provision of this Agreement.  The United States agrees to

21  consult with officials from the County before commencing enforcement proceedings,

22  and to provide opportunity to cure consistent with the informal dispute resolution

23  procedure set forth in Paragraph 204.

24      207.   The Monitor, County, and DOJ may jointly stipulate to make changes,

25  modifications, and amendments to the Agreement.  Such changes, modifications, and

26  amendments to the Agreement will be encouraged when the Parties agree, or where the

27  reviews, assessments, and/or audits of the Monitor demonstrate, that a Agreement

28  provision as drafted is not furthering the purpose of the Agreement or that there is a

1 | preferable alternative that will achieve the same purpose.  The Parties may jointly
2 | move for approval of any proposed changes, modifications, and/or amendments, which
3 | will become effective upon approval by the Court.  No change, modification, or
4 | amendment to the Agreement will have any force or effect if not set forth in writing,
5 | signed by all the Parties to the Agreement, and approved by the Court.

6 |     208.   The Parties agree to defend the provisions of this Agreement.  The Parties
7 | shall notify each other of any court or administrative challenge to this Agreement.   In
8 | the event any provision of this Agreement is challenged in any state, county, or
9 | municipal court, the Parties shall seek removal to federal court.

10 |     209.   Nothing in this Agreement is intended to: (a) alter the existing collective
11 | bargaining agreements; or (b) impair the collective bargaining rights of employees
12 | under State and local law.  Nothing in this Agreement is intended to amend or
13 | supersede any provision of State or local law.

14 |     210.    All Parties agree that, as of the date of entry of this Agreement, litigation
15 | is not "reasonably foreseeable" concerning the matters described in this Agreement.
16 | To the extent that either Party previously implemented a litigation hold to preserve
17 | documents, electronically stored information, or things related to the matters described
18 | in this Agreement, the Party is no longer required to maintain such a litigation hold.

19 | **XV.   TERMINATION OF THE AGREEMENT**

20 |     211.   The Parties anticipate that LASD can reach full and effective compliance
21 | with this Agreement within four years of the Effective Date.

22 |     212.   The Parties may jointly petition the Court to terminate this Agreement
23 | after four years if the Parties believe that LASD has reached full and effective
24 | compliance with this Agreement and has maintained that compliance for one year.  If,
25 | after four years from the Effective Date, the Parties disagree about whether LASD has
26 | been full and effective compliance for one year, either party may seek to terminate the
27 | Agreement.  In the case of termination sought by the County, prior to filing a motion to
28 | terminate, the County agrees to notify DOJ in writing when the County has determined

1  that LASD is in full and effective compliance with this Agreement, including through

2  the alternative method of compliance using outcome assessments, and that such

3  compliance has been maintained for no less than one year.  Thereafter, the Parties shall

4  promptly confer as to the status of compliance.  The Monitor will certify whether he or

5  she agrees that the County is in compliance with the Agreement or portions of the

6  Agreement at the time of the notification.  No later than 21 days thereafter, the Parties

7  will meet and confer at a mutually agreeable time as to the status of compliance.  If,

8  after a reasonable period of consultation and the completion of any additional audit or

9  evaluation that DOJ and/or the Monitor may wish to undertake, including on-site

10  observations, document review, or interviews with the County and LASD personnel,

11  the Parties cannot resolve any compliance issues, the County may file a motion to

12  terminate the Agreement.  At all times, LASD shall bear the burden of demonstrating

13  compliance with this Agreement.

14  ///

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

1  Respectfully submitted this 28th day of _____April_____, 2015.

2

3

4

5  For the UNITED STATES OF AMERICA:

6

7

8                                          LORETTA E. LYNCH
9                                          Attorney General

10

11  STEPHANIE YONEKURA                     VANITA GUPTA
12  Acting United States Attorney          Principal Deputy Assistant Attorney
                                           General
13                                         Civil Rights Division

14  LEON W. WEIDMAN
    Assistant United States Attorney       _____/s/_____
15  Chief, Civil Division                  MARK KAPPELHOFF
16                                         Acting Deputy Assistant Attorney
                                           General
17  _____
    ROBYN-MARIE LYON MONTELEONE
18  Assistant United States Attorney       _____/s/_____
19  Assistant Division Chief               GREGORY B. FRIEL
    Civil Rights Unit Chief, Civil Division   Deputy Assistant Attorney General
20

21                                         _____/s/_____
22                                         JUDITH C. PRESTON
                                           Acting Chief
23

24                                         _____/s/_____
25                                         STEVEN H. ROSENBAUM
                                           Chief
26

27                                         _____/s/_____
                                           CHRISTY E. LOPEZ
28                                         Deputy Chief

-56-

1

2                                                            /s/
                                                    _____
3                                                    R. TAMAR HAGLER
                                                     Deputy Chief
4
                                                             /s/
5                                                   _____
                                                     CHARLES HART
6                                                    Trial Attorney

7                                                            /s/
                                                    _____
8                                                    NORRINDA BROWN HAYAT
                                                     CARRIE PAGNUCCO
9                                                    KATHRYN LADEWSKI
10                                                   Trial Attorneys

11

12

13

14

15

16

17

18

19

20   For the COUNTY OF LOS ANGELES and the LOS ANGELES SHERIFF'S
     DEPARTMENT:
21

22

23                                                  _____
                                                     MARK J. SALADINO
24                                                   County Counsel
                                                     County of Los Angeles
25

26                                                  _____
27                                                   ROGER GRANBO
                                                     Senior Assistant County Counsel
28                                                   County of Los Angeles

                                    -57-

JIM MCDONNELL
Sheriff

SO ORDERED this _____ day of _____, 2015.

_____
UNITED STATES DISTRICT JUDGE