THOMAS M. FERLAUTO (SBN 155503)
LAW OFFICE OF THOMAS M. FERLAUTO, APC
25201 Paseo de Alicia, Suite 270
Laguna Hills, California 92653
Telephone: 949-334-8650
Fax: 949-334-8691
Email: TMF@lawofficeTMF.com

Attorney for Plaintiff, JOSHUA ASSIFF

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JOSHUA ASSIFF,**<br><br>       **Plaintiff,**<br><br>  **v.**<br><br>**COUNTY OF LOS ANGELES; SHERIFF DEPUTY BADGE NUMBER 404532; And DOES 1 through 10,**<br><br>      **Defendants.** | **Case No. 2:22-cv-05367 RGK (MAAx)**<br><br>**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**<br><br>Action Filed: August 3, 2022<br>Pretrial Conference: July 10, 2023<br>Trial Date: July 25, 2023<br><br>Assigned to: Hon. R. Gary Klausner, District Judge, Courtroom 850 |

     Plaintiff, JOSHUA ASSIFF (hereinafter "Plaintiff") hereby respectfully submits the following memorandum of contentions of fact and law in support of his claims against Defendants COUNTY OF LOS ANGELES and TRAVIS KELLY (hereinafter "Defendants")

# **TABLE OF CONTENTS**

MEMORANDUM OF CONTENTIONS OF FACT AND LAW
..............................................................................................p. 5

I.      STATEMENT OF PLAINTIFF'S CLAIMS
..............................................................................................p. 5

II.     ELEMENTS REQUIRED TO ESTABLISH PLAINTIFF'S FIRST CLAIM, SECTION 1983 - UNREASONABLE SEIZURE OF PERSON
..............................................................................................p. 5

     1A: Unreasonable Stop - Wrongful Stop Without Reasonable Suspicion
..............................................................................................p. 6

     1B: Unreasonable Arrest - Wrongful Arrest Without Probable Cause
..............................................................................................p. 6

     1C: Unreasonable Force - Arrest With Excessive Force
..............................................................................................p. 6

II.     SUMMARY OF EVIDENCE IN SUPPORT OF PLAINTIFF'S FIRST CLAIM, SECTION 1983 - UNREASONABLE SEIZURE OF PERSON
..............................................................................................p. 6

     1A.    Unreasonable Stop
..............................................................................................p. 6

     1B.    Unreasonable Arrest
..............................................................................................p. 7

     1C.    Unreasonable Force
..............................................................................................p. 8

III.    ELEMENTS REQUIRED TO ESTABLISH PLAINTIFF'S SECOND CLAIM, DEFENDANT COUNTY OF LOS ANGELES IS LIABLE FOR DEFENDANT KELLY'S VIOLATIONS OF SECTION 1983
..............................................................................................p. 10

     2A.    Unlawful Official Policy, Practice, or Custom
..............................................................................................p. 10

     2B.    Policy That Fails to Prevent Violations of Law or Policy of Failure to Train
..............................................................................................p. 10

IV.     SUMMARY OF EVIDENCE IN SUPPORT PLAINTIFF'S SECOND CLAIM, DEFENDANT COUNTY OF LOS ANGELES IS LIABLE FOR DEFENDANT KELLY'S VIOLATIONS OF SECTION 1983
..............................................................................................p. 11

     A.    Defendant Kelly's Checkered Past
..............................................................................................p. 11

1

      B.     Defendant Kelly's Lack Of Supervision, Discipline & Training
……………………………………………………………………..p. 14

2

      C.     The Los Angeles County Sheriff's Department's Sordid History of
Racial Profiling And Discriminatory Traffic Stops

3

……………………………………………………………………..p. 15

4

IV.    SUMMARY STATEMENT OF COUNTERCLAIMS AND AFFIRMATIVE
DEFENSES

5

……………………………………………………………………..p. 17

6

V.     IDENTIFICATION OF ANTICIPATED EVIDENTIARY ISSUES

7

……………………………………………………………………..p. 18

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

## Ninth Circuit Manual of Model Jury Instructions

9.3 Section 1983 Claim Against Defendant in Individual Capacity—Elements and Burden of Proof
..................................................................................................................p. 5

9.5 Section 1983 Claim Against Local Governing Body Defendants Based on Unlawful Official Policy, Practice, or Custom—Elements and Burden of Proof
..................................................................................................................p. 10

