THOMAS M. FERLAUTO (SBN 155503)
LAW OFFICE OF THOMAS M. FERLAUTO, APC
25201 Paseo de Alicia, Suite 270
Laguna Hills, California 92653
Telephone: 949-334-8650
Fax: 949-334-8691
Email: TMF@lawofficeTMF.com

Attorney for Plaintiff, JOSHUA ASSIFF

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JOSHUA ASSIFF,**<br><br>**Plaintiff,**<br><br>v.<br><br>**COUNTY OF LOS ANGELES; SHERIFF DEPUTY BADGE NUMBER 404532; And DOES 1 through 10,**<br><br>**Defendants.** | **Case No. 2:22-cv-05367 RGK (MAAx)**<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br><br>DATE:        June 26, 2023<br>TIME:        9:00 a.m.<br>COURTROOM:   850<br><br>Action Filed: August 3, 2022<br>Pretrial Conference: July 10, 2023<br>Trial Date: July 25, 2023<br><br>Assigned to: Hon. R. Gary Klausner, District Judge, Courtroom 850 |

1

# **TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES

……………………………………………………………………….. p. 4

I.    INTRODUCTION

……………………………………………………………………….. p. 4

II.    STATEMENT OF FACTS

……………………………………………………………………….. p. 5

A.    The Traffic Stop And Arrest

……………………………………………………………………….. p. 5

B.    Defendant Kelly's Checkered Past

……………………………………………………………………….. p. 9

C.    Defendant Kelly's Lack Of Supervision, Discipline & Training

……………………………………………………………………….. p. 11

D.    The Los Angeles County Sheriff's Department's Sordid History of Racial Profiling And Discriminatory Traffic Stops

……………………………………………………………………….. p. 13

III.    DEFENDANT KELLY'S ARREST OF PLAINTIFF WAS WITHOUT PROBABLE CAUSE

……………………………………………………………………….. p. 15

IV.    DEFENDANT KELLY IS NOT PROTECTED BY QUALIFIED IMMUNITY

……………………………………………………………………….. p. 16

V.    THE COUNTY IS LIABLE FOR ITS UNSTATED POLICIES AND PRACTICES THAT ENABLED DEFENDANT KELLY'S VIOLATION OF PLAINTIFF'S RIGHTS

……………………………………………………………………….. p. 16

VI.    DEFENDANT KELLY IS LIABLE FOR PUNITIVE DAMAGES

……………………………………………………………………….. p. 17

VII.    PLAINTIFF REQUESTS THAT THE COURT DENY THIS MOTION PURSUANT TO FRCP RULE 56(d), OR IN THE ALTERNATIVE, TO DEFER RULING ON THIS MOTION UNTIL PLAINTIFF CAN PRESENT ADDITIONAL DISCOVERY AND DECLARATIONS

……………………………………………………………………….. p. 18

VIII.  CONCLUSION

……………………………………………………………………….. p. 19

1

## <u>TABLE OF AUTHORITIES</u>

2

42 USC § 1983

3
.................................................................................................. p. 4

4
FRCP Rule 56(d)
.................................................................................... p. 18, 19

5

6
*Arlington Heights*, 429 U.S. at 266
.................................................................................................. p. 14

7
*Dubner v. City & Cnty. of S.F.* (9th Cir. 2001) 266 Fed.3d 959, 964

8
.................................................................................................. p. 15

9
*Harlow v. Fitzgerald* (1981) 457 U.S. 800
.................................................................................................. p. 16

10
*Galen v. Cnty. of L.A.*, 477 F.3d 652, 667 (9th Cir. 2007)

11
.................................................................................................. p. 16

12
*Monell v. Dep't of Soc. Servs. of the City of N.Y.C.*, 436 U.S. 658, 694-95 (1978)
.................................................................................................. p. 16, 17

13
*Zrevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996)

14
.................................................................................................. p. 16

15
*City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 254 (1981)
.................................................................................................. p. 17

16
*Morgan v. Woessner*, 997 F.2d 1244, 1255 (9th Cir.1993)

17
.................................................................................................. p. 17

18
*Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005)
.................................................................................................. p. 18

19
*Smith v. Wade*, 416 U.S. 30, 49 (1983)

20
.................................................................................................. p. 18

21
*Celotex Corp. v. Catrett* (1986) 477 U.S. 317, 106 S.Ct. 2548, 2554
.................................................................................................. p. 18

