# Exhibit 2

## Supervisor's Report on Use of Force
URN # 921-13126-0628-058

Page 13 of 15

☐ Yes (If yes, answer 46a and 46b)
   46a. Start and end times of the TARP application:

   46b. Deputy personnel assigned to remain in close audible and visual observation of the TARP'd suspect and to continuously monitor respiratory status and level of consciousness (Name/Emp. #):

47. Were there any head strikes or head injuries to the suspect(s) during the application of force?
   ☐ No
   ☐ Unintentional
      ☐ Impact weapons
      ☐ Personal weapons
      ☐ Contact with hard objects
   ☑ Intentional
      ☐ Impact weapons
      ☑ Personal weapons
      ☐ Contact with hard objects

### TRAINING / TACTICS / EQUIPMENT REVIEW

TRAINING REVIEW

47. List any training and/or tactical concerns, implications, or recommendations.
   ☑ Investigating Supervisor   ☐ Training Supervisor

1. Once the door was opened, Suspect Assiff kicked Sergeant Kelly. Sergeant Kelly then backs up, presents his pepper spray, requests back-up, then reengages the suspect. A better tactic at this point would be to request assistance, while maintaining distance. However, Sergeant Kelly was concerned with the suspect possibly being under the influence and attempting to drive off, or arm himself, as there were points in time where the suspect was reaching for the center console.

Reaching into a vehicle is a potentially dangerous tactic for law enforcement, putting the officer at significant risk of injury. This tactic was recently listed in Field Operations Support Services Newsletter 21-13 (Reaching Into Vehicles).

2. After the suspect was pepper sprayed, Sergeant Kelly backed-up and requested assistance. Sergeant Kelly then reengaged the suspect. Pepper spray can take time for the effects to be felt by the suspect. A better tactic would have been to wait for assistance then develop a tactical plan and reassess the threat presented by the suspect. However, Sergeant Kelly's first assisting unit (Deputy Clark) was already in the same parking lot.

3. The suspect was handcuffed by Sergeant Kelly. The handcuffs appeared to be applied by using momentum. The proper technique would be to press the handcuffs against the wrist then press them onto the suspect.

I recommend training in tactics, arrest and control, and tactical communications.

EQUIPMENT ISSUES IDENTIFIED
(Taser, Safety Chair, Hobble, Special Weapons, etc.)

48. If weapons or other equipment were used, were they used properly and did they function as designed?
   ☐ Yes
   ☐ N/A

(SH-R-438PS) 09/2018

Supervisor's Report on Use of F

CONFIDENTIAL
COUNTY000109

## Supervisor's Report on Use of Force

Page 14 of 15

URN # 921-13126-0628-058

Deputy Gallegos deployed the Taser and immediately recognized that it was missing the cartridge. Deputy Gallegos quickly adapted to this and utilized the Taser in the drive stun technique. Deputy Gallegos later learned the cartridge somehow became dislodged and fell to the ground. He was unsure how this happened.

49. Was the equipment approved by the Department?
   - [x] Yes
   - [ ] N/A
   - [ ] No (If no, explain)

50. Were personnel trained and qualified to use the equipment?
   - [x] Yes
   - [ ] N/A
   - [ ] No (If no, explain)

51. List any equipment recommendations and actions taken.
   None.

### AFTER ACTION INFORMATION

52. Was an incident debriefing conducted?
   - [x] Yes (Indicate what was discussed, recommendations made, and/or actions taken if any)
   - [ ] No (If no, explain)

   We discussed Code-3 driving, the effectiveness of utilizing the Taser in the drive stun configuration and uncooperative suspects on traffic stops.

53. Corrective action recommended?
   - [ ] No
   - [x] Yes (If yes, explain)

   I recommend refresher training in tactics, arrest and control, and tactical communications.

54. Description of materials/evidence to be considered when determining if incident was objectively reasonable and within policy:

   My interview with the suspect, the Watch Commander's interview with the suspect, Sergeant Kelly's body camera video, the suspect's video, and the deputies' reports, were taken into consideration.

55. OTHER TOPICS / DISCUSSION ITEMS

   1. The video recorded by the suspect shows Deputy Clark's arms around the suspect's upper chest and neck. Deputy Clark addressed this in his report. He was not applying the carotid restraint or a choke hold. He was attempting to control the suspect's upper torso. Due to the suspect's resistance and assaultive behavior, Deputy Clark's arms slid up to the suspect's neck. This was not intentional. When Deputy Clark realized the positioning of his arms were near the suspect's neck, he immediately released his grasp.

   2. Before the suspect was handcuffed, Deputy Clark can be heard on body camera saying, "Shut the fuck up." Deputy Clark received a Performance Log Entry for use of profanity towards the suspect (MPP 3-01/000.12).

   3. Twenty-four minutes prior to this incident, Sergeant Kelly responded to a back up request (unrelated) on an uncooperative driver. During this back request, Sergeant Kelly was able to deescalate an uncooperative driver.

## Supervisor's Report on Use of Force

Page 15 of 15

URN # 921-13126-0628-058

The next traffic stop for Sergeant Kelly was this incident.

4. Sergeant Kelly's report documented the odor of burnt marijuana. During a search of the vehicle, Sergeant Kelly located and inspected a marijuana smoking pipe. Sergeant Kelly then left the pipe in the vehicle. This pipe should have been taken for evidence or photographed. I counseled Sergeant Kelly regarding this, he was receptive to my concerns.

### CASE STATUS

56. Was a case submitted to the District Attorney for filing consideration?

☑ Yes
☐ No (If no, explain)

### CASE DISPOSITION

☐ N/A
☑ DA Reject (Reason): The matter was viewed as a 148 PC crime. Per special directive 20-07 the matter was declined for filing.
☐ Case Filed:

Case # 41403790    Date Filed:
Charge(s):

Case Outcome:
Or
Next Court Date:

CONFIDENTIAL
COUNTY000111