# Exhibit 11

S⬤⬤visor's Report on Use of ⬤⬤ Page 14
015-01439-5640-057

███ had been evaluated by Physicians Assistant ███ who noted no fracture or dislocation to his right shoulder, right forearm, right elbow, and/or right hand. ███ noted "A/P R shoulder contusion."

███ had his left hand and forearm bandaged with an ace bandage, prior to the use of force. ███ claimed he had a pre-existing injury, in which he suffered nerve damage to his wrist. This injury was associated with the claim he was placed in handcuffs for an excessive amount of time (previously noted Inmate Complaint). The bandage was removed during his medical evaluation by ███ for treatment. A new bandage was applied during the examination. Refer to Inmate Injury Report under URN 015-01187-5640-687 and reference 5640-2015-0603-251. A copy of the Inmate Injury Report associated with ███ left arm injury is included with this force review.

Shortly after ███ videotaped interview, I asked him to provide a written statement regarding his injuries. ███ refused to make a written statement, which is documented on video and titled: "Suspect Medical Statement Refuse" and included with this force review.

During the Watch Commander's interview, ███ denied having any psychological history; however, medical records indicated ███ received a psychological evaluation on March 9, 2015, for depression and suicidal thoughts. Based on this information, I notified ███ (Licensed Clinical Social Worker (LCSW), Jail Mental Evaluation Team) of ███ prior psychological history. ███ was re-evaluated by Mental Health Clinical Supervisor ███ on August 19, 2015, who formed the opinion ███ was stable and not in need of mental health intervention.

## TRAINING & TACTICAL REVIEW

☐ **Lessons Learned: Debriefing held to discuss training and tactical issues.**

Following the conclusion of the incident, I conducted a comprehensive de-briefing in 915 Control with all staff members, both sworn and civilian, to discuss the incident.

The incident was not broadcasted over the radio. I discussed with Sergeant Kelly, ███ the importance of utilizing the radio to broadcast information and quickly request the appropriate resources.

███ 915 A-row to the 915 AB shower. I discussed the disadvantages of carrying a suspect, and the other options available to move an inmate.

I also discussed with Sergeant Kelly, ███ and ███ the importance of video recording these type of incidents for several reasons, including, but not limited to, assisting with the following: criminal prosecution,

documentation of force, and minimizing both Department liability and risk management issues. Furthermore, I discussed with ███ the importance of being familiar with his equipment (video camera).

I discussed with Sergeant Kelly the option of using the tray slot opening (instead of opening the cell door) to communicate with a potentially hostile inmate.

During the next week, I repeatedly briefed deputies working 900 Building, to remain professional at all times.

All staff members were receptive to the debriefing.

## WATCH COMMANDER'S REVIEW

### WATCH COMMANDER REVIEW

In reviewing the totality of this force incident, it needs to be separated into two sections: 1) The actual force incident, and; 2) Everything which occurred pre-force.

From the time ███ charged/stepped toward Sergeant Kelly, the deputies handled the incident quickly, decisively, with a minimum amount of force and with almost textbook precision. The only force used was a takedown, control holds, resisted handcuffing, and a hobble restraint. The level of force used was commendable, especially considering ███ was bitten in the forearm by the inmate during the incident.

███ actions quickly escalated the event. ███ took immediate action by wrapping his arms around ███ and taking him to the floor. ███ although preferable to hands-on force, was not a good option in this instance, due to the unexpected assault from ███ and the likelihood of contaminating all of the deputy personnel present in such close quarters. During the takedown, ███ even displayed consideration for ███ by using his forearm as a buffer, preventing ███ from striking his head on the concrete floor. Based upon the blood stains on the floor, ███ ability to utilize a takedown, the location of the takedown in the hallway, and the deputies' statements, it appeared there was no question the suspect stepped out of his cell or into the doorway.

Once ███ was restrained, deputy personnel moved him a short distance (approximately 15-20 feet) to the shower area. This allowed the deputies to remove ███ from the A row, and out of view of other disciplinary inmates, particularly the disruptive inmate in cell A-4 ███. The deputies moving ███ was a continuation of the original incident, until they could control the situation and the inmate.

*CONFIDENTIAL-PURSUANT TO STIPULATED PROTECTIVE ORDER*

COLA-000061

Prompt medical attention was given to ⬛⬛ by requesting NCCF medical staff respond to the 900 Building. As soon as ⬛⬛ was placed into the shower area, uninvolved deputies from the original incident provided security. The same deputies eventually conducted the escort of ⬛⬛ to the infirmary. No deputies involved in the use of force provided security or escorted ⬛⬛.

I did recommend to ⬛⬛ that in the case of interviewing two inmates inside a single cell, in the case of ⬛⬛ the inmates in the future should be interviewed separately, so as not to allow one inmate's testimony to influence the other's statements. ⬛⬛ agreed and stated he understood my concerns.

Tactically, several areas could be improved. First, there was no radio broadcast of the incident at any point. There were five deputy personnel present, all with radios. There was no good reason for the lack of a radio broadcast regarding deputies involved in a fight. There was no radio broadcast following the fight, advising a fight had occurred but the situation was Code 4. The first awareness of the incident outside of the 900 Building was several minutes later, when I received a phone call from Sergeant Kelly.

