1  THOMAS M. FERLAUTO (SBN 155503)
2  LAW OFFICE OF THOMAS M. FERLAUTO, APC
   25201 Paseo de Alicia, Suite 270
3  Laguna Hills, California 92653
   Telephone: 949-334-8650
4  Fax: 949-334-8691
5  Email: TMF@lawofficeTMF.com

6  Attorney for Plaintiff, JOSHUA ASSIFF

7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10

11 **JOSHUA ASSIFF,**              | **Case No. 2:22-cv-05367 RGK (MAAx)**

12              **Plaintiff,**      | **SUPPLEMENTAL DECLARATION**
                                     **OF THOMAS M. FERLAUTO IN**
13     **v.**                       **OPPOSITION TO MOTION FOR**
                                     **PARTIAL SUMMARY JUDGMENT**
14
   **COUNTY OF LOS ANGELES;**
15 **SHERIFF DEPUTY BADGE**
   **NUMBER 404532;**
16 **And DOES 1 through 10,**
17                                  DATE:          June 26, 2023
              **Defendants.**       TIME:          9:00 a.m.
18                                  COURTROOM:     850
19
20                                  Action Filed: August 3, 2022
                                    Pretrial Conference: July 10, 2023
21                                  Trial Date: July 25, 2023
22
23                                  Assigned to: Hon. R. Gary Klausner,
                                    District Judge, Courtroom 850
24

25        I, Thomas M. Ferlauto, declare as follows:

26        1.    I am an attorney licensed to practice law in all of the courts in the State

27 of California, and I am Plaintiff's counsel of record herein.  Consequently, I have

28 personal knowledge of the following:

2.     When Plaintiff initially filed his opposition to Defendants' motion for partial summary judgement, the deposition transcript for Defendant Travis Kelly ("Defendant Kelly") had not yet been prepared.  So, in my initial declaration in opposition to the motion, I included a summary of six points from Defendant Kelly's testimony.  I indicated that I would provide the actual testimony once the transcript becomes available.  On June 22, 2023, I finally received an electronic version of the final transcript.  True and accurate excerpts from that deposition transcript are attached hereto as **Exhibit 17**.

3.     Below are the six points from Defendant Kelly testimony that I included in my prior declaration, followed by a page and line citation to the portion of the transcript in Exhibit 17 that supports that point:

a.     Defendant Kelly in his deposition conceded that after he requested Plaintiff's driver's license, Plaintiff was in the process of producing his driver's licenses when Defendant Kelly, not Plaintiff, re-engaged Plaintiff in the debate over the color of the light. (Exhibit 17, 272:3-12)

b.     Defendant Kelly in his deposition conceded that the he did not see Plaintiff's kick him.  His motorcycle pants were thickly padded, and it may have been Plaintiff's knee with which he came into contact. (Exhibit 17, 296:13-298:10)

c.     Defendant Kelly in his deposition conceded that he could not see Plaintiff punch Deputy Clark in the chest on the video and had trouble locating where in the video it allegedly occurred. (Exhibit 17, 317:10-17)

d.     In the County's Use of Force Report, the County claimed that Defendant Kelly had successfully used de-escalation techniques with an uncooperative driver just 24 minutes prior of the incident involving Plaintiff.  In his deposition, Defendant Kelly denied that any such incident took place. (Exhibit 17, 332:2-24)

e.     In deposition, while discussing the June 2014 incident where Defendant Kelly drove off from a traffic stop when he was pulled over by the LAPD,

1  Defendant Kelly confessed that he did not like working for an African American
2  captain and only signed the performance log entry (COLA-40) because his signature
3  was coerced from him.  Allegedly, the African American captain threatened to
4  withhold Defendant Kelly's promotion to sergeant unless he signed the performance
5  log entry.  If Defendant Kelly is to be believed, he was required to admit to rude,
6  unprofessional, discrediting, officious, and overbearing (if not illegal) conduct to
7  secure his promotion to sergeant.  Defendant Kelly also admitted to signing the
8  performance log entry so he could stop working underneath the African American
9  captain, whom he disliked. (Exhibit 17, 27:23-28:23; 65:18-68:8)

10          f.      In April of 2017, Defendant Kelly was suspended for four days in
11  connection with a use of force incident against an Hispanic inmate in July of 2015,
12  Defendant Kelly in his deposition admitted that he never served the 4 day suspension.
13  (Exhibit 17, 172:5-173:4)

14      I declare under penalty of perjury under the laws of the State of California and
15  the United States of America that the foregoing is true and correct.  Executed this
16  23rd day of June, 2023 in Orange County, California.