9.8 Section 1983 Claim Against Local Governing Body Defendants Based on a Policy That Fails to Prevent Violations of Law or a Policy of Failure to Train—Elements and Burden of Proof
......................................................................................................p. 10, 11

9.20 Particular Rights—Fourth Amendment—Unreasonable Seizure of Person—Generally
..................................................................................................................p. 5

9.21 Particular Rights—Fourth Amendment—Unreasonable Seizure of Person—Exception to Warrant Requirement—Terry Stop
..................................................................................................................p. 6

9.23 Particular Rights—Fourth Amendment—Unreasonable Seizure of Person—Probable Cause Arrest
..................................................................................................................p. 6

9.25 Particular Rights—Fourth Amendment—Unreasonable Seizure of Person—Excessive Force
..................................................................................................................p. 6

## Case Law

*Village of Arlington Heights v. Metropolitan Housing Dev. Corp.* (1977) 429 U.S. 252
..................................................................................................................p. 17

*Harlow v. Fitzgerald* (1981) 457 U.S. 800
..................................................................................................................p. 17

*Monell v. Dep't of Soc. Servs. of N.Y.* (1978) 436 U.S. 658
..................................................................................................................p. 18

1    ### MEMORANDUM OF CONTENTIONS OF FACT AND LAW

2        Plaintiff, JOSHUA ASSIFF (hereinafter "Plaintiff") hereby respectfully

3    submits the following memorandum of contentions of fact and law in support of his

4    claims against Defendants COUNTY OF LOS ANGELES and TRAVIS KELLY

5    (hereinafter "Defendants")

6    **I.    STATEMENT OF PLAINTIFF'S CLAIMS**

7        Claim 1:    Section 1983, Defendant Kelly violated Plaintiff's

8    Constitutional rights under the Fourth Amendment, unreasonable seizure of person.

9            1A:    Wrongful Stop Without Reasonable Suspicion

10           1B:    Wrongful Arrest Without Probable Cause

11           1C:    Arrest With Excessive Force

12       Claim 2:    Section 1983, Defendant County of Los Angeles is legally

13   responsible for Defendant Kelly's violation of Plaintiff's Constitutional rights.

14           2A.    Unlawful Official Policy, Practice, or Custom

15           2B.    Policy That Fails to Prevent Violations of Law or Policy of

16   Failure to Train

17   **II.    ELEMENTS REQUIRED TO ESTABLISH PLAINTIFF'S FIRST**

18   **CLAIM, SECTION 1983 - UNREASONABLE SEIZURE OF PERSON**

19       1.    Defendant Kelly acted under color of state law; and

20       2.    The acts of the Defendant Kelly deprived the Plaintiff of his particular

21   rights under the Fourth Amendment to the United States Constitution to be free

22   from unreasonable seizures of person.  [Ninth Circuit Manual of Model Jury

23   Instructions ("Instruction") § 9.3]

24       3.    Defendant Kelly seized the Plaintiff's person

25       4.    In seizing the Plaintiff's person, Defendant Kelly acted intentionally;

26   and

27       5.    The seizure was unreasonable. [Instruction § 9.20]

28

**1A: Unreasonable Stop - Wrongful Stop Without Reasonable Suspicion**

6.    Defendant Kelly lacked "reasonable suspicion" to stop Plaintiff.

7.    "Reasonable suspicion" is a particularized and objective basis for suspecting the plaintiff of criminal activity. [Instruction § 9.21]

**1B: Unreasonable Arrest - Wrongful Arrest Without Probable Cause**

6.    Defendant Kelly arrested Plaintiff without "probable cause."

7.    "Probable cause" exists when, under all of the circumstances known to the officer at the time, an objectively reasonable police officer would conclude there is a fair probability that the plaintiff has committed or was committing a crime. [Instruction 9.23]

**1C: Unreasonable Force - Arrest With Excessive Force**

6.    Defendant Kelly used excessive force while arresting plaintiff.

7.    A police officer may use only such force as is "objectively reasonable" under all of the circumstances. [Instruction 9.25]

**II.    SUMMARY OF EVIDENCE IN SUPPORT OF PLAINTIFF'S FIRST CLAIM, SECTION 1983 - UNREASONABLE SEIZURE OF PERSON**

Defendant Kelly was acting as a Sergeant for the Los Angeles County Sheriff's Department at the time of the incident and was acting under color of state law.  The incident, from the initiation of the traffic stop, was captured on Defendant Kelly's body worn camera and partially captured on Plaintiff's mobile phone.  The video evidence is the best evidence that Defendant Kelly's actions during the traffic stop were intentional and unreasonable.