22
*Rivera-Torres v. Rey-Hernández* (1st Cir. 2007) 502 Fed.3d 7, 10

23
.................................................................................................. p. 18

24
*Tatum v. City & County of San Francisco* (9th Cir. 2006) 441 Fed.3d 1090, 1101
.................................................................................................. p. 19

25
*Trask v. Franco* (10th Cir. 2006) 446 Fed.3d 1036, 1042

26
.................................................................................................. p. 19

27
*In re PHC, Inc. Shareholder Litig.* (1st Cir. 2014) 762 Fed.3d 138, 143-144
.................................................................................................. p. 19

28

3

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiff, JOSHUA ASSIFF (hereinafter "Plaintiff") hereby respectfully submits the following memorandum of points and authorities in opposition to the motion for partial summary judgment filed in this action by Defendants COUNTY OF LOS ANGELES and TRAVIS KELLY (hereinafter "Defendants")

### I.    INTRODUCTION

Plaintiff is a 21-year old black male and a student at Antelope Valley College where he plays basketball.  Plaintiff was driving from his home to a teammate's house in order to carpool to basketball practice.  Plaintiff was obeying all traffic laws and regulations and made a legal right hand turn on a green light.  For no apparent reason and without probable cause, Defendant Kelly, a male Caucasian motorcycle Sheriff's sergeant, pulled Plaintiff over.  For no apparent reason and without probable cause, Defendant Kelly – as well as other deputies who subsequently responded to the call – all tasered, choked, pepper sprayed, beat and arrested Plaintiff.  Plaintiff has asserted two causes of action – the First Cause of Action against Defendant for violation of 42 USC § 1983 (arrest without probable cause and with excessive force), and the Second Cause of Action against the County of Los Angeles for violation of 42 USC § 1983 (*Monell* liability).

Defendants bring this motion for partial summary judgment.  Defendants argue that the arrest was made with probable cause.  However, as explained below, the evidence, including the video of the events leading up to the arrest, show that there was no probable cause for either the traffic stop or the subsequent arrest.  At the least, there is a trial issue of fact.

Defendants argue that Defendant Kelly should be protected by qualified immunity.  However, again as explained below, Defendant Kelly's actions were objectively unreasonable and a clear violation of Plaintiff's Constitutional rights.

Defendants argue that the County should not be liable for Defendant Kelly's conduct (Monell liability).  However, Defendant Kelly has a very checkered past.

Defendant Kelly was permitted to continue his abusive conduct towards motorists and the public due to the County's inadequate supervision, discipline and training. The County coddled Defendant Kelly and encouraged his violations of stated policies with promotion. This, combined with the findings of the U.S. Department of Justice and the County's own monitors demonstrate that the County had an unstated policy of employing deputies to bully and harass African American drivers by way of initiating frivolous traffic stops, making arrests without probable cause, and using excessive force.

Finally, Defendants argue that Defendant Kelly should not face the prospect of punitive damages. Defendants argue there is no evidence of malice, oppression, or disregard of Plaintiff's rights. Obviously, this is a question for the jury. The evidence suggests Defendant Kelly acted without probable cause and his violent use of force was excessive, objectively unreasonable and inconsistent with generally accepted police practices. Certainly, the jury could reasonably determine that Defendant Kelly acted in malice, oppression, or in disregard of Plaintiff's rights.

## II.   STATEMENT OF FACTS

### A.   The Traffic Stop And Arrest

On or about September 24, 2021, Plaintiff, a 21-year-old black male, was pulled over and subsequently arrested by a male Caucasian motorcycle officer, Defendant Kelly. (See, Plaintiff's Response To Defendant's Separate Statement Of Uncontroverted Facts "Response To Fact" 1) There was no probable cause for the traffic stop, let alone the subsequent arrest. The light was green when Plaintiff made a legal right hand turn. (See, Plaintiff's Additional Facts Giving Rise To Triable Issues "Additional Fact" 101) There were no pedestrians in the crosswalk when Plaintiff made a legal right hand turn. (Additional Fact 102) The incident was captured on video by Defendant Kelly once he activated his non-department issued personal Body Worn Camera ("BWC") as he was dismounting his motorcycle at the outset of the traffic stop. (Response To Fact 3) Plaintiff was polite and courteous to

Defendant Kelly, always referring him as either "officer" or "sir." Plaintiff stated his position that the light was in fact green in response to Defendant Kelly's false assertions that the light was red. (Response to Fact 4)