Secondly, Sergeant Kelly should have been in a position to supervise and direct force if necessary, rather than in a position to be involved in the force. Lastly, as always, the presence of CCTV inside NCCF would be a much-needed asset and would greatly enhance the ability to accurately review force incidents and other major events. Fixed cameras inside of 915 would be especially advantageous, considering 915 houses the disciplinary inmates and some of the most problematic inmates at NCCF.

The force prevention aspects and preamble to this incident are troublesome. Simply stated, there was no good rationale for Sergeant Kelly directing ⬛⬛ cell door to be opened. The entire incident could have been avoided, had the cell door remained closed.

Sergeant Kelly and several deputies were conducting DRB (Disciplinary Review Board) hearings in the 915 A-row. ⬛⬛ did not have a DRB hearing on the date of the incident. Sergeant Kelly wanted to talk to ⬛⬛ about his past behavior and upcoming disciplinary hearing; that alone was questionable. Conducting a discussion through the door, or even by opening the tray slot would have been preferable. Prior to engaging ⬛⬛ and opening the door, Sergeant Kelly was aware of, or should have been aware of the following:

1. ⬛⬛ had been problematic and disruptive throughout Early Morning shift. He had been so disruptive, ⬛⬛ placed ⬛⬛ on "Sergeant/Video Escort" status. Every contact with ⬛⬛ especially a face-to-face contact, should have had a video camera present and operational. ⬛⬛ indicated he forgot ⬛⬛ was on video escort status. This information was posted on the white erase board inside of 900 Max Control, where it is common practice to document

CONFIDENTIAL-PURSUANT TO STIPULATED PROTECTIVE ORDER                    COLA-000062

S███isor's Report on Use of F███          Page 17
015-01439-5640-057

any types of special handles. It is my recommendation that magnetic signs be designed to post on the outside of disciplinary housing, to provide an immediate recognition of inmates who require a special handle.

2. Sergeant Kelly conducted ███ previous DRB hearing. During the hearing, ███ verbally confronted Sergeant Kelly with a profanity-laced outburst. Sergeant Kelly sentenced ███ to 29 days of discipline. As the DRB sergeant/reviewer of ███ case, Sergeant Kelly should also have known ███ had 13 disciplinary incidents in the past three months. The above would hardly qualify as having a "good rapport" with ███.

3. ███ had made three prior Inmate Complaints, including one to the ACLU; ███ conducted all of the investigations. ███ interviewed Sergeant Kelly regarding the complaints. The complaints alleged ███ wrists were injured by handcuffs being left on too long, and two deputies present at Sergeant Kelly's DRB hearing called ███ a "punk" and a "bitch."

4. Additionally, if Sergeant Kelly had been intent on opening ███ cell door for a discussion, based upon the above information, he should have had a pre-plan with the deputies present in case ███ became hostile, recalcitrant, or physical. One deputy with O.C. spray at the ready (and/or a TASER) could have defused the incident (if the door had to be opened).

It is my opinion ███ was continually looking for opportunities to engage deputies and make complaints about them. This was reinforced by statements made by ███ during my post-force interview with him. ███ interview is peppered with fabrications, embellishments, and accusations. ███ also made several claims about what force was used on him. These allegations were not substantiated by any physical evidence, injuries, medical exams or force documentation.

A final note, although ███ has returned to full duty and his injury was minor, he faces an entire year of enduring blood tests (as well as other limitations) due to the bite from ███.

There are several other questions that should be asked to thoroughly investigate and evaluate this incident; however, they cannot and should not be asked at this time because an administrative investigation has been initiated and will be conducted by the Internal Affairs Bureau. Among the questions are: 1) The deputies present should be interviewed regarding what discussion or dialogue there was between Sergeant Kelly and ███ prior to the force. ███ made numerous accusations concerning what Sergeant Kelly said to him prior to the cell door being opened; 2) What pre-planning, conversation, or indication (if any) was there prior to Sergeant Kelly requesting ███ cell door be opened; and 3) During the DRB hearings which were being conducted, were the cell doors of those inmates opened, or were the hearings conducted through a closed door/tray slot?

*CONFIDENTIAL-PURSUANT TO STIPULATED PROTECTIVE ORDER*          COLA-000063

S⬛⬛⬛isor's Report on Use of ⬛⬛⬛    Page 18
015-01439-5640-057

I concur with ⬛⬛⬛ debriefing of the incident. As previously stated, this incident is already an administrative investigation to be handled by the Internal Affairs Bureau. Their investigation should reveal whether all Department policies and procedures were adhered to, and no opinion will be offered here regarding policies, procedures, or application of force regarding this incident.

## CASE STATUS

A criminal report was written and the case was submitted to the Los Angeles County District Attorney's Office for filing consideration. On August 4, 2015, San Fernando Court Deputy District Attorney ⬛⬛⬛ filed one count of 69 PC, one count of 243.1 PC, and one count of 148.10 PC under District Attorney case number PA083945.

*CONFIDENTIAL-PURSUANT TO STIPULATED PROTECTIVE ORDER*                    *COLA-000064*