17
18
19                                                  _____
20                                                  THOMAS M. FERLAUTO
21
22
23
24
25
26
27
28

Exhibit 17

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


JOSHUA ASSIFF,                        )    No. 2:22-cv-05367
                                      )         RGK (MAAx)
                                      )
                Plaintiff,            )
                                      )
            vs.                       )
                                      )
COUNTY OF LOS ANGELES; SHERIFF        )
DEPUTY BADGE NUMBER 404532;           )
and DOES 1 through 10,                )
                                      )
                Defendants.           )
_____)




DEPOSITION OF TRAVIS KELLY


MAY 30, 2023









Reported by:  Wendy Sobel,
CSR NO. 2341
File No.: 23-134

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3

4   JOSHUA ASSIFF,                    )    No. 2:22-cv-05367
                                      )         RGK (MAAx)
5                                     )
                     Plaintiff,       )
6                                     )
               vs.                    )
7                                     )
    COUNTY OF LOS ANGELES; SHERIFF    )
8   DEPUTY BADGE NUMBER 404532;       )
    and DOES 1 through 10,            )
9                                     )
                     Defendants.      )
10  _____)

11

12

13

14          DEPOSITION OF TRAVIS KELLY, TAKEN ON

15      BEHALF OF PLAINTIFF, AT 100 WILSHIRE BOULEVARD,

16      SANTA MONICA, CALIFORNIA, 90401, COMMENCING AT

17      10:09 A.M., TUESDAY, MAY 30, 2023, BEFORE WENDY

18      SOBEL, CSR NO. 2341.

19

20

21

22

23

24

25

2

1        A     Hundred percent.

2        Q     Hold on.  I'm going to let you finish, you've

3   got to let me finish the question, otherwise the court

4   reporter is going to be --

5        A     I understand.  My apologies.

6        Q     So you objected to the way in which the LAPD

7   officer performed his duties with respect to you.

8              Is that correct?

9        A     Correct.

10       Q     Despite the fact that you objected, be fair to

11  say you remained calm?

12       A     Yes.

13       Q     Fair to say you listened to his instructions?

14       A     Yes, I did.

15       Q     Fair to say you complied with the law?

16       A     Yes, I did.

17       Q     You're aware of the findings of the Sheriff's

18  Department with respect to that interaction.  Correct?

19       A     Correct.

20       Q     And you're aware that the Sheriff's Department

21  found something different than your position?

22       A     Correct.

23       Q     What steps did you take after the sheriff's

24  department made those findings to appeal or to have some

25  type of subsequent hearing with respect to those

PATRICK L. RADOGNA & ASSOCIATES (626) 331-9516

1    findings?

2        A    None.

3        Q    Why not?

4        A    Because I wanted to get promoted.  That was

5    being held against me.

6        Q    I'm not sure I understand that.

7        A    The captain threatened me, even though I had

8    voiced my opinions of the policy violations by the

9    sergeant from LAPD, of their own policy violations.

10       Q    Are you done?

11       A    Yes.

12       Q    What captain threatened you?

13       A    The captain at -- Roosevelt Johnson.

14       Q    Black or White?

15       A    Black.

16       Q    What kind of -- and this is a captain within

17   the L.A. County Sheriff's Department?

18       A    Correct.

19       Q    What threats did Captain Johnson make to you?

20       A    He told me that he would keep me from getting

21   promoted.

22       Q    If?

23       A    If I didn't sign the written reprimand.

24       Q    So let's break this down a little bit.

25            MR. STOCKALPER:  I'll just state for the record just

1    you whether it was your decision to make.  I asked you --

2        MR. STOCKALPER:  Hold on.  Try again.

3        Q   BY MR. COHEN:  I asked you, do you recall having

4    any feeling about whether the Consent Decree issued to

5    Antelope Valley was necessary or not?

6        A    My opinion was, I mean, I don't know who was

7    telling the truth or not, but they must have had

8    something that they did.  I have no clue.

9             My opinion is that Lancaster and Palmdale

10   Station was put under that decree from the Federal

11   Government by the data that they were given.

12            I mean, I don't know the whole story so I'm not

13   going to sit there and judge why they're put under a

14   Consent Decree.

15       Q    Okay.  So did you have -- it sounds like you

16   had no feeling one way or another?