**1A.    Unreasonable Stop**

As for the stop itself, there is no evidence except the testimony of Plaintiff and Defendant Kelly as to the reason for the stop.  Plaintiff will testified the light was green and there were no pedestrians in the crosswalk and the turn was perfectly legal.  Defendant Kelly will testify the light was red and there were pedestrians in the crosswalk.  Plaintiff contends that a jury will believe Plaintiff over Defendant

Kelly.  The practice of Los Angeles County Sheriff's Department personnel disproportionately initiating traffic stops against African American drivers, as well documented in the NCCD report, adds further credence to Plaintiff's contention that the stop was without reasonable suspicion.

### 1B.    Unreasonable Arrest

As for probable cause for the arrest, again, the video record represents the best evidence.  Plaintiff was polite and courteous to Defendant Kelly, always referring him as either "officer" or "sir."  Plaintiff stated his position that the light was in fact green in response to Defendant Kelly's false assertions that the light was red.  Plaintiff was not agitated and his speech was not rapid.  Once Plaintiff was requested to produce his driver's license for the first time, Plaintiff immediately complied and reached for his wallet.  Even Defendant Kelly in his deposition conceded that Plaintiff was in the process of producing his driver's license when Defendant Kelly, not Plaintiff, re-engaged Plaintiff in the debate over the color of the light.

Defendant Kelly claims without evidence that he could smell a strong odor of burnt marijuana emitting from Plaintiff's vehicle.  However, there was not a smell of burnt marijuana emanating from Plaintiff's vehicle.  It was 7:50 a.m. in the morning.  Plaintiff, a college athlete, was on his way to basketball practice.  Plaintiff did not ingest any marijuana that morning.  Plaintiff did not smoke any marijuana on that morning.  Plaintiff never smoked marijuana in his Vehicle.

After only 42 seconds into a traffic stop for a minor traffic infraction, Kelly threatened to arrest Plaintiff.  Following this seemingly irrational threat, Plaintiff stated his intention to record the interaction on his mobile phone.  Immediately thereafter, Defendant Kelly threw open the door to Plaintiff's vehicle and grabbed Plaintiff's arm in an effort to prevent Plaintiff from recording the encounter.

As set forth above, there was no probable cause for the arrest.  There was no traffic infraction.  There was no marijuana smell.  Plaintiff was in the process of

complying by producing his license when Defendant Kelly reengaged Plaintiff in the argument over the color of the light.  After Defendant Kelly unreasonable threatened to arrest Plaintiff after only a matter of seconds, Plaintiff paused to start recording the encounter.  That momentary pause was not a refusal to comply, it did not create probable cause for an arrest, and it did not justify Defendant Kelly's unnecessary and unreasonable escalation of the incident to the use of force.

### 1C.    Unreasonable Force

After the fact, Defendant Kelly claimed that Plaintiff had kicked him when Defendant Kelly first grabbed Plaintiff's arm, and Defendant Kelly used that alleged assault and battery on an officer to justify his use of force against Plaintiff.  However, Plaintiff never kicked Defendant Kelly.  Defendant Kelly conceded in his deposition the he did not see the alleged kick.  His motorcycle pants were thickly padded and it may have been Plaintiff's knee with which he came into contact.

After only a mere 73 seconds into a traffic stop for a minor traffic infraction, Defendant Kelly threatened to pepper spray Plaintiff.  In response to that irrational threat, Plaintiff requested to speak with Defendant Kelly's supervisor.  In immediate response, Defendant Kelly deployed the pepper spray. The request to speak to the supervisor was at 07:54:06, the pepper spray was deployed at 07:54:07 and Defendant Kelly can be heard angrily shouting "I AM THE SUPERVISOR" as he sprayed the pepper spray into Plaintiff's face.