Defendant Kelly claims without evidence that he could smell a strong odor of burnt marijuana emitting from Plaintiff's vehicle. However, there was not a smell of burnt marijuana emanating from Plaintiff's vehicle. It was 7:50 a.m. in the morning. Plaintiff, a college athlete, was on his way to basketball practice. Plaintiff did not ingest any marijuana that morning. Plaintiff did not smoke any marijuana on that morning. Plaintiff never smoked marijuana in his Vehicle. (Additional Fact 103)

Plaintiff was not agitated and his speech was not rapid. (Additional Fact 104) Once Plaintiff was requested to produce his driver's license for the first time, Plaintiff immediately complied and reached for his wallet. (Additional Fact 106) Even Defendant Kelly in his deposition conceded that Plaintiff was in the process of producing his driver's license when Defendant Kelly, not Plaintiff, re-engaged Plaintiff in the debate over the color of the light. (Additional Fact 107)

After only 42 seconds into a traffic stop for a minor traffic infraction, Kelly threatened to throw Plaintiff in jail. Following this seemingly irrational threat, Plaintiff stated his intention to record the interaction on his mobile phone. (Additional Fact 108) Immediately after Plaintiff stated his intention to record the interaction on his mobile phone, Defendant Kelly threw open the door to Plaintiff's vehicle and grabbed Plaintiff's arm in an effort to prevent Plaintiff from recording the encounter. (Additional Fact 109)

After the fact, Defendant Kelly claimed that Plaintiff had kicked him when Defendant Kelly first grabbed Plaintiff's arm, and Defendant Kelly used that alleged assault and battery on an officer to justify his use of force against Plaintiff. However, Plaintiff never kicked Defendant Kelly. (Additional Fact 110) Defendant Kelly conceded in his deposition the he did not see the alleged kick. His

1   motorcycle pants were thickly padded and it may have been Plaintiff's knee with
2   which he came into contact. (Additional Fact 111)

3        After only a mere 73 seconds into a traffic stop for a minor traffic infraction,
4   Defendant Kelly threatened to pepper spray Plaintiff.  In response to that irrational
5   threat, Plaintiff requested to speak with Defendant Kelly's supervisor. (Additional
6   Fact 112)  In immediate response to Plaintiff's request to speak with Defendant
7   Kelly's supervisor, Defendant Kelly deployed the pepper spray. The request to
8   speak to the supervisor was at 07:54:06, the pepper spray was deployed at 07:54:07
9   and Defendant Kelly can be heard angrily shouting "I AM THE SUPERVISOR" as
10  he sprayed the pepper spray into Plaintiff's face. (Additional Fact 113) Defendant
11  Kelly's use of pepper spray on Plaintiff was objectively unreasonable, excessive
12  and inconsistent with generally accepted police practices.  (Additional Fact 129)

13       At about 1 minute and 25 seconds into the BWC footage, a second Deputy
14  (identified as Deputy Joshua Clark) can be seen attempting to aid Defendant Kelly
15  by pulling Plaintiff out of the vehicle with a choke hold around Plaintiff's neck
16  which was excessive, objectively unreasonable and inconsistent with generally
17  accepted police practices. (Additional Fact 139)  During the struggle Defendant
18  Kelly punched Plaintiff in the face.   After the fact, Defendant Kelly attempted to
19  justify punching Plaintiff in the face by claiming that Plaintiff had punched Deputy
20  Clark in the Chest.  Plaintiff did not punch Deputy Clark in the chest. (Additional
21  Fact 114)  Defendant Kelly in his deposition conceded that he could not see the
22  punch on the video and had trouble locating where in the video it allegedly
23  occurred. (Additional Fact 115)  Again, Defendant Kelly fabricated this claimed
24  assault and battery on an officer to justify, after the fact, his unlawful use of force
25  against Plaintiff.  Defendant Kelly's punch to Plaintiff's face was excessive,
26  objectively unreasonable and inconsistent with generally accepted police practices.
27  (Additional Fact 138)
28

Plaintiff's resistance was passive.  He did not kick or punch anyone.  He was merely trying to prevent himself from being pulled from his vehicle.  (Additional Fact 136)  As can be seen from Exhibit B, Defendant Kelly's BWC, generally, Plaintiff passively resisting the deputies' efforts to remove him from the vehicle, the "struggle" was one sided as the deputies pepper sprayed, punched and choked Plaintiff.  (Additional Facts 110 and 114)