17       A    No, I don't.

18       Q    I want to go back to this Exhibit 1 for the

19   moment.

20            Did Captain Johnson approach you about signing

21   off on these findings listed in Exhibit 1?

22       A    I was -- he had me come to his office.

23       Q    Do you remember when that was?

24       A    It was after the incident and I think right

25   after I had made the promotion list.

1          Q    Did Captain Johnson indicate to you what the

2     findings were regarding your interaction with LAPD?

3          A    He told me what -- and I can't remember his

4     name correctly, what -- he had received a call from a

5     Sergeant Collins or -- I can't remember his exact name,

6     and then explained to me what his side of the story was.

7               And I remember him yelling at me that he said

8     the sergeant said he could go in pursuit of me -- this is

9     what the sergeant allegedly told him, that he could have

10    went in pursuit of me and it could have went all these

11    different ways.

12              And then when I explained to Captain Johnson --

13    he was captain at the time.  I think he's retired now.

14    He made commander.

15              But when I explained to him that he had stopped

16    me and he wasn't even in uniform and didn't identify

17    himself to me, that he was violating his own policies by

18    doing so.  And that's when he told me, he says, well, I

19    should keep you from getting promoted, but, you sign that

20    or else you're not getting promoted.

21         Q    Did you want to sign it?

22         A    There's a time where you have to pick your

23    battles, and this is not one I was willing to go up

24    against a captain on.  So, no, I did not want to sign it.

25    I wanted to get promoted, that way I would actually get

66

PATRICK L. RADOGNA & ASSOCIATES (626) 331-9516

1    away from that captain by getting promoted.

2         Q    Get away from Captain Johnson?

3         A    Yes.  I would have got promoted and got

4    transferred.

5         Q    Did you have a problem with Captain Johnson?

6         A    No, I just thought it was unfair the things

7    that he said to me.  There's a process that you go

8    through and he wasn't going through that process and he

9    was threatening me.

10        Q    Even worse than not going through a process, he

11   was blackmailing you.

12        A    It's happened.  In my 32 years on the

13   department, it's happened.

14        Q    It's happened to you more than once?

15        A    Yes.

16        Q    We'll come back to those.

17             So was anyone present with you when Johnson

18   told you, sign this thing or you're not getting promoted?

19        A    No.  That's -- and actually that's not his

20   signature on there.

21        Q    No, it's not.

22             Was anyone else present with you when Captain

23   Johnson told you this?

24        A    No.

25        Q    And you signed it in front of Captain Johnson?

67

1       A    No.

2       Q    What did you do?

3       A    I walked out of his office and --

4       Q    Hold on.  Let me go back.

5            What did you say to Captain Johnson when he

6    said that to you, either sign this or you're not getting

7    promoted?

8       A    I said okay.

9       Q    Did he present it to you to sign it at that

10   point?

11      A    No.

12      Q    How did it come about being signed?

13      A    Sergeant Cohen brought it up to me and had me

14   sign it.

15      Q    That's Sergeant Richard Cohen.

16           Is that correct?

17      A    Correct.

18      Q    Did Sergeant Cohen threaten you as well?

19      A    No.

20      Q    What did Sergeant Cohen say?

21      A    He -- you know, he was my direct supervisor so

22   he was directed to write the performance log entry.  And

23   he disagreed with it, as well, and told me I should sign

24   it if I wanted to get promoted.

25      Q    So Sergeant Cohen disagreed with the findings

1       Q    And I think you indicated none of them have

2   ended in any type of significant discipline.  Correct?

3       MR. STOCKALPER:  Well, the question assumes any

4   discipline.  But, all right.

5       Q    BY MR. COHEN:  None of them have ended in any

6   discipline.  Is that right?

7       A    No.  The one you were just talking about I was

8   given five days in abeyance.  Basically on my record it

9   shows I did five days off.  So...

10      Q    The one we just spoke about?

11      A    I think I got five days on that one.

12      Q    I don't know.  All I have is the records.

13           Did you get five days on unpaid leave as a

14  result of that interaction with the inmate?

15      A    The way it works is it's called -- I think I

16  was given five, maybe four days on that one.  Four days

17  and they hold it in abeyance.