At about 1 minute and 25 seconds into the BWC footage, a second Deputy (identified as Deputy Joshua Clark) can be seen attempting to aid Defendant Kelly by pulling Plaintiff out of the vehicle with a choke hold around Plaintiff's neck which itself was excessive, objectively unreasonable and inconsistent with generally accepted police practices.  During the struggle Defendant Kelly punched Plaintiff in the face.   After the fact, Defendant Kelly attempted to justify punching Plaintiff in the face by claiming that Plaintiff had punched Deputy Clark in the chest.  Plaintiff did not punch Deputy Clark in the chest.  Defendant Kelly in his

deposition conceded that he could not see the punch on the video and had trouble
locating where in the video it allegedly occurred.  Again, Defendant Kelly
fabricated this claimed assault and battery on an officer to justify, after the fact, his
unlawful use of force against Plaintiff.

At about 2 minutes and 20 seconds into the stop, a third Deputy (Deputy
Garrett Gallegos) arrived on the scene. Shortly thereafter, Deputy Gallegos
deployed his Taser to Plaintiff's back through direct contact.  At about 2 minutes
and 27 seconds, the three Deputies were able to bring Plaintiff out of his vehicle
and to the ground next to it. After being removed from his vehicle, Plaintiff was not
resisting.  He was involuntarily thrashing about as a result of being pepper sprayed
in the face and tased in the back.  He did not kick or punch. At about 2 minutes and
36 seconds, Deputy Gallegos again deployed his Taser to Plaintiff.  Defendant
Kelly ordered Plaintiff to roll onto his stomach and place his hands behind his back,
and warned that the Taser would be used again if he did not comply. Plaintiff then
rolled onto his stomach and was placed in handcuffs.

Defendant Kelly's use of force against Plaintiff was unreasonable and
excessive.  As Plaintiff's police practices expert will testify, Defendant Kelly's
failure to use de-escalation techniques was inconsistent with generally accepted
police practices.  If he had used proper de-escalation techniques no force would
have been necessary.  Defendant Kelly's use of pepper spray, given the
circumstances, was objectively unreasonable, excessive and inconsistent with
generally accepted police practices.  Defendant Kelly's use of a punch to Plaintiff's
face, given the circumstances, was objectively unreasonable, excessive and
inconsistent with generally accepted police practices.

### III.    ELEMENTS REQUIRED TO ESTABLISH PLAINTIFF'S SECOND CLAIM, DEFENDANT COUNTY OF LOS ANGELES IS LIABLE FOR DEFENDANT KELLY'S VIOLATIONS OF SECTION 1983

1.    Defendant Kelly, an employee of The County of Los Angeles, acted under color of state law;

2.    The acts of Defendant Kelly deprived Plaintiff of his particular rights under the Fourth Amendment to the United States Constitution to be free from unreasonable seizures of person; [Instructions §§ 9.5 and 9.8]

**2A.    Unlawful Official Policy, Practice, or Custom**

3.    Defendant Kelly acted pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom of the Defendant County of Los Angeles; and

4.    Defendant County of Los Angeles' official policy or widespread or longstanding practice or custom caused the deprivation of the plaintiff's rights by the Defendant Kelly; that is, Defendant County of Los Angeles' official policy or widespread or longstanding practice or custom is so closely related to the deprivation of the plaintiff's rights as to be the moving force that caused the ultimate injury. [Instruction § 9.5]

**2B.    Policy That Fails to Prevent Violations of Law or Policy of Failure to Train**

3.    The training and policies of Defendant County of Los Angeles were not adequate to prevent violations of law by its employees or to train its employees, such as Defendant Kelly, to handle the usual and recurring situations with which they must deal;

4.    Defendant County of Los Angeles was deliberately indifferent to the substantial risk that its policies were inadequate to prevent violations of law by its employees or known or obvious consequences of its failure to train its employees, such as Defendant Kelly, adequately; and

5.     The failure of Defendant County of Los Angeles to prevent violations of law by its employees or to provide adequate training caused the deprivation of Plaintiff's rights by the Defendant Kelly; that is, Defendant County of Los Angeles' failure to prevent violations of law by its employees or to train played a substantial part in bringing about or actually causing the injury or damage to Plaintiff. [Instruction § 9.8]

## IV.     SUMMARY OF EVIDENCE IN SUPPORT PLAINTIFF'S SECOND CLAIM, DEFENDANT COUNTY OF LOS ANGELES IS LIABLE FOR DEFENDANT KELLY'S VIOLATIONS OF SECTION 1983

Defendant Kelly's personnel records demonstrate that he has a very checkered past.  He has demonstrated animosity towards people of color.  He has a long history of rude and abusive conduct towards motorists and the public that was not only condoned but actually rewarded due to the County's inadequate supervision, discipline and training.  The County coddled Defendant Kelly and encouraged his violations of stated policies with a promotion.  This, combined with the findings of the U.S. Department of Justice and the National Council on Crime & Delinquency ("NCCD") demonstrate that the County had policies, practices or customs that resulted in Plaintiff's injuries or the County's failure to prevent violations of the law by its employees or its failure to train its employees played a substantial part in bringing about or actually causing the injury or damage to Plaintiff.