At about 2 minutes and 20 seconds into the stop, a third Deputy (Deputy Garrett Gallegos) arrived on the scene. (Response to Fact 20)  Shortly thereafter, Deputy Gallegos deployed his Taser to Plaintiff's back through direct contact. (Response to Fact 21)  At about 2 minutes and 27 seconds, the three Deputies were able to bring Plaintiff out of his vehicle and to the ground next to it. (Response to Fact 22)  After being removed from his vehicle, Plaintiff was not resisting.  He was involuntarily thrashing about as a result of being pepper sprayed in the face and tased in the back.  He did not kick or punch. (Additional Fact 117) At about 2 minutes and 36 seconds, Deputy Gallegos again deployed his Taser to Plaintiff. (Response to Fact 24) Defendant Kelly ordered Plaintiff to roll onto his stomach and place his hands behind his back, and warned that the Taser would be used again if he did not comply. (Response to Fact 25) Plaintiff then rolled onto his stomach and was placed in handcuffs. (Response to Fact 26)

Defendant Kelly's failure to use de-escalation techniques was inconsistent with generally accepted police practices. (Additional Fact 118)  Defendant Kelly unnecessarily escalated the contact with Plaintiff creating the need to use force that would have likely not have been otherwise necessary. (Additional Fact 123)  Had Defendant Kelly followed generally accepted police practices and his department policy and used de-escalation to gain voluntary compliance, it is likely that no force would have been necessary. (Additional Fact 128)

**B.    Defendant Kelly's Checkered Past**

Defendant Kelly is a bad motorcycle cop.  He has repeatedly been subject to complaints from members of the public for being rude and abusive. (Additional Fact 140)

In July of 2013, Defendant Kelly was rude to a motorist during a traffic stop. He threw the driver's license back at the motorist (a nurse), took back the citation, changed it, gave it back to the motorist, and said, "now it's double." (Additional Fact 141)

In November of 2019, Defendant Kelly was dealing with a motorist involved in a collision.  The motorist complained that Defendant Kelly was incomplete, defensive, disrespectful and condescending.  The Department investigated and concluded, "our employee could have been better." (Additional Fact 142)

In February of 2020, Defendant Kelly was accused of harassing a motorist and arresting a motorist for merely having an expired registration.  After an investigation of the complaint, the Sheriff's Department again concluded, "our employee could have been better." (Additional Fact 143)

In April of 2020, Defendant Kelly was subject of a personnel complaint while dealing with a member of the public who called into the station to complain about excessive motorcycle noise.  Defendant Kelly, a motorcycle cop and rider, reportedly refused to accept the report, was rude, and threatened to hang up. (Additional Fact 144)

In June of 2022, Defendant Kelly was once again rude to a motorist.  He threw the motorist's credentials back at the motorist and told him to "enjoy your citation."  After an investigation of the complaint, the Sheriff's Department once again concluded, "our employee could have been better." (Additional Fact 145)

These repeated complaints show that Defendant Kelly simply does not have the temperament, nor the manners, to be a law enforcement officer dealing with motorists and other members of the public. (Additional Fact 146)  However, there

1  are even more troubling incidents in Defendant Kelly's past reflecting on his

2  disposition and temperament.

3        In June of 2014, Defendant Kelly while riding a motorcycle off-duty was

4  himself pulled over by a sergeant with the LAPD for speeding. Defendant Kelly

5  was rude to the sergeant, questioned where he worked, and drove off from the

6  traffic stop before the sergeant could cite him. The Sheriff's Department

7  investigated the incident and yet again officially concluded "the actions of

8  [Defendant Kelly] should have been better." Internally, Defendant Kelly's

9  supervisor found, "[y]our actions were unprofessional and your behavior brought

10 discredit to yourself and the Department." (Additional Fact 147)

11       In deposition, while discussing the June 2014 incident, Defendant Kelly

12 confessed that he did not like working for an African American captain and only

13 signed the performance log entry (COLA-40) because his signature was coerced

14 from him. Allegedly, the African American captain threatened to withhold

15 Defendant Kelly's promotion unless he signed the performance log entry. If

16 Defendant Kelly is to be believed, he was required to admit to rude, unprofessional,

17 discrediting, officious, and overbearing (if not illegal) conduct to secure his