18           And I have a year from when I am served my

19  letter of intent, which is the letter of discipline

20  they're going to give me, to complete a certain amount of

21  hours of training in certain classes.

22           And if I don't complete those, then I get the

23  days off without pay.  But it still shows on my record as

24  discipline days.

25      Q    Did you receive a suspension?

1    A     Without pay?  No.  I did the classes.

2    Q     Is that considered a suspension?

3    A     It shows on my personal performance index as a

4    suspension.

5    Q     Do you have the ability to appeal that in any

6    way?

7    A     Yes.

8    Q     Did you?

9    A     No.

10    Q     Why not?

11    A     Because I met with the chief and had a chief's

12    hearing and we had talked about everything.  And he

13    offered me four days in abeyance, and -- instead of doing

14    the days off.

15        And I had a good rapport with the chief and I

16    had respected him and he saw some discrepancies and was

17    kind of a -- I guess like what you call it in a

18    criminal-type thing, a plea bargain.

19    Q     But you believed and you believe you had done

20    absolutely nothing wrong.  Correct?

21    A     No, I made some mistakes, yeah.

22    Q     What mistake did you make?

23    A     Thinking that I could have a decent

24    conversation with him.  I've given inmates time in the

25    hole before and I've taken days away, let them out early.

```
 1              Go ahead.  Continue.
 2              (Video playing.)
 3         Q   BY MR. COHEN:  So what does he do now when you
 4    say, let me see your driver's license?
 5         A    I think he was reaching for his wallet.
 6         Q    Where is his left hand?
 7         A    It's on the door frame.
 8         Q    And his right hand, based on your observations,
 9    went down to his wallet?
10         A    I could see his hand near his lap.
11         Q    So he's complying?
12         A    Yes.
13         Q    And you want his license?
14         A    Yes.
15         Q    And you don't want to do anything to disturb
16    him from getting his license?
17         A    No.
18         Q    Is that correct?
19         A    Well, usually when people are retrieving their
20    license, and as you can hear I was starting to explain.
21              What are you explaining?  We've already --
22    You've interacted --
23         MR. STOCKALPER:  Hold on.  Can he answer the
24    question?  Because now you've moved onto another
25    question.  Again, that's not appropriate.
```

PATRICK L. RADOGNA & ASSOCIATES (626) 331-9516

1    39 seconds, a.m., on the video, it is your position that

2    he does what with his legs and his foot?

3         A    As I grabbed his left wrist he kicked out with

4    his left foot.

5         Q    So he removes his left foot from the well where

6    the brake and gas would be?

7         A    I'm not sure exactly where his foot was in that

8    well area.

9         Q    Well, his foot had not come out of the car

10   previously, right?  You just opened the door?

11        A    Yes, it was -- I don't know where his foot was

12   positioned inside there, or leg.

13        Q    Do you see his foot kick you?

14        A    No, I felt it.

15        Q    How do you know it was a foot?

16        A    Because it felt like a foot.

17        Q    What does a foot feel like?

18        A    It felt like the shape of a foot hitting my

19   leg.  I don't know how to describe it.  I mean, it wasn't

20   like a blunt object or...

21        Q    What part of the foot did it feel like?

22        MR. STOCKALPER:  Calls for speculation --

23   speculation.  What part of the foot?

24        MR. COHEN:  The shape of a foot.

25        Q    Do you know what his shoe size is, by any

```
 1   chance?

 2        A    I have no clue.

 3        Q    I imagine at 6-foot eight, probably pretty big

 4   feet.  So the shape of the foot is obviously long and

 5   could be thinner or wider, what have you, but the shape

 6   of a foot is a whole big foot.

 7        A    Yes.

 8        Q    So when you said it felt like a foot, I'm not

 9   trying to be facetious, but I'm just trying to figure

10   out, did it feel like an entire foot?  Did it feel like a

11   part of a foot?  Could it have been something other than

12   a foot?

13        A    Yeah, it could have been -- could have been

14   part of his foot.

15        Q    It could have been something other than a foot?

16        A    Could have been his leg, knee.

17        Q    Could have been his knee?

18        A    Could have.  It's hard to tell from the

19   equipment that I'm wearing.

20        Q    I understand.  I'm just trying to -- I know we

21   can't see it on the equipment, that would make these

22   questions easier.

23        A    Well, I don't think you understand how the

24   motorcycle pants are.

25        Q    Tell me.
```

1      A    They have -- on a motorcycle pants we have

2    thick pads on the thighs that wrap around knees and

3    shins.