### A.     Defendant Kelly's Checkered Past

Defendant Kelly is a bad motorcycle cop.  He has repeatedly been subject to complaints from members of the public for being rude and abusive.

In July of 2013, Defendant Kelly was rude to a motorist during a traffic stop. He threw the driver's license back at the motorist (a nurse), took back the citation, changed it, gave it back to the motorist, and said, "now it's double."

In November of 2019, Defendant Kelly was dealing with a motorist involved in a collision. The motorist complained that Defendant Kelly was incomplete, defensive, disrespectful and condescending. The Department investigated and concluded, "our employee could have been better."

In February of 2020, Defendant Kelly was accused of harassing a motorist and arresting a motorist for merely having an expired registration. After an investigation of the complaint, the Sheriff's Department again concluded, "our employee could have been better."

In April of 2020, Defendant Kelly was subject of a personnel complaint while dealing with a member of the public who called into the station to complain about excessive motorcycle noise. Defendant Kelly, a motorcycle cop and rider, reportedly refused to accept the report, was rude, and threatened to hang up.

In June of 2022, Defendant Kelly was once again rude to a motorist. He threw the motorist's credentials back at the motorist and told him to "enjoy your citation." After an investigation of the complaint, the Sheriff's Department once again concluded, "our employee could have been better."

These repeated complaints show that Defendant Kelly simply does not have the temperament, nor the manners, to be a law enforcement officer dealing with motorists and other members of the public. However, there are even more troubling incidents in Defendant Kelly's past reflecting on his disposition and temperament.

In June of 2014, Defendant Kelly while riding a motorcycle off-duty was himself pulled over by a sergeant with the LAPD for speeding. Defendant Kelly was rude to the sergeant, questioned where he worked, and drove off from the traffic stop before the sergeant could cite him. The Sheriff's Department investigated the incident and yet again officially concluded "the actions of [Defendant Kelly] should have been better." Internally, Defendant Kelly's

supervisor found, "[y]our actions were unprofessional and your behavior brought discredit to yourself and the Department."

In deposition, while discussing the June 2014 incident, Defendant Kelly confessed that he did not like working for an African American captain and only signed the performance log entry for the incident because his signature was coerced from him.  Allegedly, the African American captain threatened to withhold Defendant Kelly's promotion unless he signed the performance log entry.  If Defendant Kelly is to be believed, he was required to admit to rude, unprofessional, discrediting, officious, and overbearing (if not illegal) conduct to secure his promotion to sergeant.  Defendant Kelly also admitted to signing the performance log entry so he could stop working underneath the African American captain whom he did not like.

In July of 2015, Defendant Kelly was criticized for his conduct leading up to a use of force incident against an Hispanic inmate.  According to reports, Defendant Kelly had a history of conflict with this Hispanic inmate.  Defendant Kelly caused this inmate to be sentenced to 29 days of discipline for allegedly being disrespectful, and yet it was Defendant Kelly who had been disrespectful.  He said to the inmate, "What the fuck are you, a Southsider (an Hispanic jail gang member)"  After sentencing this Hispanic inmate to discipline, Defendant Kelly taunted the inmate outside his cell.  Defendant Kelly called the Hispanic inmate a "faggot" and "little punk."  When the inmate responded by saying he should have taken his shot at Defendant Kelly at the discipline hearing, Defendant Kelly responded, "Oh you want a chance?"  Then Defendant Kelly, against department policy, ordered the inmate's cell door opened, stood in the doorway, and said, "Here's your shot."  A physical altercation between the inmate and Defendant Kelly ensued and the inmate claimed he was beaten and choked.

Defendant Kelly was criticized for this use of force by his supervisor for there being no video of the incident, there was no radio broadcast of the incident,

1  and Defendant Kelly opened the cell door against department policy.  An internal

2  affairs investigation apparently resulted in Defendant Kelly being suspended for 4

3  days, but the suspension was not given until almost three years later in April of

4  2017.  Furthermore, Defendant Kelly in his deposition admitted that he never

5  served the 4 day suspension.