18 promotion to sergeant. Defendant Kelly also admitted to signing the performance

19 log entry so he could stop working underneath the African American captain whom

20 he did not like. (Additional Fact 148)

21       In July of 2015, Defendant Kelly was criticized for his conduct leading up to

22 a use of force incident against an Hispanic inmate. According to reports, Defendant

23 Kelly had a history of conflict with this Hispanic inmate. Defendant Kelly caused

24 this inmate to be sentenced to 29 days of discipline for allegedly being

25 disrespectful, and yet it was Defendant Kelly who had been disrespectful. He said

26 to the inmate, "What the fuck are you, a Southsider (an Hispanic jail gang

27 member)" After sentencing this Hispanic inmate to discipline, Defendant Kelly

28 taunted the inmate outside his cell. Defendant Kelly called the Hispanic inmate a

"faggot" and "little punk."  When the inmate responded by saying he should have taken his shot at Defendant Kelly at the discipline hearing, Defendant Kelly responded, "Oh you want a chance?"  Then Defendant Kelly, against department policy, ordered the inmate's cell door opened, stood in the doorway, and said, "Here's your shot."  A physical altercation between the inmate and Defendant Kelly ensued and the inmate claimed he was beaten and choked. (Additional Fact 149)

Defendant Kelly was criticized for this use of force by his supervisor for there being no video of the incident, there was no radio broadcast of the incident, and Defendant Kelly opened the cell door against department policy.  An internal affairs investigation apparently resulted in Defendant Kelly being suspended for 4 days, but the suspension was not given until almost three years later in April of 2017.  Furthermore, Defendant Kelly in his deposition admitted that he never served the 4 day suspension. (Additional Fact 150)

Defendant Kelly has a recorded history of animosity towards people of color. Defendant Kelly disliked and could not stand working for an African American captain (Additional Fact 148)  Defendant Kelly had a running feud with an Hispanic inmate resulting in Defendant Kelly challenging the inmate to a fight. (Additional Fact 149)

In spite of all of these glaring warning signs showing that Defendant Kelly is unfit to be a Sheriff's Deputy, he was nevertheless promoted to sergeant and in his July 2020 performance evaluation his supervisor wrote, "you are an outstanding sergeant and a key member of my team." (Additional Fact 151)

**C.    Defendant Kelly's Lack Of Supervision, Discipline & Training**

The County provided Defendant Kelly with inadequate supervision. Defendant Kelly was his own supervisor at the time of the incident, meaning he had no supervision whatsoever.  (Additional Fact 113 -- at 07:54:07 Defendant Kelly can be heard angrily shouting "I AM THE SUPERVISOR" as he sprayed the pepper spray into Plaintiff's face.)

The County provided Defendant Kelly with inadequate discipline following his many transgressions.  (Additional Facts 140-151)  He was repeatedly given inconsequential slaps on the writ for being rude and abusive to motorists and other members of the public -- "our employee could have been better."  (Additional Fact 141-145) Incredibly, after he himself drove off from a traffic stop, his reward for admitting to rude, unprofessional, discrediting, officious, and overbearing (if not illegal) conduct was a promotion to sergeant. (Additional Fact 148)  After a use of force incident where Defendant Kelly called an Hispanic inmate a "faggot" and "little punk" and opened up the inmate's cell door so that he could challenge the inmate to a fight, Defendant Kelly was only given a 4 day suspension. However, even here, the suspension was only for show.  It was given almost 3 years after the incident (in the interim Defendant Kelly had been promoted), and Defendant Kelly admitted that he was never required to serve the suspension. (Additional Fact 150)

The County provided Defendant Kelly with inadequate training.  Although the County is good a checking boxes claiming they provided training, the proof is in the product of that training.  Defendant Kelly is a horribly arrogant law enforcement officer. (Additional Facts 140-151)  Defendant Kelly's failure to use de-escalation techniques was inconsistent with generally accepted police practices. (Additional Fact 118)  Defendant Kelly unnecessarily escalated the contact with Plaintiff creating the need to use force that would have likely not have been otherwise necessary. (Additional Fact 123)  Had Defendant Kelly followed generally accepted police practices and his department policy and used de-escalation to gain voluntary compliance, it is likely that no force would have been necessary. (Additional Fact 128)  Defendant Kelly's use of pepper spray on Plaintiff was objectively unreasonable, excessive and inconsistent with generally accepted police practices.  (Additional Fact 129)  Defendant Kelly's punch to Plaintiff's face was excessive, objectively unreasonable and inconsistent with generally accepted police practices. (Additional Fact 138)