4      Q    Like Kevlar?

5      A    The pants are Kevlar but the pads are foam,

6    so -- with holes in it.

7      Q    So given the thickness of the padding, it may

8    be difficult to tell exactly what's touching you; fair to

9    say?

10     A    Yes, but it was definitely from him, an impact

11    from him.

12     Q    Okay.

13     A    But I felt like it was a foot at the time and I

14    still feel like it was a foot or a part of his foot.

15     Q    I understand and appreciate that.

16          Could have been a knee.  Right?

17     A    Could have been his knee?

18     Q    I mean, if we think about how tall he is, and I

19    don't know what the legroom is in this SUV, but at 6-foot

20    eight, regardless of what car you're in, unless it's a

21    custom-made Shaq-Mobile or something, your knees are

22    going to be up and your legs are going to be pretty well

23    into the well.  Correct?

24     A    You can assume that.

25     Q    Do you have anything other than the feel on

```
 1    know what, if anything, he believed was the, what led to
 2    the interaction between you and Assiff and led to the
 3    extraction?
 4        A    No.  I don't remember and I haven't talked to
 5    him in a while.
 6        Q    Are you guys friends?
 7        A    We're coworkers.  We never hung out.
 8        MR. COHEN:  We're at 1:48.  Let's pick it up.
 9            (Video playing.)
10        MR. COHEN:  Oh, by the way, let me know when you
11    believe Assiff punches Clark, please.
12        THE WITNESS:  Okay.
13        MR. COHEN:  Thanks.
14            We're at 1:56.  We'll start again.
15            (Video playing.)
16        THE WITNESS:  I don't know exactly where he punched
17    him there.
18        Q    BY MR. COHEN:  Are we past the point?
19        A    Yes, we're past the point where I punched
20    him -- I punched him when he was still inside the car.
21        Q    You punched Assiff?
22        A    I punched Assiff while he was still inside the
23    car.
24        Q    I'm asking about Assiff punching Clark.
25        A    Yeah, I don't know exactly where on that video
```

PATRICK L. RADOGNA & ASSOCIATES (626) 331-9516

1    is where him punched him.  I just know I saw him punch

2    Deputy Clark in the chest and I immediately punched him

3    in the face.

4        Q    Has that already occurred?

5        A    Yes, that's already occurred.

6        MR. COHEN:  Let's go back a little bit.

7            Can you tell me when you punch Assiff, please?

8            Let's go to 1:44.

9            (Video playing.)

10       Q    BY MR. COHEN:  And let's just break it down just

11   a little bit.  He's got his phone in his right hand --

12       A    Yes.

13       Q    -- correct?

14            You and/or Clark, perhaps both of you, have his

15   left hand?

16       A    I have his left hand.

17       Q    You have his left hand.

18            What hand do you see him punch Clark with?

19       A    His right hand.

20       Q    With the phone?

21       A    With the phone in this hand, yeah.

22       Q    And have we seen that yet?

23       A    I haven't seen it yet.

24       Q    You punching -- so let me know when you punch

25   Assiff.

```
 1        A     No.

 2        Q     In the supervisor's report on use of force

 3   there's an entry that 24-minutes prior to this incident

 4   Sergeant Kelly responded to a backup request, unrelated,

 5   on an uncooperative driver.

 6        A     There's lots of times that I respond to a

 7   backup request for a driver not wanting to sign.  A lot

 8   of times that's what it is, refusal to sign.

 9              And by the time I get there, the traffic stop's

10   over or they've got the person to sign.  So...

11        Q     Do you have a recollection of the stop that you

12   assisted with just prior to your interaction with Assiff?

13        A     No, because I didn't make a stop, with one

14   before that.

15        Q     I know you didn't make -- I'm not saying you

16   made a stop but --

17        A     No, I understand what you've saying, but I

18   would have probably documented that in my log someplace.

19        Q     The report indicates that during this backup

20   request Sergeant Kelly was able to deescalate an

21   uncooperative driver.  And the next traffic stop for

22   Sergeant Kelly was this incident.

23              No recollection of that?

24        A     No, none whatsoever.

25        Q     Is that your goal -- strike that.
```

332

PATRICK L. RADOGNA & ASSOCIATES (626) 331-9516