6      In spite of all of these glaring warning signs showing that Defendant Kelly is

7  unfit to be a Sheriff's Deputy, he was nevertheless promoted to sergeant and in his

8  July 2020 performance evaluation his supervisor wrote, "you are an outstanding

9  sergeant and a key member of my team."

10  **B.  Defendant Kelly's Lack Of Supervision, Discipline & Training**

11      The County provided Defendant Kelly with inadequate supervision.

12  Defendant Kelly was his own supervisor at the time of the incident, meaning he had

13  no supervision whatsoever.  (At 07:54:07 Defendant Kelly can be heard angrily

14  shouting "I AM THE SUPERVISOR" as he sprayed the pepper spray into

15  Plaintiff's face.)

16      The County provided Defendant Kelly with inadequate discipline following

17  his many transgressions.  He was repeatedly given inconsequential slaps on the writ

18  for being rude and abusive to motorists and other members of the public -- "our

19  employee could have been better."  Incredibly, after he himself drove off from a

20  traffic stop, his reward for admitting to rude, unprofessional, discrediting, officious,

21  and overbearing (if not illegal) conduct was a promotion to sergeant.  After a use of

22  force incident where Defendant Kelly called an Hispanic inmate a "faggot" and

23  "little punk" and opened up the inmate's cell door so that he could challenge the

24  inmate to a fight, Defendant Kelly was only given a 4 day suspension. However,

25  even here, the suspension was only for show.  It was given almost 3 years after the

26  incident (in the interim Defendant Kelly had been promoted), and Defendant Kelly

27  admitted that he was never required to serve the suspension.

28

The County provided Defendant Kelly with inadequate training.  Although the County is good a checking boxes claiming they provided training, the proof is in the product of that training.  Defendant Kelly is a horribly arrogant law enforcement officer.  Defendant Kelly's failure to use de-escalation techniques was inconsistent with generally accepted police practices.  Defendant Kelly unnecessarily escalated the contact with Plaintiff creating the need to use force that would have likely not have been otherwise necessary. Had Defendant Kelly followed generally accepted police practices and his department policy and used de-escalation to gain voluntary compliance, it is likely that no force would have been necessary.  Defendant Kelly's use of pepper spray on Plaintiff was objectively unreasonable, excessive and inconsistent with generally accepted police practices.  Defendant Kelly's punch to Plaintiff's face was excessive, objectively unreasonable and inconsistent with generally accepted police practices.

Finally, it appears that the County falsified the investigation of this incident to make it appear that the County's training was more effective than it actually was. Defendant Kelly's superiors in their use of force review attempted to demonstrate that Defendant Kelly was aware of appropriate de-escalation training and techniques by stated Defendant Kelly appropriately used these techniques with an uncooperative driver just 24 minutes prior to the incident involving Plaintiff. However, the County has no record whatsoever of this prior incident.  Furthermore, in deposition, Defendant Kelly denied that any such incident took place.

**C.**    **The Los Angeles County Sheriff's Department's Sordid History of Racial Profiling And Discriminatory Traffic Stops**

The incident that is the subject matter of this lawsuit happened while Plaintiff was traveling to the Antelope Valley.  However, it occurred in Santa Clarita, in a northern part of the County, but just one Sheriff's Department station adjacent to but south of the actual Antelope Valley.

The Los Angeles County Sheriff's Department has a long and sordid history of racial profiling and discriminatory traffic stops, particularly in the County's northern stations, such as the Antelope Valley.  For years, black and Latino residents in the Antelope Valley complained they were the victims of racially biased stops and searches along with other mistreatment by Los Angeles County Sheriff's deputies.  In 2013, the US Department of Justice, Civil Rights Division analyzed Sheriff's Department data from tens of thousands of vehicle and pedestrian stops, interviewed hundreds of people and reviewed volumes of internal sheriff's documents, and after this thorough analysis the Department of Justice "found that LASD's Antelope Valley stations have engaged in a pattern or practice of discriminatory and otherwise unlawful searches and seizures, including the use of unreasonable force, in violation of the Fourth Amendment, the Fourteenth Amendment, and Title VI."  The findings forced the county to reach a legal settlement with federal authorities in 2015 that called for significant reforms and continued oversight.