Finally, it appears that the County falsified the investigation of this incident to make it appear that the County's training was more effective than it actually was. Defendant Kelly's superiors in their use of force review attempted to demonstrate that Defendant Kelly was aware of appropriate de-escalation training and techniques by stated Defendant Kelly appropriately used these techniques with an uncooperative driver just 24 minutes prior to the incident involving Plaintiff. However, the County has no record whatsoever of this prior incident.  Furthermore, in deposition, Defendant Kelly denied that any such incident took place.  (Response to Fact 67)

**D.    The Los Angeles County Sheriff's Department's Sordid History of Racial Profiling And Discriminatory Traffic Stops**

The incident that is the subject matter of this lawsuit happened while Plaintiff was traveling to the Antelope Valley.  However, it occurred in Santa Clarita, in a northern part of the County, but just one Sheriff's Department station adjacent to but south of the actual Antelope Valley. (Additional Fact 152)

The Los Angeles County Sheriff's Department has a long and sordid history of racial profiling and discriminatory traffic stops, particularly in the County's northern stations, such as the Antelope Valley.  For years, black and Latino residents in the Antelope Valley complained they were the victims of racially biased stops and searches along with other mistreatment by Los Angeles County Sheriff's deputies.  In 2013, the US Department of Justice, Civil Rights Division analyzed Sheriff's Department data from tens of thousands of vehicle and pedestrian stops, interviewed hundreds of people and reviewed volumes of internal sheriff's documents, and after this thorough analysis the Department of Justice "found that LASD's Antelope Valley stations have engaged in a pattern or practice of discriminatory and otherwise unlawful searches and seizures, including the use of unreasonable force, in violation of the Fourth Amendment, the Fourteenth Amendment, and Title VI."  The findings forced the county to reach a legal

settlement with federal authorities in 2015 that called for significant reforms and continued oversight. (Additional Fact 153)

However, despite all of this, the racial profiling and discriminatory traffic stops persist, as evidenced by continued gross racial disparities.  An NCCD report from 2020 found on the Sheriff's Department's own website entitled, "An Analysis of Racial/Ethnic Disparities in Stops by Los Angeles County Sheriff's Deputies in the Antelope Valley" the report found that Black drivers make up 32% of all traffic stops even though they account for only 17% of the population.  The report also found that black drivers once stopped were more likely to have both their vehicle and their persons searched, more likely to experience backseat detentions, and more likely to be asked if they are on probation or parole.  All this is in spite of the fact that black drivers have a much lower contraband discovery rate (15.4%) than either their white or Hispanic counterparts (24.4% and 22.3% respectfully).  This problem with racial profiling and discriminatory traffic stops in the Antelope Valley is not an isolated single incident, but rather a persistent and ongoing problem with the Los Angeles County Sheriff's Department recognized by the US Department of Justice, Civil Rights Division. (Additional Fact 154)

The racial disparities also existed in those suspicious use of force incidents (such as the incident between Plaintiff and Defendant KELLY) where a suspect was charged with only resisting arrest or obstructing an officer but no other crimes. U.S. Department of Justice, Civil Rights Division found as follows:  "Perhaps most strikingly, we found that 81% of the uses of force we reviewed where the only charge was obstruction-related involved targets who were African American or Latino. For the 25 felony obstruction-only arrests, 88% involved victims who were people of color. This is an extraordinarily disproportionate number of obstruction charges involving use of force against people of color and warrants close attention by the Department. See *Arlington Heights*, 429 U.S. at 266 (intent may be

1   established by "clear pattern, unexplainable on grounds other than race")."

2   (Additional Fact 155)

3          The US DOJ's findings and the findings of the Sheriff's Department's own

4   oversight monitors show that the unconstitutional racial profiling and

5   discriminatory traffic stops in the northern parts of the Sheriff's Department's

6   jurisdiction, as well as the County's supervision, training, retention, promotion and

7   rewarding of violent and abusive deputies such as Defendant Kelly reflect the

8   County's unwritten policies, customs, practices and usages in violation of the

9   Fourth and Fourteenth Amendment respectively to the United States Constitution,

10  which policies, customs, practices, and usages resulted in Plaintiff's injury and the