However, despite all of this, the racial profiling and discriminatory traffic stops persist, as evidenced by continued gross racial disparities.  An NCCD report from 2020 found on the Sheriff's Department's own website entitled, "An Analysis of Racial/Ethnic Disparities in Stops by Los Angeles County Sheriff's Deputies in the Antelope Valley" the report found that Black drivers make up 32% of all traffic stops even though they account for only 17% of the population.  The report also found that black drivers once stopped were more likely to have both their vehicle and their persons searched, more likely to experience backseat detentions, and more likely to be asked if they are on probation or parole.  All this is in spite of the fact that black drivers have a much lower contraband discovery rate (15.4%) than either their white or Hispanic counterparts (24.4% and 22.3% respectfully).  This problem with racial profiling and discriminatory traffic stops in the Antelope Valley is not an isolated single incident, but rather a persistent and ongoing problem with the Los

Angeles County Sheriff's Department recognized by the US Department of Justice,
Civil Rights Division.

The racial disparities also existed in those suspicious use of force incidents
(such as the incident between Plaintiff and Defendant KELLY) where a suspect was
charged with only resisting arrest or obstructing an officer but no other crimes.
U.S. Department of Justice, Civil Rights Division found as follows:  "Perhaps most
strikingly, we found that 81% of the uses of force we reviewed where the only
charge was obstruction-related involved targets who were African American or
Latino. For the 25 felony obstruction-only arrests, 88% involved victims who were
people of color. This is an extraordinarily disproportionate number of obstruction
charges involving use of force against people of color and warrants close attention
by the Department. See, *Arlington Heights*, 429 U.S. at 266 (intent may be
established by "clear pattern, unexplainable on grounds other than race")."

The combination of US DOJ's findings and the findings of the Sheriff's
Department's own oversight monitors as well as the evidence of the inadequate
supervision, discipline, and training of Defendant Kelly show that Defendant
County of Los Angeles had policies customs or practices that resulted in Plaintiff's
injuries or that the Defendant County of Los Angeles' failure to prevent violations
of the law by its employees or failure to train its employees resulted in Plaintiff's
injuries.

## IV.    SUMMARY STATEMENT OF COUNTERCLAIMS AND
## AFFIRMATIVE DEFENSES

Defendants contend that Defendant Kelly's actions are protected by qualified
immunity.  Statutory immunity protects government official unless their actions
violate "clearly established statutory or Constitutional rights of which a reasonable
person would have known."  [*Harlow v. Fitzgerald* (1981) 457 U.S. 800]
Defendant Kelly's traffic stop of Plaintiff was made without reasonable suspicion
and constituted racial profiling. Defendant Kelly's arrest was without probable

cause and his use of force against Plaintiff was excessive, objectively unreasonable,
and inconsistent with generally accepted police practices.  The facts, as set forth
above, do not show a mistake or a slight lapse of judgment, but rather show a clear
violation of Plaintiff's Constitutional rights about which any reasonable person
would know.

## V.    IDENTIFICATION OF ANTICIPATED EVIDENTIARY ISSUES

Defendants argue that the findings of the Justice Department and the NCCD
only concern the Antelope Valley stations and are irrelevant here.  Plaintiff was
traveling to the Antelope Valley at the time of the incident.  However, the traffic
stop actually took place in Santa Clarita -- another northern area of the County and
just one Sheriff's Department station adjacent to but south of the actual Antelope
Valley.  The studies concern the same governmental entity, the Los Angeles County
Sheriff's Department, which has the same policies and procedures regardless of the
station.  The fact that there are a few off ramps on the 14 freeway separating
Defendant Kelly's station from the stations subject to the report, would only
potentially go to weight, not admissibility.

Additional evidentiary issues have been identified in Plaintiff's motions in
limine.  1) Plaintiff seeks issue and evidentiary sanctions against Defendants for
failing to produce a witness for a properly notice deposition.  2) Defendants' expert
testimony should excluded or limited, because Defendants' expert seeks to opine
concerning legal conclusions and ultimate issues such as "probable cause" or liability
generally under *Monell v. Dep't of Soc. Servs. of N.Y.* (1978) 436 U.S. 658.


DATED: June  16 , 2023          The Law Office Of Thomas M. Ferlauto, APC


By: _____

Thomas M. Ferlauto
Attorney For:  Plaintiff, JOSHUA ASSIFF