11  County's *Monell* liability.  (Additional Fact 156)

12  **III.    DEFENDANT KELLY'S ARREST OF PLAINTIFF WAS WITHOUT**

13  **PROBABLE CAUSE**

14         Plaintiff alleges that he was unlawfully arrested. "A claim for unlawful arrest

15  is cognizable under § 1983 as a violation of the Fourth Amendment, provided the

16  arrest was without probable cause or other justification." [*Dubner v. City & Cnty. of*

17  *S.F.* (9th Cir. 2001) 266 Fed.3d 959, 964]  Defendants' current motion presents the

18  same arguments previously rejected by this Court on Defendant's motion to

19  dismiss.  The evidence currently before the Court bears out all of the allegations

20  made in the Complaint.  The evidence, as set forth above, shows that Plaintiff was

21  "obeying all traffic laws, rules, and regulations" when he "made a legal right hand

22  turn on a green light." (FAC § 10.) The light was green light.  There were no

23  pedestrians in the crosswalk.  Thus, there was no probable cause for the traffic stop

24  in the first place.  Rather, the stop was the result of unlawful racial profiling, not

25  anything illegal that Plaintiff did.  After the illegal stop, Defendant Kelly retaliated

26  against Plaintiff and used force against him not for anything illegal that Plaintiff

27  did, but for attempting to record the encounter on his mobile phone.  Plaintiff did

28  not kick Defendant Kelly and Plaintiff did not punch Deputy Clark.  Rather,

1  Defendant Kelly pepper sprayed Plaintiff in retaliation for asking to see Defendant

2  Kelly's supervisor.  The arrest was without probable cause or other justification and

3  in clear violation of Plaintiff's Constitutional rights.

4  **IV.    DEFENDANT KELLY IS NOT PROTECTED BY QUALIFIED**

5  **IMMUNITY**

6      Statutory immunity protects government official unless their actions violates

7  "clearly established statutory or Constitutional rights of which a reasonable person

8  would have known."  [*Harlow v. Fitzgerald* (1981) 457 U.S. 800]  Defendant

9  Kelly's traffic stop of Plaintiff was made without probable cause and constituted

10  racial profiling. Defendant Kelly's arrest and use of force against Plaintiff was

11  excessive, objectively unreasonable, and inconsistent with generally accepted

12  police practices.  The facts, as set forth above, do not show a mistake or a slight

13  lapse of judgment, but rather show a clear violation of Plaintiff's Constitutional

14  rights about which any reasonable person would know.

15  **V.    THE COUNTY IS LIABLE FOR ITS UNSTATED POLICIES AND**

16  **PRACTICES THAT ENABLED DEFENDANT KELLY'S VIOLATION OF**

17  **PLAINTIFF'S RIGHTS**

18      For liability against a municipality, a plaintiff must allege that he was

19  deprived of a constitutional right and that the municipality "had a deliberate policy,

20  custom, or practice that was the 'moving force' behind the constitutional violation

21  he suffered." *Galen v. Cnty. of L.A.*, 477 F.3d 652, 667 (9th Cir. 2007) (quoting

22  *Monell v. Dep't of Soc. Servs. of the City of N.Y.C.*, 436 U.S. 658, 694-95 (1978)).

23  A plaintiff must allege either an official policy or a "longstanding practice or

24  custom which constitutes the standard operating procedure of the local government

25  entity." *Zrevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

26      Defendants argue that there is no evidence of a County practice that resulted

27  in Plaintiff's injuries.  However, as set forth above, there is.  Defendant Kelly's

28  personnel records demonstrate that he has a very checkered past.  He has

16

demonstrated animosity towards people of color.  He has a long history of rude and
abusive conduct towards motorists and the public that was not only condoned but
actually rewarded due to the County's inadequate supervision, discipline and
training.  The County coddled Defendant Kelly and encouraged his violations of
stated policies with a promotion.  This, combined with the findings of the U.S.
Department of Justice and the National Council on Crime & Delinquency
("NCCD") demonstrate that the County had an unstated policy of employing
deputies to bully and harass African American drivers by way of initiating frivolous
traffic stops, making arrests without probable cause, and using excessive force –
exactly what happened to Plaintiff.

Defendants argue that the findings of the Justice Department and the NCCD
only concern the Antelope Valley stations and are irrelevant here.  Plaintiff was
traveling to the Antelope Valley at the time of the incident.  However, the traffic
stop actually took place in Santa Clarita -- another northern area of the County and
just one Sheriff's Department station adjacent to but south of the actual Antelope
Valley.  The studies concern the same governmental entity, the Los Angeles County
Sheriff's Department, which has the same policies and procedures regardless of the
station.  The fact that there are a few off ramps on the 14 freeway separating
Defendant Kelly's station from the stations subject to the report, would only
potentially go to weight, not admissibility.

## VI.    DEFENDANT KELLY IS LIABLE FOR PUNITIVE DAMAGES

Punitive damages may be available against governmental employees acting
in their individual capacities. [See, *Monell v. New York City Dept. of Soc. Services*,
436 U.S. 658 (1978); *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 254
(1981).]  In Section 1983 claims, "[i]t is well-established that a 'jury may award
punitive damages . . . either when a defendant's conduct was driven by evil motive
or intent, or when it involved a reckless or callous indifference to the constitutional
rights of others.'" [*Morgan v. Woessner*, 997 F.2d 1244, 1255 (9th Cir.1993).]

"The standard for punitive damages under § 1983 mirrors the standard for punitive

damages under common law tort cases. . . . [M]alicious, wanton, or oppressive acts

or omissions are within the boundaries of traditional tort standards for assessing

punitive damages and foster 'deterrence and punishment over and above that

provided by compensatory awards.' . . . Such acts are therefore all proper predicates

for punitive damages under § 1983." [*Dang v. Cross*, 422 F.3d 800, 807 (9th Cir.

2005) (citing *Smith v. Wade*, 416 U.S. 30, 49(1983)).]

Defendants argue that Defendant Kelly should not face the prospect of

punitive damages.  Defendants argue there is no evidence of malice, oppression, or

disregard of Plaintiff's rights.  Obviously, this is a question for the jury.  The

evidence suggests Defendant Kelly acted without probable cause and his violent use

of force was excessive, objectively unreasonable and inconsistent with generally

accepted police practices.  Certainly, the jury could reasonably determine that

Defendant Kelly acted in malice, oppression, or in disregard of Plaintiff's rights.

**VII.   PLAINTIFF REQUESTS THAT THE COURT DENY THIS MOTION
PURSUANT TO FRCP RULE 56(d), OR IN THE ALTERNATIVE, TO
DEFER RULING ON THIS MOTION UNTIL PLAINTIFF CAN PRESENT
ADDITIONAL DISCOVERY AND DECLARATIONS**

If the opposing party shows (by affidavit or declaration) that, for specified

reasons, it cannot present facts essential to justify its opposition, "the court may: (1)

defer considering the motion or deny it; (2) allow time to obtain affidavits or

declarations or to take discovery; or (3) issue any other appropriate order." [FRCP

56(d); See, *Celotex Corp. v. Catrett* (1986) 477 U.S. 317, 106 S.Ct. 2548,

2554; *Rivera-Torres v. Rey-Hernández* (1st Cir. 2007) 502 Fed.3d 7, 10—rule

provides useful safety valve "against judges swinging the summary judgment axe

too hastily"]  To obtain postponement or denial for further discovery, the opposing

party's declaration must show the following: 1) facts indicating a likelihood that

controverting evidence exists as to a material fact; 2) specific reasons why such

evidence was not discovered or obtained earlier in the proceedings (i.e., "good cause"); 3) the steps or procedures by which the opposing party proposes to obtain such evidence within a reasonable time; and 4) an explanation of how those facts will suffice to defeat the pending summary judgment motion (i.e., to rebut the movant's allegations of no genuine issue of material fact). [*Tatum v. City & County of San Francisco* (9th Cir. 2006) 441 Fed.3d 1090, 1101; *Trask v. Franco* (10th Cir. 2006) 446 Fed.3d 1036, 1042; *In re PHC, Inc. Shareholder Litig.* (1st Cir. 2014) 762 Fed.3d 138, 143-144—Rule 56(d) requirements can be summarized as "authoritativeness, timeliness, good cause, utility, and materiality"]

As set forth in the declaration of Thomas M. Ferlauto, Plaintiff has shown good cause for relief under FRCP Rule 56(d).

## VIII. CONCLUSION

For the reasons set forth above, Defendants motion for partial summary judgment should be denied.

DATED: June 5th , 2023        The Law Office Of Thomas M. Ferlauto, APC


By: _____
Thomas M. Ferlauto
Attorney For: Plaintiff, JOSHUA ASSIFF